## CONDOMINIUM OFFERING PLAN
### FOR

# ONE HUNTERS POINT CONDOMINIUM

Located At

**5-49 Borden Avenue**
**Long Island City, Queens County, New York**

The Condominium will be comprised of 132 residential units, 26 roof terrace units and 25 parking space units. All units are being offered for sale pursuant to this Offering Plan.

Total Amount of Offering:  132 residential units: ....................................................................$84,005,700.00
26 roof terrace units: ....................................................................$    916,750.00
25 parking space units:.................................................................$  1,120,000.00
Total .............................................................................................$86,042,450.00

|  |  |
|---|---|
| *SPONSOR:* | *SELLING AGENT:* |
| **Borden East River Realty** | **Brown Harris Stevens Project Marketing** |
| **c/o Simone Development Companies** | **675 Third Avenue (Suite 411)** |
| **1000 Main Street** | **New York, New York  10017** |
| **New Rochelle, New York  10801** | |

*SPONSOR'S ATTORNEY:*
**Ruskin Moscou Faltischek, P.C.**
**1425 RexCorp Plaza**
**East Tower, 15th Floor**
**Uniondale, New York  11556**

Date of Acceptance for Filing: September 11, 2007.

This Offering Plan Will Be Effective For Twelve (12) Months From The Above Date. The Term May Be Extended By An Amendment To The Offering Plan.

### SEE PAGE (1) FOR SPECIAL RISKS TO PURCHASERS.

**BECAUSE SPONSOR IS RETAINING THE UNCONDITIONAL RIGHT TO RENT RATHER THAN SELL UNITS, THIS PLAN MAY NOT RESULT IN THE CREATION OF A CONDOMINIUM IN WHICH A MAJORITY OF THE UNITS ARE OWNED BY OWNER-OCCUPANTS OR INVESTORS UNRELATED TO SPONSOR. (SEE SPECIAL RISKS SECTION OF THE PLAN.)**

**PURCHASERS FOR THEIR OWN OCCUPANCY MAY NEVER GAIN CONTROL OF THE BOARD OF MANAGERS UNDER THE TERMS OF THIS OFFERING PLAN. (SEE SPECIAL RISKS SECTION OF THE PLAN.)**

**THIS OFFERING PLAN IS THE ENTIRE OFFER TO SELL THESE CONDOMINIUM UNITS.  NEW YORK LAW REQUIRES THE SPONSOR TO DISCLOSE ALL MATERIAL INFORMATION IN THIS OFFERING PLAN AND TO FILE THIS OFFERING PLAN WITH THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL PRIOR TO SELLING OR OFFERING TO SELL ANY CONDOMINIUM UNIT.  FILING WITH THE OFFICE OF THE ATTORNEY GENERAL DOES NOT MEAN THAT THE DEPARTMENT OR ANY OTHER GOVERNMENT AGENCY APPROVED THIS OFFERING.**

## TABLE OF CONTENTS

## PART I

| TAB | | PAGE |
|---|---|---|
| 1. | SPECIAL RISKS | 1 |
| 2. | INTRODUCTION | 9 |
| 3. | DESCRIPTION OF PROPERTY AND IMPROVEMENTS | 22 |
| 4. | LOCATION AND AREA INFORMATION | 28 |
| 5. | SCHEDULE A - OFFERING PRICES AND RELATED INFORMATION | 30 |
| 6. | SCHEDULE B - BUDGET FOR FIRST YEAR OF CONDOMINIUM OPERATION | 36 |
| 7. | SCHEDULE B-1 - BUDGET FOR INDIVIDUAL ENERGY COSTS | 45 |
| 8. | COMPLIANCE WITH REAL PROPERTY LAW § 339-i | 47 |
| 9. | CHANGES IN PRICES AND UNITS | 49 |
| 10. | PROCEDURE TO PURCHASE | 51 |
| 11. | ASSIGNMENT OF PURCHASE AGREEMENTS | 61 |
| 12. | EFFECTIVE DATE | 63 |
| 13. | TERMS OF SALE | 65 |
| 14. | UNIT CLOSING COSTS AND ADJUSTMENTS | 68 |
| 15. | RIGHTS AND OBLIGATIONS OF SPONSOR | 74 |
| 16. | CONTROL BY THE SPONSOR | 84 |
| 17. | CONDOMINIUM BOARD | 86 |
| 18. | RIGHTS AND OBLIGATIONS OF THE UNIT OWNERS | 89 |
| 19. | RIGHTS AND OBLIGATIONS OF THE CONDOMINIUM BOARD/SUMMARY OF BY-LAWS | 100 |
| 20. | INCOME TAX DEDUCTIONS TO UNIT OWNERS AND TAX STATUS OF THE CONDOMINIUM | 107 |
| 21. | REAL ESTATE TAXES AND ANTICIPATED TAX EXEMPTION BENEFITS | 109 |
| 22. | WORKING CAPITAL FUND AND APPORTIONMENTS | 112 |
| 23. | MANAGEMENT AGREEMENT, CONTRACTS AND LEASES | 114 |
| 24. | IDENTITY OF PARTIES | 117 |
| 25. | REPORTS TO UNIT OWNERS | 120 |
| 26. | DOCUMENTS ON FILE | 121 |
| 27. | GENERAL | 122 |
| 28. | SPONSOR'S STATEMENT OF BUILDING CONDITION | 124 |

## TABLE OF CONTENTS

## PART II

| TAB | | | PAGE |
|---|---|---|---|
| 1. | EXHIBIT A | DESCRIPTION OF PROPERTY AND SPECIFICATIONS | 127 |
| 2. | EXHIBIT A-1 | FLOOR PLANS | 141 |
| 3. | EXHIBIT B | PURCHASE AGREEMENT | 201 |
| 4. | EXHIBIT C | FORM OF UNIT DEED | 227 |
| 5. | EXHIBIT D | DECLARATION OF CONDOMINIUM | 233 |
| | | CONDOMINIUM BY-LAWS | 273 |
| | | UNIT POWER OF ATTORNEY | 343 |
| 6. | EXHIBIT E | ATTORNEY'S INCOME TAX OPINION | 345 |
| 7. | EXHIBIT F | ATTORNEY'S 421-a REAL ESTATE TAX BENEFITS OPINION | 351 |
| 8. | EXHIBIT G | UNIT OWNER'S SPECIMEN TITLE POLICY | 361 |
| 9. | EXHIBIT H | IRS FORM W-9 AND FORM W-8 BEN | 367 |
| 10. | EXHIBIT I | APPLICATION TO ATTORNEY GENERAL FOR DETERMINATION OF THE DISPOSITION OF DOWNPAYMENTS | 369 |
| 11. | EXHIBIT J | ESCROW AGREEMENT | 373 |
| 12. | EXHIBIT K | CERTIFICATION OF SPONSOR AND PRINCIPALS | 379 |
| 13. | EXHIBIT L | CERTIFICATION OF ARCHITECT | 381 |
| 14. | EXHIBIT M | CERTIFICATION OF BUDGET EXPERT | 383 |
| 15. | EXHIBIT N | REAL PROPERTY LAW SECTION 339-kk | 385 |

## I. SPECIAL RISKS

1.      The purchase of a condominium unit has many significant legal and financial consequences and may be one of the most important financial transactions of your life. The Attorney General of the State of New York strongly urges you to read this offering plan carefully and to consult with an attorney before signing an agreement to purchase a condominium unit.

2.      At the time a Purchase Agreement is executed, a Purchaser is required to make a Deposit in an amount equal to 10% of the purchase price. If a Purchaser defaults under his Purchase Agreement, time being of the essence with regard to the obligations of the Purchaser thereunder, and does not cure such default within 30 days after Sponsor gives notice to the Purchaser of such default, Sponsor may, at its option, cancel such Purchase Agreement and retain, as liquidated damages, the Deposit, together with interest earned theron, if any (See the section of the Offering Plan entitled "Procedure to Purchase").

3.      If a Purchaser makes a Deposit in excess of $100,000 for the purchase of a Unit, the amount in excess of $100,000 will not be federally insured. Additionally, while the Deposit is in the non-interest bearing position of the Master Escrow Account, the Deposit may not be federally insured even if the Deposit does not exceed $100,000.

4.      Time is of the essence as to Purchaser's obligations under the Purchase Agreement, including without limitation, for the payment of all deposits and the balance of the purchase price. If a Purchaser fails for any reason to close title to his/her Unit within 7 days of the scheduled date of closing ("Scheduled Closing Date") and Sponsor elects not to cancel the Purchaser's Purchase Agreement as a result of the same, (a) the apportionments to be made at the Closing will be made as of midnight of the day preceding the Scheduled Closing Date, and not as of midnight of the day preceding the actual date of closing ("Actual Closing Date"), and (b) the Purchaser will be required to pay to Sponsor interest equal to 0.04% of the purchase price of his Unit per day, which equals an annual rate of 14.6% commencing with the Scheduled Closing Date through the Actual Closing Date (See the Section of the Plan entitled "Procedure to Purchase").

5.      The signing of the Purchase Agreement signifies the Purchaser's acceptance of the condition of the Property (as represented by Sponsor in the Plan). Sponsor has no obligation to make any repairs, improvements or decorations in or to the Property, the Building, the Unit or the Facilities, except as may otherwise be set forth in the Plan (See the Section of the Plan entitled "Rights and Obligations of Sponsor").

6.      Although a Purchaser is free to apply for a loan to finance the purchase of a Unit, the Purchase Agreement that Purchaser shall be required to sign is not contingent upon Purchaser obtaining such financing. Accordingly, if a Purchaser applies for and is denied a loan, Purchaser shall be obligated to close under the Purchase Agreement. If Purchaser fails to close under the Purchase Agreement, Purchaser may forfeit the down payment paid under the Purchase Agreement as liquidated damages (See the Section of the Plan entitled "Procedure to Purchase").

7.      Paragraph 41 of the Purchase Agreement provides as follows:

Restrictions on Sale.  Purchaser covenants and agrees to retain ownership in the Unit for a period of one (1) year from the date Purchaser acquired the Unit, except in the case of the death of Purchaser or spouse.  Failure to abide by this requirement shall result in the Purchaser paying the Seller a sum equal to 25% of the difference between the new Purchase Price of the Unit and the Purchase Price set forth in paragraph 3 of this Agreement but in no event less than 10 % of the Purchase Price set forth in paragraph 3 of this Agreement.  The provisions of this Paragraph shall survive delivery of the deed and the closing of title.

8.      Purchasers will be required to pay at the closing of their Units all New York City Real Property Transfer Taxes, New York State Real Estate Transfer Taxes and New York State Additional Real Estate Transfer Taxes imposed on their purchase (See the Section of the Plan entitled "Closing Costs and Adjustments").

9.      Sponsor will control the Condominium Board until the earlier of: (i) the Closing of Title with Purchasers under the Plan to Units having more than 50% of the aggregate Common Interests appertaining to all Units, or (ii) three (3) years after the First Closing ("Initial Control Period"). During this Initial Control Period, Sponsor shall have the right to designate the majority of board members and to retain voting control of the Board of Managers of the Condominium.

After the Initial Control Period, Sponsor, as owner of Unsold Units, shall have the right to designate one member of the Condominium Board for so long as Sponsor owns at least one (1) Unsold Unit.

During the period that Sponsor controls the Condominium Board, Sponsor will have control of maintenance, facilities and services to be provided to Unit Owners and will determine the Common Charges to be paid by all Unit Owners (See the Section of the Plan entitled "Control By Sponsor").

For a period ending not more than five (5) years after the First Closing or whenever unsold Units constitute less than ten percent of the Common Interest, whichever is sooner, the Condominium Board may not take any of the following actions without Sponsor's prior written consent: (a) make any addition, alteration or improvement to the Common Elements or to any Unit, unless the same are required by Law, or (b) assess any Common Charges for the creation of, addition to, or replacement of, all or part of a working capital, reserve, contingency or surplus fund, or (c) increase or decrease the number, or change the kind of, employees initially employed for the Condominium, or (d) enter into any service or maintenance contract for work or otherwise provide services in excess of those initially contracted for the Condominium, except as is required to reflect normal annual increases in operating services, or (e) borrow money on behalf of the Condominium, or (f) exercise a right of first refusal to lease or purchase a Unit; provided, however, that Sponsor's written consent is not

necessary to perform any function or take any action described in clauses (a) through (f) above, if, and only if, the performance of such function or the carrying out of such an action is necessary (and no other alternative is available) to enable the Condominium Board to comply with Law, remedy any notice of violation or remedy any work order of the Condominium's insurer (See the Section of the Plan entitled "Control By Sponsor").

10.     Sponsor has elected not to provide for a reserve fund to be used for capital replacements or repairs because the Building, upon completion of the construction to be performed by Sponsor as described herein, will be entirely new construction. The Condominium Board, in its discretion, and subject to certain restrictions contained in the By-laws, may decide in the future to create a reserve fund by special assessment or by increases in Common Charges (See the Section of the Plan entitled "Working Capital Fund and Apportionments").

11.     A Purchaser of a Unit shall be required to make a contribution at the Closing of Title to his Unit to the Working Capital Fund of the Building. Such contribution shall be in an amount equal to two month's Common Charges in effect for such Unit (See the Section of the Plan entitled "Working Capital Fund and Apportionments").

12.     No bond or other security has been posted by Sponsor to secure its obligations under the Plan. The ability of Sponsor to perform its obligations under the Plan will partly depend upon its financial condition at the time it is called upon to perform. No representation can be made that it will be financially able to perform any or all of such obligations (See the Section of the Plan entitled "Rights and Obligations of Sponsor").

13.     Prospective Purchasers are advised that for a period following the First Closing, some of the services and facilities described in the Plan may not be available or incomplete. Notwithstanding the foregoing, the Building shall be adequately maintained during this period (See the Section of the Plan entitled "Description of Property and Improvements").

14.     No amendment, modification, addition, or deletion of the Declaration, By-laws or any Rules and Regulations (other than those required by Law) shall be effective against Sponsor or its designees or any Unsold Unit unless Sponsor has given its written consent thereto (See the Section of the Plan entitled "Rights and Obligations of the Condominium Board/Summary of By-laws").

15.     Sponsor will apply for partial exemption from real estate taxes pursuant to Section 421-a of the New York Real Property Tax Law and should obtain a Preliminary Certificate of Eligibility. Nevertheless, there can be no assurance that a Certificate of Eligibility will be granted. If for any reason the aforementioned application is not granted there will be no exemption from real estate taxes on the Units. Such exemption, if granted, will be for a limited period of 15 years and will decrease progressively during such period (See the Section of the Plan entitled "Real Estate Taxes and Anticipated Tax Exemption Benefits", and "Special Counsel's 421-a Real Estate Tax Exemption Benefits Opinion" set forth in Part II of the Plan). Neither Sponsor, Sponsor's counsel, Sponsor's

special counsel, the Managing Agent or any other person makes any warranty that the partial exemption from real estate taxes under Section 421-a will be granted or as to the amount, if any, of the minimum tax that will be assessed against the Units or the amount of real estate taxes payable at any time by any Unit Owner.

16.     No Residential Unit has an appurtenant Parking Space Unit or Roof Terrace Unit allocated for sale along with such Residential Unit.

17.     All Unit Owners shall severally, to the extent of their respective interests in their Units and their appurtenant Common Interests, indemnify each member of the Condominium Board against any liability or claim except those arising out of such member's own bad faith or willful misconduct.

18.     At the First Closing, certain apportionments will be made between the Sponsor and the Condominium, as more fully set forth in the Section of the Plan entitled "Working Capital Fund and Apportionments." If the result of the closing adjustments is a net credit in favor of Sponsor, the payment of such net credit shall be paid to Sponsor from the Working Capital Fund.  If the result of the closing adjustments is a net credit in favor of the Condominium, the payment of such net credit shall be paid by Sponsor as a contribution to the Working Capital Fund.

19.     Pursuant to existing law and regulation the Sponsor may declare the plan effective by selling a minimum of 15% of the Residential Units in the Building. Even if the Plan is declared effective with a minimum number of sales, it is possible that the Sponsor may be able to convert the Building with fewer than the minimum number of sales, if Purchasers counted towards effectiveness do not ultimately purchase a Unit (See the Section of the Plan entitled "Effective Date").

          Purchasers should note that in the current real estate market, banks and other lenders are imposing various restrictions on loans. Such restrictions include requiring that a certain percentage (50% or more) of the units in a building be sold or be sold to owner-occupants before the lender will consider making a loan. Sponsor does not represent or guarantee the percentage of Units or owner-occupied Units that will be sold at any given time. Thus it may be possible for a Purchaser to experience difficulty obtaining a loan in a building where the percentage of units purchased is lower than a lender's particular sales minimum.

          Even after a building undergoes conversion, lenders may still impose minimum sales requirements before granting a loan. It then may be difficult for a Purchaser to resell an apartment if prospective buyers are unable to obtain a loan due to such minimum sales requirements.

20.     The Sponsor has entered into a management agreement with Taube Management Corp., an experienced management company. The management agreement provides for an initial one (1) year term, which initial term shall automatically be extended on a year-to-year basis unless and until the Condominium or management company elects not to renew upon not less than ninety (90) days' prior written notice to the other party.  The

Condominium and the management company each have the right and option to terminate the management agreement at any time due to default of the other party or bankruptcy of the management company (See footnote 9 to Schedule B of the Plan, the Section of the Plan entitled "Agreements Affecting Building Operations", and the Section of the Plan entitled "Identity of the Parties".)

21.     Each Purchaser will be obligated to execute a power of attorney at the closing of title to the Unit (the "Power of Attorney"). The form of Power of Attorney, set forth in Part II of the Plan, grants broad powers to the Condominium Board to enter into agreements affecting the Common Elements. The Power of Attorney also grants to Sponsor the right to amend the Condominium Declaration with respect to Unsold Units.

22.     In making this offering, no representation or warranty is made and no promise or assurance is given, implied or otherwise, by Sponsor as to when or if all of the Units will be sold. Although it is the present intention of Sponsor to sell all Units pursuant to the terms of the Plan, Sponsor expressly disclaims any obligation to sell all of the Units, and Sponsor shall have no liability to any Purchaser or Unit Owner for Sponsor's continued ownership of any of the Units after the First Closing for as long as Sponsor determines it is in its interest to do so. Sponsor reserves the unconditional right to rent, rather than sell the Units. In addition, Sponsor expressly reserves the right to sell Units to purchasers who intend to rent and not to occupy their Units personally. The decision to sell or not to sell or rent any Unit shall be made by Sponsor based upon its evaluation of market conditions and its own financial considerations and shall be in the sole discretion of Sponsor. In the event that Unsold Units are not offered for sale they may be rented at such rents as Sponsor determines and market conditions allow.

In addition, Sponsor reserves the right to make "Bulk Sales" of Units and the Purchaser of such Units shall have the same rights as Sponsor with respect to renting rather than selling Units, withholding Units for future sale or lease or limiting the number of Units sold to any Purchaser. The term "Bulk Sales," as used herein, means the transfer of ten (10) or more Units or twenty percent (20%) of the total number of Units in the Condominium, whichever is less.

Because (i) Sponsor is not limiting the conditions under which it will rent rather than sell the Units and reserves the right to make Bulk Sales; (ii) the Condominium Board has no right to approve or reject the sale of a Unit by Sponsor to a prospective purchaser so that there is no limit as to the number of "investor" or "non-occupant owners" of Units in the Building who intend to rent rather than occupy their Units; and (iii) there is no requirement in the By-Laws that after the Initial Control Period a majority of the members of the Condominium Board must be owner-occupants or members of an owner-occupant's household, owner-occupants may never gain effective control of the Condominium. Prospective Purchasers should also be aware that Sponsor and any other non-resident owners may be at odds with owner-occupants with regard to the management and operation of the Condominium because of their different reasons for purchasing; i.e. for use as a residence rather than for investment purposes.

Prospective Purchasers are advised that the rights of Sponsor to withhold Units from sale and/or rent such Units, as described above, may have an adverse impact on the ability of a Unit Owner to resell his Unit and/or the price which he will be able to obtain for such Unit.

23.     The By-Laws of the Condominium do not include a provision that after the Initial Control Period (being the earlier of the closing of title with purchasers under the Plan to Units having at least 50% of the aggregate Common Interest appertaining to all Units, or three (3) years after the First Closing) a majority of the Board of Managers must be owner-occupants or members of an owner-occupant's household who are unrelated to the Sponsor and its principals. Owner-occupants and non-resident owners, including the Sponsor, may have inherent conflicts on how the Condominium should be managed because of their different reasons for purchasing, i.e. purchase as a home as opposed to as an investment.

24.     At or subsequent to the First Closing, Sponsor will sell Residential Unit A1 to the Condominium, which will own such Residential Unit on behalf of all Unit Owners and will use the same for the residence of the Superintendent. The Condominium shall be responsible for the payment of all title insurance costs, mortgage recording and transfer taxes and miscellaneous recording and filing fees due in connection with the sale of the Residential Unit. All Common Charges, including the costs of utilities and the costs of financing the purchase of the Residential Unit, real estate taxes and the costs of repairs shall be borne by all Unit Owners as a Common Expense as more fully set forth in Schedule B-First Year's Budget. The purchase price of Residential Unit A1 is $520,000.00. At the Closing of title to Residential Unit A1, the Condominium, on behalf of all Unit Owners will pay the purchase price by executing and delivering a purchase money note in the amount of $520,000.00 secured by a purchase money mortgage on the Residential Unit. The purchase money note will be for a term of five (5) years from the First Closing with interest payable at the rate of one (1%) percent over the Prime Rate based on a twenty (20) year amortization schedule. Assuming an interest rate of 9.25% per annum, the monthly payment on the purchase money note will be equal to $4,286.26. Upon the maturity date of the purchase money note, all interest and outstanding principal will be due and payable. Sponsor does not intend to refinance or extend the purchase money note and purchase money mortgage at maturity. Purchasers are advised that refinancing by another lender may not be available and that the Condominium, in order to repay the purchase money note, may be required to assess all Unit Owners in proportion to their respective Common Interests. At Sponsor's option, the note and mortgage will be held by an institutional lender or by Sponsor.  Title insurance costs, mortgage recording taxes and transfer taxes and miscellaneous recording and filing fees due in connection with the transfer and mortgage of the Superintendent's Unit to the Condominium will be paid by the Condominium from the Working Capital Fund.  In the event the Working Capital Fund is not sufficient, Sponsor will advance the funds necessary on behalf of the Condominium and the Condominium will repay the Sponsor by executing a promissory note in the amount of the funds so advanced, to be repaid, without interest, in 12 equal monthly installments.

25.    The Building will have twenty-six (26) Roof Terrace Units. Ownership of Roof Terrace Units is restricted to the Sponsor and Residential Unit Owners. A Purchaser of both a Residential Unit and a Roof Terrace Unit may only sell or transfer the Roof Terrace Unit to a Residential Unit Owner or, upon the resale or transfer of the Owner's Residential Unit, to the purchaser on such resale or the succeeding Owner on a transfer (See the Section of the Plan entitled "Rights and Obligations of Unit Owners – Sales and Leases of Units").

26.    The Building will have twenty-five (25) Parking Space Units.  Ownership of Parking Space Units is restricted to the Sponsor and Residential Unit Owners.  A Purchaser of both a Residential Unit and a Parking Space Unit may only sell or transfer the Parking Space Unit to a Residential Unit Owner or, upon the resale or transfer of the Owner's Residential Unit, to the purchaser on such resale or the succeeding Owner on a transfer (See the Section of the Plan entitled "Rights and Obligations of Unit Owners – Sales and Leases of Units").

27.    A Unit Owner may lease his Unit for periods of one (1) year or more only upon prior notice to and subject to the right of first refusal of the Condominium Board (See Article 7 of the By-Laws).

28.    Except for those warranties or guarantees provided to Sponsor by contractors, manufacturers or suppliers, which Sponsor will assign to the Condominium Board and/or Unit Owners, as necessary, Sponsor does not make any warranty of any kind, expressed or implied, and Sponsor hereby disclaims any and all warranties, including, but not limited to, implied warranties of merchantability and fitness for a particular purpose, with respect to the construction of the Units, the Common Elements and the Building.  Article 36-B of the New York General Business Law ("Housing Merchant Implied Warranty Law") does not apply to this offering.

**THIS PAGE INTENTIONALLY LEFT BLANK**

# INTRODUCTION

Nature of the Transaction

      Borden East River Realty LLC ("Sponsor"), hereby presents this offering plan ("Offering Plan" or "Plan") for the establishment of condominium ownership of the land ("Land") together with the building erected thereon known as and having a street address of 5-49 Borden Avenue, Long Island City, Queens County, New York ("Building) (the Land, Building, and the appurtenances thereto are collectively referred to as the "Property") pursuant to the terms of Article 9-B of the Real Property Law of the State of New York ("Condominium Act"). The Condominium will be known as the "One Hunters Point Condominium" and is being referred to herein as the "Condominium." The Condominium will consist of one building containing a total of one hundred thirty-two (132) residential units ("Residential Units"), including a Superintendent's Unit, twenty-six (26) Roof Terrace Units and twenty-five (25) Parking Space Units (the Residential Units, the Roof Terrace Units and the Parking Space Units are sometimes collectively referred to as the "Units"). There will be a doorman and/or concierge stationed in the lobby, two (2) automatic passenger elevators in the Building, washer/dryer setups in each Unit, an unsupervised fitness center which includes treadmills, bicycles, weight machines, free weights and stair-masters and access to privacy gardens.  Sponsor acquired fee title by deed dated March 28, 2006 from 535 Borden Avenue LLC and Borden Vernon LLC.

The Condominium Offering Plan

      The purpose of the Plan is to set forth in detail all material facts relating to the offering by Sponsor of the Units in the Condominium. The Plan contains all of the detailed terms of the transaction.

      Sponsor may from time to time amend the Plan by filing an amendment with the New York State Department of Law ("Department of Law") and serving such amendment on Purchasers and Unit Owners.

      The Plan is presented in two parts which together constitute the entire Plan. Part I sets forth a general description of the Plan and Part II contains the basic documents necessary to create the Condominium and to otherwise effectuate the provisions of the Plan. Also included in Part II is a detailed description of the Property, legal opinion as to certain tax matters discussed in the Plan, certifications of Sponsor and certain experts. Copies of the Plan, including all documents referred to herein and all Exhibits submitted to the Department of Law in connection with the filing of the Plan will be available for inspection by prospective Purchasers and their attorneys without charge. The Exhibits will be available to prospective Purchasers for copying at a reasonable charge at the sales office. The Plan and the Exhibits are also available for inspection and for copying at a reasonable charge at the Department of Law. All of these documents are important and should be carefully read by prospective Purchasers. Prospective Purchasers are also advised to consult with their own attorneys or other advisers before agreeing to purchase. A prospective Purchaser may obtain the Plan upon payment of a $100.00 deposit, which amount will be fully refunded upon either (i) the prompt return of the Plan in good condition or (ii) the

execution by the prospective Purchaser of a Purchase Agreement subsequently accepted by Sponsor.

All capitalized terms used in the Plan shall have the meanings ascribed thereto in the Section entitled "Definitions", unless otherwise defined.

The Property

Based upon the current construction schedule, Sponsor contemplates that, unless delayed by Force Majeure, construction of the Building will be sufficiently completed to permit closings of Units to begin on or about July 1, 2008. Prospective purchasers should note, however, that the Units will be completed at different times over a period that may begin prior to and/or extend significantly beyond such date. Sponsor will have no liability to any Purchaser, nor will a Purchaser be entitled to any credit, offset or reduction in the purchase price for the Unit or otherwise be relieved from any obligations under the Purchase Agreement, if the First Closing occurs earlier or later than the projected date, or the time to complete or to close title to any Unit is delayed or postponed by Sponsor.  In the event the actual or anticipated commencement date of the first year of condominium operation is to be delayed by 6 months or more, Sponsor will amend the Plan to include a revised budget with current projections and if (i) Unit Owner's monthly Common Charges in the amended budget exceed those in the latest projected budget set forth in the Plan by 25% or more, or (ii) the First Closing does not occur within 12 months after July 1, 2008, the date set forth in Schedule B as the commencement date for the first year of condominium operation, then in either case, Sponsor will offer all Purchasers the right to rescind their Purchase Agreements within not less than 15 days after the Presentation Date of the amendment containing such revised budget, and any Purchasers electing rescission pursuant to such offer will have their Deposits and any interest accrued thereon returned.

Sponsor reserves the right to change the number of Units from time to time by subdividing and/or combining Units, even after the Condominium is created, unless a binding Purchase Agreement for such Unit has been entered into and the Purchaser does not consent to such change (See the Section of the Plan entitled "Changes in Prices and Units"). No such change in the number or size of Units and/or their respective percentages of common interest, and no material change will be made in the size or quality of common elements, except by amendment to the Plan, and, when applicable, to the Declaration.

A detailed description of the Property is contained in the "Description of the Property and Improvements" set forth in Part I of the Plan  and in the "Description of Property and Specifications" set forth in Part II of the Plan.

Offering of Units for Sale

Sponsor hereby offers the Units for sale under the Plan. The prices for each of the Units are listed in the Section of the Plan entitled "Schedule A - Purchase Prices and Related Information" ("Schedule A"). THESE PRICES HAVE BEEN SET BY SPONSOR AND ARE NOT SUBJECT TO APPROVAL BY THE DEPARTMENT OF LAW OR ANY OTHER GOVERNMENTAL AGENCY.

In making this offering, no representation or warranty is made and no promise or assurance is given, implied or otherwise, by Sponsor as to when or if all of the Units will be sold. Although it is the present intention of Sponsor to sell all Units pursuant to the terms of the Plan, Sponsor expressly disclaims any obligation to sell all of the Units, and Sponsor shall have no liability to any Purchaser or Unit Owner for Sponsor's continued ownership of any of the Units after the First Closing for as long as Sponsor determines it is in its interest to do so.  Sponsor reserves the unconditional right to rent, rather than sell the Units.  In addition, Sponsor expressly reserves the right to sell Units to purchasers who intend to rent and not to occupy their Units personally.  The decision to sell or not to sell or rent any Unit shall be made by Sponsor based upon its evaluation of market conditions and its own financial considerations and shall be in the sole discretion of Sponsor.  In the event that Unsold Units are not offered for sale they may be rented at such rents as Sponsor determines and market conditions allow.

In addition, Sponsor reserves the right to make "Bulk Sales" of Units and the Purchaser of such Units shall have the same rights as Sponsor with respect to renting rather than selling Units, withholding Units for future sale or lease or limiting the number of Units sold to any Purchaser.  The term "Bulk Sales," as used herein, means the transfer of ten (10) or more Units or twenty percent (20%) of the total number of Units in the Condominium, whichever is less.

Because (i) Sponsor is not limiting the conditions under which it will rent rather than sell the Units and reserves the right to make Bulk Sales; (ii) the Condominium Board has no right to approve or reject the sale of a Unit by Sponsor to a prospective purchaser so that there is no limit as to the number of "investor" or "non-occupant owners" of Units in the Building who intend to rent rather than occupy their Units; and (iii) there is no requirement in the By-Laws that after the Initial Control Period a majority of the members of the Condominium Board must be owner-occupants or members of an owner-occupant's household, owner-occupants may never gain effective control of the Condominium.  Prospective Purchasers should also be aware that Sponsor and any other non-resident owners may be at odds with owner-occupants with regard to the management and operation of the Condominium because of their different reasons for purchasing; i.e. for use as a residence rather than for investment purposes.

Prospective Purchasers are advised that the rights of Sponsor to withhold Units from sale and/or rent such Units, as described above, may have an adverse impact on the ability of a Unit Owner to resell his Unit and/or the price which he will be able to obtain for such Unit.

A Residential Unit may be used only as a residence and subject to compliance with the By-laws and Law. A Roof Terrace Unit may only be used for passive recreational purposes (*e.g.*, lounging) and subject to compliance with the By-laws and Law.  A Parking Space Unit may only be used for the parking of one passenger vehicle or motorcycle and subject to compliance with the By-laws and Law.

Features of Condominium Ownership

The ownership of a Residential Unit is similar in many respects to the ownership of a private home. Each Unit Owner owns fee title to his Unit and is entitled to the exclusive possession thereof.  Each Unit Owner also owns, in common with the owners of all other Units,

an undivided interest in the Common Elements. The Common Elements are comprised of: (i) portions of the Property serving and benefiting all Units, generally, including, for example, without limitation, the Land upon which the Building stands, the roof, exterior walls and foundations and supports of the Building, all sidewalks, curbs and stairways, the lobby, the hallways, exercise room and landscaped garden, and elevators, these Common Elements being more specifically designated as "General Common Elements," and (ii) portions of the Building serving and benefiting certain Residential Units, exclusively, such as Terraces, these Common Elements being specifically designated as "Limited Residential Common Elements".

Each Unit Owner is obligated to comply with the Declaration of Condominium, as well as the rules and regulations of the Condominium, as the same may be amended from time to time by the Condominium Board.

Subject to certain conditions contained in the By-laws, each Unit Owner may mortgage his Unit with such lender and in such amount as he/she chooses. However, Sponsor makes no representations about the availability of financing for any Unit. There are no limitations or restrictions upon the rights of Sponsor to mortgage Unsold Units. Each Unit is separate and will not be subject to the lien of any mortgage placed by other Unit Owners on their respective Units.

The affairs of the Condominium shall be governed by the Condominium Board, who shall be elected by the Unit Owners and Sponsor in accordance with the By-laws of the Condominium (See the Sections of the Plan entitled "Control By Sponsor" and "Condominium Board").

A Residential Unit Owner may decorate and construct the interior of his Unit in any way he desires, subject to compliance with the By-laws, the Rules and Regulations and Law, and will be solely responsible for the cost of maintenance and interior repairs to his Unit after Closing, including, but not limited to, repairs to pipes, wires and conduits located in and servicing the same Unit. Each Residential Unit Owner has exclusive use of any Terrace appurtenant to his Unit, as shown on the Floor Plans included in Part II of the Plan, and is responsible for all landscaping, normal maintenance, repairs and replacements thereto. However, the costs and expenses of any structural or extraordinary repairs or replacements to any Terrace, including any leaks which are not caused by the negligence of the Residential Unit Owner or such Owner's permitted occupants, agents or invitees having access to such Terrace, shall be charged to all Residential Unit Owners as a Residential Common Expense. The costs and expenses of any structural or extraordinary repairs or replacements to a Terrace caused by the negligence of the Residential Unit Owner or such Owner's permitted occupants, agents or invitees having access to such Terrace, shall be charged to and payable by such Residential Unit Owner. The type, size and quantity of plantings and other installations to be placed on Terraces shall be subject to the prior written approval of the Condominium Board.

A Roof Terrace Unit Owner may decorate the interior of his Unit in any way he desires, subject to compliance with the By-laws, the Rules and Regulations and Law, and will be solely responsible for the cost of maintenance and interior repairs to his Unit after Closing, including, but not limited to, repairs to pipes, wires and conduits, if any, located in and servicing the same Unit. However, the costs and expenses of any structural or extraordinary repairs or replacements

to the Roof Terrace Units, such as repair to the chain link fences and raised flooring, which are not caused by the negligence of the Unit Owner or such Owner's permitted occupants, guests or invitees, shall be charged to all Roof Terrace Unit Owners as a Roof Terrace Common Expense. The costs and expenses of any structural or extraordinary repairs or replacements to the Roof Terrace Unit caused by the negligence of the Roof Terrace Unit Owner or such Owner's permitted occupants, agents or invitees having access to such Roof Terrace Unit, shall be charged to and payable by such Roof Terrace Unit Owner.

Normal cleaning of the Parking Space Units shall be a General Common Expense and shall be charged to all Unit Owners as a General Common Charge. The costs and expenses of any structural or extraordinary repairs or replacements to the Parking Space Units, such as restriping, resealing and repaving, which are not caused by the negligence of the Parking Space Unit Owner or such Owner's permitted occupants, guests or invitees, shall be charged to all Parking Space Unit Owners as a Parking Space Common Expense. The costs and expenses of any structural or extraordinary repairs or replacements to a Parking Space Unit caused by the negligence of the Parking Space Unit Owner or such Owner's permitted occupants, agents or invitees having access to such Terrace, shall be charged to and payable by such Parking Space Unit Owner.

Each Unit will be taxed as a separate tax lot for real estate tax purposes, and a Unit Owner will not be responsible for the payment of, nor will his Unit be subjected to any lien arising from the non-payment of real estate taxes assessed against other Units. In the opinion of tax counsel to Sponsor, which opinion is set forth in full in Part II of the Plan, a Residential Unit Owner who itemizes deductions may be eligible, under current law, to deduct from his income for income tax purposes, his real estate taxes and the interest paid on his mortgage, subject to certain exceptions and limitations discussed in the "Attorney's Tax Opinion" set forth in Part II of the Plan (See also the Section of the Plan entitled "Income Tax Deductions to Unit Owners and Tax Status of the Condominium").

With certain exceptions, any sale or lease of a Residential Unit, a Roof Terrace Unit or a Parking Space Unit will be subject to a right by the Condominium Board to acquire or lease such Unit or to produce a third party to acquire or lease such Unit on the same terms as were offered to the owner of such Unit.  Sponsor and its designees may sell or lease any Unsold Unit without any restriction or limitation. (See the Section of the Plan entitled "Rights and Obligations of Unit Owner - Sales and Leases of Units"). The Condominium Board does not have the right to approve or disapprove purchasers, and there is no limit on the number of owners who may purchase a Unit for investment rather than personal occupancy. There may always be a substantial percentage of owners who are non-residents.

The statute concerning condominiums in effect in the State of New York pursuant to which the Condominium will be organized by Sponsor is Article 9-B of the Real Property Law of the State of New York, as amended, commonly known, and hereinafter referred to as the "Condominium Act". The Property will be submitted to the provisions of the Condominium Act by recording the Declaration by Sponsor, in the City Register's Office.  From and after the date of recording the Declaration, Sponsor will be the owner of the Units until each is conveyed.  The

Condominium will comply with all statutes and regulations applicable to condominiums in the State of New York.

The cost of operating the Building will be borne entirely by the Unit Owners in accordance with the allocations set forth in the "Schedule B - Projected Budget for First Year of Condominium Operation". As more particularly set forth in the By-laws, the Condominium Board will determine the amount of Common Expenses. On a monthly basis or at such other times as the Condominium Board determines, the Condominium Board will assess Unit Owners for Common Charges to meet Common Expenses in accordance with Sections 339(i) and (m) of the Condominium Act. Common Expenses shall be General Common Expenses attributable to all Unit Owners, Residential Common Expenses attributable to Residential Unit Owners only, Parking Space Common Expenses attributable to Parking Space Unit Owners only and Roof Terrace Common Expenses attributable to Roof Terrace Unit Owners only. Common Charges will be assessed against Unit Owners in accordance with the Schedule B allocations. Residential Common Charges will be assessed against Residential Unit Owners in the same proportion that their respective Residential Units bears to the aggregate Common Interests of all Residential Units. Parking Space Common Charges will be assessed against Parking Space Unit Owners in the same proportion that their respective Parking Space Units bears to the aggregate Common Interests of all Parking Space Units. Roof Terrace Common Charges will be assessed against Roof Terrace Unit Owners in the same proportion that their respective Roof Terrace Units bears to the aggregate Common Interests of all Roof Terrace Units. The estimated Common Charges for each Unit for the first year of Condominium operation are set forth in Schedule A.

The undivided percentage interest of each Unit in the Common Elements ("Common Interest" of such Unit) has been determined upon the approximate proportion that the fair value of the Unit on the date of the Declaration bears to the then fair value of all of the Units pursuant to the Condominium Act.

Unit Owners will have no interest in any rents, net profits or revenues derived from the rental or use of any Unit owned by another. The aggregate Common Interest of all Units equals 100%. The aggregate Residential Common Interests of all Residential Units equals 100%. The aggregate Parking Space Common Interests of all Parking Space Units equals 100%. The aggregate Roof Terrace Common Interests of all Roof Terrace Units equals 100%. The percentage of Common Interests are the basis for determining a Unit Owners share of distribution upon termination of the Condominium. Each Unit's Common Interest, Residential Common Interest, Parking Space Common Interest and Roof Terrace Common Interest, as applicable, and estimate of the Common Charges that will be payable by the owner of each Unit during the first year of condominium operation of the Property subsequent to the First Closing are set forth in the Section of the Plan entitled "Schedule A - Purchase Prices of Units and Related Information".

After the closing of title to a Unit, a Unit Owner will be solely responsible for maintaining casualty insurance with respect to the fixtures, equipment and personal property situated within his Unit, as well as liability insurance with respect to occurrences in or about the Unit. The Condominium Board will be solely responsible for maintaining casualty and liability

insurance with respect to the Common Elements, in accordance with the provisions of the By-laws (See the Section of the Plan entitled "Rights and Obligations of the Condominium Board").

Each Purchaser of a Unit will be required to make a contribution to the Working Capital Fund of the Condominium. Such contribution, to be made at the time of Closing of the Unit, shall be in an amount equal to two month's Common Charges in effect at the time of closing for each Unit purchased (See the Section of the Plan entitled "Working Capital Fund").

In addition to the payment of Common Charges, each Unit Owner will be responsible for the payment of the real estate taxes which will be separately assessed against such Unit Owner's Unit, interest and amortization payments on the mortgage, if any, which such Unit Owner may, at his option, obtain, and charges for electricity consumed in such Unit Owner's Unit. Water charges and sewer rents, assessed by the City of New York, will be billed to the Condominium as a Common Expense.

There are no limitations on who may purchase Units, other than an Owner of a Roof Terrace Unit and/or a Parking Space Unit must also be an Owner of a Residential Unit or be the Sponsor (See the Declaration in Part II of the Plan). Under the New York Real Property Law, a condominium unit may be owned by an individual, a corporation, a partnership, an association, a trust or any other entity which is permitted to take title pursuant to New York law. Sponsor hereby reserves the right at any time and from time to time for any reason whatsoever, without the consent of any of the Condominium Board, any Unit Owner or mortgagee, to refuse to approve and execute Purchase Agreements for one or more Units to any person or entity. Sponsor shall not discriminate against any person because of his or her race, creed, color, sex, sexual orientation, disability, marital status, age, ancestry, national origin or other ground proscribed by Law. No binding obligation will arise for the sale of a Unit unless and until a Purchase Agreement executed by both Purchaser and Sponsor has been exchanged and Sponsor has collected the funds constituting Purchaser's required deposit thereunder (see the Section of the Plan entitled "Procedure to Purchase"). Sponsor will not accept an offer of purchase from an individual younger than 18 years of age or an incompetent under Law.

**THE PURCHASE OF A CONDOMINIUM HAS MANY SIGNIFICANT LEGAL AND FINANCIAL CONSEQUENCES. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK STRONGLY URGES YOU TO READ THIS OFFERING PLAN CAREFULLY AND TO CONSULT WITH AN ATTORNEY BEFORE SIGNING AN AGREEMENT TO PURCHASE A CONDOMINIUM.**

## DEFINITIONS

For convenience of presentation, general definitions of certain of the terms used in the Plan are set forth below, which definitions are subject in most cases to the more particular definitions of such terms set forth in the Declaration, the By-laws and the Condominium Act. They include the following:

"Adverse Effect", or "adverse effect", as used in the Condominium Documents, shall mean, with respect to any action or proposed change and with respect to any Unit Owner or Unit Owners, that such action or change could, if realized, (i) increase the Common Charges payable by such Unit Owner or Unit Owners, (ii) materially interfere with such Unit Owner's access to his Unit, (iii) obstruct or degrade the view from the windows of such Unit Owner's Unit or (iv) otherwise materially diminish such Unit Owner's use and enjoyment of his Unit.

"Building" shall mean the Building known as One Hunters Point and located at 5-49 Borden Avenue, Long Island City, Queens County, New York, which the Units of the Condominium will be located.

"Buildings Department" shall mean the Department of Buildings of The City of New York or any successor agency.

"By-laws" shall mean the By-laws governing the operations of the Condominium, which are set forth as Exhibit D to the Declaration, as the same may be amended from time to time.

"Closing of Title" or "Closing" shall mean the date upon which, among other things, a Unit and its appurtenant Common Interest is conveyed to a Purchaser by the delivery by Sponsor to a Purchaser of a deed upon payment by a Purchaser to Sponsor of the balance of the purchase price for the Unit.

"Common Charges" shall mean the charges allocated and assessed by the Condominium Board to the Unit Owners, pro-rata in accordance with their respective Common Interests (except as otherwise provided in the Declaration or in the By-laws or in the First Year's Budget) to meet the Common Expenses.

"Common Elements" shall mean the Property, other than the Units themselves, being comprised of the General Common Elements and the Limited Residential Common Elements.

"Common Expenses" shall mean all costs and expenses to be incurred generally by the Unit Owners pursuant to the Declaration and/or the By-laws in connection with: (i) the repair, maintenance, replacement, restoration and operation of, and any alteration, addition, or improvement to, the Common Elements; (ii) the establishment and/or maintenance of a general operating reserve, or a reserve fund for working capital, for replacements with respect to the Common Elements, or to make up any deficit in the Common Charges for any prior year(s); and (iii) generally, the conduct of the affairs of the Condominium. Common Expenses shall be General Common Expenses attributable to all Unit Owners, Residential Common Expenses

attributable to Residential Unit Owners, Parking Space Common Expenses attributable to Parking Space Unit Owners and Roof Terrace Common Expenses attributable to Roof Terrace Unit Owners.

"Common Interest" shall mean the proportionate undivided interest, expressed as a numerical percentage, in the Common Elements appurtenant to each Unit, as determined in accordance with the Declaration. The total of all Common Interest percentages appurtenant to all Units equals 100%. The Common Interest attributable to each Unit is set forth on Exhibit B annexed to the Declaration.

"Condominium" shall mean "One Hunters Point" which was established pursuant to the terms of the Declaration and which is governed pursuant to the terms of the By-laws.

"Condominium Act" shall mean the New York Condominium Act, as amended from time to time, and presently found in the New York Real Property Law, Article 9-B.

"Condominium Board" shall mean the board of managers of the Condominium who will manage the affairs of the Condominium.

"Declaration" shall mean the instrument creating the Condominium, as the same may be amended from time to time.

"Deposit" shall mean all deposits, down payments, advances or payments made by Purchasers prior to the closing of each individual transaction.

"Effective Date" shall mean the date upon which Sponsor has declared the Plan effective pursuant to the provisions of the General Business Law.

"Facilities" shall mean all personal property and fixtures now or hereafter existing in, on, or under the Land or the Building and either existing for the common use of the Units or the Unit Owners or necessary or convenient for the existence, maintenance, or safety of the Property.

"Filing Date" shall mean the date a letter is issued by the Department of Law accepting the Plan or an amendment to the Plan, as the case may be, for filing.

"First Closing" shall mean the Closing of Title with respect to the first Unit to be conveyed to a Purchaser pursuant to the terms of the Plan.

"First Year's Budget" shall mean the Section of the Plan entitled "Schedule B - First Year's Budget". First Year's Budget is sometimes referred to herein as "Schedule B".

"Floor Plans" shall mean the floor plans of the Units certified by a professional engineer or licensed architect, filed in the Register's Office simultaneously with the recording of the Declaration, together with any supplemental floor plans thereto.

"Force Majeure" shall mean delays caused by weather, casualty, labor, difficulties, (including work stoppages and strikes), late delivery or inability to obtain materials, government restrictions or other events beyond Sponsor's reasonable control.

"General Common Elements" shall mean those certain portions of the Property (other than the Units), as well as those Facilities therein, either existing for the common use of the Units or the Unit Owners or necessary for, or convenient to, the existence, maintenance, or safety of the Property, as more particularly described in the Declaration.

"General Common Expenses" shall mean all costs and expenses to be incurred generally by the Unit Owners pursuant to the Declaration and/or By-laws in connection with (i) the repair, maintenance, replacement, restoration and operation of, and any alteration, addition, or improvement to, the General Common Elements and shall include the normal cleaning expenses of the Parking Space Units (such as sweeping, plowing); or (ii) the establishment and/or maintenance of a general operating reserve fund for working capital, for replacements with respect to the General Common Elements.

"Initial Control Period" shall mean the period ending on the earlier of: (i) the closing of title with purchasers under the Plan to Units having at least 50% of the aggregate Common Interest appertaining to all Units, or (ii) 3 years after the First Closing.

"Land" shall mean the land located in the Borough and County of Queens on the Tax Map of the Real Property Assessment Department of The City of New York as Block 34, Lot 12, and more particularly described in Exhibit A to the Declaration.

"Law" shall mean the laws and ordinances of any or all of the Federal, New York State, New York City, County and Borough governments, the rules, regulations, orders and directives of any or all departments, subdivisions, bureaus, agencies, or offices thereof or of any other governmental, public or quasi-public authorities having jurisdiction over the Property and/or the Condominium and/or the direction of any public officer pursuant to law.

"Limited Residential Common Elements" shall mean those portions of the Property (other than the Units) existing for the use and enjoyment of certain Residential Unit Owners or one or more specified Residential Units to the exclusion of all other Unit Owners, as more particularly described in the Declaration.

"Managing Agent" shall mean the managing agent or manager named in the Plan or any successor managing agent at the time in question.

"Parking Space Common Expenses" shall mean all costs and expenses to be incurred generally by the Parking Space Unit Owners pursuant to the Declaration and/or By-laws in connection with structural or extraordinary repairs to the Parking Space Units.

"Parking Space Common Interest" shall mean the proportionate undivided interest, expressed as a numerical percentage, in the aggregate Common Interest of all Parking Space

Units, as determined in accordance with the Declaration. The total of all Parking Space Common Interests of all Parking Space Units equals 100%.

"Parking Space Unit" shall mean any space designated as a Parking Space Unit in the Declaration together with its Common Interest and Parking Space Common Interest.

"Permitted Encumbrances" shall mean those matters encumbering title to a Unit subject to which a Purchaser agrees to take title, as more particularly described on Schedule A annexed to the form of Purchase Agreement.

"Permitted Mortgage" shall mean a first mortgage permitted to be placed upon a Unit pursuant to the provisions of the By-laws.

"Plans and Specifications" shall mean the plans and specifications for the construction of the Building which (to the extent required by Law) have been or will be filed with the Department of Buildings and which may from time to time be amended in accordance with the provisions of the Plan.

"Presentation Date" shall mean the date on which the Plan or an amendment thereto, as the case may be, is personally delivered or the 5th day after mailing to prospective Purchasers and Unit Owners following acceptance of the Plan or an amendment thereto for filing with the Department of Law.

"Prime Rate" shall mean the rate of interest published in the Money Rates Section of the Wall Street Journal (Eastern Edition) from time to time as the "Prime Rate." If more than one such Prime Rate is published, the highest Prime Rate shall be applicable. If the Wall Street Journal ceases to be published or goes on strike or is otherwise not published for any period of time or if it ceases to publish a Prime Rate, then the Condominium Board shall utilize any similar published prime or base rate of interest.

"Property" shall mean the Land, the Building (and any structures attached thereto), all the improvements erected or to be erected on the Land, all easements, rights and appurtenances pertaining thereto and all other property, real, personal, or mixed, used or intended to be used in connection therewith.

"Purchase Agreement" shall mean the agreement to purchase a Unit the form of which is set forth in Part II of the Plan.

"Purchaser" shall mean a purchaser of a Unit under a Purchase Agreement.

"Register's Office" shall mean the Queens County Office of the Register of The City of New York.

"Residential Common Expenses" shall mean all costs and expenses to be incurred generally by the Residential Unit Owners pursuant to the Declaration and/or By-laws in connection with (i) the repair, maintenance, replacement, restoration and operation of, and any alteration, addition, or improvement to, the Limited Residential Common Elements; or (ii) the

establishment and/or maintenance of a operating reserve fund for working capital, for replacements with respect to the Limited Residential Common Elements.

"Residential Common Interest" shall mean the proportionate undivided interest, expressed as a numerical percentage, of each Residential Unit Owner in the Residential Common Elements. The total of all Residential Common Interest percentages appurtenant to all Residential Units equals 100%. The Residential Common Interests are the basis for determining a Residential Unit Owner's liability for his share of the Residential Common Expense. The Residential Common Interest attributable to each Residential Unit is set forth on Exhibit B annexed to the Declaration.

"Residential Unit" shall mean any space designated as a Residential Unit in the Declaration together with its Common Interest and Residential Common Interest. All such Residential Units, are collectively, referred to as the "Residential Units".

"Roof Terrace Common Expenses" shall mean all costs and expenses to be incurred generally by the Roof Terrace Unit Owners pursuant to the Declaration and/or By-laws in connection with structural or extraordinary repairs to the Roof Terrace Units.

"Roof Terrace Common Interest" shall mean the proportionate undivided interest, expressed as a numerical percentage, in the aggregate Common Interest of all Roof Terrace Units, as determined in accordance with the Declaration. The total of all Roof Terrace Common Interests of all Roof Terrace Units equals 100%.

"Roof Terrace Unit" shall mean any space designated as a Roof Terrace Unit in the Declaration together with its Common Interest and Roof Terrace Common Interest.

"Rules and Regulations" shall mean the rules and regulations made in accordance with the By-laws.

"Sales Office" shall mean the sales office for the Sponsor or Selling Agent, at a location to be designated by either Sponsor or Selling Agent from time to time. The Sales Office will initially be located at 47-46 Vernon Boulevard (also known as 5-53 48th Avenue), Long Island City, New York.

"Schedule A" shall mean the Section of the Plan entitled "Schedule A - Purchase Prices and Related Information".

"Schedule B" shall mean the Section of the Plan entitled "Schedule B - First Year's Budget". Schedule B is sometimes referred to herein as the "First Year's Budget".

"Schedule B-l" shall mean the section of the Plan entitled "Schedule B-1 for Individual Energy Costs".

"Selling Agent" shall mean the selling agent named in the Plan or any successor selling agent at the time in question.

"Sponsor" shall mean Borden East River Realty LLC and any successor or assignee of Sponsor or, with the consent of Sponsor, any transferee of all of the then Unsold Units. Whenever the Plan, the Purchase Agreement or the Declaration (including the Exhibits thereto) provides that Sponsor shall not be liable or responsible, or that there shall be no recourse against Sponsor, such provision shall be deemed to include Sponsor's principals, officers, directors, shareholders, members, affiliates, agents and attorneys, whether or not so expressly stated.

"Superintendent's Unit" shall mean any space designated as the Superintendent's Unit in the Declaration, together with its Common Interest.

"Terrace" shall mean a terrace, balcony or garden appurtenant to a Residential Unit. All such terraces, balconies or gardens are, collectively, referred to as the "Terraces".

"Unit" shall mean any space designated as a Unit in the Declaration together with its Common Interest. All such Units, are collectively, referred to as the "Units".

"Unit Owner" shall mean any owner of a Unit. All such owners of Units are, collectively, referred to as "Unit Owners".

"Unsold Unit" shall mean any Unit owned or retained, by way of lease or any other arrangement by which management and/or financial responsibility is retained, by Sponsor at the time in question.  All such Unsold Units are, collectively, referred to as the "Unsold Units".

## DESCRIPTION OF PROPERTY AND IMPROVEMENTS

The following is a general description of the Property, including the Land, Building, Units and Common Elements as well as certain facilities and services to be provided at the Condominium. For a more detailed description of the Property, see the "Description of Property and Specifications" contained in Part II of the Plan.

Location, Acreage and Zoning

The Condominium is located on a corner lot with frontage on Borden Avenue and Vernon Boulevard and is known as 5-49 Borden Avenue, in the Borough and County of Queens, City and State of New York. The Land covers approximately 13,920 square feet and the Building erected thereon will be twelve (12) stories, 125 feet high, and consist of approximately 134,087 square feet of floor area. The Property is located within an M1-5/R7X zoning district, which allows multiple dwellings and commercial structures up to 125 feet tall.

Improvements - General Description of Units

The Condominium, upon completion of construction, will consist of one (1) Building containing a total of one hundred thirty-two (132) Residential Units (including one Superintendent's Unit), twenty-six (26) Roof Terrace Units and twenty-five (25) Parking Space Units.  The Building will be a twelve-story structure above grade.  Upscale amenities are also integrated into the design and will feature a concierge staffed entry lobby, an exercise room on the ground floor for Residential Unit Owners and a ground level privacy garden for use by Residential Unit Owners.

The Building will comply with Local Law 58 (Handicapped Access Law). The main entrance and the Units have been designed to accommodate handicap access.

Residential Units

The Building will contain one hundred thirty-two (132) Residential Units, which will be located on the first floor through the twelfth floor and designated as Units A–N (no I). Unit A1, the only Residential Unit located on the first floor, shall be the Superintendent's Unit.  The Residential Units vary in size from one (1) bedroom, two (2) bedrooms and three (3) bedrooms. Fifty-four (54) Residential Units will be one (1) bedroom, seventy-four (74) Residential Units will be two (2) bedrooms and four (4) Residential Units will be three (3) bedrooms.  Each Residential Unit Owner will be entitled to the irrevocable exclusive use of any Terrace to which there is direct access from the interior of his or her Residential Unit.  Purchasers are advised to consult the By-laws for a detailed description of the permitted use of the Residential Units and the Floor Plans contained in Part II of the Plan for more details regarding the Residential Units.

Superintendent's Unit

At or subsequent to the First Closing, Sponsor will sell Residential Unit A1 to the Condominium, which will own such Residential Unit on behalf of all Unit Owners and will use the same for the residence of the Superintendent. The Condominium shall be responsible for the payment of all title insurance costs, mortgage recording and transfer taxes and miscellaneous recording and filing fees due in connection with the sale of the Residential Unit. All Common Charges, including the costs of utilities and the costs of financing the purchase of the Residential Unit, real estate taxes and the costs of repairs shall be borne by all Unit Owners as a Common Expense as more fully set forth in Schedule B - First Year's Budget. The purchase price of Residential Unit A1 is $520,000.00. At the Closing of title to Residential Unit A1, the Condominium, on behalf of all Unit Owners will pay the purchase price by executing and delivering a purchase money note in the amount of $520,000.00 secured by a purchase money mortgage on the Residential Unit. The purchase money note will be for a term of five (5) years from the First Closing with interest payable at the rate of one (1%) percent over the Prime Rate based on a twenty (20) year amortization schedule. Assuming an interest rate of 9.25% per annum, the monthly payment on the purchase money note will be equal to $4,286.26. Upon the maturity date of the purchase money note, all interest and outstanding principal will be due and payable. Sponsor does not intend to refinance or extend the purchase money note and purchase money mortgage at maturity. Purchasers are advised that refinancing by another lender may not be available and that the Condominium, in order to repay the purchase money note, may be required to assess all Unit Owners in proportion to their respective Common Interests. At Sponsor's option, the note and mortgage will be held by an institutional lender or by Sponsor. Title insurance costs, mortgage recording taxes and transfer taxes and miscellaneous recording and filing fees due in connection with the transfer and mortgage of the Superintendent's Unit to the Condominium will be paid by the Condominium from the Working Capital Fund. In the event the Working Capital Fund is not sufficient, Sponsor will advance the funds necessary on behalf of the Condominium and the Condominium will repay the Sponsor by executing a promissory note in the amount of the funds so advanced, to be repaid, without interest, in twelve (12) equal monthly installments.

In the event the Condominium defaults under the note and mortgage, including, but not limited to a default as a result of the Condominium's failure to pay the balance of the purchase money note due at maturity, the holder may foreclose on Unit A1 and if the proceeds from the sale of the Unit are insufficient to satisfy the outstanding mortgage balance and other fees incurred, the Unit Owners could be liable for the deficiency. In the event of such a foreclosure, the Condominium will be without a Superintendent's Unit. Accordingly, alternate arrangements will be necessary to shelter the Superintendent's Unit in the Condominium or within such distance of the Condominium as is then required by law. (See the Section of the Plan entitled "Schedule B - First Year's Budget" for further details.)

Roof Terrace Units

As more particularly described in the "Declaration of Condominium" and in the "Description of Property and Building Specifications" contained in Part II of the Plan, the Condominium contains twenty-six (26) Roof Terrace Units. The Roof Terrace Units vary in size

from 216 square feet to 357 square feet.  The Roof Terrace Units will be divided by six (6) foot high chain link fences.

The Roof Terrace Units may only be owned by Sponsor and Residential Unit Owners. Thus, a Purchaser cannot purchase a Roof Terrace Unit without a concomitant purchase of a Residential Unit.  A subsequent sale of a Roof Terrace Unit can only be made to an existing Residential Unit Owner or to the purchaser of a Residential Unit.  Sponsor may own a Roof Terrace Unit without the requirement to also own a Residential Unit.

Roof Terrace Units may only be used for passive recreational purposes (*e.g.,* sunbathing and lounging) by its Owner and the permitted tenants and occupants of such Owner's Residential Unit in accordance with applicable law, and for no other purpose.  Purchasers are advised to consult the By-laws for a detailed description of the permitted uses of the Roof Terrace Units.

Parking Space Units

As more particularly described in the "Declaration of Condominium" and in the "Description of Property and Building Specifications" contained in Part II of the Plan, the Condominium contains twenty-five (25) Parking Space Units located in an enclosed garage on the first floor of the Building.

The Parking Space Units may only be owned by Sponsor and Residential Unit Owners. Thus, a Purchaser cannot purchase a Parking Space Unit without a concomitant purchase of a Residential Unit.  A subsequent sale of a Parking Space Unit can only be made to an existing Residential Unit Owner or to the purchaser of a Residential Unit.  Sponsor may own a Parking Space Unit without the requirement to also own a Residential Unit.

Parking Space Units may only be used for the parking of passenger vehicles and motorcycles and in accordance with applicable law, and for no other purpose.

Construction Data for Units and Common Elements

Sponsor has engaged NDG Architect, P.C. as architect of record (See the Section of the Plan entitled "Identity of Parties"). The Plans and Specifications have been prepared by such architect.

Construction of the Building, including the individual Units and Common Elements, will be completed substantially in accordance with the Plans and Specifications, and all applicable Laws.  However, Sponsor reserves the right to amend or modify, in any way, the Plans and Specifications (including, without limitation, changing materials, appliances, equipment, fixtures and other construction details) and substitute in place of any materials, appliances, equipment and fixtures set forth in the "Description of Property and Specifications," set forth in Part II of the Plan, items of substantially equal or better quality, provided, however: (i) any substitution of construction materials with inferior quality materials shall be set forth in an amendment to the Plan; (ii) any necessary approval of any governmental authority having jurisdiction is first obtained; and (iii) no such amendments, modifications or substitutions may be made if the same would materially and adversely affect any binding Purchase Agreement unless the same is

dictated by construction conditions at the Premises, and in such event, Sponsor will, in the amendment disclosing such change and delivered to the Purchaser(s), offer the affected Purchaser(s) the right, for fifteen (15) days, to rescind their Purchase Agreement(s) and receive a refund of their Deposit, together with all interest earned thereon.

Except for those warranties or guarantees provided to Sponsor by contractors, manufacturers or suppliers, which Sponsor will assign to the Condominium Board and/or Unit Owners, as necessary, Sponsor does not make any warranty of any kind, expressed or implied, and Sponsor hereby disclaims any and all warranties, including, but not limited to, implied warranties of merchantability and fitness for a particular purpose, with respect to the construction of the Units, the Common Elements and the Building. Article 36-B of the New York General Business Law ("Housing Merchant Implied Warranty Law") does not apply to this offering.

Based upon the current construction schedule, Sponsor contemplates that, unless delayed by Force Majeure, construction of the Building will be sufficiently completed to permit closings of Units to begin on or about July 1, 2008. Prospective Purchasers should note, however, that the Units will be completed at differing times over a period that may begin prior to and/or extend significantly beyond such dates. Sponsor will have no liability to any Purchaser, nor will a Purchaser be entitled to any credit, offset or reduction in the purchase price for his or her Unit or otherwise be relieved from any obligations under the Purchase Agreement, in the event that the First Closing occurs earlier or later than the targeted date or the time to complete or to close title to their Unit is delayed or postponed by Sponsor. In the event the actual or anticipated commencement date of the first year of condominium operation is to be delayed by six (6) months or more, Sponsor will amend the Plan to include a revised budget with current projections and, if (i) Unit Owner's monthly Common Charges in the amended budget exceed those in the latest budget set forth in the Plan by 25% or more, or (ii) the First Closing does not occur within twelve (12) months after July 1, 2008, the date set forth in Schedule B as the commencement date for the first year of condominium operation, then in either case, Sponsor will offer all Purchasers the right to rescind their Purchase Agreements within fifteen (15) days after the Presentation Date of the amendment containing such revised budget. Any Purchasers electing rescission pursuant to such offer will have their Deposits and any interest accrued thereon returned.

Services and Facilities

The services and facilities described below will be provided to Residential Unit Owners at no additional cost (other than Common Charges), unless otherwise specified below.

a.    Concierge

A concierge will be stationed in the lobby of the building twenty-four (24) hours a day, seven (7) days a week. The hours of duty of the concierge may be reduced until certain occupancy levels in the Condominium are achieved. However, at all times after the First Closing of a Residential Unit, the lobby will be attended twenty-four (24) hours a day, seven (7) days a week by a concierge.

b.      Elevator Service

There will be two (2) automatic passenger elevator in the Building, servicing the first floor to roof, twenty-four (24) hours a day, seven (7) days a week.

c.      Cable Television

The Building will be pre-wired for a telecommunications system which will provide cable television to the Residential Unit Owners ("Telecommunications System"). The charges for primary connections and subsequent monthly fees related to the Telecommunications System will be determined by, and payable directly to, the provider servicing the Building by the Residential Unit Owners.

d.      Intercom System

All Residential Units will be wired for an intercom facility providing direct communication from the Residential Unit to the lobby.

e.      Mail

All incoming mail will be delivered to the Unit Owners by the United States Postal Service and deposited by its personnel in mail boxes located in the lobby.

f.      Laundry

Each Unit will be equipped with a ventless washer/dryer.  There will not be a separate laundry room located in the Building.

g.      Refuse Disposal

There will be access to the Building's refuse chute located on each floor.  The refuse chutes for each Building will lead directly to an automatic compacting facility in the trash room located on the first floor of the Building.

h.      Smoke Detector/Sprinklers

Smoke detectors will be provided in each Residential Unit and at each elevator lobby in compliance with Law. Additionally, the Building will be fully sprinklered in compliance with Law.

i.      Fitness Center

An unsupervised fitness center having approximately six hundred seventy-five (675) square feet will be located on the first floor.  The Fitness Center will have a maximum occupancy of forty-five (45) persons. The Fitness Center will include the following fitness equipment: state-of-the-art treadmills, bicycles, weight machines, free weights and stair-masters, in addition to a bathroom and television access.

j.      Privacy Garden

A landscaped garden will be available for Residential Unit Owners.  Access will be through the lobby.

All Residential Units include a private garden, terrace or balcony.  The terraces and balconies also function as the roof over a portion of the floors below.  Said roof areas will be improved with concrete roofing pavers.  Owners must permit access to their terraces and balconies in the event of any needed roof repairs. No wood decking, gazebo, or similar structure shall be permitted to be installed in the said adjoining roof areas.  Unless caused by the improper use of the terrace/balcony areas or negligence by a Residential Unit Owner, the Condominium will be responsible for roof repairs.  Residential Unit Owners with private gardens will be responsible for maintenance of the garden.  Owners must permit access to their private gardens in the event of any needed repair. Unless caused by the improper use of the garden area or negligence by a Residential Unit Owner, the Condominium will be responsible for repairs to privacy fences enclosing the private gardens.

k.      Building Personnel

A superintendent, a handyman, a porter and concierge service are provided for in the proposed First Year's Budget.  All of the Building personnel will be supervised by the Building superintendent and the Managing Agent.  All building staff shall be assigned such hours of duty as are necessary for the comfortable occupancy of all Unit Owners.

## **LOCATION AND AREA INFORMATION**

Location

The Condominium is situated at 5-49 Borden Avenue in the Hunters Point section of Long Island City in the Borough of Queens in New York City. Hunters Point has recently been rezoned to foster residential development.

Surrounding Area, Shopping, Museums and Theatre

New York City is the leading cultural center of the world, with the finest universities, museums, libraries, theaters and cultural institutions, attracting millions of national and international tourists. New York City is the nation's center for communications, publishing, advertising, the stock market and other financial services, visual and performing arts and the fashion industry and has, for more than a century been the enclave of choice for the most affluent of the city's top executives, entrepreneurs and a substantial group of wealthy foreigners.

The recently rezoned Hunters Point district has been targeted as one of the most sought after areas for condominium residential development by both local and national developers because of its historic residential character, favorable zoning, access to the East River waterfront and proximity to Midtown Manhattan and transportation opportunities.

Vernon Boulevard is quickly emerging as the retail focal point of Hunters Point with many cafes, restaurants and shops lining its storefronts. Unlike most of the Hunters Point area, the Property possesses favorable zoning that permits a taller structure (125 feet rather than 60-80 feet) and greater bulk to be built.

Just minutes away, the 7 Train is one stop from Grand Central Station and a quick shuttle to Times Square. The Midtown Tunnel and the LIRR are a block away. The New York Water Taxi is just steps away at the corner of Borden Avenue and Second Street.

In close proximity to the Condominium are thirteen (13) restaurants/cafes/bars, seven (7) museums, three (3) parks, four (4) markets, along with numerous bank branches.

By either railroad or subway, the Building is only a short ride away from the famous museums and cultural institutions of Manhattan such as The Metropolitan Museum of Art, Whitney Museum of American Art, Frick Collection, Guggenheim Museum, Museum of Modern Art, The Asia Society, Museum of Natural History and Museum of American Folk Art, Lincoln Center for the Performing Arts (which includes the New York State Theater, the Metropolitan Opera House, Avery Fisher Hall and Vivian Beaumont Theater), Carnegie Hall and the Broadway theater district, which are the focal points of the musical life of the City.

Sponsor makes no representations as to the continued existence of any of the named establishments.

Transportation

New York City is served by three major airports - LaGuardia Airport, Kennedy International Airport and Newark International Airport. Passenger railroad service is provided from Pennsylvania Station, located at Seventh Avenue and 33rd Street, and from Grand Central Station, located at Lexington Avenue and 42nd Street.

Transportation to and from the Building, and through New York City, is available by taxi and limousine services. Both the Long Island Rail Road and 7 train are in walking distance of the Building. The commute to Manhattan is just one subway train stop. There is also bus service to Manhattan and Brooklyn. By car, there is easy access to the Midtown Tunnel, the Long Island Expressway, and the various bridges between Queens, Brooklyn and Manhattan.

Police, Fire, Water, Sanitation, Snow Removal and Road Maintenance

These services are provided by The City of New York and all charges (except water) are financed through real estate taxes paid by Unit Owners to The City of New York. The nearest police precinct is the 108th located at 50th Avenue near Vernon Boulevard. The nearest firehouse is Engine Company No. 258 and Ladder Company No. 115 located at 47th Avenue near Vernon Boulevard. Water charges for the Building will be metered and paid by Unit Owners as a Common Expense of the Condominium.

Medical, Educational and Religious Facilities

A number of medical centers, such as St. John's Hospital, New York Hospital, Connell Medical Center, Memorial Sloan Kettering, Lenox Hill Hospital, New York University Medical Center, Mt. Sinai Medical Center and Columbia Presbyterian Medical Center, are readily accessible to the Building.

In close proximity to the Building are many schools of different levels. LaGuardia Community College is nearby as is Robert F. Wagner Jr. Secondary School for the Arts and the High School for Information Technology. Primary and middle schools include P.S. 78, St. Raphael School, Oliver W. Holmes School and Albert Shanker School. In addition, Little Ones Pre-K and Day Care Center is within walking distance.

There are houses of worship of most major denominations in the vicinity of the Building.

Zoning

The Condominium is located within an M1-5/R7X zoning district which allows multiple dwellings and commercial structures up to 125 feet tall.

**SCHEDULE A**
**PROJECTED COMMON CHARGES AND REAL ESTATE TAXES**
**FIRST YEAR OF OPERATION**
**JULY 1, 2008 TO JUNE 30, 2009**

**ONE HUNTERS POINT**

| Unit | Type | Balcony/Terrace | Bal/Terr Sq.Ft. | Floor Area Sq. Ft. | Initial Price | Percentage Common Interest | Real/Road/Garage Percentage Common Interest | Projected Monthly Common Charges | Projected Monthly Real Estate Taxes With 421-a Exemption | Projected Monthly Real Estate Taxes Without 421-a Exemption | Projected Monthly Carrying Charges With 421-a Exemption | Projected Monthly Carrying Charges Without 421-a Exemption |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A1 | 2 BED | None | | 892 | $520,000 | 0.6104% | 0.6190% | $488.23 | $20.29 | $1,221.07 | $508.52 | $1,707.30 |
| A2 | 2 BED | Balcony | 71 | 1,168 | $830,000 | 0.9648% | 0.9800% | $778.10 | $32.39 | $1,949.02 | $808.48 | $2,725.12 |
| A3 | 2 BED | Balcony | 71 | 1,168 | $845,000 | 0.9821% | 0.9961% | $790.12 | $32.97 | $1,984.24 | $823.09 | $2,774.37 |
| A4 | 2 BED | Balcony | 71 | 1,168 | $860,000 | 0.9995% | 1.0237% | $804.15 | $33.56 | $2,019.47 | $837.71 | $2,823.62 |
| A5 | 2 BED | Balcony | 71 | 1,168 | $875,000 | 1.0169% | 1.0419% | $818.18 | $34.14 | $2,054.69 | $852.32 | $2,872.86 |
| A6 | 2 BED | Balcony | 71 | 1,168 | $890,000 | 1.0344% | 1.0595% | $832.20 | $34.73 | $2,089.91 | $866.93 | $2,922.11 |
| A7 | 2 BED | Balcony | 71 | 1,168 | $905,000 | 1.0518% | 1.0772% | $846.23 | $35.31 | $2,125.14 | $881.54 | $2,971.37 |
| A8 | 2 BED | Balcony | 71 | 1,168 | $920,000 | 1.0692% | 1.0925% | $860.25 | $35.90 | $2,160.36 | $896.15 | $3,020.61 |
| A9 | 2 BED | Terrace | 323 | 1,168 | $1,100,000 | 1.2784% | 1.3094% | $1,028.56 | $42.92 | $2,583.04 | $1,071.48 | $3,611.60 |
| A10 | 2 BED | Balcony | 68 | 1,175 | $925,000 | 1.0751% | 1.1011% | $864.93 | $36.09 | $2,172.10 | $901.02 | $3,037.03 |
| A11 | 2 BED | Balcony | 87 | 1,175 | $940,000 | 1.0925% | 1.1190% | $878.96 | $36.68 | $2,207.32 | $915.63 | $3,086.28 |
| A12 | 2 BED | Balcony | 86 | 1,175 | $955,000 | 1.1099% | 1.1388% | $892.98 | $37.26 | $2,242.55 | $930.24 | $3,135.53 |
| B1 | 2 BED | Terrace | 1,097 | 1,043 | $808,000 | 0.9387% | 0.9595% | $753.68 | $31.45 | $1,892.98 | $785.11 | $2,646.32 |
| B2 | 2 BED | Balcony | 106 | 1,043 | $890,000 | 0.8019% | 0.8180% | $645.19 | $26.82 | $1,620.27 | $672.01 | $2,265.48 |
| B3 | 1 BED | Balcony | 106 | 1,043 | $700,000 | 0.8136% | 0.8342% | $654.54 | $27.31 | $1,643.15 | $681.85 | $2,298.29 |
| B4 | 1 BED | Balcony | 106 | 1,043 | $700,000 | 0.8252% | 0.8458% | $663.88 | $27.70 | $1,665.89 | $691.59 | $2,328.09 |
| B5 | 1 BED | Balcony | 118 | 1,043 | $700,000 | 0.8369% | 0.8570% | $673.23 | $28.09 | $1,690.43 | $701.33 | $2,360.66 |
| B6 | 2 BED | Balcony | 118 | 1,043 | $720,000 | 0.8522% | 0.8726% | $682.57 | $28.09 | $1,712.24 | $710.65 | $2,384.91 |
| B7 | 1 BED | Balcony | 118 | 607 | $438,700 | 0.5214% | 0.5345% | $410.21 | $17.12 | $1,030.16 | $427.33 | $1,440.37 |
| B8 | 1 BED | Balcony | 118 | 607 | $446,700 | 0.5315% | 0.5470% | $419.58 | $17.51 | $1,053.64 | $437.07 | $1,473.21 |
| B9 | 1 BED | Balcony | 118 | 607 | $458,700 | 0.5447% | 0.5579% | $428.31 | $17.90 | $1,075.58 | $446.81 | $1,503.64 |
| B10 | 1 BED | Balcony | 118 | 607 | $468,700 | 0.5561% | 0.5679% | $438.26 | $18.29 | $1,100.81 | $456.55 | $1,538.87 |
| B11 | 1 BED | Balcony | 607 | 692 | $411,000 | 0.4893% | 0.4777% | $384.31 | $16.04 | $965.12 | $400.35 | $1,349.43 |
| B12 | 1 BED | Balcony | 692 | $426,000 | 0.5071% | 0.4951% | $398.33 | $16.62 | $1,000.34 | $414.95 | $1,398.67 |
| C2 | 1 BED | Balcony | 67 | 692 | $441,000 | 0.5125% | 0.5206% | $426.39 | $17.79 | $1,070.79 | $444.18 | $1,497.17 |
| C3 | 1 BED | Balcony | 67 | 692 | $456,000 | 0.5300% | 0.5428% | $440.41 | $18.38 | $1,106.01 | $458.79 | $1,546.42 |
| C5 | 1 BED | Balcony | 67 | 692 | $471,000 | 0.5474% | 0.5607% | $454.44 | $18.96 | $1,141.23 | $473.40 | $1,595.67 |
| C6 | 1 BED | Balcony | 67 | 692 | $485,700 | 0.5655% | 0.5786% | $468.46 | $19.55 | $1,176.46 | $488.01 | $1,644.92 |
| C8 | 1 BED | Balcony | 67 | 692 | $501,000 | 0.5823% | 0.5987% | $611.25 | $25.51 | $1,535.03 | $636.76 | $2,146.28 |
| C9 | 2 BED | Balcony | 137 | 957 | $865,700 | 0.7597% | 0.7777% | $611.25 | $25.51 | $1,535.03 | $636.75 | $2,146.28 |
| C10 | 2 BED | Balcony | 137 | 957 | $888,700 | 0.7772% | 0.7960% | $625.27 | $26.09 | $1,570.25 | $651.36 | $2,195.52 |
| C11 | 2 BED | Balcony | 137 | 957 | $883,700 | 0.7790% | 0.8017% | $639.30 | $26.68 | $1,605.48 | $665.98 | $2,244.78 |
| C12 | 2 BED | Terrace | 1,507 | 957 | $789,800 | 0.8120% | 0.8400% | $738.51 | $30.82 | $1,854.82 | $769.33 | $2,593.13 |
| D2 | 2 BED | Balcony | 137 | 987 | $903,700 | 0.8179% | 0.7468% | $653.33 | $27.26 | $1,640.70 | $680.59 | $2,294.02 |
| D5 | 2 BED | Balcony | 137 | 987 | $865,000 | 0.7760% | 0.8007% | $691.43 | $28.85 | $1,736.70 | $720.28 | $2,428.12 |
| D6 | 2 BED | Balcony | 137 | 987 | $855,000 | 0.7822% | 0.7822% | $601.24 | $25.09 | $1,509.90 | $626.33 | $2,111.15 |
| D8 | 2 BED | Balcony | 137 | 987 | $623,700 | 0.7249% | 0.7424% | $563.20 | $23.50 | $1,414.10 | $586.70 | $2,047.78 |
| D9 | 2 BED | Balcony | 137 | 987 | $633,700 | 0.7365% | 0.7544% | $572.55 | $23.89 | $1,464.58 | $596.44 | $2,080.61 |
| D10 | 2 BED | Balcony | 137 | 987 | $643,700 | 0.7480% | 0.7663% | $581.90 | $24.34 | $1,464.58 | $606.24 | $2,209.84 |
| D11 | 2 BED | Balcony | 137 | 987 | $653,700 | 0.7597% | 0.7782% | $611.25 | $25.51 | $1,535.03 | $636.76 | $2,146.28 |
| D12 | 2 BED | Terrace | 596 | 1,247 | $927,000 | 1.1035% | 1.0434% | $886.80 | $37.01 | $2,176.80 | $917.67 | $3,043.59 |
| E2 | 2 BED | Balcony | 137 | 1,247 | $876,500 | 1.0137% | 1.0553% | $816.09 | $34.59 | $2,058.77 | $850.62 | $2,873.26 |
| E5 | 2 BED | Balcony | 137 | 1,247 | $896,500 | 0.7743% | 1.0173% | $838.28 | $34.98 | $2,105.18 | $873.26 | $2,943.46 |
| E6 | 2 BED | Terrace | 69 | 1,037 | $845,000 | 0.7458% | 0.7084% | $601.24 | $25.09 | $1,509.90 | $626.33 | $2,111.15 |
| E8 | 2 BED | Balcony | 69 | 1,037 | $853,000 | 0.7823% | 0.7322% | $592.56 | $24.67 | $1,502.13 | $622.23 | $2,099.84 |
| E9 | 2 BED | Balcony | 69 | 1,037 | $888,000 | 0.7996% | 0.8190% | $643.32 | $26.84 | $1,615.57 | $670.16 | $2,258.89 |
| E10 | 2 BED | Balcony | 69 | 1,037 | $703,000 | 0.8170% | 0.8369% | $652.67 | $27.23 | $1,650.80 | $679.90 | $2,308.14 |
| E11 | 2 BED | Balcony | 137 | 1,037 | $713,000 | 0.8288% | 0.8547% | $667.57 | $27.82 | $1,686.02 | $694.69 | $2,357.39 |
| E12 | 2 BED | Balcony | 137 | 1,037 | $733,000 | 0.8519% | 0.8728% | $685.40 | $28.60 | $1,721.24 | $714.00 | $2,406.84 |
| F2 | 1 BED | Terrace | 1,351 | 936 | $755,200 | 0.8777% | 0.7904% | $620.88 | $25.91 | $1,559.22 | $646.79 | $2,180.09 |
| F5 | 1 BED | Balcony | 137 | 936 | $554,200 | 0.6441% | 0.6083% | $434.90 | $25.94 | $1,594.44 | $661.40 | $2,228.34 |
| F6 | 1 BED | Balcony | 137 | 936 | $574,200 | 0.6673% | 0.6440% | $708.16 | $27.66 | $1,664.89 | $590.62 | $2,327.84 |
| F8 | 2 BED | Balcony | 137 | 1,037 | $564,200 | 0.6755% | 0.6890% | $536.91 | $22.40 | $1,348.35 | $559.31 | $1,885.26 |
| F9 | 2 BED | Balcony | 66 | 1,037 | $594,200 | 0.6899% | 0.7102% | $548.28 | $22.79 | $1,371.83 | $571.59 | $1,918.09 |
| F10 | 1 BED | Balcony | 68 | 889 | $477,500 | 0.5686% | 0.5694% | $554.96 | $23.18 | $1,398.31 | $588.84 | $1,983.75 |
| F11 | 1 BED | Balcony | 68 | 889 | $487,500 | 0.5808% | 0.5623% | $455.84 | $19.02 | $1,144.78 | $474.86 | $1,600.62 |
| F12 | 1 BED | Balcony | 68 | 889 | $507,500 | 0.5986% | 0.6041% | $474.54 | $19.80 | $1,191.72 | $494.34 | $1,666.26 |

SCHEDULE A
PROJECTED COMMON CHARGES AND REAL ESTATE TAXES
FIRST YEAR OF OPERATION
JULY 1, 2008 TO JUNE 30, 2009

| Unit | Type | Balcony / Terrace | Bal / Ter Sq. Ft. | Floor Area Sq. Ft. | Initial Price | Res/Roof/Garage Percentage Common Interest | Percentage Common Interest | Projected Monthly Common Charges | Projected Monthly Real Estate Taxes With 421-a Exemption | Projected Monthly Real Estate Taxes Without 421-a Exemption | Projected Monthly Carrying Charges With 421-a Exemption | Projected Monthly Carrying Charges Without 421-a Exemption |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Residential Unit | G2 | 2 BED | Balcony | 69 | 1,085 | $684,200 | 0.7907% | 0.7719% | $921.07 | $25.52 | $1,559.68 | $946.59 | $2,480.75 |
| Residential Unit | G3 | 2 BED | Balcony | 69 | 1,085 | $685,000 | 0.7916% | 0.7616% | $940.51 | $26.79 | $1,608.53 | $967.30 | $2,549.04 |
| Residential Unit | G4 | 2 BED | Balcony | 69 | 1,085 | $700,000 | 0.8135% | 0.8195% | $654.54 | $27.31 | $1,643.75 | $681.85 | $2,298.29 |
| Residential Unit | G5 | 2 BED | Balcony | 69 | 1,085 | $715,000 | 0.8310% | 0.8310% | $868.57 | $27.90 | $1,676.97 | $896.46 | $2,547.54 |
| Residential Unit | G7 | 2 BED | Balcony | 69 | 1,085 | $730,000 | 0.8484% | 0.8484% | $982.59 | $28.48 | $1,714.20 | $711.08 | $2,396.79 |
| Residential Unit | G8 | 2 BED | Balcony | 69 | 1,085 | $745,000 | 0.8659% | 0.8659% | $998.62 | $29.07 | $1,749.42 | $725.69 | $2,449.44 |
| Residential Unit | G9 | 2 BED | Terrace | 596 | 1,230 | $760,000 | 0.9047% | 0.8833% | $710.64 | $29.65 | $1,784.64 | $740.30 | $2,495.29 |
| Residential Unit | G10 | 2 BED | Balcony | 137 | 1,230 | $975,000 | 1.1069% | 1.1332% | $911.68 | $38.04 | $2,289.51 | $949.72 | $3,201.19 |
| Residential Unit | G11 | 2 BED | Balcony | 137 | 1,230 | $864,600 | 1.0021% | 1.0049% | $908.45 | $34.32 | $2,065.16 | $942.78 | $2,973.61 |
| Residential Unit | G12 | 2 BED | Balcony | 137 | 1,230 | $894,600 | 1.0402% | 1.0397% | $836.90 | $34.91 | $2,100.71 | $871.81 | $2,937.22 |
| Residential Unit | H2 | 1 BED | Terrace | 820 | 690 | $585,000 | 0.6567% | 0.6567% | $528.31 | $22.05 | $1,326.74 | $550.35 | $1,855.05 |
| Residential Unit | H3 | 1 BED | Balcony | 88 | 690 | $410,600 | 0.4704% | 0.4784% | $364.87 | $16.06 | $965.53 | $380.93 | $1,347.40 |
| Residential Unit | H4 | 1 BED | Balcony | 88 | 690 | $421,600 | 0.5010% | 0.5010% | $384.22 | $16.45 | $990.01 | $410.67 | $1,394.23 |
| Residential Unit | H5 | 1 BED | Balcony | 88 | 690 | $431,600 | 0.5138% | 0.5138% | $403.57 | $16.84 | $1,013.49 | $420.41 | $1,417.08 |
| Residential Unit | H6 | 1 BED | Balcony | 88 | 690 | $441,600 | 0.5132% | 0.5257% | $412.92 | $17.23 | $1,036.97 | $430.15 | $1,449.89 |
| Residential Unit | H7 | 1 BED | Balcony | 88 | 690 | $451,600 | 0.5375% | 0.5375% | $431.62 | $17.62 | $1,061.42 | $439.68 | $1,482.72 |
| Residential Unit | H8 | 1 BED | Balcony | 88 | 690 | $461,600 | 0.5365% | 0.5365% | $451.32 | $18.01 | $1,083.94 | $449.83 | $1,515.68 |
| Residential Unit | H9 | 1 BED | Balcony | 88 | 690 | $471,600 | 0.5491% | 0.5614% | $440.97 | $18.40 | $1,107.42 | $459.37 | $1,548.39 |
| Residential Unit | H10 | 1 BED | Balcony | 88 | 846 | $481,600 | 0.5597% | 0.5723% | $450.32 | $18.79 | $1,130.90 | $469.12 | $1,581.22 |
| Residential Unit | H11 | 1 BED | Balcony | 88 | 846 | $491,600 | 0.5824% | 0.5824% | $431.68 | $19.18 | $1,153.85 | $478.86 | $1,646.85 |
| Residential Unit | H12 | 1 BED | Balcony | 88 | 846 | $501,600 | 0.5850% | 0.5971% | $469.03 | $19.57 | $1,177.87 | $488.60 | $1,646.89 |
| Residential Unit | J2 | 1 BED | Balcony | 59 | 728 | $450,500 | 0.5383% | 0.5383% | $421.24 | $17.58 | $1,057.87 | $438.82 | $1,479.11 |
| Residential Unit | J3 | 1 BED | Balcony | 59 | 728 | $455,500 | 0.5411% | 0.5411% | $435.37 | $18.16 | $1,090.28 | $453.53 | $1,527.61 |
| Residential Unit | J4 | 1 BED | Balcony | 59 | 728 | $460,500 | 0.5386% | 0.5386% | $449.30 | $19.06 | $1,152.09 | $468.04 | $1,577.81 |
| Residential Unit | J5 | 1 BED | Balcony | 59 | 728 | $500,000 | 0.5811% | 0.5811% | $467.53 | $19.51 | $1,174.11 | $487.04 | $1,641.84 |
| Residential Unit | J7 | 1 BED | Balcony | 59 | 728 | $515,000 | 0.5985% | 0.5985% | $481.55 | $20.09 | $1,209.33 | $501.65 | $1,690.89 |
| Residential Unit | J8 | 1 BED | Balcony | 59 | 728 | $530,000 | 0.6160% | 0.6216% | $495.58 | $20.68 | $1,244.55 | $516.26 | $1,740.13 |
| Residential Unit | J9 | 1 BED | Balcony | 59 | 728 | $545,000 | 0.6511% | 0.6334% | $509.61 | $21.26 | $1,279.78 | $530.87 | $1,789.38 |
| Residential Unit | J10 | 1 BED | Balcony | 88 | 1,020 | $706,900 | 0.6816% | 0.6889% | $650.99 | $27.55 | $1,659.95 | $688.57 | $2,320.95 |
| Residential Unit | J11 | 2 BED | Balcony | 88 | 1,020 | $721,900 | 0.8306% | 0.8390% | $875.02 | $28.11 | $1,695.18 | $703.19 | $2,570.20 |
| Residential Unit | J12 | 2 BED | Balcony | 88 | 1,020 | $736,900 | 0.9708% | 0.9739% | $888.64 | $28.75 | $1,766.62 | $732.41 | $2,488.89 |
| Residential Unit | K2 | 1 BED | Terrace | 520 | 661 | $555,000 | 0.6450% | 0.6450% | $515.96 | $21.55 | $1,303.26 | $540.51 | $1,822.22 |
| Residential Unit | K3 | 1 BED | Balcony | 58 | 661 | $360,800 | 0.4213% | 0.4770% | $394.87 | $16.44 | $989.44 | $370.31 | $1,384.31 |
| Residential Unit | K4 | 1 BED | Balcony | 58 | 661 | $375,800 | 0.4478% | 0.4451% | $370.45 | $15.83 | $952.91 | $386.28 | $1,332.35 |
| Residential Unit | K5 | 1 BED | Balcony | 58 | 661 | $415,800 | 0.4832% | 0.4950% | $388.60 | $16.22 | $976.39 | $405.02 | $1,365.19 |
| Residential Unit | K6 | 1 BED | Balcony | 58 | 661 | $425,800 | 0.4940% | 0.5059% | $396.13 | $16.61 | $999.87 | $414.76 | $1,398.02 |
| Residential Unit | K7 | 1 BED | Balcony | 58 | 661 | $435,800 | 0.5028% | 0.5399% | $500.28 | $17.00 | $1,023.35 | $521.13 | $1,756.55 |
| Residential Unit | K8 | 1 BED | Balcony | 58 | 661 | $445,800 | 0.5181% | 0.5392% | $514.28 | $21.48 | $1,291.52 | $535.74 | $1,805.80 |
| Residential Unit | K9 | 3 BED | Terrace | 355 | 1,220 | $966,200 | 1.1229% | 1.1502% | $903.45 | $37.70 | $2,268.85 | $941.15 | $3,172.30 |
| Residential Unit | K10 | 3 BED | Balcony | 58 | 1,220 | $815,300 | 0.9497% | 0.9765% | $795.36 | $31.81 | $1,914.60 | $828.20 | $2,709.95 |
| Residential Unit | K11 | 3 BED | Balcony | 58 | 1,220 | $835,300 | 0.9430% | 0.9807% | $781.05 | $32.29 | $1,943.30 | $813.34 | $2,730.36 |
| Residential Unit | K12 | 3 BED | Balcony | 58 | 1,220 | $835,300 | 0.9708% | 0.9842% | $790.87 | $32.99 | $1,981.45 | $813.85 | $2,742.32 |
| Residential Unit | L2 | 1 BED | Balcony | 620 | 782 | $506,000 | 0.5868% | 0.5011% | $472.20 | $19.70 | $1,185.85 | $491.91 | $1,658.05 |
| Residential Unit | L3 | 1 BED | Balcony | 69 | 782 | $520,000 | 0.6017% | 0.6100% | $384.62 | $23.29 | $1,150.45 | $410.91 | $2,530.75 |
| Residential Unit | L4 | 1 BED | Balcony | 69 | 782 | $535,000 | 0.6218% | 0.9013% | $734.77 | $30.58 | $1,845.23 | $765.43 | $2,580.00 |
| Residential Unit | L5 | 1 BED | Balcony | 69 | 782 | $550,000 | 0.6392% | 0.6392% | $745.79 | $31.25 | $1,880.45 | $780.04 | $2,626.25 |
| Residential Unit | L7 | 1 BED | Balcony | 69 | 782 | $565,000 | 0.6587% | 0.6587% | $762.62 | $31.83 | $1,915.87 | $521.13 | $2,678.49 |
| Residential Unit | L8 | 1 BED | Terrace | 1155 | 808 | $555,000 | 0.6728% | 0.6567% | $528.31 | $22.05 | $1,328.74 | $550.35 | $1,855.05 |
| Residential Unit | M2 | 3 BED | Balcony | 58 | 808 | $986,200 | 0.6915% | 0.4410% | $347.00 | $14.48 | $871.42 | $381.48 | $1,218.42 |
| Residential Unit | M3 | 1 BED | Balcony | 74 | 808 | $980,000 | 0.8405% | 0.8399% | $355.85 | $14.87 | $894.90 | $370.72 | $1,265.62 |
| Residential Unit | M4 | 1 BED | Balcony | 74 | 808 | $740,800 | 0.8810% | 0.4559% | $365.70 | $15.26 | $918.39 | $380.96 | $1,284.09 |
| Residential Unit | M5 | 1 BED | Balcony | 74 | 808 | $756,800 | 0.8968% | 0.9153% | $734.77 | $30.58 | $1,845.23 | $765.43 | $2,580.00 |
| Residential Unit | M6 | 1 BED | Balcony | 74 | 808 | $775,800 | 0.9013% | 0.9051% | $375.05 | $15.65 | $941.87 | $390.70 | $1,318.92 |
| Residential Unit | M7 | 1 BED | Balcony | 74 | 808 | $815,800 | 0.9081% | 0.9481% | $762.83 | $31.83 | $1,915.87 | $794.55 | $2,678.49 |
| Residential Unit | M8 | 1 BED | Balcony | 74 | 808 | $555,000 | 0.6567% | 0.6567% | $528.31 | $22.05 | $1,328.31 | $550.35 | $1,855.05 |
| Residential Unit | N2 | 1 BED | Terrace | 1166 | 808 | $346,700 | 0.7729% | 0.7728% | $528.31 | $22.05 | $1,328.74 | $550.35 | $1,855.05 |
| Residential Unit | N3 | 1 BED | Balcony | 68 | 808 | $347,000 | 0.4419% | 0.4441% | $347.00 | $14.48 | $871.42 | $381.48 | $1,218.42 |
| Residential Unit | N4 | 1 BED | Balcony | 68 | 808 | $355,100 | 0.4407% | 0.4467% | $355.35 | $14.87 | $894.31 | $370.72 | $1,251.62 |
| Residential Unit | N5 | 1 BED | Balcony | 68 | 808 | $391,100 | 0.4550% | 0.4559% | $365.70 | $15.26 | $918.39 | $380.96 | $1,284.09 |
| Residential Unit | N6 | 1 BED | Balcony | 68 | 808 | $401,100 | 0.4682% | 0.4776% | $375.05 | $15.65 | $941.87 | $390.70 | $1,316.92 |
| Residential Unit | N7 | 1 BED | Balcony | 68 | 808 | $411,100 | 0.4784% | 0.4784% | $384.40 | $16.04 | $965.35 | $400.44 | $1,349.44 |
| Residential Unit | N8 | 1 BED | Balcony | 68 | 808 | $421,100 | 0.4894% | 0.4894% | $386.75 | $16.43 | $988.83 | $390.18 | $1,382.59 |
| Residential Units Total | 132 | | | 19,463 | 120,635 | $64,005,700 | 97.5329% | 100.0000% | $78,550.20 | $3,277.76 | $197,283.52 | $81,827.96 | $275,833.73 |

**SCHEDULE A**
**PROJECTED COMMON CHARGES AND REAL ESTATE TAXES**
**FIRST YEAR OF OPERATION**
**JULY 1, 2008 TO JUNE 30, 2009**

| Unit | Type | Balcony/Terrace | Bal/Terr Sq.Ft. | Floor Area Sq.Ft. | Initial Price | Percentage Common Interest | Real/Roof/Garage Percentage Common Interest | Projected Monthly Common Charges | Projected Monthly Real Estate Taxes — With 421-a Exemption | Projected Monthly Real Estate Taxes — Without 421-a Exemption | Projected Monthly Carry Charges — With 421-a Exemption | Projected Monthly Carry Charges — Without 421-a Carry Charges | Projected Monthly Carrying Charges — Without 421-a Exemption |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Parking Space Unit | GA1 | | | | $45,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA2 | | | | $45,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA3 | | | | $45,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA4 | | | | $45,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA5 | | | | $45,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA6 | | | | $45,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA7 | | | | $45,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA8 | | | | $45,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA9 | | | | $45,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA10 | | | | $45,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA11 | | | | $45,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA12 | | | | $45,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA13 | | | | $45,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA14 | | | | $46,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA15 | | | | $46,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA16 | | | | $46,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA17 | | | | $46,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA18 | | | | $46,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA19 | | | | $46,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA20 | | | | $45,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA21 | | | | $44,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA22 | | | | $44,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA23 | | | | $45,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA24 | | | | $45,000 | 0.0523% | 4.0179% | $42.08 | $1.76 | $105.67 | $43.83 | $43.83 | $147.75 |
| Parking Space Unit | GA25 | Handicap | | | $40,000 | 0.0464% | 3.5714% | $37.41 | $1.56 | $93.93 | $38.97 | $38.97 | $131.33 |
| **Parking Space Unit Total** | | | | | **$1,120,000** | **1.3017%** | **100.0000%** | **$1,047.26** | **$43.70** | **$2,630.00** | **$1,090.97** | **$1,090.97** | **$3,677.27** |
| Roof Unit | R1 | | | 216 | $23,000 | 0.0287% | 2.5088% | $21.51 | $0.90 | $54.01 | $22.40 | $22.40 | $75.52 |
| Roof Unit | R2 | | | 216 | $22,000 | 0.0267% | 2.5088% | $21.51 | $0.90 | $54.01 | $22.40 | $22.40 | $75.52 |
| Roof Unit | R3 | | | 216 | $21,000 | 0.0261% | 2.4907% | $21.35 | $0.90 | $53.62 | $22.25 | $22.25 | $74.97 |
| Roof Unit | R4 | | | 225 | $27,000 | 0.0334% | 3.2724% | $28.05 | $1.17 | $70.45 | $29.22 | $29.22 | $98.50 |
| Roof Unit | R5 | | | 289 | $30,000 | 0.0349% | 3.2724% | $29.27 | $1.22 | $73.51 | $30.49 | $30.49 | $102.78 |
| Roof Unit | R6 | | | 218 | $42,000 | 0.0488% | 3.7797% | $32.40 | $1.35 | $81.37 | $33.75 | $33.75 | $113.77 |
| Roof Unit | R7 | | | 218 | $42,000 | 0.0488% | 3.7797% | $32.40 | $1.35 | $81.37 | $33.75 | $33.75 | $113.77 |
| Roof Unit | R8 | | | 218 | $34,650 | 0.0403% | 3.7797% | $32.40 | $1.35 | $81.37 | $33.75 | $33.75 | $113.77 |
| Roof Unit | R9 | | | 357 | $34,650 | 0.0403% | 4.8155% | $41.24 | $1.72 | $103.56 | $42.96 | $42.96 | $144.79 |
| Roof Unit | R10 | | | 331 | $43,750 | 0.0531% | 4.6387% | $39.76 | $1.66 | $99.86 | $41.42 | $41.42 | $139.62 |
| Roof Unit | R11 | | | 289 | $42,575 | 0.0494% | 4.2651% | $36.82 | $1.54 | $92.46 | $38.35 | $38.35 | $129.28 |
| Roof Unit | R12 | | | 245 | $39,375 | 0.0458% | 4.2378% | $36.33 | $1.52 | $91.32 | $37.84 | $37.84 | $127.64 |
| Roof Unit | R13 | | | 221 | $38,850 | 0.0427% | 4.0067% | $34.18 | $1.43 | $86.30 | $35.60 | $35.60 | $120.49 |
| Roof Unit | R14 | | | 185 | $33,600 | 0.0391% | 3.6651% | $31.42 | $1.31 | $79.90 | $32.73 | $32.73 | $110.32 |
| Roof Unit | R15 | | | 246 | $38,850 | 0.0452% | 4.2378% | $36.33 | $1.52 | $91.23 | $37.84 | $37.84 | $127.56 |
| Roof Unit | R16 | | | 246 | $38,850 | 0.0452% | 4.2378% | $36.33 | $1.52 | $91.23 | $37.84 | $37.84 | $127.56 |
| Roof Unit | R17 | | | 292 | $35,550 | 0.0413% | 5.7289% | $49.09 | $2.05 | $123.28 | $51.14 | $51.14 | $172.37 |
| Roof Unit | R18 | | | 230 | $42,000 | 0.0488% | 4.5814% | $39.27 | $1.64 | $98.63 | $40.91 | $40.91 | $137.90 |
| Roof Unit | R19 | | | 230 | $42,000 | 0.0488% | 4.5814% | $39.27 | $1.64 | $98.63 | $40.91 | $40.91 | $137.90 |
| Roof Unit | R20 | | | 301 | $50,400 | 0.0586% | 5.1677% | $44.17 | $1.84 | $110.55 | $46.01 | $46.01 | $154.48 |
| Roof Unit | R21 | | | 218 | $29,000 | 0.0337% | 3.1633% | $27.12 | $1.13 | $68.10 | $28.25 | $28.25 | $95.21 |
| Roof Unit | R22 | | | 218 | $29,000 | 0.0337% | 3.1633% | $27.12 | $1.13 | $68.10 | $28.25 | $28.25 | $95.21 |
| Roof Unit | R23 | | | 218 | $29,000 | 0.0337% | 3.1633% | $27.12 | $1.13 | $68.10 | $28.25 | $28.25 | $95.21 |
| Roof Unit | R24 | | | 218 | $29,000 | 0.0337% | 3.1633% | $27.12 | $1.13 | $68.10 | $28.25 | $28.25 | $95.21 |
| Roof Unit | R25 | | | 218 | $29,000 | 0.0337% | 3.1633% | $27.12 | $1.13 | $68.10 | $28.25 | $28.25 | $95.21 |
| Roof Unit | R26 | | | 218 | $29,000 | 0.0337% | 3.1633% | $27.12 | $1.13 | $68.10 | $28.25 | $28.25 | $95.21 |
| **Roof Unit Total** | | | | **6,346** | **$916,750** | **1.0655%** | **100.0000%** | **$857.21** | **$35.77** | **$2,152.73** | **$892.98** | **$892.98** | **$3,009.94** |
| **TOTAL** | **183** | | **19,163** | **126,094** | **$86,042,450** | **100.0000%** | | **$80,454.48** | **$3,357.23** | **$202,046.25** | **$83,811.91** | **$83,811.91** | **$282,500.93** |
| **RESIDENTIAL UNITS** | **132** | | | **119,748** | **$84,006,700** | **97.6329%** | | **$78,550.20** | **$3,277.76** | **$197,263.52** | **$81,827.96** | | **$275,813.73** |
| **GARAGE UNITS** | **25** | | **19,163** | **13,280** | **$1,120,000** | **1.3016%** | **100.0000%** | **$1,047.26** | **$43.70** | **$2,630.00** | **$1,090.97** | | **$3,677.27** |
| **ROOF UNITS** | **26** | | | **6,346** | **$916,750** | **1.0655%** | | **$857.21** | **$35.77** | **$2,152.73** | **$892.98** | | **$3,009.94** |
| **TOTAL / ALL UNITS** | **183** | | **19,163** | **139,452** | **$86,042,450** | **100.0000%** | | **$80,454.68** | **$3,357.23** | **$202,046.25** | **$83,811.91** | | **$282,500.93** |
| **ANNUAL / ALL UNITS** | | | | | | | | **$965,456.21** | **$40,286.72** | **$2,424,555.00** | **$1,005,742.94** | | **$3,390,011.21** |

## Notes to Schedule A

(1)     Prospective Purchasers should refer to the Floor Plans included in Part II of the Plan for an approximation of the dimensions and typical layouts of Units.  The number of rooms in each Unit was calculated based upon the standard employed by the Real Estate Board of New York, Inc. Each Unit should be inspected to determine its actual dimensions, layout and physical condition prior to Closing.

(2)     The square foot area and dimensions of the Units listed in Schedule A or in the Declaration are approximate (but do not exceed the actual floor area of the Units) and may vary and were obtained by using the method customarily used in New York City to measure condominium apartments.  No such variation will affect a Purchaser's obligations under the Purchase Agreement or the Plan unless the net square foot area of the Unit is diminished by more than 5% (excluding interior partitions) thereby giving the Purchaser a right to rescind.  Sponsor's sole obligation if the net square foot area of the Unit is so diminished shall be to refund the Deposit made under the Purchase Agreement and any interest earned thereon.

(3)     The purchase prices and other terms of sale (as more fully set forth in the Section of the Plan entitled "Changes in Prices and Units") of Units may be negotiated by Sponsor and, therefore, may be changed.  Accordingly, Purchasers may pay different purchase prices for similar Units. The effect of this, as well as the right of Sponsor to change purchase prices, is more particularly discussed in this Section of the Plan entitled "Changes in Prices and Units."  In addition to the payment of the Purchase Price, each Purchaser will be responsible for the payment of certain closing costs and expenses at the time of Closing as explained in the Section of the Plan entitled "Closing Costs and Adjustments."  If Purchaser obtains a mortgage loan, Purchaser will be responsible for the payment of additional closing costs and expenses relating to such loan.  There will be an apportionment of certain charges relating to the Unit at the time of Closing.  THESE PRICES HAVE BEEN SET BY SPONSOR AND ARE NOT SUBJECT TO REVIEW OR APPROVAL BY THE DEPARTMENT OF LAW OR ANY OTHER GOVERNMENT AGENCY.

(4)     (a)     The percentage interest of each Unit in the Common Elements is based on the approximate proportion that the fair value of the Unit on the date of Declaration bears to the then fair value of all of the Units in accordance with the provisions of subsection 339-i(1)(i) of the Condominium Act.

          (b)     The percentage interest of each Residential Unit in the Residential Common Interests is based upon the approximate proportion that the fair value of the Residential Unit on the date of the Declaration bears to the then fair value of all Residential Units in the Condominium.

          (c)     The percentage interest of each Parking Space Unit in the Parking Space Common Interests is based upon the approximate proportion that the fair value of the Parking Space Unit on the date of the Declaration bears to the then fair value of all Parking Space Units in the Condominium.

          (d)     The percentage interest of each Roof Terrace Unit in the Roof Terrace Common Interests is based upon the approximate proportion that the fair value of the Roof Terrace Unit on

the date of the Declaration bears to the then fair value of all Roof Terrace Units in the Condominium.

(5)    The estimated monthly Common Charges for each Unit are based on the Schedule B – First Year's Budget prepared by Sponsor's Condominium Budget Expert on the assumption that the first year of Condominium operation will be the year from July 1, 2008 through June 30, 2009.  The actual first year of Condominium operation may be earlier or later than such year.  In addition to these estimated payments, each Unit Owner will be responsible for real estate taxes on his Unit, mortgage payments under a loan, if any, obtained to finance the purchase of his Unit, the cost of electricity supplied to his Unit which will be separately metered and payable directly to the utility company, the cost of any insurance which he may wish to obtain for his Unit (and which Sponsor strongly urges each Unit Owner to obtain) and the cost of interior repairs and decorations to his Unit.  See the Section of the Plan entitled "Schedule B-Budget for Individual Energy Costs" concerning estimates of certain electric costs for the Units.

As discussed in the Section of the Plan entitled "Description of Property and Improvements" subsection "Services and Facilities", the full range of services described in the Plan may not be provided until a later date (but in no event later than 4 months after the First Closing).

(6)    The total real estate taxes for the entire Property during, the first full year of Condominium operation (July 1, 2008 to June 30, 2009) are expected to be approximately $40,287 which will be apportioned to all Units based upon the Units percentage of common interest percentage.  This amount is based on a projected Class II tax rate of $13.151 per $100 of assessed valuation in the 2007/2008 tax year; a projected Class II tax rate of $13.545 per $100 of the projected assessed valuation in the 2008/2009 tax year; and a projected $297,419 aggregate transitional assessed valuation of the Property for fiscal tax year 2005/2006.  The aforementioned projections were developed by Stanley Natkins, the Sponsor's Real Estate Tax Consultant.  The tax calculated on such valuation is referred to as the "Minimum Tax".  This assumes that the Property will be certified as eligible for a partial tax exemption pursuant to Section 421-a of the New York Real Property Tax Law.  Under that section, qualified multiple dwellings are granted a partial exemption from real property taxation during the course of construction as defined by Section 421-a and for a 15-year period thereafter.  The Sponsor will apply for a Preliminary Certificate of Eligibility for partial tax exemption from the New York City Department of Housing Preservation and Development.  It is expected that a permanent Certificate of Occupancy for the entire Building, will be obtained subsequent to January 5, 2008 (the taxable status date for the 2008/2009 fiscal year) but prior to January 5, 2009 (the taxable status date for the 2009/2010 fiscal year) and that the fifteen-year period will begin with the 2009/2010 fiscal year.  It is expected that only the Minimum Tax will be due with respect to the 2008/2009 fiscal year which encompasses the first full year of Condominium operation (July 1, 2008 to June 30, 2009).

Therefore, the estimated tax is based on the assumption that the partial exemption will be in effect for entire first year of Condominium operation.  This further assumes that the 2008/2009 tax year will receive Section 421-a partial tax benefits as a "construction year" under the statute, and that the 15 year exemption period will commence with the 2009/2010 tax year.  No warranty or guaranty is made as to the amount of any tax exemption that will actually be received.  In addition, no warranty or guarantee is made that the actual assessed valuation of the assessed valuation for the Property if Section 421-a benefits are granted will be as projected above, that the projected tax rate will be in effect for all or any portion of the Property during the first year of Condominium

operation or the method by which real estate taxes will be allocated among Units. In no event will Sponsor, Sponsor's counsel, Sponsor's Real Estate Tax Consultant, Selling Agent or any offer hereunder be liable to any Purchaser, nor will any Purchaser have the right to rescind his Purchase Agreement, in the event Section 421-a benefits are not granted, in the event the amount of such exemption and the resulting taxes differ from those projected.

If for any reason the aforesaid tax exemption under Section 421-a is not granted, it is estimated that the real estate taxes payable with respect to all Residential Units for the first year of Condominium operation will total approximately $2,367,162. This aggregate total assumes (a) an assessed valuation for the Property of $297,419 for the 2005/2006 tax year; (b) a projected aggregate assessed valuation for the Building of approximately $17,900,000 for the 2008/2009 tax year and (c) projected tax rate for the Residential Units of $13.545 per $100 of assessed valuation for the 2008/2009 tax year.

In the event that closings take place prior to the apportionment of the tax lots, the taxes shall be apportioned based upon the unit's proportionate share of the common charges. At such time as the tax lots are apportioned, each Unit will be taxed as a separate tax lot for real estate tax purposes and the individual Unit Owner will not be responsible for the payment of, nor will the Unit be subject to, any lien arising from the non-payment of taxes on other Units (See the "Attorney's Income Tax Opinion" set forth in Part II of the Plan for further details concerning the deductibility of real estate taxes for purposes).

In arriving at the assessed valuation for each Unit in the Condominium, the Building is first assessed in its entirety. This overall assessment is then apportioned among the respective Units, each of which will be assigned a tax lot designation upon the recording of the Condominium Documents at the Office of the City Register. The apportionment of the Common Interest of each Unit was determined in part upon the proportion the projected selling price presented in the Plan that each Unit bears to the gross sellout for all Units available for purchase and in part upon extrinsic indicia of value, including location, square footage and amenities.

(7)     These figures represent the aggregate estimated monthly carrying charges which include estimated Common Charges and estimated real estate taxes. Reference should be made to note (5) of these Notes for certain other "home ownership" costs that may be incurred by Unit Owners.

(8)     A Purchaser of a Unit will be required to make a contribution at the Closing of Title to his Unit to the Working Capital fund of the Building. The contribution shall be in an amount equal to two (2) month's Common Charges in effect at the time of the Closing of such Unit. (See the Section of the Plan entitled "Working Capital Fund and Apportionments" for further details).

**SCHEDULE B**

**PROJECTED BUDGET**

**One Hunter's Point**
**QUEENS, NEW YORK**

ESTIMATED SCHEDULE OF RECEIPTS AND EXPENSES
FOR FIRST FULL YEAR OF OPERATION

(BEGINNING July 1st, 2008)

| RECEIPTS | | | Receipts | |
|---|---|---|---|---|
| COMMON CHARGES - RESIDENTIAL | (Note 1) | $ | 966,289 | |
| **TOTAL RECEIPTS** | | **$** | **966,289** | |

| EXPENSES | | | Total | |
|---|---|---|---|---|
| WAGES & BENEFITS | (Note 2) | $ | 292,144 | |
| GAS | (Note 3) | $ | 198,096 | * |
| ELECTRICITY | (Note 4) | $ | 45,316 | * |
| WATER & SEWER | (Note 5) | $ | 106,621 | * |
| SERVICE CONTRACTS | (Note 6) | $ | 26,000 | |
| REPAIRS, MAINTENANCE & SUPPLIES | (Note 7) | $ | 40,000 | |
| INSURANCE | (Note 8) | $ | 69,883 | * |
| MANAGEMENT FEE | (Note 9) | $ | 75,000 | |
| LEGAL & ACCOUNTING | (Note 10) | $ | 14,500 | |
| RESIDENT MANAGER'S UNIT | (Note 11) | $ | 60,585 | |
| ADMINISTRATIVE | (Note 11) | $ | 10,000 | |
| CONTINGENCY | (Note 12) | $ | 28,144 | |
| **TOTAL OPERATING EXPENSES** | | **$** | **966,289** | |

*An additional 10% has been added to the Gas, Electricity, Water/Sewer, and Insurance
figures to represent reasonably anticipated increases.*

## FOOTNOTES FOR SCHEDULE B

| | **Total** |
|---|---|
| **(1) Common Charges** | **$966,289** |

**(2) Wages & Benefits**                                    **$292,144**

The figure shown includes wages, workers' compensation and disability insurance, payroll taxes and payroll processing. It does not include any pay for sick days, holidays or vacation time. The building staff shall consist of one (1) full-time superintendent, earning $50,000 per year; one (1) handyman at an annual salary of $35,000 and one (1) porter at an annual salary of $35,000. Concierge coverage will provide 24-hour service 7 days a week with three (3) full-time concierge and two (2) part-time concierge, earning $16.00/hour. These wages are non union and conform to minimum wage laws.

**Wage and Payroll Tax Details:**

| | | |
|---|---|---:|
| Superintendent | $ | 50,000 |
| Concierge (5) | $ | 145,152 |
| Porter | $ | 25,000 |
| Handyman | $ | 35,000 |
| **GROSS ANNUAL WAGES** | **$** | **255,152** |
| FICA | $ | 19,519 |
| FUTA | $ | 448 |
| SUI | $ | 2,788 |
| Disability | $ | 320 |
| Worker's Compensation | $ | 13,917 |
| *TOTAL WAGES & BENEFITS* | *$* | *292,144* |

### (3) Gas for Domestic Hot Water, Heating, and Cooking          $198,096*

The total projected annual cost for domestic hot water, heating and cooking will be approximately $180,087 during the first year of operation. The estimated cost for gas heating, hot water and cooking was provided by DiBari Engineering P.C., 99 Main Street, Dobbs Ferry, NY 10522.

The building has been designed with a central domestic hot water system and a de-centralized, unitary gas-fired heating system. The gas for space heat is connected to a separate utility company meter. Domestic hot water cost is for the entire building. The fuel adjustment charge is not included as it varies greatly every month and is not published by the utility company.

**Heating Cost**
Cost of Gas: $1.50 per Therm average to include taxes, adjustments but no inflation factor Calculations representative of a "typical" building with all systems operating properly and as described by the ASHRAE guide. Operating hours and demand times selected based on similar facilities' utility bills.

*TOTAL ESTIMATED ANNUAL GAS USAGE*

| | | |
|---|---|---:|
| Domestic Hot Water: | 56,449 Therms/year = | $84,674/yr |
| Space Heat: | 51,655 Therms/year = | 77,483/yr |
| Cooking: | 996.11 Therms/month based on | |
| | average use of 25 cu. ft/day = | 17,930/yr |
| **Total Estimated Annual Fuel Usage for Common Areas:** | | **$ 180,087/yr** |

\* Estimate includes an additional 10% to represent reasonably anticipated increases.

**(4)** <u>Electricity</u>                                                                    **$45,316***

Includes common area electric but does not include the cost of electric to individual Residential Units. Individual tenant electrical meters and a house meter are provided.  All directly metered Unit owners will be responsible to pay the electric bills for their individual units.

**   *Estimated Electrical Cost for Common Areas***
    Cost of Electricity: $0.185 per KWH.
    Costs include taxes, and adjustments but no inflation factors or demand charges.
    Assume 1 watt per square foot for 60 hours per week.
    Cost also includes common exhaust fans, pumps, elevators and the like.
    **For public interior and exterior lighting, elevator, fans, pumps, etc.**
    **346,808 KWH/year = $41,196/year**

The estimated cost for electricity was provided by the engineer, DiBari Engineering P.C., 99 Main Street, Dobbs Ferry, NY 10522.

* Estimate includes an additional 10% to represent reasonably anticipated increases.

**(5)** <u>Water & Sewer</u>                                                              **$106,621***

Each person will use approximately 150 gallons of water per day.  Calculations are based on metered method.  Costs include taxes and adjustments but no inflation factors.  There will be one water meter and charges will be paid collectively by the Condominium.  Estimates may vary from actual usage due to variables involved, such as user's habits, etc.  The cost may also be different due to rate changes.

**   *Building Water Consumption***
    Estimated annual water consumption & cost:
       24,601 ccf/year = $96,927.84/year

The estimated costs for water and sewer usage were provided by the engineer, DiBari Engineering P.C., 99 Main Street, Dobbs Ferry, NY 10522.

* Estimate includes an additional 10% to represent reasonably anticipated increases.

**(6) Service Contracts**                                                          **$26,000**

- No service contracts currently exist between the Condominium and any service provider.
- This figure is intended to cover annual service contracts for monitoring, services, repair and maintenance of the following systems in the Condominium:
  - Alarm                          $10,000
  - Exterminating                  $ 5,000
  - Elevator                       $11,000

- Estimate on the service contract above were provided by the following sources:

  - Fire alarm monitoring estimate provided by AFA Protective Systems Inc., 155 Michael Drive, Syosset, NY 11791.

  - Exterminating estimate provided by Assured Environments, 360 Lexington Avenue, New York, NY 10017.

  - Elevator maintenance estimate provided by Pro Elevator Services, Inc., 171 West Street, Suite 311, Brooklyn, New York, NY 11222.

- As part of the installation of the HVAC, boiler, elevator and compactor, the sponsor will be responsible for obtaining and paying for the service contracts for the first year of operation. After the first year, the condominium will be paying for the service contracts for the above.

- As part of the installation of the intercom, sprinklers, and fire alarm, the sponsor will be responsible for obtaining and paying for the maintenance service contracts for the first year of operation. After the first year, the condominium will be paying for the service contracts for the above. The contracts for the installation of the HVAC, Boiler, Sprinker, compactor, intercom, fire alarms and elevator include servicing for the first year.


**(7) Repairs, Maintenance & Supplies**                                            **$40,000**

- Includes normal repairs, maintenance and supplies with respect to Common Areas of the Building including lighting, public walkways and stairways, maintenance and painting of entrances, roof and building structure, and all building supplies. No amount is included for items covered by construction warranties or for the cost of any major capital expenditure in the Building. The budgeted number does not include repairs, painting, maintenance or supplies (including appliances) for individual Units, which are the responsibility of the individual Residential Unit owner.

- During the first year of operation, major repairs are not expected to be necessary, as the Condominium will have been substantially reconstructed.

- This figure was derived by comparable condominiums in this size in New York City.

## (8) **Insurance***                                                    **$69,883***

The budget number is projected on the basis of a preliminary quotation of insurance costs provided by Fillmore Agency Inc., 3128 Avenue U., Brooklyn, NY. 11229.

*Coverages*

| | | |
|---|---|---|
| Building | | $33,500,000 |
| Replacement Cost | | Included |
| Common Charge | $ | 4,000,000 |
| Co-Insurance | | Agreed Amount |
| Deductible | | $5,000 |

Building limit based on a 12 story, fire resistive, sprinklered building with 132 residential condo units.

| | |
|---|---|
| Flood & Quake | $500,000 - $5,000 deductable |
| Demolition & Increase Cost of | |
| Renovation | $500,000 |

**LIABILITY:**

| | |
|---|---|
| General Aggregate | $2,000,000 |
| Each Occurrence | $1,000,000 |
| Personal & Adverising Injury | $1,000,000 |
| Hired & Non-Owned Autos | $1,000,000 |
| Medical Payments | $5,000 |
| Fire Damage Legal Liability | $50,000 |
| | |
| Directors and Officers | $1,000,000 |
| Deductible | $2,500 |
| Employee Dishonesty (Fidelity) | $1,000,000 |
| Deductible | $1,000 |
| | |
| Umbrella | $50,000,000 |
| Boiler & Machinery | Building Limit |
| Business Income | Included |
| | |
| NY State Disability | Not Included |
| Workers Compensation | Based on payroll & Number of |
| | Employees Not Included |

| | |
|---|---|
| **The Annual Estimated Premiums Would Be:** | **$ 69,883.00** |

Note: Premium and coverages can change due to market conditions. The above quotes are based upon premium charged in August 2007.

Note: This proposal is for Illustration Purpose Only. There is NO COVERAGE BOUND AT THIS TIME. Coverages are subject to the terms and conditions as set forth by the Insurance Company.

By carrying $33,500,000 (this would be a replacement cost of $250., per square foot), the hazard insurance company will include a provision known as an "Agreed Amount & Replacement Cost" endorsement, whereby the carrier agrees to reimburse the insured for property losses up to the full amount of the policy regardless of the actual replacement value of the Building. This clause has the effect of "waiving" any co-insurance penalty that the insurer might otherwise invoke. This clause does not mean that the Condo Association would receive sufficient proceeds to actually rebuild the entire building in the event of a substantial loss or total destruction of the Building. The Condo Association should periodically review the amount of insurance for the building to insure that the amount of coverage carried is sufficient.

The above insurance will meet the requirements of any mortgage lender procured by Sponsor including Sponsor's construction lender. The fire, casualty and general liability insurance will be on terms which provide that each Unit Owner is an Additional Insured; that there will be no cancellation without notice to the Board of Managers; a waiver of subrogation; a waiver of invalidity because of the acts of the Insured and Unit Owners; a waiver of pro-rate reduction if Unit Owners obtain additional coverage.

Each individual Unit Owner should consider the desirability of obtaining additional insurance at his own cost for the following coverage, which is not included in the above Letter of Adequacy:

1. Fire or casualty losses to the contents of his Unit including replacements, additions, upgraded fixtures and improvements therein; and

2. Liability for personal injury or property damage as a result of occurrences in Unit, including water damage legal liability to cover damage arising from leaks or other conditions within the limit.

* Estimate includes an additional 10% to represent reasonably anticipated increases.

The following items are not included in the budget and are not applicable to the offering:

1. Rent insurance, inasmuch as all the Units will be owned; and

2. Garage keeper's liability insurance, inasmuch as the Parking Space Units will be owned by Unit Owners or the Sponsor and will not be sold separately from Units.


Sponsor will not be leasing any Parking Space Units to third parties.

**(9)** **Management Fee**                                           **$75,000**

    The Condominium will be managed by Taube Management Corp. who is independent of the
Sponsor, having principal offices at 204 East 83rd Street, New York, NY 10028. The period of
the initial management agreement shall be $75,000 per annum. This management fee reflects the
prevailing cost for similar services. It is based on the size of the building, number of Residential
Units, and the level of service to be provided.

**(10)** **Legal & Accounting**                                      **$14,500**

    All Condominium Unit Owners are entitled to receive annually from the Condominium at the
Condominium's expense an annual audited statement prepared by an independent certified public
accountant. Estimates have been obtained with respect to professional fees as follows:

- The amount set aside for Accounting services is $7,500 based on a proposal received
from Czarnowski and Beer, 554 Fifth Avenue, New York, NY 10036.
- An amount of $7,000 will also be set aside, both to engage counsel on retainer and to
cover miscellaneous legal matters which may arise during the first year of operation.

**(11)** **Resident Manager's Unit**                                 **$60,585**

    Residential Unit 1A shall be designated as the Resident Manager's Unit and will be occupied by
the Resident Manager of the Building. At or subsequent to the First Closing, Resident Unit 1A
will be purchased by the Condominium Board on behalf of all Residential Unit Owners and the
Condominium Board will be responsible for the payment of all closing costs, including mortgage
recording taxes, transfer taxes and insurance due in connection with the purchase of this Unit.
The purchase price will be $520,000. All Common Charges, attributable to the Resident
Manager's Unit and other charges including utilities, cost of repairs, alterations, and improvement
and the payments of fees, interest, principal and other costs of financing the purchase of the
Resident Manager's Unit shall be borne by all Residential Unit Owners (except the Condominium
Board as the owner of the Resident Managers' Unit) as a Common Expense. At the closing of
title to Residential Unit 1A, the Condominium Board, on behalf of all Residential Unit Owners
will pay the purchase price by executing and delivering one or more purchase money notes with
principal amounts in the aggregate equal to the purchase price for the Resident Manager's Unit,
each secured by a mortgage on the Unit. The purchase money notes will be for a term of twenty
(20 years from the First Closing with an interest rate of 9.25% per annum payable monthly in the
sum of $4,286.26 monthly ($51,435.12 annually). No assurances or representations are made that
the terms and the rates in effect at the time the Resident Manager's Unit is purchased by the
Condominium Board and the loan is obtained will be the same as estimated in this First Year's
budget. In the event, the closing of the purchase of the Resident Manager's Unit is delayed for
any reason beyond the date of the First Closing, the Condominium Board will be obligated to pay
market rent to the Sponsor for the use and occupancy by the Resident Manager of the designated
Resident Manager's Unit.

    In addition to the debt service for the Resident Manager's unit, the Condominium Board will be
responsible for periodic payment of the real estate taxes on the unit and the common charges that
would otherwise be payable if the Unit were individually owned. The estimated real estate taxes
for the First Year of operation of the Condominium for Unit 1A will be $243.84. Common
charges will be $6,306.00. The Condominium will also be responsible for the cost of the
electricity service for the Resident Manager's Unit. It is estimated that the cost of electrical
service will be approximately $2,600.00 in the first year of Condominium operation. The
estimated costs for the Resident Manager's Unit for the Condominium's first year of operation
are $60,585.00. The costs for the Resident Manager's Unit have been allocated solely to the
Residential Unit Owners.

**(12) Administrative Expenses**                                   **$10,000**

   Administrative costs cover photocopying, faxing and postage, fees, permits and filings as well as messenger services as required.  Bank fees and charges are also included.

**(13) Contingency**                                               **$28,144**

   The Contingency provides a fund for possible expenses not included in the projected budget, or possible increases in one or more categories of operating expense beyond the projected amounts.  There can be no assurance that such fund will be sufficient to pay for major capital repairs or replacement items which may be needed within the first five years of the Condominium's operation.  If additional funds are required over and above these funds, it may be necessary to increase Common Charges or separately assess all unit owners.

   IF THE ACTUAL OR ANTICIPATED DATE OF COMMENCEMENT OF THE FIRST YEAR OF CONDOMINIUM OPERATION IS TO BE DELAYED MORE THAN 6 MONTHS FROM July 1st, 2008, THE PLAN WILL BE AMENDED TO INCLUDE A REVISED BUDGET DISCLOSING CURRENT PROJECTIONS.  IF SUCH AMENDED PROJECTIONS EXCEED THE ORIGINAL PROJECTIONS BY 25% OR MORE, THE SPONSOR WILL OFFER ALL PURCHASERS THE RIGHT TO RESCIND AND A REASONABLE PERIOD OF TIME THAT IS NOT LESS THAN 15 DAYS AFTER THE DATE OF PRESENTATIO TO EXERCISE THE RIGHT.  WHETHER OR NOT SPONSOR OFFERS TO GUARANTEE THE PREVIOUS BUDGET PROJECTION, SPONSOR WILL RETURN ANY DOWN PAYMENT OR DEPOSIT PROMPTLY TO SUBSCRIBERS WHO RESCIND.


**IN THE OPINION OF TAUBE MANAGEMENT CORP. (SET FORTH IN THE SECTION TITLED "CERTIFICATION OF SPONSOR'S EXPERT CONCERNING ADEQUACY OF THE BUDGET" IN PART II OF THIS OFFERING PLAN), THE PROJECTED RECEIPTS APPEAR REASONABLE AND ADEQUATE BASED ON PRESENT PRICES (ADJUSTED TO REFLECT CONTINUED INFLATION AND PRESENT LEVELS OF CONSUMPTION FOR COMPARABLE UNITS SIMILARLY SITUATED) TO MEET THE ESTIMATED EXPENSES FOR THE FIRST YEAR OF OPERATION.  THE FOREGOING BUDGET, HOWEVER, IS NOT INTENDED AND SHOULD NOT BE TAKEN AS A GUARANTEE OR WARRANTY BY ANYONE THAT THE ANNUAL COMMON CHARGES OR OTHER RECEIPTS OR EXPENSES FOR THE FIRST OR ANY SUBSEQUENT YEAR OF OPERATION OF THE PROPERTY BY THE CONDOMINIUM WILL BE SET FORTH IN SAID PROJECTED BUDGET. IT IS LIKELY THAT THE ACTUAL EXPENSES FOR THE FIRST YEAR OF OPERATION WILL VARY FROM THE AMOUNTS SHOWN IN THE PROJECTED BUDGET.**

**NOTE:** The projections set forth in this budget assume that first year of condominium ownership will begin on or about July1st 2008, with no representation, however, of any Closing Date being made in the Plan.  Sponsor will have no liability to any Purchaser, nor will a Purchaser be entitled to any credit, offset or reduction in the Purchase Price for his or her Unit or otherwise be relieved from any obligations under the Purchase Agreement, in the event that the First Unit Closing occurs earlier or later than the targeted date or the time to complete or to close title to such Purchaser's Unit is accelerated, delayed or postponed by Sponsor; provided, however, that in the event the actual or anticipated commencement date of the projected first year of condominium operation is delayed by six months or more, Sponsor will amend the Plan to include a revised First Year Budget if such amended budget exceeds the projected First Year Budget set forth herein by twenty-five percent (25%) or more, in which event Sponsor will offer

all Purchasers (other than Purchasers who are then in default beyond any applicable grace period under their Purchase Agreements, if the Plan has been declared effective) the right to rescind their Purchase Agreements within not less than fifteen (15) days after the Presentation Date of the amendment containing such revised budget, and any Purchasers electing rescission pursuant to such offer will have their Deposits and any interest accrued thereon returned. Purchasers' rights as described in the preceding sentence are in lieu of any other rights or remedies which may be available pursuant to any Applicable Laws, all of which shall be deemed to have been waived by all Purchasers.

## SCHEDULE B-1

### One Hunter's Point
### QUEENS, NEW YORK
PROJECTED ELECTRICAL COSTS
FOR Residential Units

Estimated Electrical Consumption per Residential Unit
(Individually Sub-Metered)

The following is an estimate of annual energy costs for the typical appliances located in each
Residential Unit provided by DiBari Engineering P.C., 99 Main Street, Dobbs Ferry, NY 10522.

The projected rates are not guaranteed and it must be expected that these rates will increase with the
passage of time and may be affected by many factors which are beyond the control of the Sponsor.
Purchasers are advised that the projections are only estimates and actual consumption will be metered
and will vary based on the personal needs of Residential Unit Owners and weather conditions.

Dwelling unit electrical usage is estimated based on the following assumptions:  Assume 1 watt per square
foot for 60 hours per week, average cost from utility assumed to be $0.185 per KWH.  Apartments up to 750
sq. ft., the minimum load is 750 watts, equaling 2340 KWH/yr or $432.90.  Apartments up to 1000 sq. ft.,
the minimum load is 1000 watts, equaling 3120 KWH/yr or $577.20.  Apartments up to 1,250 sq. ft., the
minimum load is 1250 watts, equaling 3900 KWH/yr or $721.50.

| Dwelling Unit Type | Total KW hrs/Yr | Estimated Annual Electric Cost |
|---|---|---|
| 2A-8A | 14,309 | $2,647 |
| 2-8B, 2-8D, 2-8E, 2-8F, 2-8G, 9C, 9D, 9E, 9J, 10-12C, 10-12D, 10-12E, 10-12G | 13,109 | $2,425 |
| 2-8C, 2-8H, 2-8J, 2-8K, 2-8L, 2-8N, 9H, 9B, 10-12B, 10-12F, 10-12H | 10,589 | $1,959 |
| 2-8M | 7,580 | $1,402 |
| 9A, 10-12A | 8,540 | $1,580 |
| 9G, 9K, 10-12J | 13,349 | $2,490 |
| 10-12K | 18,543 | $3,430 |

## FOOTNOTES TO SCHEDULE B-1

These projections are based upon estimates of DiBari Engineering P.C., 99 Main Street, Dobbs Ferry, NY 10522 as of July 24, 2006.

The building located at One Hunter's Point, Queens, New York, shall be a multi-family dwelling. There will be a total of one hundred thirty-two (32) residential condominium units. Each floor will have _____ except for _____. There is a lobby space on the first floor.

Total gross area of the building is _____ SF (includes Cellar space _____ SF)
Total Common Spaces = _____ SF (includes Cellar space _____ SF)
Total Residential Areas = _____ SF (includes Cellar space _____ SF)

Each Residential Unit Owner will be responsible for the cost of electricity supplied to his Unit, which will be separately metered and will be payable directly to the utility company.

Actual costs may vary depending upon the hours of use, thermostat setting and proper maintenance. The cost figures are estimates and are not intended as guarantees.

In view of the facts that these estimates include the use of energy by persons of varying needs with different standards of comfort, or with families of different sizes, the amount of energy used by a purchaser may vary substantially from the estimates herein provided. In addition the effect of inflation, fuel adjustment charges and other factors may raise the costs of electrical and gas substantially higher than the current or project rated.

Although the sponsor is under the obligation to provide accurate information to prospective purchasers, factors beyond its control may substantially affect the cost of heating and cooling after the purchase of a unit or in subsequent years. The sponsor represents, however, that it will follow the plans and specifications provided by the manufacturer of appliances together with the recommendations of the experts to enable these items of equipment to operation at optimum efficiency at the lower cost.

NO REPRESENTATION OF ANY KIND IS MADE BY THE ENGINEER OR THE SPONSOR OR ANY OTHER PERSON OR ENTITY AS TO WHAT ELECTRICAL CONSUMPTION OR COST MAY ACTUALLY BE.

# BROWN HARRIS STEVENS

Established 1873

### OPINION OF LICENSED REAL ESTATE APPRAISER
### RE: COMPLIANCE WITH REAL PROPERTY LAW SECTION 339-i

New York State Department of Law
120 Broadway, 23rd Floor
New York, New York  10271
Attention:  Real Estate Financing Bureau

**Re:**   **Condominium Offering Plan (the "Plan")**
          **5-49 Borden Avenue, New York, New York (the "Condominium")**

August 1, 2007

Ladies and Gentlemen:

The Sponsor has requested our opinion on whether the method used to determine the undivided percentage interest of each Unit in the Common Elements in the above referenced Condominium complies with Real Property Law Section 339-i (**"Section 339-i"**).

We are a licensed real estate appraiser whose principals have been engaged in the real estate brokerage business for approximately 70 years.  We have also been engaged in the operation and management of residential buildings in the greater New York area for approximately 70 years. We presently manage in excess of 142 buildings encompassing ± 7,500 units.

In connection with this opinion, we have reviewed Schedule A of the Plan, the proposed Declaration of Condominium (the "Declaration") included in the Plan and the Floor Plans and have assumed the statements and information contained therein are correct and accurate.  We have not reviewed or verified the calculations of floor areas used in determining the sizes of Units or the Limited Common Elements.

Article 8 of the Declaration states that the percentage of Common Interest allocated to each Unit is based upon the approximate proportion that the fair value of the Unit at the date of the Declaration bears to the then aggregate value of all Units.

48

# BROWN HARRIS STEVENS

Established 1873

Section 339-i requires that the Common Interest of each Unit be based on any one of several methods of calculation. One of these allowable methods is the method stated in Article 8 of the Declaration (Section 339-i1. (i)).

We have evaluated the allocation of Common Interest among the Units made by the Sponsor based on the foregoing factors and it is our opinion that the allocation of Common Interest is consistent with Section 339-i.

We are not owned or controlled by the Sponsor. We consent to the incorporation of this opinion in the Plan and to the references to our name in the Plan in connection with this opinion.

Respectfully submitted,


BROWN HARRIS STEVENS
APPRAISAL & CONSULTING, LLC


By: _____
Sharon Locatell, MAI
Executive Director


Sworn to before me this
_____ day of August, 2007


_____
Notary Public


ROBERT DEUTSCH
Notary Public, State of New York
No. 31-4842387
Qualified in New York County
Commission Expires 11/30/____

ROBERT DEUTSCH
Notary Public, State of New York
No. 31-4842387
Qualified in New York County
Commission Expires 11/30/2009

## CHANGES IN PRICES AND UNITS

Purchase prices for the Units offered hereby are negotiable and Sponsor reserves the right, at any time and from time to time before and after the recording of the Declaration, without giving prior notice (except as otherwise provided herein) and without the consent of the Condominium Board or any Unit Owner or mortgagee, to change the price, including, without limitation, the manner of payment thereof and other terms of sale of any Unit, except that no such change with respect to any Unit for which a Purchase Agreement is then in effect may be made without the consent of the Purchaser. If the Purchaser refuses to consent, Purchaser shall have the right to cancel the Purchase Agreement within fifteen (15) days after Sponsor gives notice to Purchaser of such change, in which case Sponsor shall cause the Deposit, together with any interest earned thereon, to be returned to Purchaser, within thirty (30) days after receipt of Purchaser's termination notice. No increase in price or decrease in price affecting one or more lines of units, nor increase in price for an individual purchaser, will be made other than pursuant to a duly filed amendment to the Plan filed in advance of any such change, except that Sponsor reserves the right to decrease purchase prices or modify other terms of sale without filing an amendment to the Plan at any time during the offering period if such a decrease in the purchase price or modification of such other terms of sale does not constitute a general offering or an advertised price but is rather the result of an individually negotiated transaction. If any such change is made, a Purchaser of a Unit affected thereby may pay more or less than other Purchasers under the Plan for similar Units, but this will not affect any prior or subsequent sale of Units which are not the subject of such change.

Sponsor reserves the right to negotiate with each Purchaser, without amendment to the Plan, the following terms and conditions of the Purchase Agreement: purchase price; upgrades to the fixtures or equipment contained in a Unit or credits or allowances therefore; the amount of the Deposit; the availability of financing; the payment of Purchaser's financing fees and other closing costs; the availability of Common Charge rebates, purchase price rebates and subsidies payable as a credit against the purchase price or on a periodic basis and extensions of time periods within which to perform obligations under the Purchase Agreement.

Sponsor reserves the right from time to time to add and/or delete negotiable terms from the list set forth above for all or some Purchasers by a duly filed amendment to the Plan. No Purchaser will benefit from any terms and conditions negotiated with any other Purchaser, and a Purchaser's failure to so benefit will not give rise to any right of rescission under a Purchase Agreement.

The location in the Building, size and layout of the Units are shown on the Floor Plans set forth in Part II of the Plan. In order to meet the possible varying demand for number and type of Units, or to meet particular requirements of prospective purchasers, or for any other reason, Sponsor reserves the right (except to the extent prohibited by Law) at any time and from time to time, before and after the recording of the Declaration, without giving prior notice and without the consent of the Condominium Board, any Unit Owner or mortgagee, to (a) change the size, layout and square footage of, or number of rooms in, any Unsold Unit, (b) change the size and/or number of Unsold Units by dividing one or more such Units into two or more separate Unsold

Units, combining separate Unsold Units (including those resulting from such subdivision or otherwise) into one or more Unsold Units, altering any boundary walls between one or more Unsold Units, or otherwise, including incorporating Common Elements (such as a portion of a hallway) which exclusively benefit an Unsold Unit into such Unsold Unit, and (c) if appropriate, reapportion among the Unsold Units affected by any such change, their aggregate Common Interests. In the event of any change pursuant to either (b) or (c) above, such change shall be disclosed in a duly filed amendment to the Plan.  No such change, including any change in the Common Interest or in the amount or quality of Common Elements directly affecting or servicing a Unit, will be made with respect to such Unsold Unit for which a Purchase Agreement is then in effect and the Purchaser thereunder is not in default which materially changes the net square foot area (excluding interior partitions), Common Interest or the layout of such Unsold Unit, unless the Purchaser consents to such changes. Provided Purchaser's consent is not required, a Purchaser will not be excused from purchasing his Unit and will not have any claim against Sponsor as a result of any such change and no such change will affect a Purchaser's obligations under the Purchase Agreement or the Plan. If Purchaser's consent is required as a result of such change and Purchaser refuses to consent, then in such event, Sponsor's sole obligation shall be to refund to Purchaser the Deposit made under the Purchase Agreement and any interest earned thereon.

Sponsor will have no liability to any Purchaser, nor will any Purchaser be entitled to a credit, offset or reduction in the purchase price for his Unit or otherwise be relieved from any obligations under the Purchase Agreement, by virtue of a minor inaccuracy or error in the Floor Plans.

Once the Declaration is recorded, no change may be made in the number of Units or number of rooms within a Unit, nor may the size of any Unit be changed by subdivision or combination or alteration of boundary walls as aforesaid or otherwise, nor may the Common Interest of any Unit be changed, unless, in each such event, the Declaration and Floor Plans and the Plan are amended with the consent of each Unit Owner whose Unit is directly affected by such change. In the case of a material and adverse change in the size or quality of the Common Elements, no such change shall be made without the consent of every Unit Owner.  Sponsor will have the right to amend or to cause the Condominium Board to amend the Declaration to reflect any such material and adverse change and to file such amendment and any necessary plans and specifications in connection therewith.

## PROCEDURE TO PURCHASE

A prospective Purchaser desiring to purchase a Unit will be required to execute a Purchase Agreement, which will be in the form set forth in Part II of the Plan.

Prospective Purchasers shall be afforded not less than three (3) business days to review the Plan and all amendments thereto prior to executing a Purchase Agreement. A prospective Purchaser may obtain the Plan upon payment of a One Hundred ($100.00) Dollar deposit, which amount will be fully refunded upon either (i) the prompt return of the Plan in good condition or (ii) the execution by the prospective Purchaser of a Purchase Agreement subsequently accepted by Sponsor.  If a Purchaser has not received and read the Plan at least three (3) business days prior to executing a Purchase Agreement, a Purchaser shall have the right to rescind the Purchase Agreement within 7 days from the date Purchaser delivers an executed Purchase Agreement together with the required Deposit to the Selling Agent.  If Purchaser elects to rescind the Purchase Agreement within such seven (7) day period, Purchaser must either personally deliver a written notice of rescission to the Sponsor or Selling Agent within the seven (7) day period or mail the notice of rescission to the Sponsor or Selling Agent and have the mailing postage marked within the seven (7) day period. The Purchase Agreement sets forth in detail the terms of sale with respect to each Unit and should be read carefully by each prospective Purchaser. Prospective Purchasers should be aware that if any conflict exists between the Plan and the Purchase Agreement, the provisions of the Plan shall in all events control.

Sponsor reserves the right, without amendment to the Plan, to negotiate the price of a Unit, aspects of the transaction related to price, any other terms of the Plan or Purchase Agreement, any obligation of a Purchaser and every other aspect of the transaction. Notwithstanding the foregoing, Sponsor may not negotiate a price for a Unit higher than the price for that Unit contained in the Plan or in an amendment to the Plan, it being understood that prices may be increased only by amendment to the Plan and not by negotiation.  Disclosure of the fact that modification of a Purchase Agreement or the price of a Unit may be requested by a Purchaser or various aspects of the sale may be the subject of negotiation does not mean that any of them, or any other particular item, except as is otherwise specifically disclosed, is actually being offered to any particular Purchaser, whether or not it makes such allowances to any other Purchaser or Purchasers. The negotiation of such terms shall be on a case-by-case basis in Sponsor's sole discretion and without amendment to the Plan. In accordance with the foregoing, it should be understood that there is no obligation for any particular item to be negotiated or granted to any particular Purchaser, and that a Purchaser purchasing similar interests may pay different amounts or receive different terms with respect to the transaction. Although a Purchaser may obtain financing from a lending institution or any other source, Purchaser's obligation to purchase a Unit pursuant to the Purchase Agreement shall not be contingent on Purchaser obtaining financing for such purchase.

Purchase Agreements will not be binding on Sponsor until approved and executed by it, and delivered by Sponsor to the prospective Purchaser. Sponsor will have thirty (30) days after delivery by Purchaser of an executed Purchase Agreement and the Deposit required thereby, within which to accept or reject such Purchase Agreement. Sponsor reserves the right to request

thorough identification and financial information (including credit reports) concerning any prospective Purchaser, subject to any limitations and requirements imposed by Law.

If a Purchase Agreement is not accepted by Sponsor within the aforesaid thirty (30) day period, the Purchase Agreement shall be deemed to have been rejected and cancelled and the Deposit shall be returned to Purchaser within thirty (30) days thereafter. Sponsor hereby reserves the right at any time and from time to time for any reason whatsoever, to refuse to approve and execute (a) a Purchase Agreement for any Unit, except as prohibited by Law, and (b) a Purchase Agreement(s) for more than one (1) Unit to any one (1) person or entity.

The Purchase Agreement shall not contain, and shall in no event be modified to contain, a provision waiving the Purchaser's rights or abrogating Sponsor's obligations under the Plan or under Article 23-A of the General Business Law of the State of New York.

At the time of execution of a Purchase Agreement, a Purchaser will be required to make an initial Deposit in an amount equal to Ten (10%) percent of the purchase price by an official bank check or unendorsed certified check drawn on or issued by a United States bank, savings and loan association or trust company which is a member of the Federal Reserve System. All Deposits must be made payable to the direct order of "RUSKIN MOSCOU FALTISCHEK, P.C., ESCROW AGENT". All checks delivered in payment of the Deposit shall be accepted by Sponsor subject to collection, and if any such check is returned for insufficient funds or any other reason, Sponsor shall have the right, among other things, to deem such Purchase Agreement to be cancelled and of no further force or effect.

All Deposits made pursuant to a Purchase Agreement are subject to the requirements of Section 71a(3) of the State of New York Lien Law and 352-e(2)(b) and 352-h of the General Business Law of the State of New York. Pursuant to this law, Sponsor will cause all Deposits received by it directly or by its agents or employees to be promptly deposited and held in accordance with the procedures set forth below at the end of this Section.

The balance of the purchase price shall be payable simultaneously with the delivery of the deed to the Unit by wire transfer or official bank check drawn on or unendorsed certified check drawn on or issued by a United States bank, savings and loan association or trust company which is a member of The New York Clearinghouse Association and shall be payable to the direct order of Sponsor, or as Sponsor shall direct Purchaser. The deed will be substantially in the form set forth in Part II of the Plan. Interest, if any, on Purchaser's Deposit will be credited or paid to Purchaser at Closing.

The Power of Attorney to the Board of Managers, which is attached to the Purchase Agreement, must be executed by Purchaser at the closing of title. Failure to execute the Power of Attorney will result in a default under the Purchase Agreement.

TIME IS OF THE ESSENCE AS TO PURCHASER'S OBLIGATIONS PURSUANT TO THE PURCHASE AGREEMENT, INCLUDING, WITHOUT LIMITATION, FOR THE PAYMENT OF ALL DEPOSITS AND THE BALANCE OF THE PURCHASE PRICE. FUNDS DRAWN ON FOREIGN BANKS WILL NOT BE ACCEPTED IN PAYMENT OF THE PURCHASE PRICE.

After the Plan has been declared effective, Sponsor will fix dates for closing title of all Units for which Purchase Agreements have been executed by serving notice on each Purchaser stating the date of the first closing and setting such purchaser's Closing Date. Such notice will be served no less than thirty (30) days before the date set for the closing of the Units. Notwithstanding the foregoing, Purchasers shall be permitted to waive this thirty (30) day period. Purchaser will receive at least thirty (30) days prior notice of the Closing Date and in the event Purchaser fails to close on the Closing Date, then Purchaser will have a thirty (30) day period after notice within which to cure, time being of the essence, such default, following which Sponsor shall have the remedies set forth herein. If Purchaser defaults under his Purchase Agreement, and if Purchaser does not cure such default within thirty (30) days after Sponsor gives written notice to Purchaser of default, Sponsor may, at its option, cancel the Purchase Agreement and retain the Deposit together with any interest earned thereon, as liquidated damages, in which event all rights, obligations and liabilities of Sponsor and Purchaser shall wholly cease and terminate. In addition, Sponsor shall be entitled to (a) retain, as liquidated damages, any amount paid by Purchaser to Sponsor for special work requested by Purchaser and (b) recover, as liquidated damages, from Purchaser the costs and expenses Sponsor has incurred or will incur in reliance on Purchaser's request for special work. Any conflict between the Plan and the Purchase Agreement will be resolved according to the terms of the Plan.

If a Purchaser fails for any reason to close title to his or her Unit within ten (10) days of the originally scheduled Closing Date (a) the closing apportionments described in the Section of the Plan entitled "Closing Costs and Adjustments" will be made as of midnight of the day preceding the originally scheduled Closing Date, regardless of when the actual Closing occurs, and (b) Purchaser will be required to pay to Sponsor, as a reimbursement of Sponsor's higher carrying costs for the Unit by virtue of the delay, and in addition to the other payments to be made to Sponsor under the Purchase Agreement and the Plan, an amount equal to 0.03% of the purchase price of his or her Unit for each day starting from (and including) the originally scheduled Closing Date to (and including) the day before the actual Closing Date.

If a Purchaser has entered into Purchase Agreements to purchase other Units, a default by Purchaser in the payment or performance of any obligations under any of such Purchase Agreements, beyond any applicable grace periods, shall be deemed a default under the other Purchase Agreement(s). In the event of such a default, Sponsor may, at its option, cancel each such Purchase Agreement(s) and retain, as liquidated damages, the entire Deposit(s) made by Purchaser, together with any interest earned thereon, if any, under each of such Purchase Agreement(s). In addition, Sponsor shall be entitled to (a) retain, as liquidated damages, any amount paid by Purchaser to Sponsor for special work requested by Purchaser and (b) recover, as liquidated damages, from Purchaser the costs and expenses Sponsor has incurred or will incur in reliance on Purchaser's request for special work.

Prior to the closing of title to a Unit, the Purchase Agreement prohibits a Purchaser from listing the Unit for resale or rental with any broker or from advertising or otherwise offering promoting or publicizing the availability of the Unit for sale or lease, without Sponsor's prior written consent. Any listing of the Unit for sale and/or advertising by Purchaser in violation of the terms of the Plan will be deemed a material default under the Purchaser Agreement, and Sponsor may, at its option, cancel the Purchase Agreement and retain, as liquidated damages, the entire Deposit made by the Purchaser, together with interest earned thereon.

If the Plan is withdrawn or abandoned, the Deposit previously paid to and actually collected by Sponsor together with any interest earned thereon, shall be returned to Purchaser in accordance with the provisions herein set forth.

Based upon its current construction schedule, Sponsor contemplates that the construction of the Building will be sufficiently completed to permit closings of Units to begin on or about July 1, 2008. If the First Closing does not occur within twelve (12) months after July 1, 2008, Sponsor will offer Purchasers the right, for fifteen (15) days, to rescind their Purchase Agreements and receive a refund of their Deposits, together with any interest earned thereon.

From and after the Closing of each Unit, Purchaser will become obligated for the payment of Common Charges, real estate taxes and assessments (including water charges and sewer rents, if separately assessed) and all other expenses with respect to his or her Unit, whether or not he or she has taken possession of his or her Unit, and whether or not all work required to be performed by anyone in or to his or her Unit has been completed.

The risk of loss to any Unit by fire or other casualty until the Closing for such Unit is assumed by Sponsor (unless the loss is caused by Purchaser or Purchaser's representatives or unless the loss occurs after Purchaser is given possession of the Unit under an interim lease or otherwise, in which events the risk of loss is assumed by Purchaser), but without any obligation or liability by Sponsor to repair or restore any Unit.  In the event of damage or destruction of a Unit due to fire or other casualty prior to the Closing, but subsequent to the signing of a Purchase Agreement, and Purchaser or Purchaser's representatives did not cause the destruction or damage and the destruction or damage did not occur while Purchaser was in possession of the Unit, provided Sponsor elects (which election shall be in its sole discretion) to repair or restore the Unit, the Purchase Agreement shall continue in full force and effect, and, thereafter, Purchaser shall not have the right to reject title or receive a credit against, or abatement in, the purchase price for the Unit. In such event, Sponsor shall be entitled to a reasonable period of time within which to complete the repair or restoration, and any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss shall, subject to the rights of the Condominium Board and other Unit Owners, belong entirely to Sponsor. In the event of damage or destruction to any Unit by fire or other casualty prior to the Closing, but subsequent to the signing of a Purchase Agreement, and Purchaser or Purchaser's representatives did not cause the destruction or damage and the destruction or damage did not occur while Purchaser was in possession of the Unit, if Sponsor notifies Purchaser that it does not elect (which election shall be in its sole discretion) to repair or restore the Unit or if the Unit Owners do not resolve to make such repair or restoration pursuant to the By-Laws (see the Section entitled "Rights and

Obligations of the Condominium Board"), the Purchase Agreement shall be deemed cancelled and of no further force or effect and Sponsor shall return the Deposit, together with any interest earned thereon, to Purchaser, whereupon Sponsor and Purchaser shall be released and discharged from all obligations and liability under the Purchase Agreement and the Plan; provided, however, if Purchaser is then in default under the Purchase Agreement (beyond any applicable grace period), Sponsor shall retain all such sums as and for liquidated damages.

Sponsor is obligated to provide only the equipment, fixtures and furnishings set forth in the "Description of Property and Building Condition" set forth in Part II of the Plan. If a person desiring to purchase a Unit requests that Sponsor perform special or additional work on such Unit or provide extra furnishings, including, but not limited to, any deviation from the materials or specifications described in the Description of Property and Building Condition set forth in Part II of the Plan, and Sponsor agrees to perform such work and/or provide such furnishing, then Sponsor may require such person to pay for such special work or furnishings, which additional sum shall be used to fund the special work and will not be held in escrow.

SPONSOR SHALL IN NO WAY BE OBLIGATED TO PERFORM ANY SPECIAL OR ADDITIONAL WORK TO A UNIT OTHER THAN AS REQUIRED BY THE TERMS OF THE PLAN AND THE DESCRIPTION OF PROPERTY AND BUILDING CONDITION SET FORTH IN PART II OF THE PLAN.

Each Purchaser of a Unit shall be given a reasonable opportunity to examine his or her Unit prior to the Closing and is urged to make a careful inspection thereof. At the Closing, each Purchaser shall be required to sign and deliver to Sponsor an Inspection Statement in substantially the form set forth in Part II of the Plan (See the Section of the Plan entitled Purchase Agreement) wherein the Purchaser acknowledges the condition in which he or she has inspected his or her Unit. Under no circumstances shall any item included on an Inspection Statement constitute grounds for a Purchaser to postpone or otherwise delay the date scheduled for the Closing to his or her Unit.

If a Purchaser is a foreign government or other person or entity otherwise entitled to the immunities from suit enjoyed by a foreign government (i.e., diplomatic or sovereign immunity) (each such Purchaser, a "Foreign Purchaser"), such Purchaser will be required to: (a) expressly waive any and all immunity from suit by Sponsor in connection with the execution and delivery of a Purchase Agreement; (b) agree that all disputes relating to the Purchase Agreement may be dealt with in the state courts of New York or the federal courts sitting in New York; (c) consent to the jurisdiction of such courts in any suit, action or proceeding relating to the Purchase Agreement; (d) waive objections to venue, personal jurisdiction or inconvenient forum; and (e) consent to the enforcement of any judgment obtained against such Purchaser in the courts of any state or any federal court and in any other courts to the jurisdiction of which the Purchaser is subject. Foreign Purchaser shall designate an agent in New York City as its duly authorized and lawful agent to receive process. If the Purchaser is a foreign mission, as such term is defined under the Foreign Missions Act, 22 U.S.C. 4305, the Purchaser must notify the United States Department of State prior to purchasing a Unit and provide a copy of such notice to Sponsor and Sponsor will not be bound under the Purchase Agreement unless and until the earlier to occur of:

(i) a notification of approval is received from the Department of State; or (ii) sixty (60) days after the Purchaser's notice is received by the Department of State.

All deposits, downpayments, advances and payments made by Purchasers prior to the closing, of an Unsold Unit ("Deposits") will be held in escrow in conformity with the disclosure contained in this section of the Plan.

Sponsor will comply with the escrow and trust fund requirements of General Business Law Sections 352-e(2-b) and 352-h and the Attorney General's regulations promulgated pursuant thereto and Section 71-a(3) of the State of New York Lien Law.

Any provision of any contract or agreement, whether oral or in writing, by which a purchaser purports to waive or indemnify any obligation of the escrow agent holding trust funds is absolutely void. The provisions of the Attorney General's regulations concerning escrow/trust funds shall prevail over any conflicting or inconsistent provision in the Plan or in a Purchase Agreement. Purchasers shall not be obligated to pay any legal or other expense of Sponsor in connection with the establishment, maintenance or defense of obligations arising from the handling or disposition of trust funds.

All Deposits made by Purchasers prior to the Closing of each individual transaction will be placed in a segregated escrow account of Ruskin Moscou Faltischek, P.C., the escrow agent ("Escrow Agent"), whose address is 1425 RexCorp Plaza, East Tower-15th Floor, Uniondale, New York 11556-1425, and whose telephone number is 516-663-6600. The attorneys who are signatories on this account authorized to withdraw funds, acting singly, are: Michael L. Faltischek, Benjamin Weinstock, and Eric C. Rubenstein. Escrow Agent has established a master escrow account entitled "Ruskin Moscou Faltischek, P.C. Escrow Account" ("Escrow Account") at Madison National Bank located at 849 Whitman Road, Merrick, New York 11566 ("Escrow Bank"). The Deposit will be placed in the Master Escrow Account within five (5) business days after tender of the Deposit by Purchaser to Sponsor or Selling Agent. Any subsequent Deposit tendered by Purchaser after the Initial Deposit will be placed in the Master Escrow Account within ten (10) business days after tender by Purchaser to Sponsor or Selling Agent.

The Escrow Bank is covered by federal bank deposit insurance to a maximum of $100,000.00 per individual Deposit. The following are SPECIAL RISKS of this offer: (i) if a Purchaser makes a Deposit in excess of $100,000.00, such Deposit will not be federally insured in excess of $100,000.00; and (ii) while the Deposit is in the non-interest bearing portion of the Master Escrow Account, the Deposit may not be fully federally insured even if the Deposit does not exceed $100,000.00.

All instruments shall be made payable to the order of "Ruskin Moscou Faltischek, P.C., Escrow Agent" and shall be subject to collection.

All Deposits will be placed initially in the non-interest bearing portion of the Master Escrow Account. Each Purchaser is required to deliver a completed and signed Form W-9 (Request for Taxpayer Identification Number) or a Form W-8 (Certificate of Foreign Status, if

applicable) in the form set forth in Part II to the Plan, to Sponsor or Selling Agent at the time Purchaser tenders the Deposit and the Purchase Agreement. If a Deposit is accompanied by a completed and signed Form W-9 or (Form W-8), the Deposit will thereafter be promptly transferred to an individual interest bearing sub-escrow account in the name of Purchaser. If a Purchaser does not deliver the Form W-9 (or Form W-8), the Deposit will remain in the non-interest bearing portion of the Master Escrow Account. At such time as the Deposit is released, the Deposit will be transferred from the individual sub-escrow account to the non-interest bearing portion of the Master Escrow Account so that checks may be drawn thereon.

The sub-escrow account number and the initial interest rate, if any, will be disclosed to each Purchaser in a letter from Escrow Agent to each Purchaser sent within ten (10) business days after the tender of the Deposit. If Purchaser does not receive notice that the Deposit has been placed in the Master Escrow Account within fifteen (15) business days after tender of the Deposit, Purchaser may cancel the Purchase Agreement and rescind so long as the right to rescind is exercised within ninety (90) days after tender or crediting of the Deposit or Purchaser may apply to the Attorney General for relief. Rescission may not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Deposit was timely deposited and requisite notice was timely mailed to Purchaser in conformity with the Attorney General's regulations. Escrow Agent will not be required to send the letter to each Purchaser referred to above in connection with any subsequent Deposits tendered by Purchaser after the Initial Deposit to Sponsor or Selling Agent and deposited into the Master Escrow Account prior to the Closing.

Prior to any transfer of the escrow Deposit to a new escrow account, or the replacement of the escrow agent, Sponsor shall amend the Plan to provide the same full disclosure with respect to the new account, escrow agent and escrow agreement as was originally provided.

The Deposit may be tendered by Purchaser to Sponsor or Selling Agent by either personal delivery, delivery by messenger or courier service or mailed by certified mail, return receipt requested, overnight courier or express mail service. The Deposit shall be deemed tendered by Purchaser on the date it is actually received by Sponsor or Selling Agent.

Acceptance of the Deposit by Sponsor or Selling Agent and the Deposit thereof by Escrow Agent into escrow shall not be deemed a binding agreement by Sponsor to sell to Purchaser unless and until Purchaser executes a Purchase Agreement and Sponsor or Selling Agent executes a duplicate thereof and delivers the Purchase Agreement to Purchaser in accordance with the terms of the Plan.

If a Purchaser tenders a Deposit without an executed Purchase Agreement, Sponsor shall have the right to reject the Deposit and return it to Purchaser: (i) within five (5) business days after tender, if the Deposit has not been deposited into escrow, and (ii) within ten (10) business days at any time, if the Deposit has been deposited into escrow and the Purchase Agreement has not yet been delivered by Purchaser.

The Master Escrow Account will not be interest bearing. The sub-escrow account portion of the Master Escrow Account will be interest bearing. The interest rate to be earned will be the

prevailing rate for these accounts. All interest will be credited to Purchaser at such time as: (i) there is a closing under the Purchase Agreement, or (ii) Purchaser is entitled to a return of the Deposit. All interest will be credited to Sponsor only in the event there is a "consummation of the Plan" (as such term is defined in the Attorney General's regulations) and Purchaser defaults.

If a check delivered by a Purchaser fails for collection, the Purchase Agreement will be deemed void *ab initio* (as if the Purchase Agreement had never been executed) at the option of Sponsor, who reserves the right to exercise this option in its discretion by written notice to Purchaser given within ten (10) business days of Sponsor receiving notice from Escrow Agent of such failure of collection.

Funds received by Sponsor from Purchasers for special work to be performed by Sponsor or furnishings to be provided by Sponsor in such Purchaser's Unit shall be held in escrow by the Escrow Agent but may be released to Sponsor prior to Closing of Title to the Unit for the purpose of paying for such work or extras. Accordingly, in the event Purchaser becomes entitled to rescission after the release of such funds, the Purchaser shall not receive a refund of any such funds used to pay for special work or extras that cannot readily be used in another Unit, as well as the costs and expenses Sponsor has incurred or will incur in reliance on Purchaser's request for such special work.

Except as set forth in the immediately preceding paragraphs, Escrow Agent will hold the Deposit in escrow and in no event shall any disputed funds be paid to the Purchaser until otherwise directed in:

(i)       a writing signed by both Sponsor and Purchaser; or

(ii)      a determination of the Attorney General pursuant to the dispute resolution procedures contained in the Attorney General's regulations; or

(iii)     a judgment or order of a court of competent jurisdiction; or

(iv)     pursuant to the regulations of the Attorney General pertaining to release of escrowed funds; or

(v)      a notice from Sponsor that Sponsor is entitled to the Deposit as a result of Purchaser's uncured default under the Purchase Agreement.

If there is no written agreement between the parties to release the Deposit, Escrow Agent will not pay the Deposit to Sponsor until Escrow Agent has given Purchaser written notice of not fewer than ten (10) business days. Thereafter, the Deposit may be paid to Sponsor unless Purchaser has already made application to the Department of Law pursuant to the dispute resolution provisions of the Attorney General's regulations and has so notified Escrow Agent in accordance with such provisions and Escrow Agent has received such notice. Notwithstanding the foregoing, the Deposit of a defaulting Purchaser will not be released to Sponsor until after the Plan is declared effective.

Sponsor will not object and will be deemed to have agreed, without the need for a written agreement, to the release of the Deposit to:

(i)      a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an amendment to the Plan,

(ii)     all Purchasers after an amendment abandoning the Plan is accepted for filing by the Department of Law.

The Purchase Agreement provides that Purchaser will not object and will be deemed to have agreed, without the need for a further written agreement, to the release of the Deposit to Sponsor in the event Sponsor and Purchaser close title under the Purchase Agreement.

Under no circumstances shall Sponsor apply for a release of the escrowed funds of a defaulting purchaser under after the consummation of the Plan. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §352-h.

In the event of a dispute, the Sponsor shall apply, and the Purchaser or Escrow Agent may apply to the Attorney General for a determination on the disposition of the Deposit and any interest thereon. Sponsor must avail itself of this procedure if there is a dispute, which needs to be resolved. A form for this purpose is set forth in Part II of the Plan. The party applying for a determination must send to all other parties by certified mail, return receipt requested, a copy of such application.

Pending the determination of the Attorney General to grant or deny the application, Sponsor, Purchaser, and Escrow Agent shall abide by any interim directive issued by the Attorney General. If the application permitting release of funds is granted, the Deposit and any interest earned thereon shall be disposed of in accordance with the determination of the Attorney General, subject to any court action in which preliminary relief is granted. The Attorney General shall act upon the application within thirty (30) days after its submission to the Department of Law, by either making a determination or notifying the parties that an extension of time in which to do so is necessary for stated reasons. If the application seeking release of funds is denied, the Escrow Agent shall continue to hold the deposit and any interest earned thereon until (1) both the Sponsor and Purchaser direct payment to a specified party in accordance with a written direction signed by both the Sponsor and Purchaser; or (2) a judgment or order of a court of competent jurisdiction is served on the Escrow Agent; or (3) the Escrow Agent deposits the disputed amount into court. In no event shall the Escrow Agent release funds in dispute, other than a payment of such funds into court, until such dispute is finally resolved either by determination of the Attorney General or by order/judgment of a court of competent jurisdiction or by written agreement of the Sponsor and the Purchaser.

Set forth in Part II of the Plan is a copy of the form of Escrow Agreement between Sponsor and Escrow Agent which incorporates the terms of the Attorney General's regulations.

Escrow Agent shall be permitted to act as counsel to Sponsor in any dispute as to the disbursement of the Deposit or any other dispute between Sponsor and a Purchaser whether or not Escrow Agent is in possession of the Deposit and continues to act as Escrow Agent.

Escrow Agent is acting merely as a stakeholder. Upon payment of the Deposit pursuant to the Plan, Escrow Agent shall be fully released from all liability and obligation with respect to the Deposit. Escrow Agent shall accept a Deposit made by check, subject to collection.

Sponsor has agreed to indemnify Escrow Agent from all costs, claims, expenses and damages incurred in connection with or arising out of the escrow agreement or the performance or non-performance of Escrow Agent's duties under the escrow agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the escrow agreement or involving gross negligence of Escrow Agent.

Escrow Agent shall make available to the Attorney General, upon request, all books and records of Escrow Agent relating to the escrow funds.

Sponsor must make a written demand for payment after a default at least thirty (30) days before forfeiture of the deposit may be declared.

Any provision of any contract or agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding trust funds shall be absolutely void.

Escrow Agent will maintain all records concerning the Master Escrow Account for seven (7) years after the release of funds.

The Department of Law may perform random reviews and audits of any records involving escrow accounts to determine compliance with statute and regulation.

## ASSIGNMENT OF PURCHASE AGREEMENTS

Assignment

Purchaser does not have the right to assign the Purchase Agreement without the prior written consent of Sponsor, which consent may be unreasonably withheld or delayed. Any purported assignment by Purchaser in violation of this Section will be voidable at the option of Sponsor. Sponsor's refusal to consent to an assignment will not entitle Purchaser to cancel the Purchase Agreement or give rise to any claim for damages against Sponsor. Under no circumstances will Sponsor consent (a) to an assignment of a Purchase Agreement with respect to a Residential Unit if such Purchaser Agreement would not then be included in the percentage required to declare the Plan effective, or (b) to an assignment of a Purchase Agreement in which Purchaser will receive consideration. If Sponsor, in its sole discretion, consents to a Purchaser's request for an assignment of the Purchase Agreement, or for the addition, deletion or substitution of names on the Purchase Agreement, then Purchaser shall be required to pay Sponsor's attorneys fee of $750, in advance, for preparation of an assignment and assumption agreement. Any purported assignment by Purchaser in violation of this Section shall be a default by Purchaser, entitling Sponsor to the remedies set forth in the Section entitled "Procedure to Purchase", and shall be voidable at the option of Sponsor.

Notwithstanding anything to the contrary contained above, if Purchaser has signed the Purchase Agreement in an individual name (and not in the name of an entity), then Purchaser shall have a one time right to assign Purchaser's rights under the Purchase Agreement, in whole, but not in part, to an entity "controlled" (as such term is defined below) by Purchaser (the entity to which the rights are assignable may be a trust, partnership, limited liability company or a corporation) or to member(s) of Purchaser's immediate family, provided that (i) Purchaser designates such assignee at least 10 business days prior to the Closing Date; (ii) Purchaser delivers to Sponsor's counsel a fee in the amount of $750. for its services required in connection with the preparation of the assignment and assumption agreement; (iii) the Closing will not be delayed as a result of such assignment, (iv) the assignee of the Purchase Agreement assumes in writing, by an instrument prepared by Sponsor's counsel, the obligations of Purchaser under the Purchase Agreement, and (v) the assignment is made without consideration. As used in this paragraph, the term "control" shall mean the control, either directly or indirectly, of at least 51% percent of the voting shares or equity interests of such assignee, together with the authority to direct and manage the affairs of such assignee, which shall include Purchaser, being the managing general partner of such partnership or the principal manager or managing member of such limited liability company. Any obligations of Purchaser may be performed by such assignee, and Sponsor agrees to accept such performance as if it were the performance of Purchaser. No such assignment shall modify Purchaser's obligations under the Purchase Agreement, including without limitation, Purchaser's indemnity obligations contained in the Purchase Agreement, or reduce or limit any liability or obligation of Purchaser. Purchaser shall remain primarily liable under the Purchase Agreement notwithstanding any liability assumed by assignee. Unless Purchaser complies with the provisions of this paragraph, any purported assignment by Purchaser shall be null and void and of no effect as against Sponsor.

<u>No Advertising</u>

Prior to the Closing of Title, Purchaser shall not list the Unit for resale or rental with any broker or advertise or otherwise offer, promote or publicize the availability of the Unit for sale or lease, without Sponsor's prior written consent, which consent may be unreasonably withheld or delayed. Any listing of the Unit or form of advertising promotion or publicizing of the Unit by Purchaser prior to the Closing of Title shall be a default by Purchaser, entitling Sponsor to the remedies set forth in the Section entitled "Procedure to Purchase".

## EFFECTIVE DATE

The offering by Sponsor under the Plan is contingent upon the Plan being declared effective and the First Closing shall not occur until the Plan has been declared effective. The Plan may be declared effective, at Sponsor's option, at any time when bona fide purchasers, including investors, have executed Purchase Agreements with respect to not less than 15% of all Residential Units.  Executed Purchase Agreements with respect to Roof Terrace Units and Parking Space Units shall not be counted toward effectiveness.  The Plan must be declared effective at such time as Purchase Agreements have been executed and are in effect with respect to 80% of all Residential Units. The Plan will be declared effective by a duly filed amendment and a copy of such amendment will, thereafter, be delivered to all Purchasers. Sponsor will submit to the Department of Law, if requested to do so, copies of all Purchase Agreements (and any amendments or modifications thereto) within 5 business days after such request is made.

The Plan will not be declared effective based on Purchase Agreements: (i) signed by Purchasers who have been granted a right of rescission that has not yet expired or been waived; or (ii) with Purchasers who have not been afforded at least 3 business days to review the Plan and all filed amendments prior to executing a Purchase Agreement or at least 7 days to rescind after delivering an executed Purchase Agreement; or (iii) signed by any Purchaser who is Sponsor, the Selling Agent, the Managing Agent or a principal of either, or is related by blood, marriage or adoption or as a business associate, an employee, a shareholder or a limited partner of Sponsor, the Selling Agent, the Managing Agent or a principal of either, except that such a Purchaser (other than Sponsor or a principal of Sponsor) may be counted only if Sponsor has submitted proof satisfactory to the Department of Law establishing that the Purchaser is bona fide.

The Plan may be withdrawn or abandoned by Sponsor for any reason whatsoever at any time prior to its being declared effective, in which event Purchasers will be notified by Sponsor in writing, by registered or certified mail.

Once the Plan has been declared effective, it may not thereafter be abandoned or withdrawn, except that, the Plan may, at the option of Sponsor, be abandoned in the event of: (1) the existence of one or more title defects affecting any one or more Units or the Property that cannot be removed, cured or complied with prior to the date set for the First Closing without litigation or for less than 1/2 of 1% of the total offering amount in the aggregate, and which are not waived by the Purchasers thereof; (2) a substantial damage to or destruction of the Building (or any portion thereof) by fire or other casualty that cannot be repaired for less than 1/2 of 1% of the total offering amount in the aggregate; or (3) a taking of a material portion of the Property in condemnation proceedings or by eminent domain. Excluded from the dollar amounts set forth in (1) and (2) above are attorneys fees and title defects or determinations of any authority or regulatory association which exist on the Filing Date of the Plan and are either known to Sponsor or are a matter of public record.

If the Plan is withdrawn or abandoned, all Deposits, together with any interest earned thereon, will be returned to Purchasers within 30 days following such withdrawal or abandonment. Upon the return of the Deposits, together with any interest earned thereon, the Purchase Agreement will be null and void and Sponsor will have no further obligation or liability to Purchaser under the Plan or the Purchase Agreement.   Sponsor shall promptly submit an amendment to the Department of Law confirming such abandonment or withdrawal and shall file a notice of abandonment on form RS-3 or such other form as the Department of Law may require and explain the reason for the abandonment and disposition of all Deposits received, and any interest earned thereon.

## TERMS OF SALE

The Closing of Title to each Unit shall be held at the offices of Ruskin Moscou Faltischek, P.C., 1425 RexCorp Plaza, East Tower, 15th Floor, Uniondale, New York or at such other place as Sponsor may designate. The Closing to each Unit shall take place only after or concurrently with the following events:

(a)　the Plan has been declared effective in accordance with its terms and the amendment to the Plan disclosing same has been accepted for filing by the Department of Law;

(b)　a temporary or permanent certificate of occupancy for the Unit is in effect (in the event of closing after issuance of a temporary certificate of occupancy, but before issuance of a final certificate of occupancy, Sponsor's obligation to provide a final certification of occupancy shall survive closing);

(c)　the recording or filing of the Declaration, By-laws, Floor Plans and engineer's and tax authority certifications required by Section 339-p of the New York Condominium Act or other applicable Law and such other documents as may be required by Law;

(d)　the release of the Unit and its Common Interest from the lien of all mortgages, if any;

(e)　the delivery to Purchaser of written notice of the time and place of the Closing to his Unit at least 30 days prior to the Closing Date specified therein, including a reasonable opportunity, upon written request of Purchaser, for Purchaser to examine his Unit and the Property, during normal business hours and in the company of Sponsor's agent, prior to Closing;

(f)　the delivery to Purchaser of a bargain and sale deed with covenant against grantor's acts, in proper form for recording and containing the provisions set forth in subdivision 5 of Section 13 of the Lien Law upon delivery to Sponsor of the balance of the purchase price and such other checks and documents required pursuant to the Plan and the Purchase Agreement.

(g)　the execution and delivery by Purchaser of the Unit Owner's Power of Attorney, the form of which is set forth in Part II of the Plan;

(h)　if Purchaser has requested title insurance, the issuance to Purchaser (at Purchaser's sole expense) of a policy of title insurance in at least the amount of the purchase price of the Unit, insuring that (i) Purchaser has fee title to his Unit free and clear of all liens and encumbrances except for (1) Permitted Encumbrances and standard printed exceptions, (2) liens and encumbrances (other than Permitted Encumbrances) to which his Unit's title is subject, which have been expressly accepted by Purchaser, and (3) any mortgage and related security documents that Purchaser executes in connection

with the financing of the purchase price of his Unit and (ii) the Condominium has been validly created pursuant to the Condominium Act; and

(i)     The Sponsor's repair of any damage from a casualty or other cause that occurs prior to Closing.

All personal property, including but not limited to the appliances, equipment or fixtures installed in the Unit shall be included in the conveyance of the Unit, unless specifically excepted in the Plan and all appliances, equipment or fixtures installed in the Common Elements on the date the Declaration shall be assigned to the Condominium Board at the First Closing.

In the event of the existence of any lien or encumbrance other than Permitted Encumbrances, the sole remedy of Purchasers under the Plan will be to rescind their respective Purchase Agreements within 15 days after receipt of notice or an amendment disclosing such lien or encumbrance. A Purchaser electing to proceed with the purchase of his Unit will not be entitled to any credit against, or abatement of, the purchase price set forth in his Purchase Agreement and will have no claim or right of action against Sponsor by reason thereof. Sponsor has no obligation to institute any action or proceeding, or to expend any sum of money to make title marketable or to eliminate any encumbrances or title defects, except to incur expenses up to the aggregate amount of 1/2 of 1% of the total offering amount in respect of any one or more Units or the Property.

If Sponsor fails or refuses to correct any title defect, then, provided Purchaser is not then in default, the Purchaser's sole right will be to either (i) take title subject to the title defect (without abatement in or credit against the Purchase Price or claim or right of action against Sponsor for damages or otherwise) or (ii) cancel the Purchase Agreement. If Purchaser elects to cancel the Purchase Agreement, Sponsor shall cause the Deposit together with any interest earned thereon, to be returned to Purchaser, within 30 days after receipt of Purchaser's termination notice. Upon making such refund, Sponsor and Purchaser shall be relieved of all further obligations and liabilities under the Purchase Agreement and the Plan. The foregoing option must be exercised by Purchaser in writing sent to Sponsor within 15 days after the giving of Sponsor's notice of refusal to remedy the title defect. IF THE PURCHASER FAILS TO NOTIFY SPONSOR OF HIS ELECTION WITHIN 15 DAYS AFTER SPONSOR NOTIFIED PURCHASER OF SPONSOR'S REFUSAL TO REMEDY THE TITLE DEFECT, IT WILL BE CONCLUSIVELY DEEMED THAT PURCHASER ELECTED TO ACQUIRE TITLE SUBJECT TO THE TITLE DEFECT.

The existence of mortgages, liens and encumbrances other than Permitted Encumbrances shall not be objections to title, provided bonds or properly executed instruments in form for recording necessary to satisfy or release Units from such impermissible liens or encumbrances are delivered at Closing and proper adjustments are made for the cost of recording or filing such instruments. Sponsor will bear the responsibility and cost of recording or filing such instruments.

67

The acceptance of a deed by a Purchaser shall be deemed an acknowledgment that Sponsor has performed and discharged every agreement and obligation on the part of Sponsor to be performed under the Plan except those (if any) which may be expressly stated in the Plan, in the Purchase Agreement, in 13 NYCRR, Part 20 (the regulations of the Attorney General of the State of New York governing the acceptance for filing of the Plan) and in General Business Law Section 352-e to survive delivery of the deed. Notwithstanding anything to the contrary contained in the Plan or the Purchase Agreement, nothing in the Plan or the Purchase Agreement shall be deemed to create any privity of contract between a Purchaser and any person identified in the Plan or any documents filed in connection therewith as a principal of Sponsor or Selling Agent, nor shall the Purchaser have any rights as against any such principal.

## UNIT CLOSING COSTS AND ADJUSTMENTS

Closing Costs

As more particularly set forth in the Purchase Agreement, in addition to the Purchaser's legal fees, the Purchaser will pay the following estimated closing costs and expenses at the time of the Closing of Title of his or her Unit. Recording charges, fees, title costs and taxes are based on rates in effect on the date of the Plan and are subject to change without notice.

(a)    A contribution to the Working Capital Fund of the Condominium in an amount equal to two (2) month's Common Charges then applicable to each Unit being purchased.

(b)    If Purchaser elects to obtain fee title insurance, Purchaser will pay the premium therefor, which will vary depending upon the amount requested.  Purchaser is free to use the title company of its choice.  If ordered from All New York Title Agency, Inc., having an office at 180 East Post Road, Suite 200, White Plains, New York  10601 (914-686-5600) ("All New York Title"), the premium will be calculated at a discounted rate (fee bulk rate) of the standard fee policy rates. John Martin of All New York Title should be contacted to discuss the applicable fee bulk rate.

(c)    If Purchaser elects to simultaneously obtain both fee title insurance and mortgage title insurance from All New York Title, the premium for the fee title insurance will be calculated as described in paragraph (b) above. The premium for the mortgage title insurance that does not exceed the fee policy will be calculated at a discounted rate ("simultaneous mortgage rate") of the standard mortgage policy rates.  The premium for the mortgage title insurance that exceeds the fee policy will be calculated at the full rate of the standard mortgage policy rates.  John Martin of All New York Title should be contacted to discuss the applicable simultaneous mortgage rate.

The standard rates for fee title and mortgage title insurance for Queens County are as follows:

| **Amount of Insurance** | | **Owner's Policy** | **Loan Policy** |
|---|---|---|---|
| First $35,000 or less<br>*MINIMUM PREMIUM*<br>*(except simultaneously*<br>*issued policies)* | | $402 | $344 |
| Each additional $1,000 (or fraction thereof) | | | |
| **From** | **To** | | |
| 35,001 | 50,000 | 6.67 | 5.55 |
| 50,001 | 100,000 | 5.43 | 4.54 |
| 100,001 | 500,000 | 4.36 | 3.64 |
| 500,001 | 1,000,000 | 3.98 | 3.31 |

A form of Unit Owner's Specimen Title Policy, if title insurance is ordered from All New York Title, is set forth in Part II of the Plan.

(d)   A fee for recording the deed and Unit Owner's power of attorney, are approximately $175 per document, together with a fee of $25 for filing the New York City Real Property Transfer Tax Return ("City Tax Return").

(e)   New York State Real Estate Transfer Tax ("State Transfer Tax"), currently equal to $2 per $500 of purchase price plus, if applicable, a Special Additional Tax of 1% where the purchase price equals $1 million or more, and the New York City Real Property Transfer Tax ("RPT Tax") currently equal to 1% of the purchase price where the purchase price is $500,000 or less and 1.425% of the purchase price where the purchase price is more than $500,000.

The City of New York, Department of Finance has taken the position that where the purchaser of property assumes the obligation for the State Transfer Tax and the RPT Tax, the amount of the tax which would otherwise be payable if the seller were to pay such taxes, will be treated as additional consideration for the transaction subject to tax.

Thus, the effective RPT tax rate is approximately 1.01% of the purchase price where the purchase price is $500,000 or less and 1.45% where the purchase price is greater than $500,000. A similar position has been taken by the New York State Department of Taxation and Finance and as a result the effective tax rate for the State Transfer Tax is $4.016 per thousand dollars of the purchase price for the Unit. However, payment by the Purchaser of the Special Additional Tax is not considered additional consideration to Sponsor for purposes of the calculation of the State Transfer Tax.

Sponsor has been advised by the Title Company that the information set forth below reflects the current position of the New York City Department of Finance with respect to real property transfer taxes that are due and payable in connection with the transfer by a seller of one or more units to the same or related purchasers, whether pursuant to one or more purchase agreements.  The position of the New York City Department of Finance is subject to change and may be different at Closing.

*Purchase of multiple Residential Units.*

The Department of Finance takes the position that: (i) the lower tax rate (either 1% if the consideration is $500,000 or less, or 1.425% if the consideration is greater than $500,000) applies only in the case of a transfer of "an individual residential condominium unit"; and (ii) the higher tax rate (either 1.425% if the consideration is $500,000 or less, or 2.625% if the consideration is greater than $500,000) applies if a purchaser acquires more than one individual residential condominium unit (i.e., 2 Residential Units).

(f)   If Purchaser obtains a mortgage loan, Purchaser will be responsible for the payment of all mortgage recording taxes, mortgage recording fees, origination, appraisal and closing costs and other expenses in connection therewith (including legal fees) in amounts determined by governmental authorities and such lender. Currently, the mortgage recording tax for mortgages under $500,000 is 2.05% of the face amount of the mortgage and 2.175% of the face amount of the mortgage if the mortgage is $500,000 or more. Of the total tax due, the mortgagee

pays an amount equal to 0.25% of the face amount of the mortgage. In addition, there is a $30 exemption for residential property. No representation or warranty is made with respect to the amounts of such closing costs and expenses or the availability or cost of mortgage loans from any sources.

In addition to the above-specified costs and expenses, a mortgage on a Unit may provide that the Unit owner deposit monthly with the lender 1/12 of the estimated annual real estate taxes and tax assessments which are assessed or will be assessed against the Unit, together with 1/12 of the annual fire and casualty insurance policy premiums for the Unit, or other amounts, and, at Closing, Purchaser may be required to deposit with the lender a multiple of the aggregate of such one month's real estate taxes, tax assessments and insurance premiums, or other amounts, in order that sufficient funds will be available for the lender to pay the same when due.

(g)     Fees payable to Sponsor's attorney, Ruskin Moscou Faltischek, P.C. in accordance with the following schedule, all of which fees will be cumulative to the extent applicable to any individual Closing:

(1)     $1,200 for the preparation of closing documents, calculation of adjustments, attendance at Closing at the offices of Ruskin Moscou Faltischek, P.C., 1425 RexCorp Plaza, East Tower – 15th Floor, Uniondale, New York 11556 or such other place as Sponsor may designate and supervision of execution of closing documents;

(2)     If Purchaser requires that the Closing occur other than at the office of Ruskin Moscou Faltischek, P.C., 1425 RexCorp Plaza, East Tower – 15th Floor, Uniondale, New York 11556, or such other place as Sponsor may designate, and Sponsor consents to such change, an additional attendance fee of $250 for each Closing held within Nassau County and $500 for each Closing held in Suffolk or Westchester County or New York City;

(3)     If Sponsor, in its sole discretion, consents to a Purchaser's request for an assignment of the Purchase Agreement, or for the addition, deletion or substitution of names on the Purchase Agreement, a fee of $750 ($1,000 in the case of an assignment by an individual to an entity controlled by such individual), payable in advance, for preparation of an assignment agreement; and

(4)     If through no fault of Sponsor, Purchaser fails to close on the date scheduled for Closing, then Purchaser shall pay to Ruskin Moscou Faltischek, P.C., an additional fee of $750 for each rescheduled Closing to help defray the cost of preparing and coordinating the Closing and recalculating the Closing apportionments.

Purchaser may pay more than one fee pursuant to (g) above with respect to a Unit. In addition to an attendance fee in connection with a completed Unit transfer, Ruskin Moscou Faltischek, P.C. shall also be entitled to an attendance fee in the amount set forth above if they attend a scheduled Closing but the Closing is adjourned due to Purchaser's failure to comply with Purchaser's closing obligations. In addition, more than one (1) assignment fee shall be payable if Sponsor consents to more than one (1) request.

(h)   If Purchaser has dealt with any broker other than the Selling Agent or any other broker engaged in writing by Sponsor in connection with his or her purchase, then Purchaser will be required to pay any commission due to such broker.

(i)   If Purchaser obtains a mortgage loan, the Purchaser will pay Sponsor a sum equal to the partial mortgage tax credit to which Purchaser may be entitled pursuant to Section 339-ee(2) of the Condominium Act, which sum will be paid as a reimbursement for the mortgage recording tax previously paid by Sponsor in connection with any existing mortgagee(s).

(j)   If the purchase price of the Residential Unit is $1,000,000 or more, Purchaser will pay the New York State Additional Tax pursuant to Article 31 of the Tax Law, commonly referred to as the "Mansion Tax", which is currently one (1%) percent of the purchase price.

All legal costs, fees and expenses of Ruskin Moscou Faltischek, P.C., other than those specifically set forth above, will be the sole responsibility of Sponsor.

Closing Adjustments

At Closing, adjustments will be made as of midnight of the day preceding the Closing Date between Sponsor and each Purchaser with respect to (a) real estate taxes and assessments, if any (including water charges and sewer rents, if separately assessed) on the basis of the period for which assessed, (b) Common Charges and assessments for the month in which title closes and (c) accrued rent and any other charges pursuant to an interim lease or use and occupancy agreement, if any, covering Purchaser's Unit. In the event the Units have not been separately assessed for real estate tax purposes prior to the First Closing, Sponsor shall either (i) place in a special escrow account with Ruskin Moscou Faltischek, P.C. an amount equal to the unpaid real estate taxes which will be payable with respect to the Property for the six (6) month period following the First Closing or until the Units are separately assessed, whichever is shorter, or (ii) provide a surety bond or letter of credit in an amount equal to the unpaid real estate taxes in favor of the Condominium Board and each Unit Owner. Sponsor will pay the real estate taxes with respect to the Property from the special escrow account as and when such taxes become due and payable, and Sponsor will be reimbursed for such payments by the Condominium. Until the Units are separately assessed and billed, each Unit Owner will pay his or her pro rata share (in the proportion that his or her Unit's Common Interest bears to the aggregate Common Interest of all Units) of all real estate taxes and assessments with respect to the Property to the Condominium. The Condominium will pay such taxes either to the Finance Administration of The City of New York or directly to Sponsor if Sponsor has already paid such real estate taxes. If any Unit Owner fails to pay his or her pro rata share as set forth above, the Condominium, as the case may be, will have a lien on such Unit for non-payment thereof, as if such charges were Common Charges. (See the Section of the Plan entitled "Rights and Obligations of Unit Owners--Common Charges: Collection and Lien for Non-Payment".) At such time as a Unit is separately assessed and separately billed, the Unit Owner will pay such taxes directly to the taxing authority.

Subsequent to the First Closing, all Unit Owners (including Sponsor) will be required to pay to the Condominium on a monthly basis such Unit Owner's share of real estate taxes until such time as the Units are separately assessed.  After the Units are separately assessed and billed

for real estate taxes, Unit Owners will be reimbursed for any overpayment of real estate taxes or assessed for an underpayment.

If a Purchaser fails for any reason to close title to his or her Unit within ten (10) days of the Scheduled Closing Date, (a) the closing apportionments described above will be made as of midnight of the day preceding the Scheduled Closing Date, regardless of when the Actual Closing Date occurs, and (b) Purchaser will be required to pay to Sponsor, as a reimbursement of Sponsor's higher carrying costs for the Unit by virtue of the delay, and in addition to the other payments to be made to Sponsor under the Purchase Agreement and the Plan, an amount equal to 0.03% of the purchase price of his or her Unit for each day starting from (and including) the Scheduled Closing Date to (and including) the day before the Actual Closing Date. If, through no fault of Purchaser, Sponsor postpones the Scheduled Closing Date, these provisions shall apply to the rescheduled Closing Date if Purchaser fails for any reason to close title to his or her Unit on the rescheduled Closing Date.

Except as specifically set out in the Plan, Sponsor must pay all costs and expenses incurred in connection with the promulgation and consummation of the Plan and the sale of Units by Sponsor, including, but not limited to, all selling expenses and commissions payable to Selling Agent for the sale of Units pursuant to the Plan, advertising, printing and architects' fees, the fees of Sponsor's attorneys, engineering and appraisal costs and governmental filing fees, whether incurred prior or subsequent to the effective date of the Plan, in connection with the obligations of Sponsor (see the Section of the Plan entitled "Rights and Obligations of Sponsor".)

As an example, a Purchaser of a Residential Unit in which the purchase price is $660,000.00, and who procures a first mortgage in the amount of $528,000.00 will pay the following approximate closing costs (please note that for units where the selling price exceeds $500,000, the NYC Transfer Tax rate will increase from 1% of the purchase price to 1.425% of the purchase price):

| | |
|---|---|
| Fee and Mortgage Title Insurance | $ 3,344.00 |
| Title Endorsements | $ 100.00 |
| Title Company Searches | $ 300.00 |
| ACRIS Form Preparation | $ 150.00 |
| Deed Recording Fee | $ 175.00 |
| Power of Attorney Recording fee | $ 175.00 |
| Mortgage recording fee | $ 250.00 |
| NYS Transfer Tax | $ 2,652.00 |
| NYC Transfer Tax | $ 9,539.00 |
| Mortgage Recording Tax | $10,134.00 |
| Condominium Working Capital | $ 1,500.00 |
| Sponsor Attorney's Fees | $ 1,200.00 |
| | |
| TOTAL: | $29,519.00 |

Other fees that cannot be estimated because they pertain to events outside of Sponsor's control and/or statutory requirement include, but are not limited to, Purchaser's attorney's fee,

lender's attorney's fee, possible commitment fee or loan origination fee, appraisal fee, application fee, and credit check fee.

In addition to the above estimated closing costs, the Sponsor anticipates that real estate taxes, water/sewer charges and common charges will be apportioned as of 11:59 PM of the day preceding the Closing Date, and a Purchaser will be responsible for the charges and fees of his or her lender and own attorney.

## RIGHTS AND OBLIGATIONS OF SPONSOR

Sponsor has secured construction financing for the Building.  In making this offering, no representation or warranty is made and no promise or assurance is given, implied or otherwise, by Sponsor as to when or if all of the Units will be sold.  Although it is the present intention of Sponsor to sell all Units pursuant to the terms of the Plan, Sponsor expressly disclaims any obligation to sell all of the Units, and Sponsor shall have no liability to any Purchaser or Unit Owner for Sponsor's continued ownership of any of the Units after the First Closing for as long as Sponsor determines it is in its interest to do so.  Sponsor reserves the unconditional right to rent, rather than sell the Units.  In addition, Sponsor expressly reserves the right to sell Units to purchasers who intend to rent and not to occupy their Units personally.  The decision to sell or not to sell or rent any Unit shall be made by Sponsor based upon its evaluation of market conditions and its own financial considerations and shall be in the sole discretion of Sponsor.  In the event that Unsold Units are not offered for sale they may be rented at such rents as Sponsor determines and market conditions allow.

In addition, Sponsor reserves the right to make "Bulk Sales" of Units and the Purchaser of such Units shall have the same rights as Sponsor with respect to renting rather than selling Units, withholding Units for future sale or lease or limiting the number of Units sold to any Purchaser.  The term "Bulk Sales," as used herein, means the transfer of ten (10) or more Units or twenty percent (20%) of the total number of Units in the Condominium, whichever is less.

Sponsor's Obligations with Respect to the Building

Sponsor shall have the following obligations and all Purchasers upon execution of their respective Purchase Agreements will be deemed to have accepted, approved and agreed to abide and be bound by the following:

(a)     Sponsor will perform such work and supply such materials, or will cause the same to be performed and supplied, as is necessary in order to complete the construction of the Building with a quality of construction comparable to the currently prevailing, local standards and substantially in accordance with the Plans and Specifications for the construction work filed with the Buildings Department and other appropriate governmental authorities.

(b)     Sponsor reserves the right to make any changes in the proposed Condominium Documents and modifications to the Plans and Specifications as may be necessary in Sponsor's sole discretion to conform to Law or to expedite the sale of the Unsold Units; provided, however, that any such amendments, additions, or changes shall not materially and adversely affect a Unit Owner or Purchaser, increase any obligations of Unit Owners or Purchasers to any adverse and material degree, and any substitution of equipment or materials will not be of lesser quality or design.

(c)     The offering by Sponsor under the Plan is contingent upon the Plan being declared effective and the First Closing shall not occur until the Plan has been declared

effective. The Plan may be withdrawn or abandoned by Sponsor for any reason whatsoever at any time prior to its being declared effective (See the Section of the Plan entitled "Effective Date").

(d)     Based upon its current construction schedule, Sponsor contemplates that, unless delayed by *Force Majeure*, the construction of the Building will be sufficiently completed to permit Closings of Units to begin on or about July 1, 2008. Prospective Purchasers should note, however, that the Units will be completed at differing times over a period that may likely extend significantly beyond such dates. Purchasers will not be excused from paying their full purchase prices (without credit or set-off), and will have no claim against Sponsor for damages or losses, in the event that the First Closing occurs earlier or later than the targeted date or the time to complete or to close title to their Units is delayed or postponed by Sponsor. In the event the actual or anticipated commencement date of the first year of condominium operation is to be delayed by six (6) months or more, Sponsor will amend the Plan to include a revised budget with current projections. If the Unit Owner's Common Charges in the amended budget exceed those in the latest budget included in the Plan by twenty-five (25%) percent or more, Sponsor will, in the amendment disclosing such budget, offer all Purchasers the right, for at least fifteen (15) days, to rescind their Purchase Agreements and receive a refund of their Deposits, together with any interest earned thereon (provided, however, that after the Plan has been declared effective and the amendment disclosing the same has been accepted by the Department of Law, a Purchaser who is in default under his Purchase Agreement beyond the expiration of any applicable grace period will not have the right to rescind).

(e)     Sponsor is obligated to bear all costs and expenses incurred in connection with completing construction of the Building substantially in accordance with the Plans and Specifications. The Sponsor is also obligated to repair any damage from a casualty or other cause that occurs before the closing of a Unit.  During the course of construction, Sponsor retains the right to change the Plans and Specifications, substitute equipment or materials, and modify layout or design, provided, however that:

(i)     any materials, appliances, equipment and fixtures which Sponsor may substitute shall be similar products of substantially equal or better quality or design; and

(ii)     Sponsor shall not materially change the size or location of the Units, other improvements or Common Elements if such changes affect the percentage of common interests, or adversely affect the value of any Unit to which title has closed or for which a Purchase Agreement has been executed and is in effect, unless all, affected Unit owners and contract vendees consent in writing to such change, and except as more specifically provided in the Section of the Plan entitled "Changes in Prices and Units".

(f)     Upon the recording of the Declaration, Sponsor will deliver, assign, or otherwise grant to the Condominium Board, on behalf of all Unit Owners, the right to

proceed under any assignable warranties and other undertakings received by Sponsor from contractors, suppliers, or others in connection with the construction and equipping of the Building, except that warranties and undertakings received by Sponsor which relate to appliances, equipment or fixtures located in any Unit shall be assigned to Purchaser of such Unit on the date of closing of title thereto including the warranties and undertakings received by Sponsor which relate to appliances, equipment, or fixtures located in the Units and the Common Elements. Sponsor makes no representation as to which, if any, of the warranties and other undertakings will continue to remain in force upon the Closing of any particular Unit.

(g)     The Sponsor will obtain a permanent certificate of occupancy for the Building. If, as of the First Closing, only a temporary certificate of occupancy has been issued for the Building, Sponsor will use all reasonable diligence to cause the Buildings Department to continuously renew the temporary certificate of occupancy until a permanent certificate of occupancy for the Building, including all of the Units in the Building, has been issued. Sponsor will, at its sole cost and expense, do and perform all work, and will supply for the Building all materials that shall be necessary in order to cause the temporary certificate of occupancy to be continuously renewed and to obtain a permanent certificate of occupancy. In the event a permanent certificate of occupancy is not issued as of the date of closing of a Unit, Sponsor anticipates obtaining the permanent certificate of occupancy within two (2) years of the closing of a Unit.  Article 5, Section 2 of the By-Laws prohibits Unit Owners from making any alterations in or to a Unit prior to the issuance of a permanent certificate of occupancy, unless the Sponsor consents to such work, and authorizes the Sponsor to halt any unauthorized work. If there are delays in issuance of a permanent certificate of occupancy arising from unauthorized alterations, Sponsor shall remain responsible for obtaining the permanent certificate of occupancy, but may have a cause of action against the party or parties performing such alterations. Prospective Purchasers are advised that a permanent certificate of occupancy is required for permanent use of the Units in the Building, and that a temporary certificate of occupancy may be renewed only for a total of 2 years from the date of first issuance.

(h)     If Sponsor fails to obtain a permanent certificate of occupancy for the Building prior to the First Closing, Sponsor will be obligated to: (i) direct the Escrow Agent to hold and maintain those monies received pursuant to all Purchase Agreements (see the Section of the Plan entitled "Escrow and Trust Fund Requirements") which would otherwise be payable to Sponsor in the special trust account required by the General Business Law of the State of New York, Sections 352-e(2)(b) and 352(h), provided, however, that if Sponsor's Architect certifies that a lesser amount than the amount held in the special trust account is reasonably necessary to complete the work needed to obtain a permanent certificate of occupancy, then the amount exceeding the sum so certified by the Sponsor's Architect shall be released from the special escrow account to Sponsor; or (ii) Sponsor shall deposit with Escrow Agent cash or an unconditional, irrevocable letter of credit or post a surety bond in an amount Sponsor's Architect, from time to time, certifies is reasonably necessary to complete the work needed to obtain the permanent certificate of occupancy.

(i)     Construction is a complicated process requiring the coordination of numerous tasks and the balancing of complex mechanical and architectural systems. During the first year of condominium operation, construction workers and related personnel will be at the Building from time to time making adjustments and performing various tasks relating to the completion of construction. Various systems, including but not limited to water supply, heating ventilating and air conditioning and elevators, may require substantial time after any Closing to complete and may need to be shut down temporarily. Various other adjustments to windows, the elevator and other systems may require substantial time after the Closing to be completed.

(j)     Sponsor has no obligation to repair or improve the Unsold Units, the Common Elements or the Facilities used in connection with the operation of the Building except as otherwise expressly provided in the Plan. Sponsor agrees to complete construction and to cause all mechanic's liens with respect to the construction of the Building to be promptly discharged or bonded (all subject to Sponsor's rights to abandon the Plan).

(k)     Each Unit and the fixtures and personal property contained therein, are being sold and delivered "AS IS", as described in the Plan, at the time of transfer of title to such Unit unless Sponsor and the Purchaser of such Unit otherwise agree in writing. The Purchaser of a Unit shall inspect such Unit prior to the Closing Date and shall execute at such time an Inspection Statement acknowledging the Purchaser's acceptance of the Unit in good condition and in accordance with the terms of the Plan. However, if a Purchaser finds that Sponsor's improvements as described in the Plan or in the Purchase Agreement for such Unit or other writing duly executed and delivered by Sponsor, have not been fully completed, although such improvements have been substantially completed, then Sponsor or its designated representative and the Purchaser will at the time of such execution agree upon and set forth in the Inspection Statement a list of the incomplete work to be completed in the Unit by Sponsor following the Closing for such Unit.  Sponsor's obligation thereunder shall survive delivery of the deed to the Purchaser.  The failure of Sponsor to complete such work shall not be a ground for the Purchaser to delay the closing.  Sponsor and its contractors, subcontractors agents and employees, will have a right of access to enter the Unit after closing in order to complete the work on the Inspection Statement.   The issuance of a certification from a registered architect or licensed engineer shall be presumptive evidence that a particular Unit or Sponsor's improvements with respect to the Common Elements, as applicable, has been substantially completed.

(l)     Article 36-B of the New York General Business Law ("Housing Merchant Implied Warranty Law") does not apply to this offering. Sponsor will correct, repair, or replace any and all defects relating to construction of the Building, or in the installation or operation of any appliances, fixtures, or equipment therein, or will cause the same to be corrected, repaired, or replaced, but only if:

(1)     such defects are due to substantially improper workmanship or construction practices or the use of materials that are substantially and materially at variance with the Plans and Specifications for the same; and

(2)     Sponsor is notified of the same in accordance with the following, which notice shall be by certified mail, return receipt requested:

(i)     with respect to any latent defect (that is, a defect that is not visually ascertainable) in the construction of an Unsold Unit, within six (6) months of the first occupancy of such Unsold Unit;

(ii)     with respect to any patent defect in the construction of an Unsold Unit within three (3) months of the first occupancy of such Unsold Unit, provided such patent defect is not caused by the use of the Unit Owner.

The method of correcting any defect will be selected by Sponsor in its sole discretion. The quality of construction as to any such correction will be comparable to local standards customary in the particular trade or trades involved and will be in accordance with the Plans and Specifications.

Sponsor will be conclusively considered to have discharged any obligation that it may have with respect to any defects, whether patent or latent, if:

a.     Sponsor is not notified of the existence of such defect, in the manner and within the appropriate time period specified above;

b.     The Condominium Board and/or the Managing Agent and/or the Unit Owner fails to allow prompt access to the Unit in question by Sponsor or Sponsor's contractors; or

c.     Sponsor has corrected, or caused the correction of, the defect in accordance with the practice of the industry, as determined by Sponsor's general contractor, architect, or engineer, in their sole judgment.

(m)     Sponsor will not be obligated to correct, and will not be liable to the Condominium Board or any Unit Owner as a result of any defects in construction, or in the installation or operation of any mechanical equipment, appliances, other equipment, finishes, materials or fixtures (including, appliances and bathroom fixtures):

(i)     with respect to which assignable warranties or other undertakings (however denoted) from manufacturers, contractors, materialmen, or others which are assigned to the Condominium Board and/or any Unit Owner;

(ii)     resulting from normal wear and tear, natural deterioration, normal settling, deflection, or shifting of the Building; or

(iii)     that are not of a material nature, including, without limitation, the following:

a.     death of trees or landscape improvements, cracks in roof ballast, or concrete cracks that do not impair the structural soundness of the Building, including cracks or discoloration in concrete used walls and paving, leaching or color variation in colored mortar, tiles, and brick, dimensional variations in brick joints, mortar droppings on bricks, ponding, and/or controlled drainage on roof and terrace surfaces, terrace tiles not laid flat, stained tiles, and cracks in pressure treated wood used, or intended for use, outside the Building;

b.     protruding drywall fastenings, nail pops, ridging on gypsum board, slight variations in gypsum board taping visible only under certain lighting conditions, walls not square, lumber shrinkage, painting defects, electrical plates not straight, slight separation between base and floor, variations in floor and ceiling levels, carpet or floor discoloring or stretching, variations in width, length, thickness, finish, or color range of wood floors, ceiling imperfections, and stains, runs, lumps, shags, or imperfections in weave in fabric panels;

c.     door or window sticking due to weather, door warpage (including warpage of the main entrance door to an Unsold Unit within reasonable tolerances of doors of similar size, weight and quality); adjustment of bi-fold doors, and air and water infiltration from windows in excess of industry standards;

d.     variations in tone or color of natural stone or variations in tone or color of vanity tops or other natural stone surfaces, slight scratches in plastic laminate, vitreous china, natural stone, wood, stainless steel, or porcelain surfaces, discoloration to hardware and plumbing finishes, cracked bath tile grouting, variation in grouting thickness, and misalignment of bathroom finishes;

e.     variations in wood floor stains and finishes caused by normal foot traffic during construction and sales periods;

f.     normal plumbing, heating air-conditioning, ventilating and floor noises and creaking;

g.     repair of chips, scratches, mars, breaks, dents, cracks, and other defects in any windows and window sashes, sliding glass doors,

shower doors, louvers, insulation attached to the curtain wall, electrical fixtures and globes, painted surfaces, sinks, tubs, basins, water closets, kitchen cabinets, backsplashes, and countertops, vanity tops and cabinets, tile or natural stone floors and walls, saddles, appliances, woodwork, millwork, doors, mirrors, and hardware; and

h.    normal wear, including chips, to the passenger elevator cab, cab doors, elevator door frames, cab panels, apartment doors and apartment door frames.

Notwithstanding the foregoing, Sponsor will be obligated to repair abnormal scratches in plastic laminate, vitreous china, natural stone, wood, porcelain and metallic surfaces by filing or refinishing the same not caused by the use of the Unsold Units by Unit Owners, but Sponsor will not be obligated to replace any such surfaces.

THE ITEMS AND CONDITIONS DESCRIBED ABOVE IN (m) (iii) ARE NOT DEFECTS AND MAY BE FOUND IN ANY NEWLY CONSTRUCTED BUILDING. PURCHASERS WHO PURCHASE A UNIT IN THE BUILDING OR IN ANY OTHER NEWLY CONSTRUCTED BUILDING MAY EXPERIENCE SOME OR ALL OF THESE ITEMS AND CONDITIONS IN THEIR UNITS OR THE COMMON ELEMENTS.  SPONSOR HAS NO OBLIGATION TO CORRECT OR REPAIR ANY OF SUCH ITEMS AND CONDITIONS AND SHALL NOT BE LIABLE TO ANY PURCHASER OR CONDOMINIUM BOARD THEREFOR.  IF PURCHASER OR CONDOMINIUM BOARD DESIRES TO CORRECT OR REPAIR ANY SUCH ITEMS OR CONDITIONS, TO THE EXTENT THEY CAN BE CORRECTED OR REPAIRED, THE PURCHASER OR CONDOMINIUM BOARD WILL HAVE TO PROCEED AT ITS SOLE COST AND EXPENSE AND/OR ANY WARRANTIES OR UNDERTAKINGS ASSIGNED TO IT BY SPONSOR.

(n)    Except for those warranties or guarantees provided to Sponsor by contractors, manufacturers or suppliers, which Sponsor will assign to the Condominium Board and/or Unit Owners, as necessary, Sponsor does not make any warranty of any kind, express or implied, and Sponsor hereby disclaims any and all warranties, including, but not limited to, implied warranties of merchantability and fitness for a particular purpose, with respect to the construction of the Unsold Units and the Common Elements and with respect to the personal property located within the Unsold Units, the Common Elements, and the Unit Owners assume all risk and liability from the use of this property. Without limiting the generality of the foregoing, Sponsor hereby disclaims any and all express or implied warranties as to design, construction, view, sound, light quality and/or odor transmission, furnishing and equipping of the Condominium, the existence of molds, mildew, spores, fungi and/or other toxins within the Condominium, to the extent applicable and to the extent that same have not expired by their terms, Sponsor has not given and Purchaser has not relied on or bargained for any such warranties.  In no event will Sponsor be liable for incidental or consequential damages (whether based on negligence, breach of contract, warranty, or otherwise).

(o)     Prior to the Closing of Title for each Unit, Sponsor will cause such Unit and its Common Interest, benefits, rights and easements as described in the Declaration and By-laws to be released from the lien of any mortgages or security agreements encumbering the Unit (other than any mortgage or security agreements obtained by the Purchaser).

(p)     Sponsor will bear all costs and expenses incurred by it in connection with the preparation of the Plan and all selling expenses and compensation payable to sales or other personnel of Sponsor.

(q)     Sponsor will pay or cause to be paid all contractors, subcontractors and materialmen and all others involved in the construction and equipping of the Building in accordance with the New York Lien Law, for work performed and fixtures, material and equipment supplied or installed during construction thereof and will cause any and all mechanics' liens arising out of such construction and equipping, if any, to be discharged by bonding, or otherwise, promptly alter the filing of any such liens.

(r)     No Closing of an Unsold Unit will occur prior to the issuance of a temporary certificate of occupancy for the Unit. Sponsor will perform any work and/or supply any material necessary to obtain a permanent certificate of occupancy for the Unsold Units no later than the expiration of the temporary certificate of occupancy, unless extended.

(s)     The Sponsor has no obligation to defend any suits or proceedings, nor to indemnify the Condominium Board or Unit owners arising out of any act or occurrence occurring prior to the recording of the Declaration, except for claims arising out of the acts, omissions or representations of the Sponsor.

(t)     Sponsor will deliver to the Condominium Board copies of all of the mechanical, electrical and plumbing drawings for the Building.

(u)     In accordance with Section 339-p of the Condominium Act, a registered architect or licensed professional engineer shall certify within reasonable tolerances that the Floor Plans are an accurate copy of portions of the plans of the Building as filed with and approved by the municipal or other governmental authority having jurisdiction over the issuance of permits for the construction of the Building and, in addition, such architect or professional engineer shall make periodic inspections at various stages of construction to determine that the Building is built in accordance with such plans.

(v)     Sponsor will pay all Common Charges, special assessments and real estate taxes allocated to any Unsold Units in accordance with the provisions of the By-laws. Sponsor expects to have the financial resources to meet the aforesaid obligations with respect to Unsold Units and to fund same from income from projected sales, the rental or leasing of Unsold Units and Sponsor's other financial resources. No bond or other security will be posted by Sponsor with respect to this obligation.

(w)     Sponsor will initially procure on behalf of the Condominium Board the insurance relating to the Condominium which is required to be maintained by the Condominium Board in accordance with the provisions of the By-laws the cost of which insurance has been reflected in the First Year's Budget (See the Section of the Plan entitled "Rights and Obligations of the Condominium Board/Summary of By-laws").

(x)     Pursuant to the provisions of Section 352-e of the New York General Business Law, copies of the Plan and all exhibits or documents referred to herein shall be available for inspection, by prospective Purchasers and by any person who shall have purchased a Unit offered by the Plan or shall have participated in the offering of such Unit, at Sponsor's office and shall remain available for such inspection for a period of 6 years from the date of the recording of the Declaration. In addition, a set of Floor Plans showing the layout, location and approximate dimensions of each Unit and its unit number designation and tax lot number, certified by the appropriate governmental authority of The City of New York as conforming to the official tax lot number for each such Unit, will be filed in the City Register's office when the Declaration is recorded, and an additional set will be furnished to the Condominium Board.

(y)     Sponsor is obligated to deliver to the Condominium Board all books of account and records pertaining to the Building's operation which are in Sponsor's possession on the First Closing.

(z)     In the event of the dissolution or liquidation of Sponsor or the transfer of ten (10) or more Units or twenty (20%) percent or more of the total number of Units in the Condominium, whichever is less, to a single Purchaser, the principals of Sponsor will provide financially responsible entities or individuals who will assume the status and all obligations of Sponsor for those Units under the Plan and Laws.

(aa)    Following the issuance of a permanent certificate of occupancy, Sponsor will deliver a set of "as-built" plans to the Condominium Board.

Sponsor and its contractors, subcontractors, agents and employees will have a right of access to each Unit and to all of the Common Elements for the purpose of fulfilling Sponsor's obligations under the Plan and performing certain alterations and repairs in or about the Unsold Units. Sponsor will use reasonable efforts in order to exercise such access in such a manner as will not unreasonably interfere with the use of any Unit for its permitted purposes. If reasonable care under the circumstances is exercised to safeguard the Unit Owner's property, such entry shall not render Sponsor or its authorized agents liable for any damage to the Unit or to the personalty or fixtures contained therein.

Obligations of Sponsor hereunder with respect to the Building shall be enforceable by the Condominium Board on behalf of all Unit Owners. Obligations of Sponsor shall be enforceable by individual Unit Owners if either (i) the Condominium Board fails to take reasonable action to enforce such obligations within 120 days following the giving of notice of such claim by any

Unit Owner to the Condominium Board or (ii) the applicable statute of limitations with respect to any claim by a Unit Owner which would otherwise be enforceable by the Condominium Board will expire during the aforesaid one hundred twenty (120) day period.

Except as set forth above or as required by Law, Sponsor has not furnished any bond or other security for the performance of the obligations of Sponsor under the Plan. The ability of Sponsor to perform its obligations hereunder will partly depend upon its financial condition at the time it is called upon to perform. No representation can be made that it will be financially able to perform any or all of such obligations. Unless expressly provided to the contrary herein, the obligations of Sponsor under the Plan shall survive the delivery of the respective deeds to the Units to Purchasers.

In the event Sponsor is unable to perform its material obligations under the Plan, all sales will cease, Sponsor will promptly submit an amendment to the Plan setting forth its inability to perform such material obligations under the Plan, and will offer all Purchasers the right to rescind their Purchase Agreements within not less than fifteen (15) days after the Presentation Date of the amendment. Any Purchaser electing rescission pursuant to the offer will have their Deposit and any interest accrued thereon returned.

The foregoing sets forth the entire obligations of Sponsor hereunder and no others shall be implied, except that nothing contained herein shall be deemed to limit the rights of Unit Owners under their respective Purchase Agreements. Sponsor makes no representations or warranties other than as set forth in the Plan.

The terms of the Plan will govern in the event of a conflict between the Plan and any other document or advertisement used in connection with the Plan.

All representations under the Offering Plan, all obligations pursuant to the General Business Law, and such additional obligations under the Offering Plan which are to be performed subsequent to the closing date will survive delivery of the deed.

Use of Unsold Units

Sponsor reserves the right, without prior notice or amendment to the Plan, to use any Unsold Units as sales, rental offices and model apartments and in any other manner in compliance with Law.  In the event Sponsor thereafter elects to sell any such Unsold Unit, Sponsor may require the Purchaser thereof to purchase all or any of the furnishings equipment or decorations therein and pay, in addition to the purchase price for such Unit, such amounts as Sponsor may determine. In no event shall the presence of any furniture furnishings, equipment or decorations in any model apartment imply or represent that any Unit will contain such furniture, furnishings, equipment or decorations upon delivery of the Unit to the Purchaser of the such Unit unless such Purchaser agrees to pay Sponsor an amount as determined by Sponsor in addition to the purchase price for such Unit.

## CONTROL BY SPONSOR

The Sponsor, as the Owner of unsold Residential Units, will initially be entitled to designate a majority of the members of the Condominium Board.  The Condominium Board shall initially consist of three (3) persons designated by Sponsor.  Sponsor presently contemplates that the initial members of the Condominium Board shall be Joseph Simone, Michael Contillo and Joseph Deglomini who shall serve as President, Vice President and Treasurer and Secretary of the Condominium Board, respectively.  Mr. Simone is a principal of the Sponsor.  The Condominium Board will call for a special meeting of the Unit Owners to elect a new Condominium Board approximately 30 days before or after the first anniversary of the first Closing.

Commencing with the first annual meeting, the Condominium Board shall consist of five (5) persons elected by the Unit Owners (including Sponsor).  The number or composition of Condominium Board members may not be changed except in accordance with the procedures described in the By-laws.

At meetings of the Unit Owners, Sponsor will have the right to vote all of the Common Interests attributable to the Unsold Units owned by Sponsor as it sees fit.  However, at elections of members to the Condominium Board held during the Initial Control Period (that is, the period ending on the earlier of (a) the closing of title with Purchasers under the Plan to Units having at least fifty (50%) percent of the aggregate Common Interest appertaining to all Units, or (b) three (3) years after the First Closing), Sponsor will have the right to designate 3 of the 5 members of the Condominium Board, and Sponsor, and all other Unit Owners shall have the right to vote for the remaining members of the Condominium Board.

So long as Sponsor shall continue to own at least one (1) Unsold Unit, Sponsor shall have the right to designate one (1) member to the Condominium Board, and shall have the right to vote its Common Interests attributable to the Unsold Units for the remaining Members of the Condominium Board.

Within thirty (30) days after the end of the Initial Control Period, the members of the Condominium Board designated by Sponsor shall resign and their replacements shall be filled by a majority vote of the remaining Members of the Condominium Board at any regular meeting of the Condominium Board or at a special meeting thereof called for such purpose; provided, however, that if Sponsor continues to own at least one (1) Unsold Unit after the end of the Initial Control Period, only two (2) of the three (3) members of the Condominium Board designated by Sponsor shall resign.

The number of members of the Condominium Board may not be increased or decreased without the consent of Sponsor for so long as Sponsor continues to own at least one (1) Unsold Unit.

Until Sponsor no longer elects a majority of the members of the Condominium Board, Sponsor will, through its control of the Condominium Board, have control of the maintenance and operation of, and the services to be provided by, the Condominium and will determine the Common Charges to be paid by all Unit Owners.

Until Sponsor has conveyed title to all the Units, but in no event later than five (5) years after the First Closing, whichever shall first occur, the Condominium Board may not take any of the following actions without Sponsor's prior written consent (notwithstanding the number of votes Sponsor controls): (a) make any addition, alteration or improvement to the Common Elements or to any Unit unless the same are required by Law, or (b) assess any Common Charges or Special Assessments for the creation of, addition to or replacement of or addition to all or part of a reserve, contingency or surplus fund, or (c) increase or decrease the number, or change the kind of, employees initially employed for the Condominium, or (d) enter into any service or maintenance contract for work or otherwise contract for work or services not covered in the First Year's Budget, except as is required to reflect normal annual increases in operating services, or (e) borrow money on behalf of the Condominium or (f) exercise a right of first refusal to lease or purchase a Unit; provided, however, that Sponsor's written consent is not necessary to perform any function or take any action described in items (a) through (f) above, if, and only if, the performance of such function or the carrying out of such an action is necessary to enable the Condominium Board to comply with Law or to remedy any notice of violation or work order of the Condominium's insurer.

However, at no time may Sponsor exercise veto power over expenses described in Schedule B or over expenses required to (i) comply with applicable laws or regulations, (ii) to remedy any notice of violation, or (iii) to remedy any work order by an insurer.

## CONDOMINIUM BOARD

The affairs of the Condominium shall be governed by the Condominium Board. The term of office of the members of the first Condominium Board shall be for one (1) year or until their successors are elected. Members of the Condominium Board shall serve without compensation. Any member of the Condominium Board may resign at any time by written notice hand delivered or sent by certified mail, return receipt requested, to the Condominium Board. Notwithstanding the term of such member's office, such resignation shall take effect at the time specified therein.

The Condominium Board shall initially consist of three (3) persons designated by Sponsor. Sponsor presently contemplates that the initial members of the Condominium Board shall be Joseph Simone, Michael Contillo and Joseph Deglomini, who shall serve as President, Vice President and Treasurer and Secretary of the Condominium Board, respectively. Mr. Simone is a principal of the Sponsor. The Condominium Board will call for a special meeting of the Unit Owners to elect a new Condominium Board approximately thirty (30) days before or after the first anniversary of the first Closing. Thereafter, annual meetings shall be held on or about the anniversary date of the first annual meeting. Except for members designated or elected by Sponsor pursuant to the terms of Sections 2.7, 2.10 or 4.9 of the By-Laws, all members of the Condominium Board shall be either: (i) individual Unit Owners or adult family members of an individual Unit Owner; or (ii) individual Permitted Mortgagees; or (iii) officers, directors, shareholders, partners, principals, employees, or beneficiaries of corporations, partnerships, fiduciaries, or any other entities that are Unit Owners or Permitted Mortgagees. In addition, no Unit Owner may be elected to serve on the Condominium Board (nor may continue to serve on the Condominium Board) if the Condominium Board has perfected a lien against such Unit Owner's Unit and the amount necessary to release such lien has not been paid at the time of such election, or so long as such lien remains unpaid. In no event may more than one individual of a designated unit serve on the Condominium Board or as an officer of the Condominium Board at the same time during the term of office.

Sponsor reserves the right to designate different individuals to serve on the initial Condominium Board, in lieu of the above-mentioned individuals. So long as Sponsor owns any Unsold Units, Sponsor shall have the right (a) to designate at least one (1) member to any executive or other committee formed by the Condominium Board and (b) to appoint one assistant secretary authorized to execute and deliver, in connection with the Unsold Units, estoppel certificates and any other document or instrument required to be delivered by the Condominium Board to Sponsor or on Sponsor's behalf pursuant to the provisions of the declaration and By-Laws.

Commencing with the first annual meeting, the Condominium Board shall consist of five (5) persons elected by the Unit Owners (including Sponsor). So long as Sponsor owns any Unsold Units, the number of members of the Condominium Board may not be increased without the consent of Sponsor.

It shall be the duty of the President to call a special meeting of the Condominium Board, when he or she deems the same to be necessary or desirable, or if so directed by written request of three (3) or more members of the Board. It shall be the duty of the President to call a special meeting of the Unit Owners upon presentation by the Secretary of a petition signed by Unit Owners having at least fifty (50%) percent of the Common Interests of all Unit Owners. The Secretary shall cause a notice of such special meeting stating the time, place and purpose thereof to be delivered personally or mailed at least three (3) business days before such special meeting of the Board, and at least ten (10) days but no more than thirty (30) days before such meeting of the Unit Owners. No business other than that stated in the notice shall be transacted at such special meeting. (See Articles 2 and 4 of the By-Laws of the Condominium.)

Each Unit Owner (including Sponsor for so long as Sponsor shall own Unsold Units) shall be entitled to cast one (1) vote for each .0001% of Common Interest attributable to such Unit Owner's Unit at all meetings.

The By-Laws and Declaration may be amended upon a vote of sixty-six and two-thirds (66-2/3%) percent of all Unit Owners in number and aggregate Common Interest held at a duly called meeting, provided, however, that no Amendment shall change a Unit's Common Interest without the consent of such Unit Owner, and the Unit's mortgagee, if any, and provided further that no amendment to the By-Laws or Declaration affecting any Unsold Unit or Sponsor may be made without the consent of Sponsor in its sole discretion.

A member of the Condominium Board may be removed with or without cause by an affirmative vote of a majority of Unit Owners (as defined in the By-laws) who are present at a meeting containing a quorum of Unit Owners; provided, however, that members of the Condominium Board designated by Sponsor may only be removed with cause and replaced by Sponsor. No member of the Condominium Board shall continue to serve on the Condominium Board if, during his or her term of office, such member shall cease to be a Unit Owner or an interested party as described in the By-laws; provided, however, that this provision respecting Unit ownership and Condominium Board, membership shall not apply to members of the Condominium Board designated or elected by Sponsor.

The By-Laws of the Condominium do not include a provision that after the initial Sponsor voting control period a majority of the Condominium Board must be owner-occupants or members of an owner-occupant's household who are unrelated to the Sponsor and its principals.

Upon the affirmative vote of a majority of the members of the Condominium Board, any officer may be removed with or without cause. A successor officer may be elected at any regular Condominium Board meeting or at any special Condominium Board meeting called for such purpose.

All officers and members of Condominium Board and employees of the Condominium will be insured at all times from and after the First Closing under directors and officers liability insurance in favor of the Condominium. The amount and cost of the insurance has been provided

for in the First Year's Budget. As provided in the By-laws, no member of the Condominium Board or officer of the Condominium shall have any personal liability to the Condominium or to any Unit Owner, except that a member of the Condominium Board shall be liable for such members own bad faith or willful misconduct. All Unit Owners shall severally, to the extent of their respective interests in their Units and appurtenant Common Interests, indemnify each member of the Condominium Board against any liability or claim except those arising out of such members' own bad faith or willful misconduct. See Section 2.20 of the By-laws of the Condominium for further details pertaining to the indemnification of the members of the Condominium Board.

## RIGHTS AND OBLIGATIONS OF UNIT OWNERS

Sales and Leases of Units

Each Unit Owner may sell or lease his Unit for terms of 1 year or more provided he/she ("Offering Unit Owner") first gives the Condominium Board, on behalf of all Unit Owners, notice of his/her intention to sell or lease such Unit and an opportunity to purchase or lease such Unit at the same price and rental and on the same terms as were offered in good faith by a prospective Purchaser or lessee, as more specifically provided in the By-laws. If the Condominium Board does not elect to purchase or lease the Unit within 30 days after receipt of notice, the Offering Unit Owner will have an additional 60 days to enter into a written agreement with the prospective Purchaser or lessee, as the case may be, embodying the terms set forth in such notice. In the event such written agreement is not executed by the transferee within such 60 day period or such sale or lease is not consummated within an additional 60 days following the expiration of such 60 day period, the Offering Unit Owner will be required to again first offer the same to the Condominium Board, provided that the Condominium Board shall be entitled to waive, or to permit an extension of, either or both of such 60 day periods. The Condominium Board may not exercise its option to purchase or lease any Unit without prior approval of a majority in interest of Unit Owners. The Condominium Board must obtain the consent of 66 2/3 of the aggregate Common Interest of all Unit Owners in connection with capital expenditures exceeding $500,000 pursuant to Section 5.3 of the By-Laws. In the event the Board exercises its option to purchase, such purchase may be made from the funds in the capital and/or expense accounts of the Condominium, or, if such funds are insufficient, by levy of a Special Assessment. The Board may, in its discretion, finance the acquisition of a Unit provided that no such mortgage encumbers any portion of the Building other than the Unit being acquired (See Section 7.3 of the By-Laws).

Any such deed given by an Offering Unit Owner shall provide that the acceptance thereof by the grantee shall constitute an assumption of the provisions of the Declaration, the By-laws and the Rules and Regulations, as the same may be amended from time to time. Any such lease shall be consistent with the By-laws and shall provide that it may not be materially modified, amended, or extended without the prior consent in writing of the Condominium Board, that the tenant shall not assign the lease or sublet the Unit or any part thereof without the prior consent in writing of the Condominium Board, and that the Condominium Board, if permitted by Law, shall have the power to terminate such lease and/or to bring summary proceedings to evict the tenant in the name of the landlord thereunder, in the event of default by the tenant in the performance of such lease. The form of any such lease shall be a printed, reasonably applicable form of residential lease which is generally accepted in New York City such as an appropriate Real Estate Board of New York, Inc. or Blumberg form, except for such changes therein as provided in the By-laws, and such lease must comply with all applicable New York State and New York City laws.

The Board of Managers may not discriminate against any persons on the basis of race, creed, color, national origin, sex, disability, marital status or other grounds prohibited by law, in its sale or lease, if permitted, of any Unit which it acquires.

Any purported sale or lease of a Unit in violation of this section shall be voidable at the election of the Condominium Board.

A Unit Owner may lease, sell or convey the Unit to a spouse, adult child or grandchild, parent, grandparent or adult sibling, may convey his Unit by gift, may devise his Unit by will, or have it pass by intestacy, without complying with the foregoing restrictions; provided, however, that each succeeding Unit Owner shall be bound by, and his Unit shall be subject to, the preceding restrictions. In addition, any Unit Owner may lease, sell or convey the Unit to a related or controlled individual or entity, as more particularly set forth in the By-laws.

A Unit Owner may not sell the Unit for a period of one (1) year from the date Unit Owner acquired the Unit, except in the case of the death of the Unit Owner or his or her spouse.

The restrictions upon the sale and lease of Units shall not apply to Sponsor with respect to any Unsold Units, or to Units acquired by a mortgagee in foreclosure or by deed in lieu of foreclosure, and they shall be free to sell or lease without first offering to sell or lease to the Condominium Board.

The sale or conveyance of a Roof Terrace Unit may be made to only another Residential Unit Owner or to the purchaser of the seller's Residential Unit and, conversely, the sale of seller's Residential Unit must include the Roof Terrace Unit, unless the Roof Terrace Unit is sold and conveyed to another Residential Unit Owner at or prior to consummating the sale of the Residential Unit.  The restrictions on the sale or conveyance of a Roof Terrace Unit shall not apply to Sponsor with respect to any Unsold Units and Sponsor shall be free to sell or convey a Roof Terrace Unit to other than a Residential Unit Owner.

The sale or conveyance of a Parking Space Unit may be made to only another Residential Unit Owner or the purchaser of the seller's Residential Unit and, conversely, the sale of the seller's Residential Unit must include the Parking Space Unit, unless the Parking Space Unit is sold and conveyed to another Residential Unit Owner at or prior to consummating the sale of the Residential Unit. The restrictions on the sale or conveyance of a Parking Space Unit shall not apply to Sponsor with respect to any Unsold Units and Sponsor shall be free to sell or convey a Parking Space Unit to other than a Residential Unit Owner.

A Unit Owner may only sell or lease his entire Unit. In addition, each conveyance of a Unit by a Unit Owner shall include, as part of the property to be conveyed, such Unit Owner's undivided interest in (a) the Common Elements, (b) the Limited Residential Common Elements (in case of a Residential Unit only); (c) any Unit or Units acquired by the Condominium Board on behalf of all Unit Owners, or any proceeds of the sale or lease thereof and (d) any other assets of the Condominium. No part of the Unit Owner's interest in the Common Elements may be sold, transferred or otherwise disposed of, except as part of a sale, transfer or other disposition of the Unit or as part of a sale, transfer or other disposition of the specific interest in the Common Elements by all affected Unit Owners.

A Unit may not be sold or leased unless all unpaid Common Charges and liens against such Unit (other than Permitted Mortgages) are paid and/or satisfied at or prior to the sale or

lease of the Unit. In addition, the Condominium Board may establish reasonable fees for the processing of sale and lease notices, which shall be payable by the Offering Unit Owner.

Notwithstanding anything contained herein to the contrary, prior to the Closing of Title to a Unit, the Purchase Agreement prohibits a Purchaser from listing such Unit for resale or rental with any broker or from advertising or otherwise offering, promoting or publicizing the availability of the Unit for sale or lease, without Sponsor's prior written consent.

Use of Units

A Residential Unit shall be used only as a residence (except as described below), and not more than one family may occupy a Unit at one time. A Residential Unit owned or leased by an individual, corporation, partnership, fiduciary or any other entity (including, but not limited to, embassies and consulates of foreign governments) may only be occupied by such individual, an officer, director, stockholder or employee of such corporation, a partner or employee of such partnership, the fiduciary or beneficiary of such fiduciary, a principal or employee or such other entity, respectively, or by members of the immediate family or guests of any of the foregoing. A Residential Unit may be used for any other lawful purpose, provided such use is permitted by, and complies with Law, does not violate the then existing certificate of occupancy covering the Building, and the Condominium Board, in its sole discretion, grants permission for such use.

Notwithstanding the preceding paragraph, Sponsor may, without the permission of the Condominium Board: (a) use or grant permission for the use of any Unsold Residential Unit as a professional office or for any other purpose, provided such use is permitted by Law, does not violate the then existing certificate of occupancy covering the Building and the use of such Unit complies with Law; and (b) retain ownership of one or more Unsold Residential Units for use as models and sales and/or promotion and/or leasing offices in connection with the sale or rental of other Unsold Units.

A Roof Terrace Unit shall be used only for accessory passive recreational purposes (e.g., sunbathing and lounging) by the Owner thereof and the tenants and occupants of such Owner's Residential Unit in accordance with Law, and for no other purpose.

A Parking Space Unit shall be used only for the parking of a passenger vehicle or motorcycle by the Owner thereof and the tenants and occupants of such Owner's Residential Unit in accordance with Law, and for no other purpose.

The Common Elements shall be used only for the furnishing of the services and facilities for which they are reasonably suited and capable and which are incident to the use and occupancy of Units.

No nuisance, immoral, improper, offensive or unlawful use shall be allowed in the Building. All Laws, shall be complied with at the sole expense of the respective Unit Owners or the Condominium Board, whoever or whichever shall have the obligation to maintain or repair such portion of the Property.

No awnings, air conditioning equipment or ventilators shall be installed or modified in the Building without prior written approval of the Condominium Board. No radio or television aerial or other similar device shall be erected on the roof or exterior walls of the Building or on the Property, without obtaining in each instance the written consent of the Condominium Board.

No pets other than dogs, caged birds, cats and fish (which do not cause a nuisance, health hazard or unsanitary condition) may be kept in a Unit without the consent of the Condominium Board. Each Unit Owner who keeps any type of pet in his Unit will be required to: (a) indemnify and hold harmless the Condominium, all Unit Owners and the Managing Agent from all claims and expenses resulting from acts of such pet; and (b) abide by any and all Rules and Regulations of the Condominium Board adopted with respect thereto.

Each Unit Owner shall keep his Unit in a good state of preservation and cleanliness and each Unit Owner shall be obligated to maintain and keep in good order and repair his own Unit in accordance with the provisions of the By-laws and Law. The Rules and Regulations concerning the use of Units may be amended from time to time by the Condominium Board provided that copies thereof are furnished to each Unit Owner prior to the time that they become effective (except that no amendment thereof affecting the Unsold Units may be made unless agreed to by Sponsor).

Mortgage of Units by Unit Owners

Each Unit Owner may mortgage his Unit, provided that the conditions with respect thereto set forth in the By-laws are first complied with. As more fully set forth in the By-laws, these conditions include the requirements that (a) the mortgage be substantially in the form used by Institutional Lenders making mortgage loans secured by residential condominiums in New York State, (b) the Condominium Board is notified in writing of the making of such mortgage and receives a conformed copy of the note and mortgage and (c) the owner making such mortgage first satisfies all unpaid liens against his Unit, other than Permitted Mortgages. Sponsor shall have the right to mortgage any Unsold Unit without any restriction or limitation.

As more particularly set forth in the Section entitled "Amendments to Condominium Documents", in certain instances the consent of the Mortgage Representative is necessary in order to amend the Declaration, Bylaws or Rules and Regulations. The By-laws provide that no more than 3 Residential Mortgage Representatives shall be designated by the holders of mortgages (a) which satisfy the conditions set forth in the By-laws (as described above) and (b) which holders of such mortgages are (i) Sponsor, (ii) a bank, trust company, insurance company, real estate investment or mortgage trust or (iii) a governmental or union employee, welfare, pension or retirement fund or system.

Common Charges Determination and Assessment

Common Expenses, which are payable by Unit Owners and are included in their Common Charges, are allocated among Unit Owners in proportion to their respective Common Interests. Common Expenses include, among other things, (a) all costs and expenses (including the payment of wages) in connection with the repair, maintenance, replacement, restoration and

operation of, and any alteration, addition or improvement to, the Common Elements, (b) water charges and sewer rents in connection with the Building; (c) real estate taxes and assessments levied with respect to the Property (until the same are separately assessed to individual Units); and (d) amounts for certain other items as the Condominium Board may deem proper, such as amounts for reserves or in connection with the purchase or lease by the Condominium Board of any Unit (See Article 2 of the By-laws for further details pertaining to the Condominium Board's right to accumulate reserves for capital expenditures). The Condominium Board must obtain the consent of 66 2/3 of the aggregate Common Interest of all Unit Owners in connection with capital expenditures exceeding $750,000.

The Common Interests of the Units have been allocated based upon the approximate portion that the fair value of a Unit at the date of declaration bears to the then aggregate fair value of all Units in accordance with Section 339-i(1)(i) of the Real Property Law of the State of New York.

At least annually, the Condominium Board will prepare a budget for Common Expenses and allocate, as aforesaid, and assess among all Unit Owners, Common Charges to meet Common Expenses.

The Condominium Board will furnish copies of each budget on which Common Charges are based to all Unit Owners and advise such Unit Owners of the amount of Common Charges payable by them.  Unless otherwise determined by the Condominium Board, Common Charges will be payable monthly in advance on the first day of each month.

Set forth in Part II of the Plan is a copy of §339-kk of the Real Property Law of the State of New York, which provides, among other things, for the ability of the Condominium to serve a notice to any tenant occupying a Unit to pay its rent directly to the Condominium if the Unit Owner has failed to pay Common Charges, assessments or late fees for such Unit within 60 days after the expiration of any grace period.

Common Charges: Collection and Lien for Non-Payment

Under the provisions of Section 339-z of the Real Property Law of the State of New York and the By-laws, the Condominium Board, on behalf of all Unit Owners, will have a lien on each Unit for unpaid Common Charges, together with interest thereon, assessed against such Unit in proportion to the respective Common Interests of the Units. All such liens, however, to the extent permitted by Law, will be subordinate to the lien of any first Permitted Mortgage of record and to liens for real estate taxes on the particular Unit.  Any lien for unpaid Common Charges against a Unit will be effective from and after filing of a verified notice thereof in the Register's Office until all sums secured thereby with interest accrued thereon shall have been fully paid, or until 6 years from the date of filing (unless foreclosure of such lien is started within such 6 year period), whichever shall occur sooner. The By-laws provide that such liens may be foreclosed in the manner provided in Section 339-aa of the Condominium Act which authorizes a suit brought in the name of the Condominium Board (acting on behalf of all Unit Owners) in like manner as the foreclosure of a mortgage on real property, or an action may be brought by the Condominium Board to recover unpaid Common Charges without foreclosing such lien. In addition, the

Condominium Board may assess Unit Owners a late charge of $150 per month for Common Charges which remain unpaid for more than 10 days after the date when due, and interest at the rate of 1.5% per month of such unpaid amounts (less any "late charges" theretofore collected), plus all expenses of collection, including but not limited to reasonable attorneys' fees. Sponsor obligates itself to cause any members of the Condominium Board related to or affiliated with Sponsor to vote in favor of filing a lien, as provided in Section 339-aa of the Real Property Law, against any Unsold Units owned by Sponsor with respect to which payments of Common Charges have not been made within 30 days after the date when due.

No Unit Owner may exempt himself from liability for his Common Charges by waiving use of any of the Common Elements or by abandonment of his Unit. No Unit Owner, however, will be liable for the payment of any part of the Common Charges assessed against his Unit subsequent to a permissible sale, transfer or other conveyance by him of such Unit. In addition, as more specifically set forth in the By-laws, a Unit Owner may, by conveying his Unit without consideration to the Condominium Board and complying with certain conditions in connection therewith, exempt himself from Common Charges thereafter accruing. Such conditions include the payment of all Common Charges and assessments then due and payable with respect to his Unit and such Unit being free and clear of all liens and encumbrances other than Permitted Mortgages. However, in no event shall Sponsor be permitted to convey any Unsold Unit to the Condominium Board and thereby exempt itself from Common Charges attributable to such Unit thereafter accruing, unless: (i) the aggregate Common Interests appertaining to the Unsold Units constitutes 15% or less of the total Common Interests then appertaining to all Units; (ii) at least 5 years have elapsed from the date of the First Closing; and (ii) at the time of conveyance, Sponsor shall pay the Condominium Board a sum equal to the product of the then current monthly Common Charges for the Unsold Units being conveyed multiplied by 24.

On a resale of a Unit, the Purchaser thereof will be liable for the payment of Common Charges accrued and unpaid against such Unit prior to his acquisition. Prior to the permissible sale, transfer or other conveyance of a Unit, any seller or purchaser of a Unit shall be entitled to a statement from the Condominium Board, setting forth the amount of the unpaid Common Charges accrued against the Unit and neither such seller nor such purchaser shall be liable for, nor shall the Unit be conveyed subject to a lien for, any unpaid Common Charges against such Unit accrued prior to such conveyance in excess of the amount set forth in such statement. In the event of a foreclosure by the Condominium Board of its lien on any Unit for unpaid Common Charges, if the net proceeds of the foreclosure sale shall be insufficient for the payment of such unpaid charges or if a Unit is acquired by a mortgagee or Purchaser in foreclosure, the Unit Owner will remain liable for the unpaid balance. Neither (a) a Permitted Mortgagee acquiring title to a Unit at foreclosure sale nor (b) a purchaser at a foreclosure sale shall be liable, and the Unit shall not be subject to a lien, for the payment of the Common Charges assessed prior to the acquisition of title to such Unit by such Permitted Mortgagee or Purchaser. However, such Permitted Mortgagee or purchaser at a foreclosure sale shall be liable for payment of all Common Charges after the acquisition of title to such Unit. The Condominium Board will have the right to assess such unpaid balance as a Common Charge among all Unit Owners.

Repairs to, and Maintenance of, Units and Common Elements

Generally, all painting, decorating, maintenance, repairs and replacements, whether structural or nonstructural, ordinary or extraordinary, (a) in or to any Unit (other than to the Common Elements), including the heating and cooling systems, the plumbing, appliances in the Units, the fireplace and flue, the interior walls, ceilings and floors, window panes and all entrance doors thereto, along with their frames and saddles, will be made by the owner of such Unit at such Unit Owner's sole cost and expense, (b) in or to the General Common Elements will be made by the Condominium Board and the cost and expense thereof will be charged to all Unit Owners as a General Common Expense, and (c) in or to the Limited Residential Common Elements will be made by the Condominium Board and the cost and expense thereof will be charged to all Residential Unit Owners as a Residential Common Expense, if involving structural or extraordinary maintenance, repair or replacement, or by the Residential Unit Owner having direct and exclusive access thereto at such Residential Unit Owner's cost and expense, if involving painting, decorating, and non-structural ordinary maintenance, repairs and replacement, or if involving structural or extraordinary maintenance, repair or replacement caused by the negligence of such Unit Owner or Unit Owner's permitted occupants, guests or invitees. Notwithstanding anything herein to the contrary, (y) the costs and expenses of any structural or extraordinary repairs or replacements to the Roof Terrace Units, such as repair or replacement of the chain link fences and raised flooring, will be charged to all Roof Terrace Unit Owners as a Roof Terrace Common Expense, unless such structural or extraordinary repair or replacement is caused by the negligence of the Roof Terrace Unit Owner or such Unit Owner's permitted occupants, guests or invitees, in which case the repairs and replacements shall be made by the Condominium Board and the costs and expenses thereof will be charged to such Roof Terrace Unit Owner, and (z) the costs and expenses of any structural or extraordinary repairs or replacements to the Parking Space Units, such as restriping, repaving or resealing, will be charged to all Parking Space Unit Owners as a Parking Space Common Expense, unless such structural or extraordinary repair is caused by the negligence of the Parking Space Unit Owner or such Unit Owner's permitted occupants, guests or invitees, in which case the repairs and replacements shall be made by the Condominium Board and the costs and expenses thereof will be charged to such Parking Space Unit Owner.

Notwithstanding the above, all normal maintenance, repairs and replacements of any Terrace, including plantings, shall be made by the Residential Unit Owner having access to same, at his own cost and expense, but any structural or extraordinary repairs or replacements to such Terrace (including any leaks which are not caused by the negligence of the Residential Unit Owner having access to the same) will be made by the Condominium Board and the cost and expense thereof will be charged to all Residential Unit Owners as a Residential Common Expense. Any Unit Owner having access to a Terrace shall keep it free of snow, ice and accumulation of water. In order to promote a consistent appearance of the Building from the outside, no Unit Owner shall be allowed to enclose, erect a greenhouse and/or alter a Terrace appurtenant to a Unit in such a way that will alter the conformity of the Building, without the prior written consent of the Condominium Board. Additionally, the type, size and quantity of plantings and other installations to be placed on Terraces shall be subject to the prior written approval of the Condominium Board.

The exterior and interior glass surfaces of all windows located in any Unit shall not be colored or painted and are to be washed and cleaned by the Unit Owner at such Unit Owner's sole cost and expense. Any replacement of glass windows in any Unit because of breakage or otherwise shall be made by the Unit Owner thereof at the sole cost and expense of the Unit Owner (unless such breakage is caused by the Condominium Board or the negligence of any other Unit Owner, in which event such replacement of glass windows will be at the sole cost and expense of the Condominium Board or such Unit Owner).

If any repairs or replacements to the Common Elements, whether structural or non-structural, ordinary or extraordinary, are necessitated by the negligence, misuse or abuse of a Unit Owner or such Unit Owner's agents, workers, guests, etc., such maintenance, repairs or replacements will be made by the Condominium Board, and any portion of the cost thereof which is not covered by the insurance maintained by the Condominium Board shall be paid by such Unit Owner.

The By-laws provide that each Unit and all portions of the Common Elements shall be kept in first-class condition (and with respect to any roof or other part of the Property exposed to the elements, free of snow, ice and accumulation of water) by the Unit Owner or the Condominium Board, whichever is responsible for the maintenance thereof. In the event any Unit Owner fails to keep his Unit in such condition, the Condominium Board may, at the expense of such Unit Owner, enter such Unit and perform such acts as are necessary to cure such default. (See the sub-section entitled "Rights of Access").

The By-laws further require that those public or other areas of the Building exposed to public view that are required to be maintained by each Unit Owner or the Condominium Board, be kept in good appearance in conformity with the dignity and character of the Building by such Unit Owner or the Condominium Board.

<u>Alterations, Additions and Improvements of Units and Common Elements</u>

No Unit Owner may make any structural alteration, addition, improvement or repair in or to his Unit or its appurtenant Limited Residential Common Elements, if any, without the prior written approval of the Condominium Board but, as more fully set forth in the By-laws, this provision does not apply to an Unsold Unit. Except as otherwise permitted in the By-laws, no Unit Owner may make any alteration, addition, improvement or repair in or to the Common Elements without the prior written approval of the Condominium Board.

Sponsor shall have the right, without the approval of the Condominium Board, the Selling Agent, the Managing Agent, other Unit Owners, or representatives of holders of Mortgages on Units to: (a) make alterations additions, improvements, or repairs in or to any Unsold Unit, whether structural or non-structural, interior or exterior, ordinary or extraordinary, and (b) subdivide, combine and change the boundary walls of Unsold Units (See the Section of the Plan entitled "Changes in Prices and Units").

Prior to, and as a condition of, the granting of its consent to the making of a structural alteration, addition, improvement or repair in or to a Unit, or its appurtenant Limited Residential

Common Elements, the Condominium Board shall have the right to reasonably approve the Unit Owner's contractors and suppliers and may, at its option, require the Unit Owner to execute an agreement in form and substance satisfactory to the Condominium Board setting forth the terms and conditions under which such alteration, addition, improvement or repair may be made, including, without limitation, the days and hours during which any work may be done. Any Unit Owner making or permitting an alteration, addition, improvement or repair in its Unit, or its appurtenant Limited Residential Common Elements is required by the By-laws to (i) obtain such insurance as the Condominium Board may require, (ii) indemnify the Condominium Board and the Managing Agent against any liability arising from the work, (iii) reimburse the Condominium Board for any architectural, engineering and legal fees incurred in connection with such work, and (iv) execute an agreement, in form and substance satisfactory to the Condominium Board, setting forth the terms and conditions under which such alterations may be made. The provisions of this paragraph shall not apply to Sponsor.

In addition to the requirements set forth in the immediately preceding paragraph, until a permanent certificate of occupancy is obtained for the Building, no Unit Owner shall make any alterations in or to its Unit without first notifying Sponsor in writing and complying with Sponsor's reasonable requirements with respect to the alterations, including, but not limited to, posting a bond, utilizing licensed contractors, indemnifying Sponsor from any liability arising from the work, filing necessary plans and specifications with governmental authorities and procuring all required permits and licenses for such work (See Section 5.2(E) of the By-Laws).

Any contractor performing work shall not employ any personnel or means that may cause labor disturbances or stoppage in the work of Building employees or other contractors or subcontractors employed in the Building.

No application or other document shall be filed with any governmental authority for a permit covering an addition, alteration or improvement to be made in a Unit, unless approved and executed, if necessary, by the Condominium Board. The Condominium Board will not unreasonably refuse to approve and execute, if necessary, any application or other document required to be filed in connection with approved structural alterations, additions, improvements or repairs, provided that the Condominium Board and the Unit Owners shall not be subject to any expense or liability by reason of such approval and execution or, by reason of such addition, alteration or improvement, including, without limitation, liability to any contractor, subcontractor, materialman, architect or engineer, or to any person having any claim for injury to person or damage to property arising therefrom. The provisions of this paragraph shall not apply to an Unsold Unit, provided any alteration to such Unit shall be in accordance with, and only as permitted by, the Condominium Act and all governmental regulations.

Generally, all alterations or improvements in or to the Common Elements will be made by the Condominium Board and the cost and expense thereof will be charged to all Unit Owners as a Common Expense.

<u>Insurance</u>

The Condominium Board is required to obtain and maintain the forms of insurance described in the Section of the Plan entitled "Rights and Obligations of the Condominium Board/Summary of By-laws." The Condominium Board is not required to obtain or maintain any insurance with respect to any property contained in a Unit. Consequently, individual Unit Owners are strongly urged to consider obtaining casualty insurance with respect to the fixtures, furniture, furnishings and other personal property located within their respective Units and liability insurance with respect to occurrences in or about their respective Units.

Rights of Access

As more fully set forth in the By-laws, the Condominium Board and any managing agent, manager, superintendent and other persons authorized by the Condominium Board, will have a right of access to any Unit for the purposes of performing installations, alterations or repairs to the mechanical or electrical services or other Common Elements in the Unit or elsewhere in the Building, to remove violations, cure defaults by a Unit Owner, correct any condition originating in any Unit and threatening another Unit or any Common Element, and for any other purposes provided in the Plan, Declaration or as may be required by Law, provided that requests for entry (except in emergency situations) are made in advance and that any such entry (except in emergency situations) is at a time reasonably convenient to the Unit Owner and the occupants of any Unit.  In case of an emergency, such right of entry shall be immediate, whether the Unit Owner is present at the time or not. Provided reasonable care is exercised to safeguard the Unit Owner's property, any entry described herein shall not render the Condominium Board or its authorized agents liable for damage incurred in connection with the exercise of such right of entry.  In addition, Sponsor and its contractors, subcontractors, agents and employees will have a right of access to each Unit and to all of the Common Elements for purposes of performing certain alterations and repairs in or about Unsold Units and in fulfilling Sponsor's obligations under the Plan, provided that access to any Unit may not be exercised in such a manner as will unreasonably interfere with the use of such Unit for its permitted purposes.

By-laws and Rules and Regulations

Each Unit Owner must strictly comply with the provisions of the Condominium Documents. Pursuant to Section 339(j) of the Condominium Act, failure to comply is grounds for an action for damages or injunctive relief, or both, but such forms of relief shall not be exclusive of other remedies provided by law. The By-laws, together with the Rules and Regulations, will be recorded with the Declaration in the Register's Office.

Examination of Books and Records

Each Unit Owner and each mortgagee of a Unit shall be permitted upon prior request, to examine the books of account of the Condominium and other records of the Condominium during normal business hours on business days at the office of the Condominium.

<u>Self-Help</u>

In the event that any Unit Owner fails to maintain or repair his Unit or any Limited Common Elements appurtenant to such Unit, if any, or in the event of any breach of the Condominium Documents, then, as set forth in Article 9 of the By-laws, the Condominium Board shall have certain rights to perform such maintenance or repairs, or to cure such breach, at such Unit Owner's expense.

## RIGHTS AND OBLIGATIONS OF THE CONDOMINIUM BOARD/
## SUMMARY OF BY-LAWS

Condominium Board

     The affairs of the Condominium shall be governed by the Condominium Board, which shall initially be comprised of three (3) members. Initially, the members of the Condominium Board shall be designated by Sponsor. On or about thirty (30) days before or after the first anniversary of the First Closing, the Condominium Board will call for the first annual meeting of Unit Owners. At such meeting, the incumbent Condominium Board shall resign and, subject to Sponsor's right to designate members of the Condominium Board, the Unit Owners shall elect a new Condominium Board consisting of five (5) members (See the Sections of the Plan entitled "Meetings and Votes of Unit Owners" and "Control by Sponsor"). Thereafter, at each annual meeting, members of the Condominium Board shall be elected and shall serve until the next annual meeting thereof and until a successor has been elected and qualified.

     Except for the members of Condominium Board designated by Sponsor, all members of the Condominium Board must be either Unit Owners or certain interested parties as described in the Bylaws. No member of the Condominium Board shall continue to serve on the Condominium Board if, during his or her term of office, such member shall cease to be a Unit Owner or an interested party. All Board members shall serve without compensation.

Powers and Duties of and Determinations by the Condominium Board

     The Condominium Board shall have the powers and duties necessary for or incidental to the administration of the affairs of the Condominium. Generally, all determinations with respect to the administration of the affairs of the Condominium shall be made by the Condominium Board.

     As more fully set forth in the By-Laws, all determinations required to be made by the Condominium Board shall be by majority of the votes cast at any meeting at which a quorum is present.

     Notwithstanding anything to the contrary contained herein, so long as Sponsor shall continue to own any Unit, but in no event later than five (5) years from the First Closing the Condominium Board may not, without Sponsor's prior written consent, (a) make any addition, alteration, or improvement to the Common Elements or to any Unit; (b) assess any Common Charges for the creation or replacement of, or addition to, all or part of a reserve, contingency, or surplus fund; (c) increase or decrease the number or change the kind of employees from that described in the First Year's Budget; (d) enter into any service or maintenance contract for work or otherwise provide services in excess of those set forth in the First Year's Budget, except as is required to reflect normal annual increases in operating services; or (e) borrow money on behalf of the Condominium; or (f) exercise a right of first refusal to lease or purchase a Unit; provided, however, that Sponsor's written consent is not necessary to perform any function or take any

action described in clauses (a) through (f) above, if, and only if, the performance of such function or the carrying out of such action is necessary (and no alternative is available) to enable the Condominium Board to: (i) comply with Law; or (ii) remedy any notice of violation; or (iii) remedy any work order of the Condominium's insurer.

Meetings and Votes of Unit Owners

Annual meetings of Unit Owners shall be held within approximately thirty (30) days of each anniversary of the first annual meeting. At such meetings, the Unit Owners shall elect the five (5) member Condominium Board, subject to any rights of Sponsor to designate Condominium Board members, and there shall also be transacted such other business as may properly come before such meetings. In addition, special meetings may be held from time to time pursuant to the By-Laws. The Secretary of the Condominium Board shall mail notice of each annual or special meeting to all Unit Owners of record. The notice, which will be given at least five (5) days prior to any such meeting, shall state the purpose of the meeting as well as the time and place where it is to be held. Except as otherwise provided in the By-Laws or Declaration, at all meetings of Unit Owners, the presence in person or by proxy of Unit Owners owning more than Fifty (50%) percent of the Common Interests attributable to all Units shall constitute a quorum and a majority of the votes cast at any such meeting at which a quorum is present shall be binding upon all Unit Owners. At no time may Sponsor exercise veto power over expenses described in Schedule B or over expenses required to (i) comply with applicable laws or regulations, (ii) to remedy any notice of violation, or (iii) to remedy any work order by an insurer.

At all meetings, each Unit Owner (or his or her proxy) entitled to vote thereat (including Sponsor or its designees with respect to Unsold Units) shall be entitled to cast one vote for each .0001% of Common Interest attributable to his or her Unit.

Officers

The principal officers of the Condominium shall be a President, Vice President and Treasurer and Secretary, all of who shall be elected by the Condominium Board. The Condominium Board may appoint additional officers. None of the officers of the Condominium need be Unit Owners or have any interest therein or be Condominium Board members until the first organizational meeting of the Condominium Board following the first annual meeting. Thereafter, the President and Vice President must be members of the Condominium Board. Except as otherwise provided by the Condominium Board, no officer shall receive any compensation for acting as such. The By-Laws provide that all instruments of the Condominium are to be executed by any officer thereof or by such other person or persons as may be designated by the Condominium Board.

Repair or Reconstruction after Fire or Other Casualty

In the event that the Building or any part thereof is damaged or destroyed by fire or other casualty, the Condominium Board will, except as set forth below, arrange for the prompt repair

and restoration thereof (including each Unit, but excluding fixtures, furniture, furnishings or other personal property not constituting a part of such Unit).

If the Building is damaged or destroyed by fire or other casualty and the insurance proceeds are insufficient to cover, or exceed, the cost of repairs and restoration, the deficit or surplus, as the case may be, will be shared entirely by all Unit Owners in proportion to their respective Common Interests. Notwithstanding anything in this paragraph to the contrary, no payment of surplus insurance proceeds shall be made to a Unit Owner until there has first been paid out of his or her share of such funds such amounts as may be necessary to reduce unpaid liens on his or her Unit, other than mortgages which are not Permitted Mortgages, in the order of priority of such liens. The provisions of this paragraph are subject to the next paragraph.

If Seventy-Five (75%) percent or more of the Building is destroyed or substantially damaged by fire or other casualty and if Seventy-Five (75%) percent or more in Common Interest of all Unit Owners do not promptly resolve to proceed with the repair or restoration thereof, the Building will not be repaired and the Property shall be subject to an action for partition instituted by any Unit Owner or lienor, as if owned in common, in which case the net proceeds of sale, together with the net proceeds of insurance policies, shall be divided among all Unit Owners in proportion to their respective Common Interests, provided, however, that no payment shall be made to a Unit Owner until there has first been paid out of his or her share of such funds such amounts as may be necessary to discharge all unpaid liens on his or her Unit (other than mortgages which are not Permitted Mortgages) in the order of the priority of such liens.

<u>Insurance</u>

The Condominium Board is required to obtain and maintain, in accordance with the provisions of the Bylaws, to the extent obtainable and to the extent determined by the Condominium Board to be appropriate, the following insurance: (a) fire insurance with all risk extended coverage, vandalism and malicious mischief endorsements, insuring the entire Building (including each Unit Owner as an additional insured, but excluding fixtures, furniture, furnishings or other personal property not constituting a part of such Unit), together with all service machinery contained therein and covering the interests of the Condominium, and all Unit Owners and Permitted Mortgagees, as their respective interests may appear, in an amount equal to the full replacement value of the Building (exclusive of foundation and footings); (b) rent insurance in an amount equal to Common Charges for one year; (c) worker's compensation and New York State disability benefits insurance; (d) boiler and machinery insurance; (e) plate glass insurance to the extent, if any, determined by the Condominium Board; (f) water damage insurance to the extent, if any, determined by the Condominium Board; (g) elevator liability and collision insurance; (h) fidelity insurance covering all the Condominium Board and all officers, directors and employees of the Condominium; (i) directors and officers liability coverage; and (j) such other insurance as the Condominium Board may determine.

The fire insurance policies shall contain a New York standard mortgagee clause in favor of each Permitted Mortgagee which shall provide that the loss, if any, thereunder shall be

payable to such Permitted Mortgagee as its interest may appear, subject, however, to the loss payment provisions described in the By-Laws.

The amount of fire insurance and all risk extended coverage to be maintained until the first Condominium Board meeting following the first annual meeting of the Unit Owners shall be in at least the sum set forth in the First Year's Budget.

All policies of physical damage insurance shall contain, to the extent obtainable, waivers of subrogation, and waivers of any defense based on (i) co-insurance, (ii) other insurance, (iii) invalidity arising from any acts of the insured and Unit Owners or (iv) pro rata reduction of liability if Unit Owners obtain additional coverage, and shall provide that such policies may not be cancelled or substantially modified without at least ten (10) days' prior written notice to all of the insureds, including all Unit Owners, the Condominium Board and Permitted Mortagees. Duplicate originals or certificates of insurance of all policies of physical damage insurance and of all renewals thereof, together with proof of payment of premiums, shall be delivered to all Unit Owners and Permitted Mortgagees at least ten (10) days prior to the expiration of the then current policies.

The Condominium Board shall also be required to obtain and maintain, to the extent obtainable, comprehensive general liability insurance against claims for personal injury, death or property damage occurring upon, in or about the Property, in such limits as the Condominium Board may from time to time determine, covering (1) the Condominium Board, the Managing Agent or agents thereof, each Condominium Board member and each officer and employee of the Condominium, and (2) each Unit Owner, except that such policy will not cover liability of a Unit Owner arising from occurrences within his or her own Unit or within the Common Elements, if any, exclusive to his or her Unit. The Condominium Board shall review such limits not less than once each year. Until the first meeting of the Condominium Board following the first annual meeting of Unit Owners, such liability insurance shall be in at least the sum set forth in Schedule B with respect to bodily injury and property damage, combined single limit. The insurance discussed above shall also include cross-liability claims of one insured against another.

Any insurance maintained by the Condominium Board may provide for such deductible amounts as Condominium Board determines. The premiums for all insurance referred to above shall be a Common Expense.

Unit Owners shall not be prohibited from carrying other insurance for their own benefit, provided that all such policies shall contain waivers of subrogation, if available, and further provided that the liability of the carriers issuing insurance obtained by the Condominium Board shall not be affected or diminished by reason of any such additional insurance carried by any Unit Owner.

Liability of the Condominium Board and Unit Owners

Every contract made by the Condominium Board or by any Managing Agent or manager thereof shall state that (a) it is made only as agent for all Unit Owners and the members of the Condominium Board, managing agent or manager shall have no personal liability thereon

(except in their capacities as Unit Owners) and (b) the liability of any Unit Owner with respect to such contract shall be limited to such proportionate share of the total liability as the Common Interest of such Unit Owner bears to the aggregate Common Interests of all Unit Owners. To the extent permitted by Law, the members of the Condominium Board shall have no liability to Unit Owners except that a member of the Condominium Board shall be liable for his or her own bad faith or willful misconduct. All Unit Owners shall severally, to the extent of their respective interests in their Units and their appurtenant Common Interests, indemnify each member of the Condominium Board against any liability or claim except those arising out of such member's own bad faith or willful misconduct. The Condominium Board may contract or effect any transaction with any member of the Condominium Board, any Unit Owner, Sponsor, or any affiliate of any of them without incurring any liability for self-dealing except in cases of bad faith or willful misconduct.

Reports to Unit Owners

An annual report of the receipts and expenditures of the Condominium, certified by an independent certified public accountant, shall be submitted by the Condominium Board to all Unit Owners approximately four (4) months after the end of each fiscal year.

Amendments to Condominium Documents

Generally, subject to certain exceptions concerning, among other things, Sponsor, and Unsold Units, and provided that required consents of the Mortgage Representatives, if any, are obtained, any provision of the Declaration, By-Laws or Rules and Regulations affecting the Common Elements or all Unit Owners may be amended, modified, added to or deleted by affirmative vote of at least Sixty-Six and Two-Thirds (66-2/3%) percent in number and in Common Interest of all Unit Owners; provided, however, that the Common Interest appurtenant to each Unit may not be altered without the written consent of all Unit Owners directly affected thereby.

No amendment, modification, addition or deletion of the Declaration, By-Laws or Rules and Regulations (other than those required by law) shall be effective (a) against Sponsor or any Unsold Unit unless Sponsor has given its written consent thereto, or (b) against the holder of any mortgage, pledge or other lien or security interest covering any Unsold Unit unless such holder has given its prior written consent thereto.

Termination of Condominium

The Condominium shall continue and the Property shall not be subject to an action for partition (unless terminated by casualty loss, condemnation or eminent domain as provided in the By-Laws) until such time as the Property shall be withdrawn from the provisions of the Condominium Act as a result of the vote to do so of eighty (80%) percent in number and in Common Interest of all Unit Owners. Such vote shall not be effective, however, unless written consents are obtained from the Mortgage Representatives, if any.

In the event of withdrawal, the Property shall be subject to an action for partition by any Unit Owner or any lienor as if owned in common, in which event the net proceeds of the sale shall be divided among all Unit Owners in proportion to their respective Common Interests after first applying the share of the net proceeds of such sale otherwise payable to any Unit Owner to the payment of any liens on his or her Unit (other than mortgages which are not Permitted Mortgages), in the order of priority of such liens.

Units Acquired by Condominium Board

All Units acquired or leased by the Condominium Board or its designee shall be held by the Condominium Board, or its designee, on behalf of all Unit Owners and the rent or purchase price, closing costs and adjustments payable in connection therewith shall be assessed against all Unit Owners. No Units held by the Condominium Board shall carry any voting rights.

The purchase of any Unit by the Condominium Board on behalf of the Unit Owners may be made from the funds deposited in the capital and/or expense accounts of the Condominium Board. If the funds in such account is insufficient to effectuate any such purchase, the Condominium Board may levy an assessment against each Unit Owner in proportion to his Common Interest, as a Common Charge and/or the Condominium Board may, in its discretion, finance the acquisition of such Unit; provided, however, that financing may only be obtained when permitted by the By-Laws and that no such financing may be secured by an encumbrance or hypothecation of any portion of the Property other than the Unit to be purchased together with its Common Interests.

Procedure to Review Real Estate Tax Assessments

The Condominium Board, on behalf of and as agent for all Unit Owners, will be authorized to commence, pursue and settle certiorari proceedings to obtain reduced real estate tax assessments with respect to Units. All Unit Owners will share the costs in connection therewith and the benefits derived therefrom based on their respective Common Interests. In the event any Unit Owner individually seeks to have the assessed valuation of his or her Unit reduced by bringing a separate certiorari proceeding, the Condominium Board, if necessary for such proceeding, will execute any documents or other papers required for, and otherwise cooperate with such Unit Owner in pursuing, such reduction, provided that such Unit Owner indemnifies the Condominium Board from all claims, costs and expenses (including, without limitation, reasonable attorneys' fees) resulting from such proceedings.

Mechanics Liens

Under the provisions of the Condominium Act, no lien of any nature may arise or be created against the Common Elements except with the unanimous consent of all Unit Owners affected thereby. Liens may arise or be created against only the several Units and their respective Common Interests. Labor performed on, or materials supplied to, a Unit may not be the basis for a mechanic's lien against the Unit of a Unit Owner not expressly consenting to or requesting such work, except in the case of emergency repairs. No labor performed on, or materials furnished to, the Common Elements shall be the basis for a lien thereon but all Common Charges

received by the Condominium Board shall constitute trust funds for the purpose of paying the cost of labor performed or materials furnished at the request or with the consent of the Condominium Board or the Managing Agent for the Common Elements.

Easements

In order to facilitate the operation and maintenance of the Building and the sale or leasing of Units therein, each of the Units will be subject to certain easements including easements in favor of Sponsor, other Unit Owners and the Condominium Board. These easements, which are more particularly set forth in the Declaration, include an easement of support and necessity in favor of all other Units and their appurtenant Limited Residential Common Elements and the Common Elements, and an easement in favor of each Unit Owner to use, operate, maintain, repair, alter, rebuild, restore and replace provided that such easements shall be exercised in such a manner as will not unreasonably interfere with the use of the Units for their permitted purposes. In addition, Sponsor shall have an easement to erect, maintain, repair and replace any sign permitted by law on the Property for the purposes of advertising the sale of any Unit, the leasing of space in any Unit and the operation of business of a tenant or occupant of any Unit.

The Declaration and By-Laws

A copy of the Declaration and a copy of the By-Laws are set forth in Part II of the Plan.

## INCOME TAX DEDUCTIONS TO UNIT OWNERS
## AND TAX STATUS OF CONDOMINIUM

The following discussion of certain income tax consequences of the ownership of a Unit as a personal residence was prepared by Sponsor based, in part, upon the income tax opinion of Ruskin Moscou Faltischek, P.C., a copy of which is set forth in Part II of the Plan.

RUSKIN MOSCOU FALTISCHEK, P.C. IS TAX COUNSEL TO SPONSOR AND NOT THE UNIT OWNERS. EACH PURCHASER SHOULD CONSULT HIS OR HER OWN TAX COUNSEL AS TO THE TAX CONSEQUENCES OF UNIT OWNERSHIP UNDER THE PLAN.

Income Tax Deductions to Unit Owners

Each Unit Owner will own his or her Unit and its Common Interest in fee simple and each Unit will be a separate tax lot for purposes of New York City real estate taxes and assessments. Since each Unit Owner will own his or her Unit in fee simple, the owner may mortgage such Unit and become individually liable for the payment of the principal and any finance charges or interest on such mortgage indebtedness.

It is the opinion of Ruskin Moscou Faltischek, P.C., that a Residential Unit Owner who uses his or her Residential Unit as a personal residence will, under present Law, for Federal, New York State and New York City income tax purposes, be entitled to a deduction for mortgage interest and real estate taxes in the year paid in the case of cash basis taxpayers or accrued in the case of other taxpayers, subject to certain exceptions and limitations which are more particularly discussed in the Attorney's Income Tax Opinion. Purchasers who are individuals should note that mortgage interest is deductible generally only with respect to (1) secured debt used to acquire, construct or substantially improve a principal or second residence (or which constitutes a refinancing of such debt) (up to a total indebtedness of $1 million, $500,000 for married tax payers filing separately) plus (2) other debt (not in excess of $100,000) secured by a principal or second residence. Interest on home mortgage debt in excess of these limitations would not be deductible. In addition, Unit Owners should note that special limitations might apply to the deductibility of points and prepaid interest, if any, on their mortgage loans and to the overall allowance of itemized deductions.  It is the opinion of Ruskin Moscou Faltischek, P.C. that interest on borrowed funds to purchase a Parking Space Unit or Roof Terrace Unit will not be deductible as residential interest.

Tax Status of the Condominium

As discussed in the Attorney's Income Tax Opinion, the Condominium will meet the requirements for qualification as a "homeowners association", under Internal Revenue Code Section 528 and accordingly, may elect not to be subject to Federal income tax on amounts received as membership dues, fees or assessments from Unit Owners. If such an election is made, the Condominium will remain liable for Federal income tax on any taxable income it may

have from other sources such as interest earned on any reserve fund (less expenses directly connected with the production of such income).

If the Condominium does not qualify as a "homeowners association", or if it does but chooses not to make the necessary election, it will be taxable as a corporation for Federal and New York State income tax purposes.

The qualification of an organization as a "homeowners association" is determined annually at the close of each taxable year, and it is possible that if the Condominium does not qualify in one year, it may nevertheless qualify in one or more future years.

No warranties are given that the Internal Revenue Service, the New York State Department of Taxation and Finance or the Finance Administration of the City of New York will allow the aforementioned deductions for mortgage interest and real estate taxes. There is also no assurance that the tax laws or the regulations or rulings issued thereunder, or any judicial interpretation thereof upon which Ruskin Moscou Faltischek, P.C., as Tax Counsel to Sponsor, bases its opinion, will not change. In addition, none of the aforesaid give any warranties with respect to the tax consequences of the Plan or the tax consequences of ownership of any Units offered under the Plan, and no one has been authorized to give any warranties.

## REAL ESTATE TAXES AND ANTICIPATED TAX EXEMPTION BENEFITS

Each Unit will be taxed as a separate tax lot for real estate tax purposes, and no Unit Owner will be responsible for payment of, nor will the Unit be subjected to, any lien arising from the nonpayment of real estate taxes on other Units. Generally, Units may not be separately assessed until the tax year following the tax year in which the Declaration of Condominium is recorded. Until the Units are separately assessed and billed, each Unit Owner shall pay such Unit Owner's pro rata share (in the proportion that such Unit Owner's Unit's Common Interest bears to the aggregate Common Interest of all Units) of all real estate taxes with respect to such Unit.

As more fully explained in the Tax Exemption Benefits Opinion Letter of Sponsor's Counsel set forth in Part II of the Plan, New York City's program for partial real estate tax exemption under Section 421-a of the Real Property Tax Law of the State of New York ("Section 421-a") provides that the Units qualify for the benefits of Section 421-a. Sponsor is in the process of applying to the New York City Department of Housing Preservation and Development ("HPD") for preliminary approval of Section 421-a benefits for the Units, and will use its best efforts to obtain such benefits. Upon completion of the Units, Sponsor will apply to HPD for final approval. Sponsor anticipates but does not represent or guarantee that such final approval will be obtained. If such approval is not obtained, Purchasers will have no right to rescind their Purchase Agreements even though Section 421-a benefits would not be available to the Units.

The City of New York is the tax assessing authority for the Condominium. Prospective purchasers should note that the real estate taxes that will be payable by the Unit Owners for future years will vary in accordance with the amounts of the Unit's assessed valuation (transitional and actual) and of the real estate tax rate. Residential Units in Condominiums of more than three dwelling units are Class 2 properties and are generally assessed by the City of New York at 45% of their perceived fair market value. Notwithstanding physical improvements, assessment increases on Class 2 residential properties are limited pursuant to section 1805 of the New York Real Property Tax Law. In this regard, assessments on Class 2 residential property are phased in over a five year period at 20% per year. In tax year 2006/2007, the tax rate for Class 2 properties is 12.737%.

The City of New York reevaluates the fair market value of each property on an annual basis. In this regard, prospective purchasers should note that, assuming the partial exemption from real estate taxes pursuant to Section 421-a is maintained, the real estate taxes payable by the Unit Owners will in any event increase periodically over the fifteen years of condominium ownership as an integral part of the Section 421-a program. The tax exemption program provides that the increase in a newly constructed building's assessed valuation over such property's assessed valuation for the fiscal year before construction began is partially exempted up to a maximum of 100% for 11 years (plus the period of construction, not to exceed 3 years), up to 80% for the twelfth year, up to 60% for the thirteenth year, up to 40% for the fourteenth year and up to 20% for the fifteenth year of a 15 period.

Sponsor's Real Estate Tax Consultant projects that if Section 421-a benefits for the Units are obtained, approximately 100% of the increase in the assessed valuation attributable to the Building will be exempt during the first 11 years after the completion of construction, approximately 80% for the 12th year after completion of construction, approximately 60% for the 13th year after completion of construction, approximately 40% for the 14th year after completion of construction, and approximately 20% for the 15th year after completion of construction.

Assuming that the Property will be certified as eligible for a partial tax exemption pursuant to Section 421-a, it is estimated that for tax year 2008/2009, starting July 1, 2008, the assessed valuation of the Property well be $297,419.00. Neither Sponsor, Sponsor's Counsel, Sponsor's Real Estate Tax Consultant, the Selling Agent, the Managing Agent, nor any other person makes any warranty that the partial exemption from real estate taxes under Section 421-a will be granted in whole or in part, or if granted, will not be later reduced or revoked, or as to the amount of the tax which will be assessed against any Unit or the amount of real estate taxes payable at any time by any Unit Owner.

The real estate tax projections found in Schedule A, and note 6 of Schedule A, are merely estimates and cannot be construed as an assurance of the actual amount of real estate taxes that will be assessed or the actual amount of any Section 421-a benefit.

There are no tax certiorari proceedings currently pending for the property. Article 2, Section 2.4 of the By-Laws, and the Unit Power of Attorney empower the Board of Managers to bring tax certiorari proceedings on behalf of the Unit owners.

The By-Laws provide that the Condominium Board is entitled to execute and deliver documents necessary in connection with proceedings to obtain reduced real estate tax assessments with respect Unit Owners, for the benefit and on behalf of (i) all Unit Owners, or (ii) for individual Unit Owners, provided that each such Unit Owner indemnifies the Condominium Board from and against all claims, costs and expenses (including, without limitation, reasonable attorneys' fees) resulting from such proceedings.

In connection with its application to HPD to obtain Section 421-a benefits for the Units, Sponsor will (i) keep all records required by HPD and make such records available to HPD whenever requested by HPD to do so and (ii) in a timely fashion file all applications required to be submitted to HPD in connection with the Section 421-a benefits and otherwise comply with all procedures required by HPD to properly procure and maintain the Section 421-a benefits. In addition, upon the Closing of the first Unit, Sponsor will make available to the Board of Managers all Section 421-a documents for inspection and copying for so long as the Units receive any Section 421-a benefits.

In connection with HPD's enforcement of the Section 421-a program, all prospective Purchasers are advised that HPD may conduct an audit which may result in a

revocation of Section 421-a benefits if all documents required to be filed with HPD are not so filed.

Prospective purchasers should note that increases in a property's assessed valuation resulting from changes in its market value (other than changes resulting from new construction or alteration of an existing improvement) are phased in over five fiscal tax years in annual increments of twenty percent each.  Any further increase in assessed valuation during such five-year period resulting from a still higher market value is similarly phased in over an additional five-year period from the date of such increase. The full increased assessed valuation targeted to be in effect after the end of the five-year period is called the "actual" assessed valuation, and the amount of the incremental assessed valuation upon which taxes, are actually computed for each fiscal tax year during such five year period is called the "transitional" assessed valuation.

## **WORKING CAPITAL FUND AND APPORTIONMENTS**

The Purchaser of a Unit shall be required to make a contribution at the Closing of his Unit to the working capital fund of the Building ("Working Capital Fund"). Such contribution shall be in an amount equal to two month's Common Charges then in effect for such Unit.

Sponsor has not elected to provide for a reserve fund to be used for capital replacements or repairs because the Building, upon completion of the construction to be performed by Sponsor as described herein, will be new construction. The Condominium Board, in its discretion, and subject to certain restrictions contained in the Bylaws, may decide in the future to create a reserve fund by special assessment or by increases in Common Charges.

At the First Closing, Sponsor will apportion with the Condominium the following items as of midnight of the day preceding the First Closing:

(1) deposits with utility companies, if any, and fees for assignable permits and licenses, if any;

(2) charges for electricity and other utilities for the Common Elements;

(3) cost of fuel on hand (plus sales tax), if any;

(4) charges and receipts in connection with service, maintenance and concession contracts;

(5) water charges and sewer rents on the basis of the fiscal or calendar year for which assessed (unless separately assessed to individual Units);

(6) cost of Building supplies on hand at Sponsor's cost (including sales tax);

(7) premiums for transferable insurance policies, if any;

(8) management fees, and;

(9) other customary closing adjustments.

If any of the foregoing items to be apportioned cannot be adjusted at the First Closing because they are not fully ascertainable, they shall be apportioned and adjusted to the extent reasonably possible at the First Closing, and final adjustment will be made as soon thereafter as the undetermined amounts are ascertained. Except as herein otherwise expressly provided, the customs in respect to title closings adopted by the Real Estate Board of New York, Inc., as amended, shall apply to apportionments and other matters herein mentioned.

If the result of the closing adjustments is a net credit in favor of the Condominium, Sponsor will contribute the amount of such net credit to the Working Capital Fund. If the result of the closing adjustments is a net credit in favor of Sponsor, the payment of such net credit shall be paid to Sponsor from the Working Capital Fund. If there are insufficient funds in the Working Capital Fund to pay the net credit to Sponsor, the payment of the net credit shall be deferred and paid to Sponsor by the Condominium in one installment on the six month anniversary of the First Closing, without interest, pursuant to an unsecured, negotiable, installment promissory note to be executed by the Condominium Board and delivered to Sponsor at the First Closing. Such promissory note may be prepaid by the Condominium in full at any time, or in part from time to time, without penalty.

The Working Capital Fund will be held and used for working capital, a reserve for repairs or for such other appropriate purposes as will be determined by the Condominium Board and may be augmented by allocations from the monthly Common Charges collected from each Unit. While the Sponsor controls the Condominium Board (see the Section of the Plan entitled "Control By Sponsor"), the Working Capital Fund will not be used to reduce Common Charges.

The Condominium Board will be able to utilize the funds in the Working Capital Fund at any time and, accordingly, no representation or warranty can be made and no assurance can be given as to the exact amount of funds available at any specific time. However, in no event shall any portion of the Working Capital Fund be used to pay any Common Charges attributable to Unsold Units. In addition, within 3 months following the end of the Initial Control Period, Sponsor shall deliver to the Condominium Board a statement from an officer of Sponsor, certifying in reasonable detail as to any changes in the amount of the Working Capital Fund which have occurred since the First Closing.

No representation or warranty is made that the Working Capital Fund will be, or is intended to be, adequate to cover current or future expenses, including repairs, replacements or major improvements, for the first or any subsequent year of Condominium operation. If additional funds are required over and above the Working Capital Fund to cover expenses of the Building operation, it may be necessary to increase Common Charges or make special assessments. Neither the Department of Law nor any other government agency has passed upon the adequacy of the Working Capital Fund.

## MANAGEMENT AGREEMENT, CONTRACTS AND LEASES

Management Agreement

At or before the First Closing, Sponsor will assign, and the Condominium Board will assume, the Management Agreement for the Building between Sponsor and Taube Management Corp. (the "Managing Agent") having an office address at 204 East 83rd Street, New York, New York  10028 ("Managing Agreement").

The Management Agreement shall commence on or prior to the First Closing on 14 days prior notice from Sponsor ("Commencement Date") and shall continue for an initial one (1) year term, unless earlier terminated at the option of the Managing Agent or the Condominium Board for cause by written notice to the other.  The initial term shall automatically be renewed for one year periods unless and until the Condominium Board or the Managing Agent elect not to renew, upon ninety (90) days written notice to the other party. The Managing Agent will receive, payable in equal monthly installments, the sum of $75,000 per annum for the initial year of the Management Agreement. In addition, the Condominium Board will be obligated to reimburse the Managing Agent for any out of pocket expenses, including but not limited to, messenger services, postage, facsimile transmissions, photocopying and other similar customary out of pocket expenses incurred by the Managing Agent. Thereafter, the annual fee will be mutually agreed upon for the renewal periods.  In addition, the Managing Agent shall receive a fee from each Unit Owner for the following services: $350.00 for services rendered in connection with processing a sale or transfer of a Unit which is subject to the Condominium's right of first refusal under the By-Laws; $350.00 for services rendered in connection with processing a lease of a Unit which is subject to the Condominium's right of first refusal under the By-Laws; $350.00 for services rendered in connection with processing a Unit alteration that requires the Condominium's consent or oversight under the By-Laws; and $350.00 in connection with a Unit Owner's application for an appraisal or mortgage financing or re-financing to the extent any action by the Condominium is required or requested.  The foregoing fees may change upon renewals of the Management Agreement. The Management Agreement may not be assigned by the Managing Agent.

The duties and services to be rendered by the Managing Agent include, among others:

> (1)     billing, and collecting Common Charges payable by Unit Owners;

> (2)     causing the Common Elements to be maintained, repaired and altered in the manner deemed advisable by the Condominium Board.  Except for emergency repairs, which may be made by the Managing Agent irrespective of cost, ordinary repairs and alterations involving an expenditure in excess of $5,000 require the approval of the Condominium Board;

> (3)     contracting for necessary services and repairs and purchasing all supplies necessary to properly maintain and operate the Building and its Common Elements. The approval of the Condominium Board is necessary for any service

contract which exceeds $5,000 per year or is for a term in excess of one (1) year. The approval of the Condominium Board is required for the purchase of supplies costing in excess of $5,000, unless purchased in connection with an emergency repair;

(4)     checking all bills received in connection with the maintenance and operation of the Common Elements and causing all such bills and other expenses to be paid;

(5)     supervising, hiring and discharging employees necessary for the proper maintenance and operation of the Building;

(6)     rendering monthly statements of receipts and disbursements to the Condominium Board or other designated entity, upon request;

(7)     maintaining payroll records and filing withholding tax statements for employees;

(8)     maintaining accurate sets of books for the Condominium Board;

(9)     cooperating with the Condominium Board's accountants in preparing and submitting annually to the Condominium Board an operating budget of the anticipated income and expenses for the ensuing year;

(10)     attending meetings of the Condominium Board and Unit Owners, and preparing agendas and sending notices relating to such meetings;

(11)     causing to be obtained and maintained insurance for the Condominium in amounts deemed advisable by the Condominium Board;

(12)     processing applications of Unit Owners for permission to alter the Units; and

(13)     generally, doing all things deemed reasonably necessary or desirable by the Condominium Board for the proper management of the Building.

The Managing Agent, at its expense, will be insured during the term of the Management Agreement under a liability insurance policy and under a fidelity insurance policy in favor of the Condominium for any loss resulting from larceny, embezzlement, forgery, misappropriation or fraudulent or dishonest acts committed by the Managing Agent, its directors, officers or employees. The Managing Agent shall not be liable to the Condominium for any loss or damage not caused by the Managing Agent's own gross negligence, willful misconduct or violation of the Management Agreement. The Condominium will indemnify and save harmless the Managing Agent from any liability for damages, costs and expenses for injury to any person or property in, about and in connection with the Property based on any acts properly engaged in on the

Condominium's behalf by the Managing Agent in the proper performance of its duties and services pursuant to the Management Agreement, unless such injury shall be caused by the Managing Agent's own gross negligence, willful misconduct or in violation of the Management Agreement.  The Condominium will also indemnify and hold harmless the Managing Agent from expenses for all acts properly performed by the Managing Agent pursuant to express written instructions of the Condominium. The Condominium will carry liability, worker's compensation and employer's liability insurance, and will include the Managing Agent as a party insured under the liability policy, and will deliver a copy of such liability policy to the Managing Agent.

## IDENTITY OF PARTIES

Sponsor

Sponsor is Borden East River Realty LLC, a New York limited liability company with offices c/o Simone Development Company, LLC at 1000 Main Street, New Rochelle, New York 10801. The managing member of the Sponsor is Simone Borden LLC, a New York limited liability company.

The Sponsor is owned 50% by Simone Borden LLC and 50% by De Con Associates, LLC, a New York liability company. Joseph Simone, manager of Simone Borden LLC, is the principal of the Sponsor and will be actively involved with this offering. Mr. Simone has been active in the New York metropolitan real estate industry for approximately thirty (30) years. He is currently President of Simone Development Companies, a recognized leader in the real estate development industry, which owns more than ninety (90) commercial properties, including stand-alone Class A office buildings, office parks, retail centers and industrial/flex buildings. Most recently, Simone Development Companies has created the highly successful Hutchinson Metro Center in the Bronx and has been selected by the City of New Rochelle as the developer of a high-rise luxury apartment building containing 400 residential units and a retail plaza.

Neither the Sponsor nor its principals has any prior felony convictions, currently own ten (10%) percent or more of the unsold apartments in any cooperative, condominium or home owner's association, nor has offered for sale any cooperatives, condominiums, planned unit development homes or time shares within the last five years. Neither the Sponsor, its principals, or entities in which principals of the Sponsor were principals, has any prior bankruptcies, convictions, injunctions or judgments that may be material to the Plan or to an offering of securities generally and that occurred within the fifteen years prior to the submission of this Plan.

Attorneys for Sponsor

Sponsor has retained the law firm of Ruskin Moscou Faltischek, P.C., having an office at 1425 RexCorp Plaza, East Tower – 15th Floor, Uniondale, New York 11556 to represent it in connection with the Plan and with matters relating to Closings of Units. Ruskin Moscou Faltischek, P.C. was established approximately thirty-five (35) years ago. Patricia M. Schaubeck, Esq. participated in and supervised the preparation of the Plan. Patricia M. Schaubeck, Esq., has been in the active practice of law in the real estate field for over ten (10) years. Ruskin Moscou Faltischek, P.C. will serve as Escrow Agent and will represent the Sponsor in connection with matters relating to Closing of Units.

Real Estate Tax Consultant

Sponsor has retained Stanley Natkins, a member of the American Institute of Certified Planners, to secure real estate tax exemption benefits pursuant to Section 421-a of the Real Property Tax Law of the State of New York. Mr. Natkins has extensive experience in real estate development, including securing 421-a tax exemptions for various New York City projects. Mr.

Natkins has held various economic planning and development positions with the City of New York.

### Selling Agent

The Selling Agent is Brown Harris Stevens Project Marketing, having an office at 675 Third Avenue (Suite 411), New York, New York 10017. The Selling Agent is a licensed real estate broker, and a nationally recognized real estate sales and marketing agent. Principals of Selling Agent have been engaged in the real estate brokerage business for approximately seventy (70) years. Selling Agent presently manages in excess of 142 buildings encompassing approximately 7,500 units.

The Selling Agent has no financial interest in the Sponsor or the Condominium other than commissions it will receive from the sale of Units, and is not affiliated with Sponsor.

Pursuant to the terms of the Agreement between the Selling Agent and Sponsor, Sponsor shall pay Selling Agent certain commissions with respect to the sale of each Unit.

Neither the Selling Agent nor its principals has any prior felony convictions. Neither the Selling Agent, its principals, or entities in which principals of the Selling Agent were principals, has any prior bankruptcies, convictions, injunctions or judgments that may be material to the Plan or to an offering of securities generally and that occurred within the fifteen years prior to the submission of this Plan.

### Managing Agent

The Managing Agent for the Condominium will be Taube Management Corp., having an office at 204 East 83rd Street, New York, New York 10028. Founded in 1972, Taube Management Corp. manages a portfolio of eight hundred fifty (850) residential apartments in cooperative, condominium and rental developments in the metropolitan area. The Managing Agent also is a licensed real estate broker. The Managing Agent presently manages eighteen (18) properties, including the following: 82 Beaver Street, New York, new York (also known as the Cocoa Building), 84 Front Street, Brooklyn, New York and the Gantry at Hunters Point Condominium, located at 48-21 5th Street, Long Island City, New York.

The Managing Agent has also served as the Sponsor's Budget Expert in connection with all estimated amounts of income and expenses in Schedule B and B-1.

Neither the Managing Agent nor its principals has any prior felony convictions. Neither the Managing Agent, its principals, or entities in which principals of the Managing Agent were principals, has any prior bankruptcies, convictions, injunctions or judgments that may be material to the Plan or to an offering of securities generally and that occurred within the fifteen years prior to the submission of this Plan.

Construction Professionals

NDG Architect, P.C., having an office at 210 West Rogues Path, Cold Spring Hills, New York 11743 is the architect of record for the Building.  Newman Design Group prepared the Floor plans of Units set forth in Part II of the Plan and the Floor Plans which will be filed with the New York City Real Property Assessment Department required in order to create the Condominium.

NDG Architect, P.C. was founded in 1984, and employs over fifteen (15) professionals under its principal architect, Mitchell Newman.  Mr. Newman has completed a significant number of projects and design assignments, and is well known for his work on the Element Condominium in Long Island City, New York and the Meridian Condominium in Long Beach, New York.  Mr. Newman has also examined the physical condition of the Building and has rendered his report thereof and a Certification which is set forth in Part II of the Plan.

Insurance

The estimated insurance rates have been passed upon by Fillmore Agency Inc., 3128, Avenue U, Brooklyn, New York.  The aforementioned estimate has been included in this Offering Plan in reliance upon the opinions of said agency and upon its authority as an expert, and the Sponsor has no knowledge that this estimate is not correct.

Title Company

All New York Title Agency, Inc., as agent for First American Title Insurance Company of New York and Lawyers Title Insurance Corp., having an office at 180 East Post Road, Suite 200, White Plains, New York   10601 (914) 686-5600, has reviewed the Plan and the Condominium Documents and has committed to insure that a valid condominium will be created pursuant to the Condominium Act.  The Title Company is prepared to issue fee and/or mortgage title insurance policies to those Purchasers who request them.  A form of Unit Owner's Specimen Title Policy, if title insurance is ordered from the Title Company is set forth in Part II of the Plan.

Related Parties

The Sponsor has no affiliation with the Selling Agent, the Managing Agent, the Construction Professionals, Title Company, Insurance Agent, the Attorneys, nor any person or firm which will provide services to the Condominium subsequent to the First Closing.

Neither the Selling Agent, the Managing Agent, the Construction Professionals, Title Company, Insurance Agent, or the Attorneys have any financial interest in or affiliation with Sponsor or the Property, the Units, the Condominium, or this offering, except for their fees for services rendered pursuant to written contract.

## REPORTS TO UNIT OWNERS

It is the obligation of the Condominium Board to give all Unit Owners annually:

1. A financial statement of the Condominium prepared by a certified public accountant or public accountant, within approximately 120 days after the end of each fiscal year of the Condominium.   Such statement shall be certified while Sponsor is in control of the Condominium Board;

2. At least 30 days' prior notice of the annual Unit Owners' meeting; and

3. A copy of the proposed annual budget of the Condominium at least 30 days prior to the date set for adoption thereof by the Condominium Board.  While Sponsor is in control of the Board, such budget shall be certified in compliance with Section 20.4(d) of the Regulations of the Department of Law.

## DOCUMENTS ON FILE

Pursuant to the provisions of Section 352-e(9) of the New York General Business Law, copies of the Plan and all exhibits or documents referred to herein, shall be available for inspection by prospective Purchasers and by any person who shall have purchased a Unit offered by the Plan or shall have participated in the offering of such Unit at Sponsor's office and shall remain available for such inspection without charge and copying at a reasonable charge for a period of 6 years.  In addition, a set of Floor Plans showing the layout, locations and approximate dimensions of each Unit and its unit number designation and tax lot number, certified by the appropriate governmental authority of The City of New York as conforming to the official tax lot number for each such Unit, will be filed in the Register's Office following the recording of the Declaration, and an additional set will be furnished to the Condominium Board.  Sponsor shall deliver to the Condominium Board a copy of all documents filed with the appropriate recording office at the time of the First Closing.

The Declaration and the By-laws will be recorded in advance of or concurrently with the First Closing. The recording of all deeds conveying individual Units will also be in the Register's Office.

## GENERAL

The Plan does not knowingly omit any material fact or knowingly contain any untrue statement of any material fact. Sponsor believes that the Plan contains a fair summary of the material provisions of the documents referred to in the Plan, including those documents contained in Part II of the Plan. Exact copies are contained in Part II of the Plan of the form of Declaration, form of By-Laws, form of Purchase Agreement, form of Unit Deed, form of Power of Attorney and other documents. Statements made in Part I of the Plan as to the provisions of such documents or any other document referred to herein, copies of which are on file with Sponsor, are not necessarily complete. Each such statement is qualified in all respects by the contents of such documents and, in the case of any such document executed by or with the written consent of a Purchaser pursuant to the Plan, any rider or separate agreement changing or adding provisions to such document.

There are no lawsuits or other legal proceedings now pending, or any judgments outstanding. which could materially and adversely affect this offering the Purchasers of Units, the Property, the Condominium or the operation thereof; which are not covered by insurance.

No party other than the Purchasers shall have any right or benefit herein or herefrom, including without limitation, the right to insist upon or enforce against Sponsor the performance of all or any of the Sponsor's obligations hereunder and no such third party shall be deemed to have received any benefit as a result of any of the provisions of the Plan.

Sponsor reserves the right, from time to time prior to the First Closing, without obtaining the consent of Purchasers or others, to substantially revise the terms and conditions upon which the Units are to be sold, including changes affecting the rights, obligations and liabilities of Sponsor, the Purchasers and/or prospective Purchasers under the Plan. However, Sponsor may not unilaterally cancel a Purchase Agreement which is in effect, except as therein provided, as in the case of an uncured default, nor unilaterally change the purchase price or payment terms contained in such Purchase Agreement. All substantive or material revisions will be contained in a duly filed amendment to the Plan. If there is a substantial amendment to the Plan that materially and adversely affects Purchasers, except as otherwise provided herein, Purchasers will have a right of rescission which may only be exercised within 15 days from the Presentation Date of such amendment. Sponsor shall promptly return any Deposit, together with any interest earned thereon to Purchasers who rescind, except that Sponsor shall retain the Deposit of any Purchaser who is in default under the Purchase Agreement beyond any applicable grace period.

In accordance with the provisions of the Laws of the State of New York, neither Sponsor nor any selling agent engaged by Sponsor will discriminate against any person in the sale of Units offered by the Plan or in the leasing of any such Units because of such person's sex, sexual orientation, race, creed, color, national origin, marital status, age, disability or any other ground proscribed by Law.

Unless the context otherwise requires, words used in the singular in Part I of the Plan include the plural and vice versa, and a reference herein to any one gender, masculine, feminine or neuter, includes the other two.

No person has been authorized to make any statement or representation or furnish any information not expressly contained herein. Any information, data, or representations not contained herein or in the documents and exhibits referred to herein must not be relied upon. The Plan may not be changed or modified orally.

The Property has not been the subject of a prior public offering.

Sponsor has conducted a market test in accordance with the Attorney General's Cooperative Policy Statement No. 1 under CP06-0265.  The market test ended on **[date]**.

As of the date the Plan is accepted for filing, Sponsor has not entered into any contracts or agreements, written or oral, for the sale or transfer of any of the units offered in the Plan. As of the date the Plan is accepted for filing, Sponsor has not, nor has anyone on behalf of Sponsor, taken any deposits or advances of funds, either directly or indirectly, in connection with the reservation, sale or transfer of any of the units offered in the Plan.

All of the Units in the Condominium are vacant, and will be offered vacant to Purchasers.

## SPONSOR'S STATEMENT OF BUILDING CONDITION

Sponsor adopts the "Description of Property and Specifications" set forth in Part II of the Plan and represents that it has no knowledge of any material defects or need for major repairs to the Building except as set forth in the Description of Property and Specifications or as contemplated to be made as described therein.  As more fully described above, and subject to the matters described therein, Sponsor anticipates that construction of the Building will be sufficiently completed to allow the First Closing to occur as projected in Schedule B.  Except for those warranties or guarantees provided to Sponsor by contractors, manufacturers or suppliers, which Sponsor will assign to the Condominium Board and/or Unit Owners, as necessary, Sponsor does not make any warranty of any kind, expressed or implied, and Sponsor hereby disclaims any and all warranties, including, but not limited to, implied warranties of merchantability and fitness for a particular purpose, with respect to the construction of the Units, the Common Elements and the Building.  Article 36-B of the New York General Business Law ("Housing Merchant Implied Warranty Law") does not apply to this offering.

<u>PART II</u>

**THIS PAGE INTENTIONALLY LEFT BLANK**



**ARCHITECTURE • URBAN PLANNING • ENGINEERING**

January 16, 2007

## DESCRIPTION OF PROPERTY AND SPECIFICATIONS

### 5-49 BORDEN AVENUE
### LONG ISLAND CITY, N.Y.

**a.   Location and Use of Property**

    (1) <u>Address</u>: *This building is to be constructed on 0.59 acres of land on the Northwest Corner of Borden Avenue & Vernon Blvd in Long Island City, Queens County, New York.  Actual address is 5-49 Borden Avenue, Long Island City, NY 11101.*

    (2) <u>Block and Lot</u>: *block 12, Previous lots 2, 3, 5-13, which have all been merged into new Lot 12.  The development rights from the adjacent lot 1 are included in this project.  Lot 1 to remain undeveloped.*

    (3) <u>Zoning</u>: *The property is within the Long Island City special use district and lies within the M1-5/R7X which allows multiple dwellings and commercial structures up to 125 feet tall.*

    (4) <u>Permissible use</u>: *This zone allows the construction of a multi-story multiple dwelling.*

**b.   Status of Construction**

    (1) <u>Year built</u>: *Foundation construction was started December 18th, 2006*

    (2) <u>Classification of construction</u>: *Construction classification shall be Type 1 (Fire resistive.)*

    (3) <u>Certificate of Occupancy</u>: *Is expected to be issued upon completion of project which is projected for April 2008.*

    (4) <u>Permit</u>:  *New York City Department of Buildings issued New Building permit 402115661-01-NB dated December 15, 2006 based on plans prepared by Alayo Architects.  A post approval amendment was filed by Newman Design group modifying the structure, window wall and mechanical systems as describe in this report.*

**c.   Site**

    (1) <u>Size</u>:  *The site is 0.59 acres.*

    (2) <u>Number of buildings</u>: *There will be one building on the site.*

    (3) <u>Streets owned or maintained by the project</u>: *There are no streets owned or maintained by the project.*

        (i)   <u>Paving (material and condition)</u>: *N/A*

        (ii)   <u>Curbing (material and condition)</u>: *N/A*

        (iii)   <u>Catch basins, drainage (location and condition)</u>: *N/A*

        (iv)   <u>Street lighting (material, type location and condition)</u>: *N/A*

        (v)   <u>Conformity with local fire district, town or municipal building codes</u>: *N/A*