(4) Drives, sidewalks and ramps:
  (i)    Paving (material and condition): *New 4" concrete walks are to be installed along Borden Avenue.*
  (ii)   Curbing (material and condition): *New 6" x 18" steel faced concrete curbs are to be installed along Borden Avenue.*
  (iii)  Catch basins, drainage (location and condition*): There will be three (3) catch basins in the parking lot and two (2) yard drains in the lawn areas for storm drainage connected to the city sewer system.*
  (iv)   Street lighting (material, type, location and condition): *There are two (2) pole mounted street lights on Borden Avenue. Wall mounted lights together with the pole lights provide adequate site lighting, along Borden Avenue.*

  (v)    State whether these items are in conformity with local fire district, town or municipal building codes: *There is a total of 25 parking spaces. The driveways, curbs and ramps are in conformance with New York City Code.*

**d.   Utilities**
  *Water service is provided by the City of New York.   Sanitary Sewer is provided by the City of New York.  Gas and electric will be provided by Con Edison and are available on Borden Avenue and Vernon Avenue.  Electric will be provided from Vernon Avenue with Con Ed underground transformers located within the garden. Electric for each unit will be individually metered, with all other utilities part of the common charges.*

**e.   Sub-Soil Conditions**
  *In general, the borings indicate that the surface layers consist of fill, sand and silt above gneiss rock which is approximately 40' deep. Ground water is approximately 14' deep.*
  (1) Whether uneven foundation movement or settling has occurred (cracking, mortar joint decay, etc.): *N/A*
  (2) Whether there is any evidence of moisture or seepage or round water infiltration and, if so, whether corrective action is needed: *N/A*
  (3) Whether there is any danger from flooding, either due to water table in area or overflow from other bodies of water.  Note potential for mudslides or erosion and what preventative action is appropriate: *N/A*
  (4) *It should be noted that the Triboro Bridge and Tunnel Authority have an easement across the Southeast portion of the property for below grade access to the Queens Midtown Tunnel. The foundations as designed and as approved by the TBTA cantilever over this easement for access by the TBTA in the event that they have to repair the tunnel.  In addition, a city sewer is located at the southeast corner of the property, in the garden area, for which an easement has been granted to NYC DEP in the event repairs have to be made to this pipe.*

**f.   Landscaping and Enclosures**

*There will be a landscaped garden at the east end of the property.  The street landscaping will include six (6) American Linden street trees per NYC Parks Department.*

(1) Grass cover: *Lawn areas to be topsoil and seeded.*

(2) Planting (type, location): *Perennials and Boxwood hedges in garden.*

(3) Trees (location): *Six (6) American Linden street trees.*

(4) Fencing (type, location): *Six (6) four high walls will surround the garden constructed of steel posts and "trex" or equal horizontal battens.*

(5) Gates (type, location): *There are no gates to garden, access is through the lobby.*

(6) Garden walls (type, location): *N/A.*

(7) Retaining walls (type, location): *N/A*

(8) Display pools and fountains (locations, materials): *N/A.*

**g.   Building Size**

(1) Total height (approximate total feet from ground level to highest part of roof): *Total height from ground level to roof is 125 feet.*

(2) Crawl spaces (floor to ceiling height): *There are no crawl spaces.*

(3) Number of sub-cellars and cellars: *There are no cellar spaces.*

(4) Number of floors (actual including penthouses): *The building is twelve (12) stories plus an elevator and stair bulkhead.*

(5) Equipment rooms (location and use): *The electric room, water meter & pump room are located on the first floor.*

(6) Parapet (height above roof): *The roof parapet and glass railings will be three feet six inches above the roof.*

**h.   Structural System**

(1) Exterior of building

(i) Walls: List materials, type of construction, method of construction.  For New York City buildings, if Local Law 10 is inapplicable, so state.  If such inspection is required, but not performed, specify as a violation.  If insulated, describe material, type, size, and insulting value where available: *Walls will be face brick with concrete block back-up.  The exterior walls will have R-13 fiberglass batt insulation with a vapor retarder facing and gypsum board interiors.  The "R" value of the wall system is 17.6.  Feature panels will be E.I.F.S. on block or concrete.*

(ii) Windows: Specify type and materials in all parts of the building including sills, screens, window guards, lintels, storm, sash, hardware, single or double glazing and caulking.  Indicate whether lot line windows exist an describe any potential future problems: *Windows will be aluminum insulated hopper windows with 1" insulated glass, with aluminum window sills, completely caulked to brick.  The windows will have an STC rating of 42.  The windows will have stops which limit opening the windows to 4 inches in accordance with the NYC Department of Health regulations.  If these limit arms are disabled, the unit owner is required to install child guards on these windows. There are no window guards or screws provided.  There are no lot line windows.*

3

(iii) Landmark status:  State whether building has landmark status and discuss consequences: *N/A*

(2) Parapets and copings: *Parapets are brick and block with aluminum copings.*

(3) Chimneys and caps: *There are no chimneys.*

(4) Balconies and terrace: *The balconies will be poured concrete with Neoguard waterproofing and AVCON thermoplastic and glass rails. The roof terraces will receive 4" rigid insulation, a modified Bitumen roof and concrete pavers over the roofing. The main roof terraces will be divided by six (6) foot high galvanized chain link fence..  No additional structures can be built on the roof since the roof is at the maximum allowable building height.*

   (i)   Deck and finish (material): *Concrete with neoguard deck waterproofing for balconies, 24" x 24" concrete pavers on roof terraces.*

   (ii)  Balustrade (type, material): *AVCON thermoplastic.*

   (iii) Railings (material): *AVCON thermoplastic with 3/8" tempered glass.*

   (iv)  Copings (material): *Aluminum.*

   (v)   Soffits (material): *N/A*

   (vi)  Doors to balconies and terraces (type, material): *Aluminum hinged doors with insulated glass matching the windows.*

(5) Exterior entrances

   (i)   Exterior doors and frames (material , type, lock): *Lobby entrances are to be aluminum & glass entrance doors with matching frames & sidelights. Vestibule doors & frames will match the exterior doors. Other exterior doors to be hollow metal and frames all with cylindrical locks.*

   (ii)  Vestibule doors and frames (material, type, lock): *Entrance doors will have electronic latches tied into the intercom system.*

   (iii) Exterior stairs (material, location): *N/A*

   (iv)  Railings (material, location): *N/A*

   (v)   Mail boxes (type, location): *Wall mounted mailboxes will be aluminum and will be located in the lobby.*

   (vi)  Lighting (type, location): *Wall mounted decorative fixtures will provide exterior entrance lighting.*

(6) Service entrance:. *The compactor room is a separate area with a hollow metal door & frame with cylindrical lock. Roof doors from stair bulkheads and elevator machine room will be hollow metal doors & frames with cylindrical locks and weather-stripping.*

   (i)   Doors and frames (material, type, lock): *There is a service entrance into the garage with hollow metal door and frame with cylindrical lock.*

   (ii)  Gates (material, type, lock): *N/A*

   (iii) Exterior stairs (material, location): *N/A*

   (iv)  Railings (material, location): *N/A*

(7) Roof and roof structures: *All will be constructed of brick and block similar to the main building.*

   (i)   Type roofs for all areas:

      (a)   Material: *The roof will be a modified bitumen system applied over 4" rigid insulation.*

     (b)   Insulation: *4" of rigid insulation will be installed between the roof and the concrete structure.*

     (c)   Surface finish: *24" x 24" Concrete roof pavers.*

     (d)   Bond or guarantee: *It will have a manufacturer's fifteen (15) year guarantee.*

     (e)   Flashing materials including counter flashing: *All flashings to be aluminum.*

  (ii)  Drains

     (a)   Location, material and type: *There will be seven (7) 4" cast iron roof drains located at the low points of the main roof, six (6) at the 2nd floor terraces and four (4) at the ninth floor terrace.*

     (b)   Gutter and leaders (type, material): *There are no gutters or leaders except at the stair and elevator bulkheads.*

  (iii)  Skylights (location, type, material): *There are no skylights.*

  (iv)  Bulkheads:

     (a)   Stairs (material): *Cast in place concrete.*

     (b)   Elevator (material): *There will be one (1) stair bulkhead and one elevator/ stair bulkhead constructed of brick and block.*

     (c)   Other:

  (v)  Metal work at roof levels:

     (a)   Exterior, metal stairs (material): *N/A*

     (b)   Vertical ladders, including gooseneck (material): *N/A*

     (c)   Railings (material): *AVCON thermoplastic and glass.*

     (d)   Hatches to roof (type, material): *N/A*

     (e)   Other: _____

  (vi)  Rooftop facilities: *Domestic hot water heater.*

*(8)* Fire escapes: *There are no fire escapes. All fire exits are through two enclosed fire stairs within the building.*

     (i) Location (describe at each floor and specify any unusual access situations: *N/A*

     (ii) Floors covered: *N/A*

     (iii) Drop ladder: *N/A*

     (iv) Type: *N/A*

     (v) Materials: *N/A*

(9) Yard and courts: *There is a street level garden to the east of the building.*

     (i) Paving (material): *Brick pavers.*

     (ii) Drainage: *Two (2) yard drains.*

     (iii) Railing: *N/A*

     (iv) Stairs: *N/A*

     (v) Fencing: *Six (6) foot high "trex" or equal horizontal battens on steel posts.*

     (vi) Walls: *N/A.*

(10) Interior stairs: *Railings to be steel pipe rails.*

     (i) Number of stairs of each type: *There are two main stairs within the building; both extending from the roof to the 1st floor.*

5

(ii)Enclosure (construction and interior finishes): *All the stair enclosures are to be painted concrete block.*

(iii)Stair construction: *Stairs to be poured in place concrete.*

(iv)Stringers (material): *N/A*

(v)Treads (material): *Concrete*

(vi)Risers (material): *Concrete*

(vii)Guard rails (material): *Steel pipe rails (1 ½ dia.)*

(viii)Balustrade (materials): *Vertical square steel tube*

(11)  Interior doors and frames:

(i)Unit entrance and interior doors and frames: *All interior common area doors and service doors to be fire rated hollow metal doors and frames. Doors inside apartments to be 1 3/8" solid core wood doors with wood frames.  Closet doors to be 1 3/8" solid core or 1" solid bi folding with top track, no frames. Unit entrance doors to be 1¾" fire rated solid core wood doors with H.M. frames.*

(ii)Corridor doors and frames: *Hollow metal doors and frames*

(iii)Stair hall doors frames: *Hollow metal doors and frames*

(iv)Roof door, basement doors and frames: *Hollow metal doors and frames*

(12)  Elevators:

(i)Number of passenger and service elevators: *Elevator can accommodate 16 people. There are to be two (2) elevators*

(ii)Manufacturer, age of each and capacity (in pounds and number of passengers): *The elevators will be Otis "Gen 2" or equal 2500 lb. capacity belt driven units with hi efficiency 7.5 HP A.C. motors.  The elevators will have a speed of 350 F.P.M. servicing all floors and the roof.*

(iii)Type of operation for each elevator by elevator number or location in building (for large numbers of elevators describe by class-passenger/freight): *Both elevators are fully automatic passenger*

(iv)Automatic (type of controls): *Both elevators will be fully automatic with sliding doors*

(v)Floor served: *All floors and roof*

(vi)Type (hydraulic; gearless): *Belt driven traction*

(vii)Doors (sliding, swinging, manual, automatic): *Auto, sliding*

(viii)Location of machine rooms: *The machine control room will be in the roof penthouse*

(ix)DC Motor (manufacturer): *N/A*

(x)AC motor-generator set (manufacturer): *Otis*

(xi)Other: *N/A*

(13) Elevator cabs:

(i)  Kind (manufacturer): *Otis*

(ii) Floor (material): *Carpet*

(iii)Walls (material):*Stainless steel and plastic laminate panels*

(iv)Ceiling (material): *Mirror ceilings*

(v) Lighting: *Down lights*

    (vi) <u>Alarm, safety system:</u> *There will be telephones in the cabs in the event*
        *of emergency.*

**i.**  **Auxiliary Facilities**
    (1) <u>Laundry rooms:</u> *There will be no laundry room since each apartment will have a*
        *stacked washer / dryer located in closets.*
        (i) <u>Location and number of rooms:</u> *N/A*
        *(ii)* <u>Clothes washers, number and type (e.g. heavy duty, coin operated,</u>
            <u>electric, gas):</u> *N/A*
        (iii) <u>Clothes dryer (number and type):</u> *N/A*
        (iv) <u>Room ventilation (method and final exhaust):</u> *N/A*
        (v) <u>Dryer ventilation (method and final exhaust):</u> *N/A*

    (2) <u>Refuse disposal:</u> .
        (i) <u>Incinerator(s) (number, location, capacity, type, manufacturer):</u> *N/A*
        (ii) <u>Compactor(s) (number, location, capacity, type, manufacturer):</u> *There*
        *will be a Royal-Krusher (or equal) compactor. A 24" aluminized steel 16*
        *gauge rubbish chute discharges into a trash compactor at the 1st floor.*
        (iii) <u>Approvals by authorities having jurisdiction (date of each approval):</u> *N/A*
        (iv) <u>Initial storage location (ultimate storage location):</u> *located in the trash*
        *room in the first floor*
        (v) <u>Pick up schedule, whether public or private provider:</u> *Trash pick-up is by*
        *the City of New York D.E.P*

**j.**  **Plumbing & Drainage**
    (1) <u>Water supply:</u> *Water is supplied from the 8" municipal water main located Borden*
        *Avenue. There will be a triplex water booster system with two (2) 80 gpm and one*
        *(1) 40 gpm pumps, located in the water meter room on the first floor.*
    (2) <u>Fire protection:</u>
        (i) <u>Standpipes (material, size, location):</u> *The fire protection system will*
        *consist of one (1) - 6" combined standpipe/riser in the stairwell.*
        (ii) <u>Hose racks, hoses and nozzles (location):</u> *None*
        (iii) <u>Sprinkler heads (type system, location):</u> *The apartments, garage, and all*
        *common areas will be fully sprinklered with concealed pendant or*
        *sidewall heads.*
        (iv) <u>Siamese connection (type, location):</u> *There will be a Siamese connection,*
        *on Borden Avenue. A 40 HP electric, 500 gpm, fire pump will supply*
        *pressure to the system.*

    (3) <u>Water storage:</u> *There are no water storage tanks, except two (2) turbo*
        *max hot water heat exchangers: :Located in roof mechanical room.*
        (i) <u>Number, type, location of each:</u> *N/A*
        (ii) <u>Material (interior exterior and roof of tank):</u> *N/A*
        (iii) <u>Access to tank (e.g. vertical gooseneck ladder):</u> *N/A*
        (iv) <u>Capacity (total gallons):</u> *N/A*
        (v) <u>Capacity (fire reserve):</u> *N/A*

(4) <u>Water pressure</u>: *Water pressure will be maintained at 55 psi with the Booster Pump System. All water piping within the building shall be Type L copper pipe and fittings with lead free solder.*

(5)<u>Sanitary sewage</u>:

(i)<u>Sewage piping (materials)</u>: *Sanitary sewer piping will be cast iron below grade and cast iron or DWV copper above grade.*

(ii)<u>Sewage pumps (if any)</u>: *N/A*

(iii)<u>Sewage disposal (public/private; treatment; drainfield; sewer)</u>: *The building system will tie into the municipal sewer located on Borden Avenue.*

(6) <u>Permits required</u>: *There are no plumbing permits required except a City plumbing permit. Six (6) roof drains located at the low points of the roofs and terraces are piped into the storm system.*

(7) <u>Storm drainage system</u>: *The storm drainage system will consist of cast iron roof drains and piping connected to a series of a detention tank that then drains into the municipal sewer on Borden Avenue.*

(i)<u>Catch basins (location)</u>: *None*

(ii)<u>Yard and roof drains (location)</u>: *3 yard drains*

(iii)<u>Piping (materials)</u>: *XH cast iron*

(iv)<u>Eject or sump pumps (describe in detail and describe conditions requiring pumps)</u>: *There will be a sump pump in the elevator pit discharging to the sewer system.*

## k.  Heating

(1)<u>Method</u>

*Heating for each unit is provided by individual gas fired P.T.A.C. units by Suburban or equal 7,000, or 16,000 BTU/H capacity. There are four split A/C units. Two (2) three ton units for the gym, a two (2) ton unit for elevator lobby, and four (4) ton unit for main lobby. The HVAC system is designed based on the following design criteria which is in accordance with N.Y.S. energy code and will provide adequate heating and cooling:*

| Summer: | Outdoor Air | 91fdb | 74 fwb |
|---------|-------------|-------|--------|
|         | Indoor Air  | 74fdb | 50% rh |
| Winter: | Outdoor Air | 11fdb |        |
|         | Indoor Air  | 72fdb |        |

(2) <u>Number of Boilers and Description</u>: *Two (2) PNCH model 1000 or equal gas fired, low pressure, boilers for domestic hot water are located in rooftop mechanical room. Each has an output of 839,200 BTU/HR*

(3) <u>Manufacturer and Age of Boilers:</u>
*Not Applicable*

(4) <u>Manufacturer and Age of Burners:</u>
*Not Applicable*

(5) <u>Types of Controls:</u>
*The heating system will be regulated by an individual integral thermostat in each HVAC unit.*

(6) <u>Radiators, Piping, Insulation, Valves, Pumps etc.</u>
*All gas piping within the building shall be schedule 40 black steel pipe with black malleable IPS fittings.*

(7) <u>Fuel:</u>
*Natural gas.*

(8) <u>Location of Oil Tank and Materials:</u>
*Not Applicable*

(9) <u>Capacity of Oil Tank</u>
*Not Applicable*

**l.   Gas Supply**

(1) <u>Type:</u> *Gas for heating, cooking, rooftop barbeque grills, and hot water will be supplied by Con Edison, located in Borden Avenue.*

(2) <u>Meters:</u> *There will be two meters, one for cooking and one for heating.*

(3) <u>Piping:</u> *Schedule 40 black steel pipe*

**m.   Air Conditioning**
*The cooling system will be self-contained units within each apartment.*

(1) <u>Type of System</u> - *Air cooled thru the wall*

(2) <u>Central System</u> -*Not Applicable*

(3) <u>Cooling Towers, Condensers</u>- *Not Applicable*

(4) <u>Individual Units (thru Wall)</u> - *Two sizes of PTAC's are utilized throughout the units: PTAC-2 – (In all bedrooms except corner bedrooms) and PTAC-3 – (All living rooms and corner bedrooms.)*

- *PTAC-2 -7,000 BTU, 208 volt Suburban Model DL3-1220 or equal.*
- *PTAC-3 16,000 BTU, 208 volt Suburban model DL3-1622 or equal.*

(5) <u>Common Areas:</u>
*Corridors are heated and cooled with two (2) 12.5 ton, roof mounted, gas fired, DX units, Trane model YC151C or equal with supply and return ductwork to each floor.  There are four (4) split system units with electric heat supplying heating and cooling for the 1st floor lobby, gym, lounge and elevator lobby.  The units will be EMI or equal with a total cooling capacity of 14 tons.*

**n.   Ventilation**
*Interior toilets will be exhausted thru a vertical ducted shaft thru roof with registers in each bathroom connected to roof mounted exhaust fans. Individual electric dryers will be self vented within the apartment which is code acceptable.  Corridors to be vented by two (2) rooftop units (1,150 CRM each).*

o. **Electrical System**

   (1) Service from main service switchgear: *The underground service by Con Edison will supply 120/208 volt three (3) phase (4) wire power to the distribution boards. A 1200 amp switch board supplies power to the elevators, fire pump, booster pumps, compactor, common area lightings and HVAC. The service also feeds a 5000 amp switch board feeding seven (7) 800 amp switches feeding seven (7) meter banks feeding individual apartment meters, and a 200 amp switch supplying the separate garage meter. All meters to be located in the electric room on the first floor.*

   (2) Service to individual units: *Feeders to individual apartments are all 125 ampere, 120/208 volt and run in conduit, or armored cable.*

   (3) Compartment switch gear: *All switch gear is located in the 1st floor electric room.*

   (4) Unit Service: *Each apartment shall have a 125 amp 120/208 volt single (1) phase 3 wire 30 circuit panel with 20 amp circuit breakers except for 30 amp dryer breaker. This will be sufficient to provide power for the A/C units, lights, receptacles and appliances, including dishwashers and dryers.*

   (5) Adequacy:

      (i) Service: average number of circuits per apartment and capacity to handle modern appliances – specifically air conditioners, dishwashers and dryer: *Each kitchen to have two (2) appliance circuits. All will be adequate for the use, with an average of 15 circuits per apartment.*

      (ii) Lighting and Fixtures

        a. *Apartments shall have ceiling mounted fluorescent fixtures in the kitchens. Incandescent ceiling mounted fixtures to be provided in bathrooms, halls & closets.*

        b. *Stairwells to have fluorescent fixtures with emergency packs. Exit lights shall be provided at all exits & stairs as required.*

      (iii) Convenience outlets, applicable outlets: *Receptacles and switches shall be provided in accordance with NEC & local codes.*

p. **Intercom & Television**

   *System will have an exterior master unit at the main entrance A door release system will be controlled from each apartment. The intercom system will be hard wired to each apartment. Television reception shall be provided by local cable service.*

q. **Public Lighting**

   *All corridors shall have fluorescent wall mounted sconces. All other common areas, mechanical rooms, etc. to have 2 x 2 or 1 x 4 fluorescent light fixtures. There will be wall mounted decorative lighting at the entrance at the front of the building and at the service entrance.*

**r.   Garages**
   *(1)* Location of garages: *There is an enclosed garage on the 1ˢᵗ floor .*
   *(2)* Location of parking: *There are twenty-five (25) parking spaces in the parking garage..*
   *(3)* Surfaces: *The parking garage floor to be concrete.  Lighting will be by ceiling mounted 175 watt metal halide fixtures.*
   *(4)* Parking (attended or unattended):*The parking shall be unattended.*
   *(5)* Garage ventilation (method and equipment): *Three (3) ceiling mounted 4000 CFM exhaust fans discharging thru the 2ⁿᵈ floor roof terraces.  Exhaust fans are controlled by carbon monoxide detectors.*
   *(6)* Garage fire protection (method and equipment): *Dry pipe sprinkler system*
   *(7)* Drainage: *Drainage is accomplished by floor drains connected to a detention tank that ties into the city combined sewer on Borden Avenue.*

**s.   Swimming pool** – *None.*
   **(1)** Type: *N/A*
   **(2)** Size, length: *N/A*
   *(3)* Enclosure: *N/A*
   **(4)** Pumping and filter system: *N/A*
   **(5)** Water heating equipment: *N/A*
   **(6)** If on iron roof, specify structural system: *N/A*

**t.   Tennis Courts, Playgrounds** – *None*
   (1) Tennis courts: *N/A*
       (i)Type: *N/A*
       (ii)Number and size: *N/A*
       (iii) Lighting: *N/A*
       (iv)Fencing: *N/A*
   (2) Playgrounds. Describe location and size, fencing, equipment types and sand bed or safely padding: *N/A*
   (3) Recreation facilities: *Gym is located on 1ˢᵗ floor.*

**u.   Permits & Certificates**
   *The following are required:*
   *(1) Building permit – 402115661-01-NB issued December 15, 2006.*
   *(2) Certificate of Occupancy – City of New York DOB.*
   *(3) Plumbing Permit - City of New York DOB.*
   *(4) HVAC Permit - City of New York DOB.*
   *(5) Fire Protection Permit & Approval – City of New York FD.*
   *(6) N.Y.C. Electrical Permit*
   *(7) Sewer Connection – City of New York, DEP - #SCQ-319/06*
                                          *Certified October 6, 2006*
   *(8) Curb Cut – City of New York DOB.*

**v.   Violations** - *Not Applicable*

w.  **Unit Information**

*There shall be 132 apartments of varying configurations and sizes, Chart I indicates the size of each unit, bedroom / bathroom configuration, apartment configuration and floor area. (see attachments for individual floor plans). There will also be twenty six (26) roof top terraces.*

(1)  Type and grade of finish material used:  *All the apartments shall be finished similarly, with painted gypsum board walls, ceramic tile floors and full height tile walls including tubs and showers.  Engineered oak strip wood floors throughout the rest of the rooms.  All ceilings shall be concrete with Kadex smooth finish painted, at a height of 9'-0" except kitchens and bathrooms which will be 8'-0".*

(2)  Bathroom fixtures: *All plumbing fixtures to be as indicated below, or equal.*

| | |
|---|---|
| *Lavatories* | *- Suneli Model # SK-2381 with Danze #D222658BN faucet* |
| *Toilets* | *- Toto Model #MS866114* |
| *Bathtubs* | *- Crane SanMarco 2206X with Danze #D560758BN thermostatic shower control* |
| *Master Bath* | |
| *Lavatories* | *- Suneli Model # SK-2385 with Danze #D222658BN Faucet* |
| *Vanities* | *- Wood flat panel with thermofoil doors, flat panel with wood veneer on particle board* |

(3)  Kitchen and laundry equipment: *All kitchen cabinets to be wood with granite counter tops, & stainless steel sink.  Appliances to be as follows:*

| | | |
|---|---|---|
| *Refrigerators* | *-* | *Fisher Paykel #E521BRX* |
| *Gas Cooktop* | *-* | *DCS #CTD304* |
| *Gas Self Clean Oven* | | *DCS#W0S130* |
| *Dishwasher (Double Draw)* | | *Fisher-Paykel # DD60355* |
| *Microwave Oven* | *-* | *Sharp #RZ1ZOJK* |
| *Electric Washer and Dryer-* | | *Bosch # WTE86300US & WFL2060UC* |
| *Kitchen Sink* | *-* | *Suneli Model # SM2318* |
| *Garbage Disposal* | | *WasteKing #SS5000TC* |

## x. Finish Schedule (Other Than Apartments)

| Room | Floor | Walls | Ceiling | Remarks |
|---|---|---|---|---|
| *Vestibule* | *Porcelain Tiles* | *Gyp Bd/Vwc* | *Gyp Bd/Ptd* | *N/A* |
| *Main Lobby* | *Granite* | *Gyp Bd/Vwc* | *Gyp Bd/Ptd* | *N/A* |
| *Lobbies & Corridors* | *Carpet* | *Gyp Bd/Vwc* | *Gyp Bd/Ptd* | *N/A* |
| *Halls* | *Carpet* | *Gyp Bd/Ptd* | *"* | *N/A* |
| *Stairs* | *Conc/Ptd* | *Block or Gyp Bd/Ptd* | *"* | *N/A* |
| *Compactor* | *"* | *Block/Gyp Bd.* | *Concrete* | *N/A* |
| *Mechanical* | *"* | *"* | *"* | *N/A* |
| *Telephone* | *"* | *"* | *"* | *N/A* |
| *Water* | *"* | *"* | *"* | *N/A* |
| *Electric* | *"* | *"* | *"* | *N/A* |
| *Storage* | *"* | *"* | *"* | *N/A* |
| *Elev. Mach. Rm* | *"* | *"* | *"* | *N/A* |
| *Garage* | *"* | *"* | *2x4 Layin* | *N/A* |

**y.   Safety And Warning Devices**
*Individual hard wired smoke detectors shall be located adjacent to and in each bedroom.  Smoke detectors shall be installed at each elevator lobby connected to the elevator recall.*

**z.   Additional Information**

(1)   A site plan showing landscape features, roads and the outside dimensions: *Landscape plan indicates nine (9) nine 2 ½ " caliper Bald Cypress trees in the garden, Boxwood Hedges along the Borden Avenue garden wall, as well as to the west of the entrance along Borden Avenue.  The garden will have planting beds around the perimeter with Perennials.  Six (6) American Linden Street trees, will be planted along Borden Avenue.  Yard areas to be seeded. (See attached site plan)*

(2)   Area map: *Area map is on site plan.*

(3)   Floor plan: *Floor plans for each floor are included.*

(4)   Floor to ceiling heights of units: *9'-0*

(5)   Approximate square footage of each unit: *Please see attached*

(6)   A master floor plan showing unit boundaries and the relationship of units to each other. *(Please see attached)*

aa.   **Asbestos** - *No ACM to be installed in building.*

bb.   *N/A*

cc.   *N/A*

dd.   *N/A*

NDG Architect, P.C.

Mitchell D. Newman
President

13

**THIS PAGE INTENTIONALLY LEFT BLANK**























PRIVATE GARDEN
PRIVATE GARDEN
LOUNGE
618 S.F.
GYM / WORKOUT
675 S.F.
ELECTRICAL
ROOM
327 S.F.
BICYCLE
STORAGE
264 S.F.
ELEVATOR
LOBBY
ELEV. #1
ELEV. #2
ELEC.
CL.
JAN.
SINK
COMPACTOR
ROOM
324 S.F.
LOBBY
912 S.F.
VESTIBULE
178 S.F.
CONCIERGE
DESK
TELECOM
ROOM
COOLER
PACKAGE
ROOM
TOILET
RM.
TOILET
RM.
MAIL
ROOM
SUPER'S
APT.
LR
BR 1
BR 2
GAS
METER
/RPZ
ROOM
ST-B
A
FIRE PUMP
ROOM
WATER METER
ROOM
MATCH LINE
MATCH LINE
1ST FLOOR PLAN
Scale: 1/16" = 1'-0"
1
A1.1
DATE: 05/08/06
SCALE: 1/16" = 1'-0"
DRAWN BY: W. DESSALINES
JOB #: 05-77
DWG. #: A1.1b
PROJECT:
ONE HUNTERS POINT
5-49 BORDEN AVENUE
LONG ISLAND CITY, NY
NEWMAN DESIGN GROUP
ARCHITECTS • PLANNERS • ENGINEERS
210 WEST ROGUES PATH
COLD SPRING HILLS, NY 11743
Tel.: 631-673-3111 • Fax: 631-673-2031 • E-MAIL: INFO@NEWMANDESIGNGROUP.COM

| | |
|---|---|
| DATE: | 05/08/06 |
| SCALE: | 1/16" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | A1.2a |

PROJECT:

ONE HUNTERS POINT
5-49 BORDEN AVENUE
LONG ISLAND CITY, NY

NEWMAN DESIGN GROUP
ARCHITECTS • PLANNERS • ENGINEERS
210 WEST ROGUES PATH COLD SPRING HILLS, NY 11743
Tel.: 631-673-3111 • Fax: 631-673-2031 • E-MAIL: INFO@NEWMANDESIGNGROUP.COM

MATCH LINE
MATCH LINE
ST. A
1 A1.6 ROOF PLAN
Scale: 1/16" = 1'-0"
NEWMAN DESIGN GROUP
ARCHITECTS • PLANNERS • ENGINEERS
210 WEST ROGUES PATH COLD SPRING HILLS, NY 11743
Tel.: 631-673-3111 • Fax: 631-673-2031 • E-MAIL: INFO@NEWMANDESIGNGROUP.COM
PROJECT:
ONE HUNTERS POINT
5-49 BORDEN AVENUE
LONG ISLAND CITY, NY
DATE: 05/08/06
SCALE: 1/16" = 1'-0"
DRAWN BY: W. DESSALINES
JOB #: 05-77
DWG. #: A1.Ra



1 ROOF PLAN
A1.9 Scale: 1/16" = 1'-0"

NEWMAN DESIGN GROUP
ARCHITECTS • PLANNERS • ENGINEERS
210 WEST ROGUES PATH        COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL INFO@NEWMANDESIGNGROUP.COM

PROJECT:

ONE HUNTERS POINT
5-49 BORDEN AVENUE
LONG ISLAND CITY, NY

DATE:        05/09/06
SCALE:       1/16" = 1'-0"
DRAWN BY:    W. DESSALINES
JOB #:       05-77
DWG. #:      A1.Rb



UNIT A
892 SF

KITCHEN
16'-6" x 8'-0"

(H.C. ADAPTABLE)

W/D

BEDROOM
11'-5" x 11'-4"

LIVING / DINING ROOM
17'-6" x 11'-10"

MASTER BEDROOM
19'-4" x 10'-10"

UNIT 1A

PRIVATE GARDEN          PRIVATE GARDEN

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 1A |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS · PLANNERS · ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 ·Fax: 631-673-2031 · E-MAIL: INFO@NEWMANDESIGNGROUP.COM



MASTER BEDROOM
16'-6" x 11'-1"

KITCHEN
13'-4" x 7'-5"

LIVING / DINING ROOM
19'-4" x 17'-0"

BEDROOM
10'-8" x 10'-2"

W/D

(H.C. ADAPTABLE)

E.P.

UNIT A
1,168 SF

BALCONY
13'-8" x 5'-5"

UNIT 2A

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 2A |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS   •   PLANNERS   •   ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 • Fax: 631-673-2031 • E-MAIL: INFO@NEWMANDESIGNGROUP.COM



BALCONY
34'-10" x 5'-0"

MASTER BEDROOM
15'-2" x 12'-0"

BEDROOM
11'-9" x 11'-0"

LIVING / DINING ROOM
19'-10" x 13'-1"

UNIT B
1,043 SF

E.P.

(A.C. ADAPTABLE)

KITCHEN
9'-6" x 8'-0"

W/D

UNIT 2B

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 | PROJECT: |
|---|---|---|
| SCALE: | 1/8" = 1'-0" | **ONE HUNTERS POINT** |
| DRAWN BY: | W. DESSALINES | 5-49 BORDEN AVENUE |
| JOB #: | 05-77 | LONG ISLAND CITY, NEW YORK |
| DWG. #: | UNIT 2B | |



**NEWMAN DESIGN GROUP**
ARCHITECTS  •  PLANNERS  •  ENGINEERS
210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 • Fax: 631-673-2031 • E-MAIL: INFO@NEWMANDESIGNGROUP.COM



UNIT 2C

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 | PROJECT: | | | |
|---|---|---|---|---|---|
| SCALE: | 1/8" = 1'-0" | | | | |
| DRAWN BY: | W. DESSALINES | **ONE HUNTERS POINT** | | | |
| JOB #: | 05-77 | 5-49 BORDEN AVENUE | | | |
| DWG. #: | UNIT 2C | LONG ISLAND CITY, NEW YORK | | | |



**Newman Design Group**

ARCHITECTS   •   PLANNERS   •   ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743

Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



BALCONY
27'-0" x 5'-0"

LIVING / DINING ROOM
15'-5" x 13'-4"

BEDROOM
11'-5" x 11'-0"

MASTER BEDROOM
15'-2" x 11'-6"

UNIT D
967 SF

W/D

KITCHEN
13'-9" x 8'-0"

UNIT 2D

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 2D |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH                 COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



**UNIT E**
1,037 SF

KITCHEN
13'-9" x 8'-0"

BEDROOM
14'-1" x 11'-8"

LIVING / DINING ROOM
20'-3" x 13'-4"

MASTER BEDROOM
14'-9" x 11'-3"

BALCONY
13'-6" x 5'-3"

(H.C. ADAPTABLE)

W/D

E.F.

UNIT 2E

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 | PROJECT: |  |
| SCALE: | 1/8" = 1'-0" | **ONE HUNTERS POINT** | **NEWMAN DESIGN GROUP** |
| DRAWN BY: | W. DESSALINES | 5-49 BORDEN AVENUE | ARCHITECTS • PLANNERS • ENGINEERS |
| JOB #: | 05-77 | LONG ISLAND CITY, NEW YORK | 210 WEST ROGUES PATH     COLD SPRING HILLS, NY   11743 |
| DWG. #: | UNIT 2E | | Tel.: 631-673-3111•Fax: 631-673-2031•E-MAIL: INFO@NEWMANDESIGNGROUP.COM |



TERRACE
44'-6" x 29'-4"

MASTER BEDROOM
15'-2" x 11'-0"

BEDROOM
11'-4" x 11'-0"

LIVING / DINING ROOM
15'-5" x 14'-2"

UNIT F
936 SF

w/b

KITCHEN
12'-0" x 8'-0"

UNIT 2F

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 2F |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS • PLANNERS • ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 • E-MAIL: INFO@NEWMANDESIGNGROUP.COM



KITCHEN
9'-7" x 7'-8"

UNIT G
1,065 SF

(H.C. ADAPTABLE)

MASTER BEDROOM
28'-4" x 12'-0"

LIVING / DINING ROOM
20'-2" x 13'-2"

BEDROOM
14'-1" x 11'-2"

BALCONY
13'-3" x 5'-5"

UNIT 2G

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 2G |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 • Fax: 631-673-2031 • E-MAIL: INFO@NEWMANDESIGNGROUP.COM



TERRACE
29'-4" x 27'-0"

BEDROOM
11'-5" x 11'-4"

LIVING / DINING ROOM
15'-7" x 13'-8"

UNIT H
690 SF

W/D

(H.C.
ADAPTABLE)

KITCHEN
13'-9" x 8'-0"

E.P.

UNIT 2H

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 2H |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**Newman Design Group**
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



**UNIT J**
728 SF

KITCHEN
12'-1" x 8'-0"

(H.C. ADAPTABLE)

W/D

BEDROOM
12'-8" x 11'-4"

LIVING / DINING ROOM
20'-0" x 14'-8"

BALCONY
13'-3" x 5'-3"

UNIT 2J

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 2J |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 • Fax: 631-673-2031 • E-MAIL: INFO@NEWMANDESIGNGROUP.COM



TERRACE
29'-4" x 27'-0"

BEDROOM
11'-5" x 11'-0"

LIVING / DINING ROOM
15'-1" x 12'-5"

UNIT K
661 SF

W/D

(H.C.
ADAPTABLE)

KITCHEN
13'-9" x 8'-0"

E.P.

UNIT 2K

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 2K |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**Newman Design Group**
ARCHITECTS   •   PLANNERS   •   ENGINEERS

210 WEST ROGUES PATH                COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



KITCHEN
13'-9" x 8'-0"

W/D

(H.C. ADAPTABLE)

**UNIT L**
782 SF

LIVING / DINING ROOM
20'-3" x 13'-8"

BEDROOM
12'-9" x 12'-8"

BALCONY
13'-8" x 5'-2"

UNIT 2L

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 2L |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH                    COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



**TERRACE**
30'-0" x 14'-0"

**MASTER BEDROOM**
13'-10" x 11'-8"

W/D

E.P.

**KITCHEN**
13'-2" x 8'-0"

(H.C. ADAPTABLE)

**UNIT M**
1,173 SF

**BEDROOM**
11'-8" x 11'-4"

**LIVING / DINING ROOM**
26'-4" x 13'-0"

**BALCONY**
12'-2" x 5'-8"

UNIT 2M

**KEY PLAN**
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 2M |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS • PLANNERS • ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031•E-MAIL: INFO@NEWMANDESIGNGROUP.COM



TERRACE
38'-0" x 29'-4"

BEDROOM
11'-5" x 11'-0"

LIVING / DINING ROOM
15'-0" x 13'-0"

UNIT N
608 SF

W/D

(HC ADAPTABLE)

KITCHEN
12'-0" x 8'-0"

E.F.

UNIT 2N

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 2N |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS   •   PLANNERS   •   ENGINEERS

210 WEST ROGUES PATH                    COLD SPRING HILLS, NY   11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



BEDROOM
10'-8" x 10'-2"

W/D

(H.C. ADAPTABLE)

**UNIT A**
1,168 SF

MASTER BEDROOM
16'-6" x 11'-1"

KITCHEN
13'-4" x 7'-5"

LIVING / DINING ROOM
19'-4" x 17'-0"

BALCONY
13'-7" x 5'-2"

UNIT 3-8A

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 | PROJECT: | |
|---|---|---|---|
| SCALE: | 1/8" = 1'-0" | | |
| DRAWN BY: | W. DESSALINES | **ONE HUNTERS POINT** | |
| JOB #: | 05-77 | 5-49 BORDEN AVENUE | |
| DWG. #: | UNIT 3-8A | LONG ISLAND CITY, NEW YORK | |



**NEWMAN DESIGN GROUP**
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



BALCONY
21'-2" x 5'-0"

MASTER BEDROOM
15'-2" x 12'-0"

BEDROOM
11'-9" x 11'-0"

LIVING / DINING ROOM
19'-10" x 13'-1"

UNIT B
1,043 SF

E.P.

(H.C.
ADAPTABLE)

KITCHEN
9'-6" x 8'-0"

W/D

Unit 3-8B

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|-------|----------|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 3-8B |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS   •   PLANNERS   •   ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



KITCHEN
13'-9" x 8'-0"

(H.C. ADAPTABLE)

W/D

UNIT C
692 SF

LIVING / DINING ROOM
20'-0" x 12'-9"

BEDROOM
12'-9" x 11'-7"

BALCONY
13'-3" x 5'-5"

UNIT 3-8C

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 3-8C |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS • PLANNERS • ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY 11743
Tel.: 631-673-3111 • Fax: 631-673-2031 • E-MAIL: INFO@NEWMANDESIGNGROUP.COM



BALCONY
27'-4" x 5'-0"

LIVING / DINING ROOM
15'-5" x 13'-4"

BEDROOM
11'-5" x 11'-0"

MASTER BEDROOM
15'-2" x 11'-6"

UNIT D
967 SF

KITCHEN
13'-9" x 8'-0"

E.P.

W/D

UNIT 3-8D

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 3-8D |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



NEWMAN DESIGN GROUP
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



**UNIT E**
1,037 SF

KITCHEN
13'-9" x 8'-0"

(H.C. ADAPTABLE)

BEDROOM
14'-1" x 11'-8"

LIVING / DINING ROOM
20'-3" x 13'-4"

MASTER BEDROOM
14'-9" x 11'-3"

BALCONY
13'-8" x 5'-3"

UNIT 3-8E

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 3-8E |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN  DESIGN  GROUP**
ARCHITECTS   •   PLANNERS   •   ENGINEERS

210 WEST ROGUES PATH            COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 • Fax 631-673-2031 • E-MAIL: INFO@NEWMANDESIGNGROUP.COM



BALCONY
27'-4" x 5'-0"

MASTER BEDROOM
15'-2" x 11'-0"

BEDROOM
11'-4" x 11'-0"

LIVING / DINING ROOM
15'-5" x 14'-2"

UNIT F
936 SF

W/D

KITCHEN
12'-0" x 8'-0"

UNIT 3-8F

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 3-8F |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS • PLANNERS • ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



KITCHEN
9'-7" x 7'-8"

W/D

UNIT G
1,065 SF

(H.C.
ADAPTABLE)

MASTER BEDROOM
14'-9" x 12'-0"

LIVING / DINING ROOM
20'-2" x 13'-2"

BEDROOM
14'-1" x 11'-2"

BALCONY
13'-6" x 5'-3"

UNIT 3-8G

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 3-8G |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS • PLANNERS • ENGINEERS

210 WEST ROGUES PATH                COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



BALCONY
13'-8" x 5'-0"

BEDROOM
11'-5" x 11'-4"

LIVING / DINING ROOM
15'-7" x 13'-8"

UNIT H
690 SF

W/D

(H.C. ADAPTABLE)

KITCHEN
13'-9" x 8'-0"

E.P.

UNIT 3-8H

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 | PROJECT: | |
|---|---|---|---|
| SCALE: | 1/8" = 1'-0" | | |
| DRAWN BY: | W. DESSALINES | **ONE HUNTERS POINT** | |
| JOB #: | 05-77 | 5-49 BORDEN AVENUE | |
| DWG. #: | UNIT 3-8H | LONG ISLAND CITY, NEW YORK | |



**NEWMAN  DESIGN  GROUP**
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS,  NY   11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



UNIT J
728 SF

KITCHEN
12'-1" x 8'-0"

BEDROOM
12'-8" x 11'-4"

LIVING / DINING ROOM
20'-0" x 14'-8"

BALCONY
13'-8" x 5'-3"

UNIT 3-8J

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 3-8J |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS • PLANNERS • ENGINEERS

210 WEST ROGUES PATH            COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



BALCONY
13'-8" x 5'-0"

BEDROOM
11'-5" x 11'-0"

LIVING / DINING ROOM
15'-1" x 12'-5"

W/D

(H.C. ADAPTABLE)

UNIT K
661 SF

KITCHEN
13'-9" x 8'-0"

UNIT 3-8K



KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 3-8K |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK

**NEWMAN DESIGN GROUP**
ARCHITECTS • PLANNERS • ENGINEERS
210 WEST ROGUES PATH          COLD SPRING HILLS, NY 11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



KITCHEN
13'-9" x 8'-0"

W/D

(H.C. ADAPTABLE)

UNIT L
782 SF

LIVING / DINING ROOM
20'-3" x 13'-8"

BEDROOM
12'-9" x 12'-8"

BALCONY
13'-4" x 5'-5"

UNIT 3-8L

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|-------|----------|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 3-8L |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



NEWMAN DESIGN GROUP
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



MASTER BEDROOM
14'-5" x 11'-8"

W/D

E.P.

KITCHEN
13'-2" x 8'-0"

(H.C.
ADAPTABLE)

UNIT M
1,173 SF

BEDROOM
11'-8" x 11'-4"

LIVING / DINING ROOM
25'-5" x 12'-9"

BALCONY
12'-5" x 5'-9"

UNIT 3-8M

KEY PLAN
1/32" = 1'-0"



ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 3-8M |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK

**NEWMAN DESIGN GROUP**
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 • E-MAIL: INFO@NEWMANDESIGNGROUP.COM



**BALCONY**
13'-8" x 5'-0"

**BEDROOM**
11'-5" x 11'-0"

**LIVING / DINING ROOM**
15'-0" x 13'-0"

**UNIT N**
608 SF

W/D

(H.C.
ADAPTABLE)

**KITCHEN**
12'-0" x 8'-0"

E.P. 

UNIT 3-8N

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 3-8N |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK

**NEWMAN  DESIGN  GROUP**
ARCHITECTS   •   PLANNERS   •   ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 • E-MAIL: INFO@NEWMANDESIGNGROUP.COM



**MASTER BEDROOM**
15'-7" x 11'-10"

W/D

**KITCHEN**
14'-6" x 8'-4"

(H.C. ADAPTABLE)

E.P.

**UNIT A**
1,175 SF

**BEDROOM**
12'-4" x 11'-0"

**LIVING / DINING ROOM**
19'-5" x 17'-11"

**TERRACE**
40'-5" x 8'-0" IRRG. 323sf

UNIT 9A

**KEY PLAN**
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE



| DATE: | 05/08/06 |
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 9A |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK

**NEWMAN DESIGN GROUP**
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



BALCONY
118 SF

BEDROOM
11'-4" x 10'-7"

LIVING / DINING ROOM
14'-0" X 11'-5"

UNIT B
607 SF

E.P.

P.C.
ADAPTABLE

KITCHEN
8'-10" x 7'-4"

UNIT 9B

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 9B |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



NEWMAN DESIGN GROUP
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



BALCONY
27'-4" x 5'-0"

LIVING / DINING ROOM
15'-0" x 13'-4"

BEDROOM
11'-4" x 11'-0"

MASTER BEDROOM
15'-2" x 10'-10"

UNIT C
957 SF

KITCHEN
14'-1" x 8'-0"

E.P.

W/D

UNIT 9C

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|-------|----------|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 9C |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH         COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



NEWMAN DESIGN GROUP
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH
COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 • Fax: 631-673-2031 • E-MAIL: INFO@NEWMANDESIGNGROUP.COM

PROJECT:
ONE HUNTERS POINT
5-49 BORDEN AVENUE
LONG ISLAND CITY, NY

ALL DIMENSIONS ARE APPROXIMATE

KEY PLAN
1/32" = 1'-0"

UNIT 9D

TERRACE
40'-3" x 8'-0" IRRG. 323sf

MASTER BEDROOM
16'-10" x 11'-8"

KITCHEN
15'-0" x 7'-10"

UNIT D
1247 SF

LIVING / DINING ROOM
18'-5" x 18'-0"

BEDROOM
12'-7" x 11'-4"

W/C
ADAPTABLE

DATE: 05/08/06
SCALE: 1/8" = 1'-0"
DRAWN BY: W. DESSALINES
JOB #: 06-77
DWG. #: UNIT 9D



BALCONY
27'-4" x 5'-0"

MASTER BEDROOM
15'-2" x 11'-0"

BEDROOM
11'-4" x 11'-0"

LIVING / DINING ROOM
14'-5" x 14'-2"

UNIT E
933 SF

W/D

KITCHEN
12'-0" x 8'-0"

E.P.

UNIT 9E

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 9E |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN  DESIGN  GROUP**
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH           COLD SPRING HILLS, NY  11743

Tel.: 631-673-3111 •Fax: 631-673-2031 • E-MAIL: INFO@NEWMANDESIGNGROUP.COM



BALCONY
13'-9" x 5'-0"

BEDROOM
11'-10" x 11'-2"

LIVING / DINING ROOM
15'-3" x 14'-2"

UNIT F
689 SF

W/D

(H.C.
ADAPTABLE)

KITCHEN
12'-0" x 8'-0"

E.P.

UNIT 9F

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 9F |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS • PLANNERS • ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM





**BALCONY**
13'-9" x 5'-0"

**BEDROOM**
11'-4" x 11'-0"

**LIVING / DINING ROOM**
15'-3" x 11'-0"

W/D

**UNIT H**
646 SF

(H.C. ADAPTABLE)

**KITCHEN**
12'-0" x 8'-3"

E.P.

UNIT 9H

**KEY PLAN**
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 9H |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS   •   PLANNERS   •   ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



BALCONY
13'-9" x 5'-0"

MASTER BEDROOM
14'-5" x 11'-2"

BEDROOM
17'-4" x 11'-2"

LIVING / DINING ROOM
15'-4" x 14'-4"

UNIT J
1,020 SF

W/D

(H.C. ADAPTABLE)

KITCHEN
12'-0" x 8'-2"

UNIT 9J

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 9J |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS • PLANNERS • ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031• E-MAIL: INFO@NEWMANDESIGNGROUP.COM



KITCHEN
17'-0" x 12'-0"

UNIT K
1,220 SF

(H.C. ADAPTABLE)

W/D

MASTER BEDROOM
13'-10" x 11'-0"

LIVING / DINING ROOM
15'-0" x 13'-6"

BEDROOM
11'-6" x 11'-3"

BEDROOM
11'-0" x 11'-3"

TERRACE
44'-3" x 8'-0" IRRG. 356 sf

UNIT 9K

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 9K |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS • PLANNERS • ENGINEERS

210 WEST ROGUES PATH        COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



MASTER BEDROOM
15'-7" x 11'-10"

KITCHEN
14'-6" x 8'-4"

UNIT A
1,175 SF

(H.C.
ADAPTABLE)

W/D

BEDROOM
12'-4" x 11'-0"

LIVING / DINING ROOM
19'-5" x 17'-11"

UNIT 10-12A

BALCONY
13'-9" x 5'-0"

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 10-12A |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



BALCONY
23'-8" x 5'-0"

BEDROOM
11'-4" x 10'-7"

LIVING / DINING ROOM
14'-0" x 11'-5"

W/D

(H.C. ADAPTABLE)

E.P.

UNIT B
607 SF

KITCHEN
8'-10" x 7'-4"

UNIT 10-12B

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 10-12B |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH                COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



BALCONY
27'-4" x 5'-0"

LIVING / DINING ROOM
15'-0" x 13'-4"

BEDROOM
11'-4" x 11'-0"

MASTER BEDROOM
15'-2" x 10'-10"

UNIT C
957 SF

KITCHEN
14'-1" x 8'-0"

W/D

E.P.

UNIT 10-12C

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|-------|----------|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 10-12C |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



UNIT D
1247 SF

LIVING / DINING ROOM
18'-5" x 18'-0"

BEDROOM
12'-7" x 11'-4"

MASTER BEDROOM
16'-10" x11'-8"

KITCHEN
15'-0" x 7'-10"

BALCONY
13'-9" x 5'-0"

BALCONY
13'-9" x 5'-0"

W.C.
(ADAPTABLE)

W/D

UNIT 1D-12D

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

PROJECT:

ONE HUNTERS POINT
5-49 BORDEN AVENUE
LONG ISLAND CITY, NY

| DATE: | 05/08/06 |
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 06-77 |
| DWG. #: | UNIT 1D-12D |

**Newman Design Group**
ARCHITECTS · PLANNERS · ENGINEERS

210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel: 631-673-3111 ·Fax: 631-673-2031· E-MAIL: INFO@NEWMANDESIGNGROUP.COM



BALCONY
27'-4" x 5'-0"

MASTER BEDROOM
15'-2" x 11'-0"

BEDROOM
11'-4" x 11'-0"

LIVING / DINING ROOM
14'-5" x 14'-2"

UNIT E
933 SF

W/D

KITCHEN
12'-0" x 8'-0"

UNIT 10-12E

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 10-12E |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK

 **NEWMAN DESIGN GROUP**
ARCHITECTS   •   PLANNERS   •   ENGINEERS

210 WEST ROGUES PATH                     COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 • E-MAIL: INFO@NEWMANDESIGNGROUP.COM



BALCONY
13'-9" x 5'-0"

BEDROOM
11'-10" x 11'-2"

LIVING / DINING ROOM
15'-3" x 14'-2"

UNIT F
689 SF

W/D

(H.C.
ADAPTABLE)

KITCHEN
12'-0" x 8'-0"

UNIT 10-12F

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 10-12F |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN  DESIGN  GROUP**
ARCHITECTS   •   PLANNERS   •   ENGINEERS

210 WEST ROGUES PATH                    COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 • E-MAIL: INFO@NEWMANDESIGNGROUP.COM





BALCONY
13'-9" x 5'-0"

BEDROOM
11'-4" x 11'-0"

LIVING / DINING ROOM
15'-3" x 11'-0"

UNIT H
646 SF

W/D

(H.C. ADAPTABLE)

KITCHEN
12'-0" x 8'-3"

E.P.

UNIT 10-12H

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 10-12H |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS  •  PLANNERS  •  ENGINEERS

210 WEST ROGUES PATH            COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 • E-MAIL: INFO@NEWMANDESIGNGROUP.COM



BALCONY
13'-9" x 5'-0"

MASTER BEDROOM
14'-5" x 11'-2"

BEDROOM
17'-4" x 11'-2"

LIVING / DINING ROOM
15'-4" x 14'-4"

UNIT J
1,020 SF

W/D

(H.C. ADAPTABLE)

KITCHEN
12'-0" x 8'-2"

E.P.

UNIT 10-12J

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 10-12J |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN DESIGN GROUP**
ARCHITECTS • PLANNERS • ENGINEERS
210 WEST ROGUES PATH          COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 •Fax: 631-673-2031 •E-MAIL: INFO@NEWMANDESIGNGROUP.COM



KITCHEN
17'-0" x 12'-0"

UNIT K
1,220 SF

W/D

(H.C.
ADAPTABLE)

MASTER BEDROOM
13'-10" x 11'-0"

LIVING / DINING ROOM
15'-0" x 13'-6"

BEDROOM
11'-6" x 11'-3"

BEDROOM
11'-0" x 11'-3"

BALCONY
13'-9" x 5'-0"

UNIT 10-12K

KEY PLAN
1/32" = 1'-0"

ALL DIMENSIONS ARE APPROXIMATE

| DATE: | 05/08/06 |
|---|---|
| SCALE: | 1/8" = 1'-0" |
| DRAWN BY: | W. DESSALINES |
| JOB #: | 05-77 |
| DWG. #: | UNIT 10-12K |

PROJECT:

**ONE HUNTERS POINT**
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK



**NEWMAN  DESIGN  GROUP**
ARCHITECTS   •   PLANNERS   •   ENGINEERS

210 WEST ROGUES PATH                    COLD SPRING HILLS, NY  11743
Tel.: 631-673-3111 • Fax: 631-673-2031 • E-MAIL: INFO@NEWMANDESIGNGROUP.COM

**THIS PAGE INTENTIONALLY LEFT BLANK**

UNIT NUMBER ___

ONE HUNTERS POINT CONDOMINIUM
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK

(TO BE EXECUTED IN QUINTUPLICATE)

AGREEMENT, made as of _____ ____, _____ between Sponsor (defined below) and Purchaser (defined below).

WITNESSETH:

1.      THE PLAN. Purchaser acknowledges having received and read a copy of the Offering Plan for ONE HUNTERS POINT CONDOMINIUM dated _____ ___, ____ and all amendments thereto, if any filed with the Department of State of New York (hereinafter, collectively, referred to as the "Plan") at least three (3) business days prior to Purchaser's signing this Agreement.  If Purchaser has not received and read the Plan and all amendments thereto at least three (3) business days prior to Purchaser's signing this Agreement, Purchaser shall have the right to rescind this Agreement by sending written notice of such rescission to Sponsor by certified or registered mail, return receipt requested, or by personal delivery, in either case within seven (7) days from the date Purchaser delivers an executed Purchase Agreement together with the required Deposit to the Selling Agent. The Plan is incorporated herein by reference and made a part hereof with the same force and effect as if set forth at length.  In the event of any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan will govern and be binding, except as to inconsistencies arising from changes to the Purchase Agreement negotiated between Sponsor and Purchaser.  Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Declaration, By-Laws and Rules and Regulations contained therein) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor.  Notwithstanding anything to the contrary contained in this Agreement, nothing in the Plan or this Agreement shall be deemed to create any privity of contract between the Purchaser and any person identified in the Plan or any documents filed in connection therewith as a principal of Sponsor or Selling Agent, nor shall   the Purchaser have any rights as against any such principal by reason of the incorporation of the Plan in this Agreement.

2.      DEFINITIONS.  Terms used herein which are also used in the Plan shall have the same meanings as they do in the Plan, unless the context requires otherwise.

2.1     "Sponsor" means Borden East River Realty LLC, having an office c/o Simone Development Company LLC, 1000 Main Street, New Rochelle, New York  10801. Sponsor's taxpayer identification number is _____.

1

2.2.   "Purchaser" means _____ and _____ having an address at _____.   Purchaser's social security number is _____ and _____.

2.3   "Attorney for Sponsor" means Ruskin Moscou Faltischek, P.C. having an office at 1425 RexCorp Plaza, 15th Floor, East Tower, Uniondale, New York 11556.

2.4   "Attorney for Purchaser" means _____ having an address at _____ attn: _____ Esq.. Telephone Number: _____. Facsimile Number: _____.

2.5   "Selling Agent" means Brown Harris Stevens Project Marketing, having an office at 675 Third Avenue (Suite 411), New York, New York 10017.

2.6   "Co-Broker" means _____.

3.   THE UNIT.   Upon and subject to the terms and conditions set forth herein, Sponsor agrees to sell and convey, and Purchaser agrees to purchase, the Unit(s), having the Unit Number(s) in the Declaration, together with (its) (their) undivided % of interest in the Common Elements appurtenant to such Unit(s) set forth below:

UNIT NO.          % OF COMMON INTEREST

4.   PURCHASE PRICE.

4.1   The purchase price for the Unit ("Purchase Price") is:

$_____

The Purchase Price is payable as follows:

(a)   $_____ (the "Deposit") due upon Purchaser's signing and submitting this Agreement check (subject to collection), receipt of which is hereby acknowledged;

(b)   $_____ constituting the balance of the Purchase Price, by wire transfer of immediately available federal funds or by good certified check of Purchaser or official bank check payable on the delivery of the deed as hereinafter provided.

4.2   Wires shall be of immediately available federal funds wired to an account designated by the Sponsor. All checks shall represent United States currency, be drawn on or issued by a United States Bank or trust company which is a member of the Federal Reserve System and shall be unendorsed. The Deposit shall be made payable to the direct order of

"Ruskin Moscou Faltischek, P.C., Escrow Agent." The balance of the Purchase Price shall be by wire or made payable to the direct order of "Borden East River Realty LLC" (or such other party as Sponsor directs to Purchaser, in writing at least three (3) days prior to the date of closing of title). If any check is returned for insufficient funds or any other reason, such return shall be deemed to be a default by Purchaser under this Agreement and shall entitle Sponsor to exercise any of the remedies set forth in Article 14 hereof. Notwithstanding the foregoing, if the check representing the Deposit is returned for insufficient funds or any other reason, such return shall be deemed to be a non-curable default by Purchaser and the Agreement shall automatically be deemed cancelled. Upon the cancellation of this Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though this Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of such sale.

5.   <u>DEPOSIT TO BE HELD IN TRUST</u>. All Deposits made pursuant to this Agreement are subject to the requirements of Sections 352-e(2)(b) and 352-h of the New York General Business Law and the Attorney General's regulations promulgated pursuant thereto. All monies received from Purchaser towards the Deposit shall be delivered to Ruskin Moscou Faltischek, P.C., as escrow agent ("Escrow Agent") and shall be held by Ruskin Moscou Faltischek, P.C. in a segregated Escrow Account at Madison National Bank located at 849 Whitman Road, Merrick, New York 11566 in accordance with the section of the Plan entitled "Escrow and Trust Fund Requirements". By signing this Agreement, Purchaser will not object and will be deemed to have agreed, without the need for a further written agreement, to the release of the Deposit to Sponsor in the event Sponsor and Purchaser close title under this Agreement. If Purchaser shall default on his obligations under this Agreement, then the Deposit, and all sums paid by Purchaser to Sponsor for special work requested by Purchaser, shall be released to Sponsor as liquidated damages, and thereafter, neither party shall have any further rights or obligations against or to each other. In the event Sponsor cannot convey title to the Unit to Purchaser by reason other than Purchasers default, the Deposit shall be returned to Purchaser, within thirty (30) business days of Sponsor's notification to Purchaser that it cannot convey title.

6.   <u>CLOSING DATE AND PLACE</u>.

6.1   The closing of title shall be held at the offices of Ruskin Moscou Faltischek, P.C., 1425 RexCorp Plaza, East Tower, 15th Floor, Uniondale, New York 11556 (or such other place in the City and State of New York as Sponsor may designate to Purchaser) and on such date and hour as Sponsor may designate to Purchaser on not less than thirty (30) days' prior written notice. If Sponsor consents to close at any other location as an accommodation to Purchaser, Purchaser shall pay to Sponsor's attorneys at closing an extra fee as set forth in the Plan. Sponsor may, from time to time, adjourn the date and hour for closing on not less than five (5) business days' notice to Purchaser, which notice shall fix a new date, hour and place for the closing of title.

6.2     The term "Closing Date", "Closing", "Closing Of Title" or words of similar import, whenever used herein, shall mean the date designated by Sponsor on which the deed to the Unit is delivered to Purchaser, or any adjourned date fixed by Sponsor pursuant to subsection 6.1 hereof.

## 7.     DELIVERY OF THE DEED AND UNIT POWER OF ATTORNEY.

7.1     At the closing of title, Sponsor shall deliver to Purchaser a bargain and sale deed with covenant against grantor's acts conveying fee simple title to the Unit to Purchaser, subject only to the liens, encumbrances, and title conditions set forth on Schedule A annexed hereto and made a part hereof. The deed shall be prepared by Sponsor substantially in the form set forth in Part II of the Plan and shall be executed and acknowledged by Sponsor in form for recording. Purchaser shall pay all New York State and New York City real property transfer taxes, and Sponsor and Purchaser shall duly execute a New York City Real Property Transfer Tax return (NYC RPT), a New York State Combined Real Estate Transfer Tax Return (TP-584) and a Real Property Transfer Report (RP-5217 NYC) and any other forms then required by law, all of which shall be prepared by Sponsor.

7.2     At the closing of title and simultaneously with the deliver of the deed conveying the Unit to Purchaser, Purchaser shall execute and acknowledge a power of attorney to the Condominium Board prepared by Sponsor substantially in the form set forth in Part II of the Plan.

7.3     At the closing of title, Purchaser shall execute whatever other documents are reasonably necessary or customary in connection with the conveyance of a Condominium Unit, including hut not limited to title affidavits, real property transfer tax forms, etc.

7.4     The executed deed and power of attorney to the Condominium Board shall be delivered to the representative of the title company insuring Purchaser's title (or, if no such representative is present, then to Sponsor's attorney) for recording in the City Register's Office, which recording shall be at Purchaser's expense. After being recorded, (i) the deed shall be returned to Purchaser and (ii) the power of attorney shall be sent to the Condominium Board.

7.5     Purchaser's payment of the balance of the Purchase Price and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing. However, nothing herein contained shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of purchasers under Article 23-A of the General Business Law, the Plan, and Part 20 of the Regulations issued by the Department of Law.

4

8.　　STATUS OF TITLE.

8.1　　At the closing of title, Sponsor shall convey to Purchaser good and insurable title in fee simple to the Unit, free and clear of all liens and encumbrances other than those expressly agreed to by Purchaser or set forth in Schedule A annexed hereto and made a part hereof or as otherwise permitted pursuant to the Plan.　Any lien and encumbrance or condition to which title is not to be subject shall not be an objection to title if (a) the instrument required to remove it of record is delivered at or prior to the closing of title to the proper party or to Purchaser's title insurance company, together with the attendant recording or filing fee, if any, or (b) All New York Title Agency, Inc. (or such other title insurance company as Purchaser may utilize), is or would be willing, in a fee policy issued by it to the Purchaser, to insure Purchaser that it will not be collected out of the Unit if it is a lien, or will not be enforced against the Unit if it is not a lien at no additional cost or additional premium to Purchaser.

8.2　　Sponsor shall be entitled to adjourn the closing to remove or correct any defect in title which is not set forth in Schedule A.　However, if such defect existed at least ten (10) days prior to the closing and Purchaser, or Purchaser's attorney, failed to send Sponsor's attorney written notice of such defect in title at least ten (10) days prior to the closing of title, then, for purposes of Article 14 below, Purchaser shall be deemed at fault for not having sent timely notice, and the closing adjournment to allow Sponsor to correct or remove such title defect shall be considered as being at the request of Purchaser.

8.3　　Purchaser's acceptance of the deed for the Unit shall be deemed to be a full performance and discharge of each and every agreement and obligation on the part of Sponsor to be performed pursuant to the provisions of this Agreement, the Plan, 13 NYCRR, Part 20 (the regulations of the Attorney General of the State of New York governing the acceptance for filing of the Plan) and General Business Law §352-e, and no obligations of the Sponsor shall survive delivery of the Unit Deed except as otherwise expressly provided in this Agreement or the Plan.　Except where the context otherwise requires, all the representations, warranties, and obligations of the Purchaser under this Agreement shall survive delivery of the deed and the closing of title hereunder, whether or not specifically so stated in any particular provision.

9.　　CLOSING ADJUSTMENTS.

9.1　　The following adjustments shall be made as of midnight of the day preceding the Closing Date with respect to the Unit:

(a)　　real estate taxes and assessments, if any (including water charges and sewer rents, if separately assessed), on the basis of the period for which assessed:

(b)　　Common Charges and assessments for the month in which title closes; and

(c)     if Purchaser is allowed to occupy the Unit prior to Closing, accrued rent  and any other charges pursuant to an interim lease or use and occupancy agreement, if any, covering the Unit.

9.2     If a Unit has been separately assessed but the closing of title occurs before the tax rate is fixed, adjustment of taxes shall be based upon the latest tax rate applied to the most recent applicable assessed valuation.  Installments for tax assessments due after the delivery of the deed, if any, shall be paid by Purchaser and shall not be considered a defect in title.  If a Unit has not been separately assessed as of the Closing Date for the then current tax period, the adjustment under subsection 9.1(a) hereof shall be based upon the assessment for the Property and the percentage interest in the Common Elements appurtenant to the Unit.

9.3     Purchaser hereby agrees that, if Sponsor obtains a refund for real estate taxes paid (or a credit for such taxes to be paid) on Purchaser's Unit, Purchaser and Sponsor will apportion the refund (as well as the costs and/or fees for obtaining the refund or credit) based on the percentage of time for which the refund or credit is obtained during which each party hereto owned the Unit in question. The provisions of this subsection shall survive the closing of title.

9.4     Provided Sponsor is ready, willing and able to close title in accordance with this Agreement, if Purchaser fails for any reason to close title to his Unit within ten (10) days of the originally scheduled Closing Date (a) the closing apportionments described in Section 9. 1 of this Agreement will be made as of midnight of the day preceding the originally scheduled Closing Date, regardless of when the actual closing of title occurs, and (b) Purchaser will be required to pay to Sponsor, as a reimbursement of Sponsor's higher carrying costs for the Unit by virtue of the delay, and in addition to the other payments to be made to Sponsor under this Agreement and the Plan, an amount equal to 0.03% of the Purchase Price for each day starting from (and including) the originally scheduled Closing Date to (and including) the day before the actual Closing Date. If, through no fault of Purchaser, Sponsor postpones the originally scheduled Closing Date, these provisions shall apply to the rescheduled Closing Date if Purchaser fails for any reason to close title to his Unit within ten (10) days of the rescheduled Closing Date.

9.5     Adjustments and apportionments shall be calculated on the basis of the actual number of days in the period for which payments were made or are due, as the case may be. The "Customs in Respect of Title Closings" recommended by The Real Estate Board of New York. Inc., as amended to date, shall apply to the adjustments and other matters therein mentioned except as otherwise provided herein in the Plan.

9.6     Any errors or omissions calculating apportionments at closing shall be corrected and, any payment shall be made to the proper party promptly after discovery. This provision shall survive the closing of title for a period of one (1) year from the Closing Date.

10.    MORTGAGE TAX CREDIT. In the event a mortgage recording tax credit becomes available pursuant to Section 339-ee(2) of the New York Condominium Act, it is specifically understood that such credit shall inure to the benefit of Sponsor. Accordingly, at closing, a Purchaser who elects mortgage financing will be responsible to pay the full amount (but not in excess thereof) of the mortgage recording tax chargeable on the entire amount being financed. At the closing of title, Sponsor will be reimbursed by Purchaser to the extent of any mortgage tax credit allowed.

11.    CLOSING COSTS. In addition to those costs and adjustments described in Articles 9 and 10 herein, Purchaser shall be required to pay the other closing costs which are Purchaser's responsibility as more particularly described in the Section of the Plan entitled "Closing Costs and Adjustments." All such Closing Costs shall be paid by Purchaser, at closing, by Purchaser's unendorsed personal certified check or by official bank check, in either event drawn upon a bank that is a member of the New York Clearing House Association.

12.    TRANSFER TAX RETURNS. At the closing, Purchaser and Sponsor shall duly complete and sign before a notary public the Real Property Transfer Report Form RP-5217NYC required to be filed with the City of New York ("Transfer Report"), the real property transfer tax return required to be filed with the City of New York ("RPT Form") and the Combined Real Estate Transfer Tax Return and Credit Line Mortgage Certificate ("Combined Tax Form") required to be filed with the Department of Taxation and Finance of the State of New York (the "Tax Department") or such other forms as may then be required by law. The Transfer Report, RPT and Combined Tax Form shall be delivered at the closing of title to the representative of Purchaser's title insurance company (or, if none, to Sponsor's attorney) for filing with the proper governmental officer.

13.    AGREEMENT SUBJECT TO MORTGAGE. No lien or encumbrance shall arise against the Property or the Unit as a result of this Agreement or any monies deposited hereunder, except as hereinafter set forth. In furtherance and not in limitation of the provisions of the preceding sentence, Purchaser agrees that the provisions of this Agreement are and shall be subject and subordinate to the lien of any mortgage heretofore or hereafter made, including, but not limited to, any construction or building loan mortgage, and any advances heretofore or hereafter made thereon and any payments or expenses made or incurred or which hereafter may be made or incurred, pursuant to the terms thereof, or incidental thereto, or to protect the security thereof, to the full extent thereof, without the execution of any further legal documents by Purchaser. This subordination shall apply in all cases, regardless of the timing of, or cause for, the making of advances of money or the incurring of expenses. Sponsor shall, at its option, either satisfy such mortgages or obtain a release of the Unit and its undivided interest in the Common Elements from the lien of such mortgages on or prior to the Closing Date. The existence of any mortgage or mortgages encumbering the Property, or portions thereof other than the Unit and its undivided interest in the Common Elements, shall not constitute an objection to title or excuse Purchaser from completing payment of the Purchase Price or performing all of Purchaser's other obligations hereunder or be the basis of any claim against, or liability of, Sponsor, provided that any such mortgage(s) is subordinated to the Declaration.

7

14.   DEFAULT BY PURCHASER.

14.1   The following shall constitute "Events of Default" hereunder:

(i)   Purchaser's failure to pay the balance of the Purchase Price set forth in Section 4.1(b) hereof, or any closing apportionment or closing cost required to be paid by Purchaser in Article 9, 10 or 11 hereof on the Closing Date designated by Sponsor pursuant to Article 6 hereof, or the dishonor of any check given by Purchaser to Sponsor; or

(ii)   the failure to pay, perform or observe any of Purchaser's other obligations hereunder; or

(iii)   if Purchaser is permitted to become the tenant or other occupant of the Unit, Purchaser's failure to pay rent or to perform some other lease or occupancy obligation within the period after notice, if any, set forth in the lease or occupancy or other agreement; or

(iv)   Purchaser's assignment of any of Purchaser's property for the benefit of creditors, or Purchaser's filing a voluntary petition in bankruptcy; or

(v)   If a non-bankruptcy trustee or receiver is appointed over Purchaser or Purchaser's property, or an involuntary petition in bankruptcy is filed against Purchaser; or

(vi)   If a judgment or tax lien is filed against Purchaser and Purchaser does not pay or bond the judgment or tax lien; or

(vii)   If Purchaser has entered into other purchase agreements to purchase other Units, and an Event of Default, as defined in such other purchase agreements has occurred.

14.2   TIME IS OF THE ESSENCE with respect to Purchaser's obligations to pay the balance of the Purchase Price and to pay, perform or observe Purchaser's other obligations under this Agreement.  Upon the occurrence of an Event of Default,  Sponsor, in its sole discretion, may elect by notice to Purchaser to cancel this Agreement.  If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of the notice of cancellation to cure the specified default.  If the default is not cured within such thirty (30) days, then this Agreement shall be deemed cancelled, and Sponsor shall have the right to retain, as and for liquidated damages, the entire Deposit and any interest earned on the Deposit.  In addition, Sponsor shall be entitled to (a) retain, as liquidated damages, any amount paid by Purchaser to Sponsor for special work requested by Purchaser and (b) recover, as liquidated damages, from Purchaser the costs and expenses Sponsor has incurred or will incur in reliance on Purchaser's request for special

work. Sponsor shall not close title to a Roof Terrace Unit or Parking Space Unit unless Purchaser has previously purchased or simultaneously purchases a Residential Unit. Upon the cancellation of this Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though this Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of such sale.

15.     AGREEMENT SUBJECT TO PLAN BEING EFFECTIVE. The performance by Sponsor of its obligations under this Agreement is contingent upon the Plan having been declared effective in accordance with the terms and provisions of the Plan (as the same may be amended from time to time). The Plan may be withdrawn or abandoned by Sponsor only under certain conditions and at certain times, as set forth in the Plan. If the Plan is abandoned or if after being declared effective, the Plan is not consummated for any reason and Purchaser is not in default under this Agreement beyond any applicable grace period, this Agreement shall be deemed cancelled and the Deposit, together with interest earned thereon, shall be returned to Purchaser. Upon such return, neither party shall have any further rights, obligations or liability to or against the other and the parties shall be released and discharged from all obligations and liability under this Agreement and the Plan.

16.     SPONSOR'S INABILITY TO CONVEY THE UNIT. If Sponsor is unable to deliver title to the Unit to Purchaser in accordance with the provisions of this Agreement and the Plan by reason of a defect in title, substantial damage or destruction of the building by fire or other casualty, or the taking of any material portion of the Property by condemnation or eminent domain, Sponsor shall not be obligated to bring any action or proceeding or otherwise incur any cost or expense of any nature whatsoever in excess of its obligations set forth in the Plan in order to cure such inability. If Sponsor is not so obligated under the Plan and notifies Purchaser of its election or inability to cure such title defect, Purchaser's sole remedy shall be to either (a) take title to the Unit subject to such title defect (without any abatement in, or credit against, the Purchase Price, or any claim or right of action against Sponsor for damages or otherwise) or (b) terminate this Agreement. If Purchaser so elects to terminate this Agreement, Sponsor shall, within thirty (30) days after receipt of notice of termination from Purchaser, return to Purchaser all sums deposited by Purchaser hereunder, together with interest earned thereon, if any. Upon making such payment this Agreement shall be terminated and neither party hereto shall have any further rights, obligations or liability to or against the other under this Agreement or the Plan. The foregoing remedy must be exercised by notice to Purchaser in writing to Sponsor within fifteen (15) days after the giving of Sponsor's notice of election not to cure such inability, failing which it shall be conclusively deemed that Purchaser elected the remedy described in clause (a) above, *i.e.* to acquire title subject to such inability.

17.     FIXTURES, APPLIANCES AND PERSONAL PROPERTY. Only those fixtures, appliances and items of personal property which are described in the Plan as being included in the Unit are included in this sale. No portion of the Purchase Price shall be attributable to such items.

18.    CONSTRUCTION.

18.1    The construction of the Building and the Unit, including the materials, equipment and fixtures to be installed therein, shall be substantially in accordance with the Plan and the Plans and Specifications (as defined in the Plan), subject to the right of Sponsor to amend the Plan and the Plans and Specifications in order to substitute materials, equipment or fixtures of equal or better quality, provided that the approval of any governmental authorities having jurisdiction is first obtained (if required). The issuance of a final certificate of occupancy for the Building shall be deemed presumptive evidence that the Building and the Unit have been fully completed in accordance with the Plan and the Plans and Specifications.

18.2    Purchaser acknowledges and agrees that Sponsor will not be liable for, and will have no obligation to correct, certain variations from the Plan and Plans and Specifications as indicated in the Section of the Plan entitled "Rights and Obligations of Sponsor" and will only be responsible to correct any construction defects to the extent, and on the terms and conditions, set forth in such Section.

18.3    The closing of title shall occur only after, or concurrently with, compliance with the prerequisites set forth under "Closing of Title to Units" in Part I of the Plan.  As a result, if all other prerequisites not involving the construction of the Unit are met, Purchaser shall be obligated to close and complete payment of the full purchase Price (without provision for escrow) once a temporary or permanent certificate of occupancy is issued for the Unit (notwithstanding any construction items noted on Purchaser's Inspection Statement (as hereinafter defined) remaining for Sponsor to complete and/or correct in accordance with its obligation under the Plan, and notwithstanding the incomplete construction and/or decoration of any other portions of the Building not affecting the Unit).

18.4    The actual date for the First Closing is not guaranteed or warranted, and may be earlier or later depending on the progress of construction and compliance with the other prerequisites recited in the Section of the plan entitled "Closing of Title to Units". Purchaser acknowledges that construction may be delayed by late delivery of material or equipment, labor difficulties, unavailability of building trades, casualty, inclement weather and other events beyond Sponsor's reasonable control. Purchaser further acknowledges that the Units in the Building will be completed at varying times over a period that could extend well beyond the First Closing. The order in which these Units will be completed is in the discretion of Sponsor. Purchaser acknowledges that Purchaser shall not be excused from paying the full Purchase Price, without credit or set-off, and shall have no claim against Sponsor for damages or losses, but may be entitled to terminate this Agreement and obtain a full refund of the Deposit under limited circumstances as provided in the Plan, in the event that the First Closing occurs substantially later than the projected date or the time to complete or to close title to the Unit is delayed or is postponed by Sponsor.

19.     INSPECTION OF THE UNIT.

19. 1   At least one week (but not more than one month) prior to the Closing Date, the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange appointment with a representative of Sponsor to inspect the Unit within the week prior to the Closing Date. Purchaser or his or her duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Statement (in the form set forth as Schedule B to this Agreement) and deliver same to the Sponsor's representative at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within the Prior to the Closing Date or to so sign and deliver the completed Inspection Statement shall not excuse Purchaser paying the balance of the purchase price when due and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in the Section of the Plan entitled "Rights and Obligations of Sponsor".

Any work set forth on the Inspection Statement may be completed by Sponsor in a period of time following the Closing and shall not be grounds for delaying the Closing. Purchaser will be required to provide Sponsor with reasonable access to the Unit subsequent to the Closing in order to complete punch list work. Sponsor has no obligation under the Plan to deposit any monies in escrow at Closing as a result of any punch list items.

20.     DAMAGE TO THE UNIT.

20.1    If between the date of this Agreement and the Closing of Title the Unit is damaged by fire or other casualty, unless the damage is caused by Purchaser or Purchaser's representatives (including, but not limited to, an architect, engineer, contractor, decorator or agent, or an employee of any of the foregoing) or unless damage occurs after Purchaser is given possession of the Unit under an interim lease or otherwise, the following provisions shall apply:

(a)     The risk of loss to the Unit by fire or other casualty until the earlier of closing of title or possession of the Unit by Purchaser is assumed by Sponsor; provided that Sponsor shall have no obligation or liability to repair or restore the Unit. If Sponsor elects to repair or restore the Unit, which election shall be made within sixty (60) days of such damage, this Agreement shall continue in full force and effect, Purchaser shall not have the right to reject title or receive a credit against, or abatement in, the Purchase Price and Sponsor shall be entitled to a reasonable period of time within which to complete the repair or restoration, not to exceed one hundred eighty (180) days from Sponsor's election to repair the Unit. Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss shall, subject to the rights of the Condominium Board and other Unit Owners if the Declaration has theretofore been recorded, belong entirely to Sponsor and, if such proceeds are paid to Purchaser, Purchaser shall promptly upon receipt thereof turn them over to

Sponsor.  The provisions of the preceding sentence shall survive the Closing of Title.

(b)     In the event Sponsor notifies Purchaser that it does not elect to repair or restore the Unit, or, if the Declaration has been recorded prior thereto, the Unit Owners do not resolve to make such repairs or restoration pursuant to the By-laws, this Agreement shall be deemed cancelled and of no further force and effect and Sponsor shall return to Purchaser all sums deposited by Purchaser hereunder, together with interest earned thereon, if any, and neither party hereto shall have any further rights, obligations or liability to or against the other hereunder or under the Plan, except that if Purchaser is then in default hereunder (beyond any applicable grace period), Sponsor shall retain all sums deposited by Purchaser hereunder, together with any interest earned thereon, as and for liquidated damages.

20.2   If the damage or casualty occurs after Purchaser is given possession of the Unit under an interim lease or otherwise, or the damage or casualty is caused by Purchaser or a representative of Purchaser (including, but not limited to, an architect, engineer, contractor, decorator or agent, or an employee of any of the foregoing), Purchaser shall assume the risk of loss, to the extent the loss is not covered by insurance maintained by Sponsor or, if the First Closing of a Unit has occurred, the Condominium Board, and the following shall apply:

(a)     Purchaser shall be obligated: (1) to accept title to the Unit at Closing subject to such loss; and (2) to pay the full Purchase Price without abatement, set-off or credit and without recourse of any kind against Sponsor;

(b)     Purchaser shall not be entitled to postpone the Closing by reason of the damage or casualty and may not commence work to restore the loss until after title closes (unless Purchaser is in possession under an interim lease or otherwise); and

(c)     if Purchaser fails to comply with this Section 20.2, such failure shall constitute an Event of Default by Purchaser entitling Sponsor to cancel this Agreement and receive and retain the Deposit and other amounts specified in Section 14.2 as liquidated damages.

Purchaser expressly waives the provisions of Section 227 of the Real Property Law of the State of New York and agrees that the provisions of this Article 20 shall govern and control in lieu thereof.

21.   NO REPRESENTATIONS. Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or otherwise, including, but not limited to, any relating to the description

12

or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners, the estimated Common Charges allocated to the Unit, the estimated real estate taxes on the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, the right to any income tax credit with respect to the purchase of the Unit or any other data, except as herein or in the Plan specifically represented. Purchaser has relied solely on his own judgment and investigation in deciding to enter into this Agreement and purchase the Unit. No person has been authorized to make any representations on behalf of Sponsor except as herein or in the Plan specifically set forth. No oral representations or statements shall be considered a part of this Agreement. Except as expressly set forth in the Plan, Sponsor does not make any representations as to the condition, income, expenses, use, operation or any other matter or thing affecting or relating to the Property or title thereto or the transactions contemplated hereby. Without limiting the generality of the foregoing, but except as may otherwise be specifically provided in the Plan, Sponsor has not made any representations or warranties, in either case express or implied as to (i) the description or physical condition of the Property or the Unit, or the size or the dimensions of the Unit, or any other physical characteristics thereof; (ii) the services to be provided to Unit Owners; (iii) the estimated Common Charges allocable to the Unit; (iv) the right to any income tax deduction for any real estate taxes or mortgage interest paid by the Purchaser; (v) the current or future real estate tax liability, assessment or valuation of the Property or the Unit; (vi) the potential qualification of the Property or the Unit for any and all benefits conferred by federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar of dissimilar to those enumerated; (vii) the compliance of the Unit or the Property, in its current or any future state with applicable zoning ordinances and the ability to obtain a variance in respect to any non-compliance, if any, with said zoning ordinances; (viii) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Unit or the Property from any source, including but not limited to the state, city or federal government or any institutional lender; (ix) the current or future use of the Unit or the Property; (x) the current or future condition and operating state of any and all machinery or equipment in the Unit or on the Property and the current or future structural and physical condition of the Unit, the Building or any other improvements to the Property or their suitability for rehabilitation or renovation; (xi) the state of title to the Unit; (xii) the presence or absence of violations of law or municipal ordinances, orders or requirements; or (xiii) the ability of any Unit Owner to exercise, enjoy or enforce any rights or benefits granted to any Unit Owner under either the Declaration or the By-Laws, the compliance thereof with applicable law or the sufficiency thereof for any Unit Owner's intended use. Except as specifically provided otherwise in the Plan, Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof or of the Common Elements, as shown on the Floor Plans is accurate or correct, and (b) that Purchaser shall not be relieved of any Purchaser's obligations hereunder by reason of any immaterial or insubstantial inaccuracy or error. The provisions of this Article 21 shall survive the closing of title.

22.     PROHIBITION AGAINST ADVERTISING. Prior to the closing of title, Purchaser agrees not to list the Unit for resale or rental with any broker or to advertise or otherwise offer, promote or publicize the availability of the Unit for sale or lease, without Sponsor's prior written consent. Any listing of the Unit or form of advertising, promotion or publicizing of the Unit by Purchaser prior to Closing of title shall be a default by Purchaser, entitling Sponsor to the remedies set forth in Article 14 hereof.

23.     BROKER. Purchaser represents to Sponsor that Purchaser has not dealt with any broker in connection with this transaction other than the Selling Agent and the Co-Broker. Purchaser shall pay the commission of any broker with whom Purchaser may have dealt, other than the Selling Agent and the Co-Broker. Purchaser agrees that, should any claim be made against Sponsor for commissions by any broker, other than the Selling Agent, on account of any acts of Purchaser or Purchaser's representatives, Purchaser will indemnify and hold Sponsor free and harmless from and against any and all liabilities and expenses in connection therewith, including reasonable legal fees. The provisions of this Article shall survive the closing of title.

24.     AGREEMENT MAY NOT BE ASSIGNED.

24.1     Purchaser does not have the right to assign this Agreement without the prior written consent of Sponsor, which consent may be unreasonably withheld or delayed. Any purported assignment by Purchaser in violation of this Agreement will be voidable at the option of Sponsor. Sponsor's refusal to consent to an assignment will not entitle Purchaser to cancel this Agreement or give rise to any claim for damages against Sponsor. Under no circumstances will Sponsor consent (a) to an assignment of a Purchase Agreement with respect to a Residential Unit if such Purchase Agreement would not then be included in the percentage required to declare the Plan effective, or (b) to an assignment of the Purchase Agreement in which the Purchaser will receive consideration. If Sponsor, in its sole discretion, consents to a Purchaser's request for an assignment of this Agreement or for the addition, deletion or substitution of names on this Agreement, then Purchaser shall be required to pay Sponsor's attorneys a fee of $750, in advance, for preparation of an assignment and assumption agreement. Any purported assignment by Purchaser in violation of this Agreement shall be a default by Purchaser, entitling Sponsor to the remedies set forth in Article 14 hereof and shall be voidable at the option of Sponsor.

24.2     Notwithstanding anything to the contrary contained in Article 24, if Purchaser has signed this Agreement in an individual name (and not in the name of an entity). Purchaser shall have a one time right to assign Purchaser's rights under this Agreement, in whole, but not in part, to an entity "controlled" (as such term is defined below) by Purchaser, (the entity to which the rights are assignable may be a trust, limited liability company or a corporation) or to member(s) of Purchaser's immediate family, provided that (i) Purchaser designates such assignee at least five (5) business days prior to the Closing Date; (ii) Purchaser delivers to Sponsor's counsel a fee in the amount of $750 for its services required in connection with the preparation of the assignment and assumption agreement; (iii) the Closing will not be delayed as a result of such assignment, (iv) the assignee of this Agreement assumes in writing,

14

by an instrument prepared by Sponsor's counsel of this Agreement assumes in writing the obligations of Purchaser under this Agreement and (v) the assignment is made without consideration.   As used in this subparagraph, the term "control" shall mean the control, either directly or indirectly, of at least 51% of the voting shares or equity interests of such assignee, together with the authority to direct and manage the affairs of such assignee, which shall include Purchaser, being the managing general partner of such partnership or the principal manager or managing member of such limited liability company. Any obligations of Purchaser may be performed by such assignee, and Sponsor agrees to accept such performance as if it were the performance of the Purchaser. No such assignment shall modify Purchaser's obligations hereunder, including without limitation, named Purchaser's indemnity obligations contained in this Agreement, or reduce or limit any liability or obligation of Purchaser, who shall remain primarily liable notwithstanding any liability assumed by assignee. Unless Purchaser complies with the provisions of this subparagraph, any purported assignment by Purchaser shall be null and void and of no effect as against Sponsor.

25.   BINDING EFFECT. The submission of this Agreement to Purchaser does not create a binding obligation on the part of Sponsor. This Agreement shall not be binding on Sponsor until a fully executed counterpart hereof has been delivered to Purchaser. If this Agreement is not accepted within thirty (30) days from the date hereof by the delivery to Purchaser of a fully executed counterpart this Agreement shall be deemed to have been rejected and cancelled and the deposit paid on the execution hereof shall be promptly returned to Purchaser. Upon such refund being made, neither party shall have any further rights, obligations liability to or against the other hereunder or under the Plan. Prior to Sponsor's countersigning and returning this Purchase Agreement to Purchaser, and at any time thereafter. Purchaser agrees upon request to provide Sponsor with written information about Purchaser's employment, financial and rental/ownership history. Such information obtained prior to countersignature may be used to determine Purchaser's qualification to purchase and own the Unit, but does not constitute a reservation or binding obligation on either the applicant or Sponsor. Sponsor has the right, without incurring any liability, to reject this Agreement without cause or explanation to Purchaser. This Agreement may not be rejected due to Purchaser's sex, race, creed, color, national origin, ancestry, disability, marital status, or other ground proscribed by law.

26.   NOTICES.

26.1   Any notice, election, demand, request; letter, consent or other communication hereunder or under the Plan shall be in writing and either delivered in person or sent, postage prepaid, by registered or certified mail return receipt requested or by Federal Express or other reputable overnight courier, with receipt confirmed to Purchaser at the address given at the beginning of this Agreement with a copy to the Attorney for Purchaser and to Sponsor at the address given at the beginning of this Agreement, with a copy to the Attorney for Seller in the same manner as notice is given to Sponsor. Either party may hereafter designate to the other in writing a change in the address to which notices are to be sent.  Except as otherwise expressly provided herein, a notice shall be deemed given when personal delivery or delivery by overnight courier is effected, or in the case of mailing, the three (3) days after the date of

mailing, except that the date of actual receipt shall be deemed to be the date of the giving of any notice of change of address.  Any notice either of the parties hereto receives from the other party's attorney's shall be deemed to be notice from such party itself

26.2     Sponsor hereby designates and empowers both the Selling Agent and Sponsor's counsel Ruskin Moscou Faltischek, P.C. as Sponsor's agents to give any notice to Purchaser under this Agreement (including, without limitation, a notice of default) in Sponsor's name, which notice so given shall have the same force and effect as if given by Sponsor itself.

27.     <u>JOINT PURCHASERS</u>. The term "Purchaser" shall be read as "Purchasers" if more than one person are Purchasers, in which case their obligations shall be joint and several.

28.     <u>LIABILITY OF SPONSOR.</u>  Sponsor shall be excused from performing any obligation or undertaking provided for in this Agreement for so long as such performance is prevented, delayed or hindered by an act of God, fire, flood, explosion, war, riot, sabotage, inability to procure or general shortage of energy, labor, equipment, facilities, materials or supplies in the open market, failure of transportation, strike, lockout, action of labor unions, or any other cause (whether similar or dissimilar to the foregoing) not within the reasonable control of Sponsor. Sponsor's time to perform such obligations or undertaking shall be tolled for the length of the period during which such performance was excused.

29.     <u>FURTHER ASSURANCES</u>.     Either party shall execute, acknowledge and deliver to the other party such instruments, and take such other actions, in addition to the instruments and actions specifically provided for herein, as such other party may reasonably request in order to effectuate the provisions of this Agreement or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

30.     <u>AGREEMENT NOT CONTINGENT UPON FINANCING</u>. Purchaser fully understands that this Agreement is not be contingent upon Purchaser securing financing of the Purchase Price (or any portion thereof), and Purchaser understands and agrees that his failure to obtain such financing will not relieve him/her of his/her obligations hereunder.  If Purchaser elects to finance the purchase of the Unit and obtains a commitment to lend from a financial institution, neither a subsequent change in the terms of such commitment, the failure of Purchaser to satisfy the conditions of such commitment, the expiration or other termination of such commitment, nor any change in Purchaser's financial status or condition will release or relieve Purchaser of his obligation under this Agreement.  If Purchaser finances the purchase of his Unit, neither Sponsor nor the Condominium Board will be obligated to execute or deliver any documents to Purchaser's lender, except as may be required by applicable law.

31.     <u>SEVERABILITY</u>.  If any provision of this Agreement or the Plan is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement or the Plan and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Agreement or of the Plan, except as

otherwise herein or therein provided shall be valid and enforced to the fullest extent permitted by law.

32.   <u>STRICT COMPLIANCE</u>.  Any failure by either party to insist upon the strict performance by the other of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof and each party, notwithstanding any such failure shall have the right thereafter to insist upon the strict performance by the other party of any and all of the provisions of this Agreement to be performed by such party.

33.   <u>GOVERNING LAW</u>.  The provisions of this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed wholly in the State of New York, without regard to principles of conflicts of law.

34.   <u>WAIVER OF JURY</u>.  Except as prohibited by law, the parties shall, and they hereby do expressly waive trial by jury in any litigation arising out of or connected with, or relating to, this Agreement or the relationship created hereby or in the Plan. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

35.   <u>ENTIRE AGREEMENT</u>. This Agreement, together with the Plan, supersedes any and all understandings and agreements between the parties and constitutes the entire agreement between them with respect to the subject matter hereof.

36.   <u>CERTAIN REFERENCES</u>. A reference in this Agreement to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural, and vice versa unless the context otherwise requires. The terms "herein," "hereof or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and not to the particular provision in which the term is used, unless the context otherwise requires. Unless otherwise stated, all references herein to Articles, Sections, subsections, subparagraphs or other provisions are references to Articles, Sections, subsections, subparagraphs or other provisions of this Agreement.

37.   <u>CAPTIONS</u>. The captions in this Agreement are for convenience of reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

38.   <u>SUCCESSORS AND ASSIGNS</u>. The provisions of this Agreement shall bind and inure to the benefit of Purchaser and his heirs, legal representatives, successors and permitted assigns and shall bind and inure to the benefit of Sponsor and its successors and assigns.

39.    CONFIDENTIALITY. Sponsor and Purchaser hereby acknowledge and agree to keep all of the terms and conditions of the Purchase Agreement confidential. Sponsor and Purchaser agree that any information which is required to be disclosed to the parties respective lawyers, architects/engineers, accountants, individuals who "need to know" or governmental agencies shall not be deemed to be a breach by Sponsor or Purchaser of the parties undertaking of confidentiality contained in this Agreement. Any failure by Purchaser to keep the terms and conditions of this Agreement confidential shall be a default by Purchaser, entitling, Sponsor to the remedies set forth in Article 14 of this Agreement.

40.    NO ORAL CHANGES. This Agreement cannot be changed or terminated orally. Any changes or additional provisions must be set forth in a rider attached hereto or in a separate written agreement signed by the parties hereto or by an amendment to the plan.

41.    RESTRICTIONS ON SALE.   Purchaser covenants and agrees to retain ownership in the Unit for a period of one (1) year from the date Purchaser acquired the Unit, except in the case of the death of Purchaser or spouse.  Failure to abide by this requirement shall result in the Purchaser paying to Sponsor a sum equal to 25% of the difference between the new purchase price of the Unit and the Purchase Price set forth in Article 4 of this Purchase Agreement, but in no event less than 10% of the Purchase price set forth in Article 4 of this Purchase Agreement.  The provisions of this Article shall survive delivery of the deed and Closing of Title.

42.    WAIVER OF SOVEREIGN IMMUNITY.   The provisions of this Article 42 apply to any Purchaser that is a foreign government, a resident representative of a foreign government or such other person or entity otherwise entitled to the immunities from suit enjoyed by a foreign government (i.e., diplomatic or sovereign immunity).

The Purchaser hereby waives any and all immunity from suit or other actions or proceedings and agrees that, should the Sponsor or any of its successors or assigns bring any suit, action or proceeding in New York or any other jurisdiction to enforce any obligation or liability of the Purchaser arising, directly or indirectly, out of or relating to this Agreement, no immunity from such suit, action or proceeding will be claimed by or on behalf of the Purchaser.

As of the execution of this Agreement, the Purchaser acknowledges and agrees that all disputes arising, directly or indirectly, out of or relating to this Agreement may be dealt with and adjudicated in the state courts of New York or the federal courts sitting in New York, and hereby expressly and irrevocably submits the person of the Purchaser to the jurisdiction of such courts in any suit, action or proceeding arising, directly or indirectly, out of or relating to this Agreement.  So far as is permitted by applicable law, this consent to personal jurisdiction shall be self-operative and no further instrument or action shall be necessary in order to confer jurisdiction upon the person of the Purchaser in any such court.

The Purchaser irrevocably waives, to the fullest extent permitted by applicable law, and agrees not to assert, by way of motion, as a defense or otherwise in any suit, action or proceeding arising, directly or indirectly, out of relating to this Agreement, brought in the state

courts in New York or the federal courts sitting in New York: (i) any objection which it may have or may hereafter have to the laying of the venue of any such suit, action or proceeding in any such court; (ii) any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum; or (iii) any claim that it is not personally subject to the jurisdiction of such courts. The Purchaser agrees that final judgment from which the Purchaser has not or may not appeal or further appeal in any such suit, action or proceeding brought in such a court shall be conclusive and binding upon the Purchaser and, may so far as is permitted under the applicable law, be enforced in the courts of any state or any federal court and in any other courts to the jurisdiction of which the Purchaser is subject, by a suit upon such judgment and that the Purchaser will not assert any defense, counterclaim, or set off in any such suit upon such judgment.

The Purchaser agrees to execute, deliver and file all such further instruments as may be necessary under the laws of the State of New York, in order to make effective the consent of the Purchaser to jurisdiction of the state courts of New York and the federal courts sitting in New York and any other provisions of this Article 42.

Nothing in this Article 42 shall affect the right of the Sponsor to bring proceedings against the Purchaser in the courts of any jurisdiction or jurisdictions.

The Purchaser hereby designates _____, having its offices, at the date hereof, at _____, _____, New York _____ as its duly authorized and lawful agent to receive process for and on behalf of the Purchaser in any state or Federal suit, action or proceeding in the State of New York based on, arising out of or connected with this Agreement.

If the Purchaser is a foreign mission, as such term is defined under the Foreign Missions Act, 22 U.S.C. 4305, the Purchaser shall notify the United States Department of State prior to purchasing a Unit and provide a copy of such notice to the Seller. Sponsor shall not be bound under this Agreement unless and until the earlier to occur of: (i) a notification of approval is received from the Department of State; or (ii) sixty (60) days after the Purchaser's notice is received by the Department of State.

The provisions of this Article 42 shall survive the Closing of Title or the termination of this Agreement for the purpose of any suit, action, or proceeding arising directly or indirectly, out of or relating to this Agreement.

43. <u>SPONSOR NOT A FOREIGN PERSON</u>. Seller is not a "foreign person," as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code of 1986, Section 1445, as amended, and the regulations promulgated thereunder. Seller shall deliver to Purchaser, at Closing or at such earlier date as may be required by regulations promulgated pursuant to Section 1445 of the Internal Revenue Code of 1986, an affidavit to such effect.

44.   <u>NO RECORDING OF AGREEMENT</u>.   Neither this Agreement nor any memorandum thereof shall be recorded by Purchaser.  Any recordation or attempted recordation by Purchaser of same shall be void and shall be an Event of Default under this Agreement.

45.   <u>FORM 1099-S</u>.  Purchaser's attorney, or such other person as designated by Sponsor, is hereby designated as "the real estate reporting person" with respect to this Agreement and is responsible for the completion and filing of Form 1099-S or such other successor forms as may be prescribed by the Internal Revenue Service and for fulfilling all of the obligations and requirements of Section 6045(e) of the Internal Revenue Code of 1986, as amended (the "Code").  Purchaser and the real estate reporting person shall indemnify and hold harmless Sponsor and its attorneys against any and all penalties, loss and expenses (including, without limitation, attorneys' fees and expenses) resulting from the failure of the real estate reporting person to comply with the Code and the provisions of this Agreement.  The provision of this Article 45 shall survive Closing.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

PURCHASER(S):

_____
(signature)


_____
(signature)


SPONSOR:
BORDEN EAST RIVER REALTY LLC

By: Simone Borden LLC,
      its Managing Member

By:_____
        Name: Joseph Simone
        Title:  Manager

SCHEDULE A - PERMITTED ENCUMBRANCES

1.      Building restrictions and zoning and other regulations, resolutions and ordinances and any amendments thereto now or hereafter adopted.

2.      Any state of facts which an accurate survey or personal inspection of the Property would show, provided such state of facts would not prevent the use of the Unit for dwelling purposes with respect to Residential Units; parking of passenger vehicles or motorcycles with respect to Parking Space Units; and passive recreational purposes with respect to Roof Terrace Units.

3.      The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations, all as set forth in the Declaration, the By-laws (and the Rules and Regulations made thereunder), the Power of Attorney from the Purchaser to the Condominium Board, and the Floor Plans as all of the same may be amended from time to time.

4.      Consents by the Sponsor or any former owner of the Land for the erection of any structure or structures on, under or above any street or streets on which the Property may abut.

5.      Any easement or right of use in favor of any utility company for construction, use, maintenance or repair of utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles and other equipment and facilities on, under and across the Property.

6.      Rights and licenses, if any, to maintain vaults and chutes under the sidewalks and streets; and revocability of rights and licenses, if any, for vault space and chutes under the sidewalks and streets.

7.      Any easement or right of use required by Sponsor or its designee to obtain a temporary, permanent or amended Certificate of Occupancy for the Building or any part of same.

8.      Encroachments of stoops, areas, cellar steps or doors, trim, copings, retaining walls, bay windows, balconies, sidewalk elevators, fences, fire escapes, cornices, foundations, footings and similar projections, if any, on, over, or under the Property or the streets or sidewalks abutting the Property, and the rights of governmental authorities to require the removal of any such projections and variations.

9.      Leases and service, maintenance, employment, concessionaire and license agreements, if any, of other Units or portions of the Common Elements.

10.     The lien of any unpaid Common Charge, real estate tax, water charge or sewer rent, or vault charge, provided the same are adjusted at the closing of title.

11.     The lien of any unpaid assessment payable in installments (other than assessments levied by the Condominium Board), except that the Sponsor shall pay all such assessments due prior to

the Closing Date (with the then current installment to be apportioned as of the Closing Date) and the Purchaser shall pay all assessments due from and after the Closing Date.

12.     Any declaration or other instrument affecting the Property which the Sponsor deems necessary or appropriate to comply with any law, ordinance, regulation, zoning resolution or requirement of the Department of Buildings, the City Planning Commission, the Board of Standards and Appeals, or any other public authority, applicable to the demolition, construction, alteration, repair or restoration of the Building.

13.     Any encumbrance as to which All New York Title Agency, Inc., as agent for First American Title Insurance Company and Lawyers Title Insurance Corp. (or such other New York Board of Title Underwriters member title insurance company which insures the Purchaser's title to the Unit) would be willing, in a fee policy issued by it to the Purchaser, to insure the Purchaser that such encumbrance (a) will not be collected out of the Unit if it is a lien or (b) will not be enforced against the Unit if it is not a lien.

14.     Any other encumbrance, covenant, easement, agreement, or restriction against the Property other than a mortgage or other lien for the payment of money, which does not prevent the use of the Unit for dwelling purposes with respect to Residential Units; parking of passenger vehicles or motorcycles with respect to Parking Space Units; and passive recreational purposes with respect to Roof Terrace Units.

15.     Any lease covering the Unit(s) made from the Sponsor to the Purchaser.

16.     Any violation against the Property (other than the Unit) which is the obligation of the Condominium Board, or another Unit Owner to correct.

17.     Standard printed exceptions contained in the form of fee title insurance policy then issued by the Title Company.

18.     Any certificate of occupancy for the Building, so long as same permits, or does not prohibit, use of the Unit for its stated purposes.

19.     Covenants, easements, leases, agreements of record, etc., including, but not limited to the following:

      (a)     Easement recorded in Liber 6522, Page 266.

      (b)     Declaration of Zoning Lot Restrictions recorded in CRFN 2005000388660.

            (i)     Waiver of Right to Execute Declaration of Zoning Lot Description recorded in CRFN 2005000388658.

            (ii)    Waiver of Right to Execute Declaration of Zoning Lot Description recorded in CRFN 2005000388659.

(c)      Zoning Lot Development Agreement recorded in CRFN 2005000388661.

20.      The lien of any mortgage, lien or other encumbrance granted, created or obtained by the Purchaser.

21.      All loss or damage arising from the imposition of any lien resulting from the restoration of real property taxes upon the premises or the rescission of tax abatements and/or exemptions, including 421-a benefits.

22.      Any loss, claim or damage of any unpaid fee or charge by the City of New York entered in the records of the Department of Finance after the date of Closing.

23.      Service, labor, concessionaire and maintenance agreements contemplated under the Plan.

24.      The Superintendent's Unit mortgage.

25.      Judgments, bankruptcies or other returns against other persons having names the same as or similar to that of Sponsor or any of its principals, provided Sponsor or any such principals, as the case may be, deliver to the Purchaser or the Purchaser's title insurance company an affidavit showing that such judgments, bankruptcies or other returns are not against Sponsor or any such principals, as the case may be.

THIS PAGE INTENTIONALLY LEFT BLANK

SCHEDULE B
TO PURCHASE AGREEMENT
INSPECTION STATEMENT

Date: _____ ___, _____


Gentlemen:

1.     On the date hereof the undersigned Purchaser has inspected the Unit(s) set forth below which the undersigned Purchaser is purchasing and have found the Unit(s) to be in good condition, except as otherwise noted below.

_____

_____

_____


2.     The undersigned acknowledges that to prevent pilferage, certain items such as medicine cabinet doors, shower heads, toilet seats, kitchen cabinets, vanity knobs and mechanical chimes will be installed just prior to the date the undersigned moves into the Building. The undersigned Purchaser agrees to sign-off each item requiring adjustment, or repairs, if any, as they are completed.

3.     Purchaser understands that the full balance of the Purchase Price of the Unit must be paid at Closing under the Purchase Agreement, without provision for escrow, notwithstanding Sponsor's obligation to complete or correct the items noted herein.

4.     Purchaser understands and agrees that Sponsor shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, from and after the date of delivery of possession of the Unit to Purchaser, except as to those items (if any) expressly excepted herein (and Sponsor's obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same).   Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction

to the extent required and subject to the conditions set forth in the section entitled "Rights and Obligations of Sponsor" of the Offering Plan.

_____ Unit No. ____
One Hunters Point Condominium
5-49 Borden Avenue
Long Island City, New York

PURCHASER(S):

_____
(signature)

_____
(signature)

SPONSOR:
BORDER EAST RIVER REALTY LLC

By:   Simone  Borden  LLC,  its  Managing Member

BY: _____
Name: Joseph Simone
Title:  Manager

## UNIT DEED

THIS INDENTURE, made the ___ day of _____, _____, between Borden East River Realty LLC, having an office c/o Simone Development Company, LLC, 1000 Main Street, New Rochelle, New York 10801 ("Grantor"), and _____ __ __ _____ having an address at _____ ("Grantee").

<div align="center">WITNESSETH:</div>

That the Grantor, in consideration of Ten and 00/100 ($10.00) Dollars and other good and valuable consideration paid by the Grantee, does hereby grant and release unto the Grantee, the heirs or successors and assigns of the Grantee, forever:

The Condominium Unit ("Unit") known as Unit No. __ in the building ("Building") known as One Hunters Point ("Condominium") and by the street number 5-49 Borden Avenue, Borough and County of Queens, City and State of New York, said Unit being designated and described by the above Unit No. in a certain declaration dated _____ __ _____ made by Grantor pursuant to Article 9-B of the Real Property Law of the State of New York (the "Condominium Act") establishing a plan for condominium ownership of the Building and the land ("Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed hereto and by this reference made a part hereof), which declaration was recorded in the Queens County Office of the Register of The City of New York ("Register's Office") on ____ _____ _____ _____ in Document ID _____ ("Declaration"). The Unit is also designated as Tax Lot ___ in Section 1, Block 34, Lot 12 of the Borough of Queens on the Tax Map of the Real Property Assessment Department of The City of New York and on the Floor Plans of the Building, certified by and filed with the Real Property Assessment Department of The City of New York on _____ ____, _____ as Condominium Plan No. _____ and also filed in the Register's Office on _____ as Map No. ____.

TOGETHER with an undivided _____% interest in the Common Elements (as such term is defined in the Declaration);

TOGETHER with the appurtenances and all the estate and rights of the Grantor in and to the Unit;

TOGETHER with, and subject to, the rights, obligations, easements, restrictions and other provisions set forth in the Declaration and the By-Laws of the Condominium (the "By Laws"), as the same may be amended from time to time; all of which constitute covenants running with the Land and shall bind any person having at any time any interest or estate in the Unit, as though recited and stipulated at length herein.

SUBJECT also to such other liens, agreements, covenants, easements, restrictions, consents and other matters of record as pertain to the Unit, to the Land and/or to the Building (which Land and Building are collectively referred to as the "Premises").

<div align="center">1</div>

TO HAVE AND TO HOLD the same unto the Grantee and the heirs or successors and assigns of the Grantee forever.

If any provision of the Declaration or the By-Laws is invalid under, or would cause the Declaration or the By-Laws to be insufficient to submit the Premises to, the provisions of the Condominium Act, or if any provision which is necessary to cause the Declaration and the By-Laws to be sufficient to submit the Premises to the provisions of the Condominium Act is missing from the Declaration or the By-Laws, or if the Declaration and the By-Laws are insufficient to submit the Premises to the provisions of the Condominium Act, the applicable provisions of the Declaration shall control.

Except as otherwise specifically permitted by the Condominium Board or provided in the Declaration or the By-Laws, the Unit is intended for residential use only with respect to Residential Units; parking of passenger vehicles or motorcycles with respect to Parking Space Units; and passive recreational purposes with respect to Roof Terrace Units.

Grantor covenants that the Grantor has not done or suffered anything whereby the Unit has been encumbered in any way whatever, except as set forth in the Declaration and the By-Laws (and any Rules and Regulations adopted under the By-Laws).

Grantor, in compliance with Section 13 of the Lien Law of the State of New York, covenants that the Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the same for any other purposes.

Grantee accepts and ratifies the provisions of the Declaration and the By-Laws (and any Rules and Regulations adopted under the By-Laws) and agrees to comply with all the terms and provisions thereof.

This conveyance is made in the regular course of business actually conducted by the Grantor.

The term "Grantee" shall be read as "Grantees" whenever the sense of this indenture so requires.

All capitalized terms used herein which are not separately defined herein shall have the meanings given to those terms in the Declaration or the By-Laws of the Condominium.

IN WITNESS WHEREOF, the Grantor has duly executed this Indenture as of the day and year first above written.

SPONSOR:    BORDEN EAST RIVER
            REALTY, LLC
By:  Simone Borden LLC, its Managing Member


By:_____
Name: Joseph Simone
Title: Manager

## **(ACKNOWLEDGMENT)**

STATE OF NEW YORK    )
                            ) ss.:
COUNTY OF _____    )

On the _____ day of _____, in the year _____, before me, the undersigned, a Notary Public in and for said State, personally appeared Joseph Simone, Manager of Simone Borden LLC, the Managing Member of Borden East River LLC, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

4

**EXHIBIT A**
**TO UNIT DEED**

<u>**DESCRIPTION OF THE LAND**</u>

**THIS PAGE INTENTIONALLY LEFT BLANK**

DECLARATION

Establishing a Plan for Condominium Ownership
of the Premises known as
5-49 Borden Avenue
Long Island City, Queens, New York
Pursuant to Article 9-B of the Real Property
Law of the State of New York

Name:                         One Hunters Point Condominium

Sponsor:                      Borden East River Realty LLC
                        c/o Simone Development Company LLC
                              1000 Main Street
                        New Rochelle, New York 10801

Date of Declaration:          _____ _____, 2007

                              Prepared by:
                        Ruskin Moscou Faltischek, P.C.
                              Attorneys at Law
                              1425 RexCorp Plaza
                           East Tower, 15th Floor
                        Uniondale, New York 11556-1425
                              (516) 663-6600

                 The land affected by the within instrument lies in
                           Block 34, Lot Number 12
                 Tax Map of the Borough of Queens, City of New York

**THIS PAGE INTENTIONALLY LEFT BLANK**

## INDEX TO DECLARATION

| ARTICLE | CAPTION | PAGE |
|---------|---------|------|
| ARTICLE 1. | DEFINITIONS | 1 |
| ARTICLE 2. | SUBMISSION OF THE PROPERTY | 1 |
| ARTICLE 3. | NAME OF THE CONDOMINIUM | 1 |
| ARTICLE 4. | THE LAND | 2 |
| ARTICLE 5. | THE PROPERTY AND THE BUILDING | 2 |
| ARTICLE 6. | THE UNITS | 2 |
| ARTICLE 7. | COMMON ELEMENTS | 4 |
| ARTICLE 8 | DETERMINATION OF COMMON INTEREST | 5 |
| ARTICLE 9. | USE OF BUILDING AND UNITS | 6 |
| ARTICLE 10. | EASEMENTS FOR THE ENJOYMENT OF THE COMMON ELEMENTS | 7 |
| ARTICLE 11. | OTHER EASEMENTS | 8 |
| ARTICLE 12. | ALTERATIONS, ADDITIONS, IMPROVEMENTS AND CHANGES TO UNSOLD UNITS | 10 |
| ARTICLE 13. | ACQUISITION OF UNIT BY THE CONDOMINIUM BOARD | 11 |
| ARTICLE 14. | POWER OF ATTORNEY TO SPONSOR AND THE CONDOMINIUM BOARD | 12 |
| ARTICLE 15. | TERMINATION OF CONDOMINIUM | 13 |
| ARTICLE 16. | COVENANT OF FURTHERASSURANCES | 13 |
| ARTICLE 17. | COVENANTS RUNNING WITH THE LAND | 14 |
| ARTICLE 18. | AMENDMENTS TO THIS DECLARATION | 15 |
| ARTICLE 19. | CONSENTS BY SPONSOR | 16 |
| ARTICLE 20. | PERSON TO RECEIVE SERVICE | 16 |
| ARTICLE 21. | INCORPORATION BY REFERENCE | 17 |
| ARTICLE 22. | WAIVER | 17 |

| **ARTICLE** | **CAPTION** | **PAGE** |
|---|---|---|
| ARTICLE 23. | SEVERABILITY | 17 |
| ARTICLE 24. | SUCCESSORS AND ASSIGNS | 17 |
| ARTICLE 25. | CAPTIONS | 18 |
| ARTICLE 26. | CERTAIN REFERENCES | 18 |

| **EXHIBIT** | **CAPTION** |
|---|---|
| A. | DESCRIPTION OF THE LAND |
| B. | DESCRIPTION OF THE UNITS |
| C. | DEFINITIONS |
| D. | BY-LAWS OF THE CONDOMINIUM |
| E. | UNIT OWNER POWER OF ATTORNEY |

# DECLARATION

## OF

## ONE HUNTERS POINT

(Pursuant to Article 9-B of the Real Property Law
of the State of New York)

BORDEN EAST RIVER REALTY LLC, a limited liability company under the laws of the State of New York, having an office at c/o Simone Development Company LLC, 1000 Main Street, New Rochelle, New York 10801 ("Sponsor"), does hereby declare as follows:

## ARTICLE 1.
## DEFINITIONS

All capitalized terms used in this Declaration (hereinafter referred to as the "Declaration") that are not otherwise defined in the Articles hereof shall have the meanings set forth in Exhibit C annexed hereto, unless the context in which they are used shall otherwise require. All capitalized terms used in this Declaration that are defined in any of the Articles hereof shall have the meanings ascribed to them in such Articles, unless the context in which they are used otherwise require. Each of the capitalized terms shall be applicable to singular and to plural nouns, as well as to verbs of any tense.

## ARTICLE 2.
## SUBMISSION OF THE PROPERTY

2.1.    Sponsor hereby submits the Land and Building, all other improvements erected and to be erected thereon, all easements, rights and appurtenances belonging thereto and all other property, real, personal or mixed, intended for use in connection therewith (collectively, the "Property") to the provisions of Article 9-B of the Real Property Law of the State of New York (the "Condominium Act") and pursuant thereto does hereby establish a condominium to be known as "One Hunters Point" (the "Condominium").

2.2.    Attached to this Declaration and made a part hereof are the By-Laws of the Condominium, which set forth detailed provisions governing the operation, use and occupancy of the Condominium (said By-Laws, as they may be amended from time to time, are hereinafter referred to as the "By-Laws"). All capitalized terms that are not separately defined herein shall have the meanings given to those terms in the By-Laws.

## ARTICLE 3.
## NAME OF THE CONDOMINIUM

The Condominium shall be known as One Hunters Point.

## ARTICLE 4.
## THE LAND

Included in the Property described in Article 2 is all that certain tract, plot, piece and parcel of land (the "Land") situate, lying and being in the County of Queens, City and State of New York, and more particularly described in Schedule A annexed hereto and made a part hereof. The Land is owned by Sponsor in fee simple absolute. The Land has an area of approximately 13,920 square feet.

## ARTICLE 5.
## THE PROPERTY AND THE BUILDING

Included in the Property described in Article 2 is 1 building (the "Building") consisting of (i) 132 residential units located in portions of the 2nd through 12th floors of the Building and one (1) superintendent's unit on the 1st floor of the Building (the residential and Superintendent's units in the Building are hereinafter referred to as the "Residential Units"), (ii) 25 parking space units located in a covered parking area on the street level of the Building (hereinafter referred to as "Parking Space Units", (iii) 26 roof terrace units located on the roof of the Building (hereinafter referred to as the "Roof Terrace Units"), and (iv) the Common Elements (as hereinafter defined). The Residential Units, the Parking Space Units and the Roof Terrace Units are sometimes hereinafter collectively referred to as the "Units". The owners of the Residential Units from time to time are herein called the "Residential Unit Owners;" the owners of the Parking Space Units from time to time are herein called the "Parking Space Unit Owners;" and the owners of the Roof Terrace Units from time to time are herein called the "Roof Terrace Unit Owners."

The Building is classified as Type 1 conforming to all applicable regulations of the Building Code of the City of New York. The Building is of fire resistive construction.

As shown on the Floor Plans on file at the Sponsor's Office, the floors of the Building are designated 1st floor, 2nd floor, 3rd floor through 8th floor, 9th floor, 10th through 12th floor and roof. References to floors in the Declaration are in accordance with such floor designations.

## ARTICLE 6.
## THE UNITS

Exhibit B annexed hereto and made a part hereof, sets forth the following data with respect to each Unit necessary for the proper identification thereof: Unit designation; tax lot number, approximate location in the Building; approximate square foot area; number of rooms, if applicable; the portions of the Common Elements to which such Unit has immediate access; and the percentage interest in the Common Elements appurtenant to such Unit. The precise location of each Unit is shown on the Floor Plans.

Each Residential Unit consists of the area measured horizontally from the exterior walls (perimeter concrete columns and wall and perimeter mechanical pipes included) to the centerline of any partitions, including concealed metal studs, blockwork, concrete columns and walls and

mechanical pipes and ducts that are in the interior walls and partitions separating one Unit from another Unit, corridors, stairs, elevator and other mechanical equipment spaces. Each Residential Unit consists of the area measured vertically from the top of the concrete floor to the underside of the concrete ceiling.

Each Parking Space Unit consists of the area measured horizontally.

Each Roof Terrace Unit consists of the area measured horizontally.

To the extent each Unit includes the following, each Unit Owner shall be responsible for, the front entrance door and any other entrance doors to such Unit, the interior walls, partitions, floors and floor coverings and plastered ceilings affixed, attached or appurtenant to such Unit, smoke detectors, window panes, all plumbing, gas and heating fixtures and equipment such as refrigerators, dishwashers, washers and dryers, heating, ventilating, and air conditioning ("HVAC") units (including the fans inside the units), heating equipment, ranges and other appliances, sinks, bathtubs, waterclosets and all other Facilities as may be affixed, attached or appurtenant to such Unit exclusively. Plumbing, gas and heating fixtures and equipment as used in the preceding sentence shall include exposed gas and water pipes from branch or fixture shut-off valves attached to fixtures, appliances and equipment and the fixtures, appliances and equipment to which they are attached, and any special pipes or equipment which a Unit Owner may install within a wall or ceiling, or under the floor, but shall not include gas, water or other pipes, conduits, wiring or ductwork within the walls, ceiling, or floors of the Unit. Each Unit shall also include all lighting and electrical fixtures and appliances within the Unit and any special equipment fixtures or Facilities affixed, attached or appurtenant to the Unit, to the extent located within the Unit from a panel and serving or benefiting only that Unit. Any Common Elements located within a Unit shall not be considered a part of such Unit.

Notwithstanding anything contained in this Article to the contrary, each Residential Unit Owner will have the right, exercisable at any time, to install, at the Residential Unit Owner's sole cost and expense, decorations, fixtures and coverings (including, without limitation, painting, finishing, wall paper, carpeting, pictures, mirrors, shelving and lighting fixtures) on the surfaces of the walls, ceilings and floors that face the interior of such Residential Unit and to a depth of one inch behind such surfaces for the purposes of installing nails, screws, bolts and the like, provided that no such installation shall impair the structural integrity and mechanical and electrical systems of the Residential Unit or of the Building or violate Law.

Notwithstanding anything contained in this Article to the contrary, no installations, alterations, decorations, fixtures or coverings to a Parking Space Unit shall be permitted to be made by a Parking Space Unit Owner.

Notwithstanding anything contained in this Article to the contrary, each Roof Terrace Unit Owner will have the right, exercisable at any time, to install, at the Roof Terrace Unit Owner's sole cost and expense, decorations and furniture (including, without limitation, plants and chairs) in the interior of such Roof Terrace Unit, provided that no such installation shall be nailed, screwed, bolted, or the like, to the Roof Terrace Unit or impair the structural integrity of the Roof Terrace Unit, the roof or the Building or violate Law.  Roof Terrace Unit Owners shall

not do or permit anything to be done on, in or to their Roof Terrace Units that would violate any roof warranties or warranties pertaining to roof coverings. No decorations shall be permitted that cover the walls of the Unit. No electricity shall be provided or permitted to be run into a Roof Terrace Unit. Each Roof Terrace Unit includes, and each Roof Terrace Unit Owner shall be responsible for, the gas grill included in the Roof Terrace Unit.

As of the date of the filing of this Declaration with the City Register's Office, fee simple absolute title shall automatically vest in Sponsor in all Units, individually and collectively, without the need to execute specific and particular deeds or indentures for each and every Unit.

## ARTICLE 7.
## COMMON ELEMENTS

7.1.    The Common Elements of the Condominium (the "Common Elements") consist of the entire Property, including the Land and all parts of the Building and improvements thereon other than the Units. The Common Elements are comprised of the General Common Elements and the Limited Residential Common Elements.

7.2    The General Common Elements consist of the Land and those rooms, areas, corridors, spaces and other parts of the Building (other than the Units), and all Facilities therein for the common use of the Units and the Unit Owners or which are necessary or convenient for the existence, management, operation, maintenance or safety of the Property. Without intending to limit the generality of the foregoing in any respect, the General Common Elements include the following:

7.2-1    The Land (including the landscaping), together with all easements, rights and privileges appurtenant thereto;

7.2-2    Any of the following: all foundations, footings, columns, girders, beams, supports, interior load bearing walls, partitions, floors, window system other than the glass, roofs and ceilings in, on, or under the Building, separating a Unit from a General Common Element, and that portion of all such interior walls, partitions, floors and ceilings separating a Common General Element from a Unit and/or a Limited Residential Common Element, from the midpoint of any such wall, partition, floor or ceiling to the boundary line of such General Common Element to the extent that the same are not expressly included as part of the Limited Residential Common Elements pursuant to section 7.3 below or a Unit pursuant to the terms of Article 6 hereinabove;

7.2-3    All concrete floor slabs and concrete ceilings, all sidewalks, curbs, hallways, corridors, mechanical and electrical spaces, all fire staircases, landings and stairs, service entrances, lobbies, vestibules and basements and cellars, yards, storage spaces, mail area, mail boxes, elevator shaft and pit, entrances to, and exits from the Building and spaces devoted to the use of persons employed with the operation of the Property, to the extent that the same are not expressly included as part of the Limited Residential Common Elements pursuant to section 7.3 below or a Unit pursuant to the terms of Article 6 hereinabove;

7.2-4   All central and appurtenant installations and Facilities for services such as power, light, telephone, intercom, gas, sewer, plumbing, drainage, hot and cold water distribution, heat, garbage disposal, master and cable television and other mechanical and electrical systems, which service the Units and/or the Limited Residential Common Elements, to the extent that the same are not expressly included as part of the Limited Residential Common Elements pursuant to section 7.3 below or a Unit pursuant to the terms of Article 6 hereinabove;

7.2-5   All other parts of the Property, and all apparatus and installations now existing or hereafter constructed in the Building or on the Property, either existing for the common use of the Units or the Unit Owners or necessary for, or convenient to, the existence, maintenance, or safety of the Property;

7.2.6   Fitness center located on the 1st floor of the Building and the privacy garden located adjacent to the lobby and all furnishings, structural and decorative elements contained therein;

7.2.7   passenger elevators;

7.2.8   all interior portions of the Building, and all furnishings, structural and decorative elements contained therein, to the extent that the same are not expressly included as part of the Limited Residential Common Elements pursuant to the terms of section 7.3 below or a Unit pursuant to the terms of Article 6 hereof; and

7.2.9   open rooftop and sitting areas.

7.3     The Limited Residential Common Elements consist of all portions of the Land and Building (other than the Units) that are for the use of one or more specified Residential Units to the exclusion of all other Units. Without intending to limit the generality of the foregoing in any respect, the Limited Residential Common Elements include the Terraces adjoining each Residential Unit (except for the Superintendent's Unit which has no Terrace) which provide direct and exclusive access from the interior of such Residential Units which Limited Residential Common Elements shall be for the exclusive use of such Residential Units.

7.4     The Common Elements shall remain undivided, and no Unit Owner or any other Person shall bring, or shall have the right to bring, any action for partition or division thereof, except as is expressly permitted pursuant to the terms of Article 15 hereof and Section 5.5 of the By-laws.

## ARTICLE 8.
## DETERMINATION OF COMMON INTEREST,

8.1     The undivided percentage interest of each Unit in the Common Elements is based upon the approximate proportion that the fair value of the Unit on the date of the Declaration bears to the then fair value of all of the Units pursuant to the Condominium Act.

8.2     The percentage interest of each Residential Unit in the Residential Common Interests is based upon the approximate proportion that the fair value of the Residential Unit on the date of the Declaration bears to the then fair value of all of the Residential Units pursuant to the Condominium Act.

8.3     The percentage interest of each Parking Space Unit in the Parking Space Common Interests is based upon the approximate proportion that the fair value of the Parking Space Unit on the date of the Declaration bears to the then fair value of all of the Parking Space Units pursuant to the Condominium Act.

8.4     The percentage interest of each Roof Terrace Unit in the Roof Terrace Unit Common Interests is based upon the approximate proportion that the fair value of the Roof Terrace Unit on the date of the Declaration bears to the then fair value of all of the Roof Terrace Units pursuant to the Condominium Act.

## ARTICLE 9.
## USE OF BUILDING AND UNITS

9.1.     As more particularly set forth in and subject to the provisions of the By-Laws, the Residential Units may be used only as residences and for no other purpose; the Parking Space Units may be used for parking of passenger vehicles and motorcycles only and for no other purpose; and the Roof Terrace Units may be used only for passive recreational uses such as lounging and sunbathing and for no other purpose. A Unit owned or leased by an individual, corporation, partnership, fiduciary or any other entity (including, but not limited to, the United States government and any instrumentality thereof and foreign governments and any embassy, consulate, or other instrumentality thereof, any foreign government or any embassy, consulate or other instrumentality thereof) may only be occupied (unless the Condominium Board otherwise consents) by said individual, or an individual officer, director, stockholder or employee of such corporation, or by an individual partner or employee of such partnership, or by said individual fiduciary (including directors, officers, stockholders or employees of corporate fiduciaries or partners or employees of partnership fiduciaries) or by an individual beneficiary of said fiduciary, or an individual principal or employee of such other entity, respectively, or by Family Members or guests of any of the foregoing (and nothing contained in this sentence shall be deemed to prohibit the exclusive occupancy of any Unit by such Family Members or guests); however, the foregoing restrictions shall not apply to Unsold Units. Upon the prior written consent of Sponsor (or, where there are no longer any Unsold Units, the Condominium Board), any Unit may be used for professional purposes, or for any other lawful purposes, subject, however, to (1) the terms and conditions of the then existing certificate of occupancy for the Building, (2) applicable Law, (3) the use of such Unit not adversely affecting the use and enjoyment of neighboring or adjacent Units for residential purposes, and (4) the prior written permission of the Condominium Board which permission shall in no event be granted unless the Condominium Board affirmatively finds that the conditions in (1) through (3) above have been met. Units may only be leased in accordance with the By-laws and the Rules and Regulations.

9.2     Notwithstanding the foregoing or anything contained in the By-laws or the Rules and Regulations to the contrary, Sponsor may without the permission of the Condominium Board, (1) grant permission for the use of any Unsold Unit as a professional office or for any other purpose, provided such use is permitted by Law, and does not violate the then existing certificate of occupancy for the Building or any other governmental regulations, (2) use any Unsold Units as model Units and offices for the selling, leasing, management, operation and promotion of the Unsold Units or for any other purpose, subject only to compliance with Law, and (3) lease an Unsold Unit to third parties.

9.3.     No nuisance shall be allowed in or out of a Unit (including, but not limited to, the feeding of pigeons or conducting of any other nuisance from the windows of, within or without a Residential Unit) nor shall any use or practice be allowed in a Unit that interferes with the possession or proper use of the Property by either Unit Owner or the tenants or occupants of the Property. No immoral or unlawful use shall be made of a Unit or any portion thereof. All valid laws, zoning ordinances and regulations of governmental bodies having jurisdiction thereof, relating to any portion of the Property shall be complied with at the full expense of the Unit Owner.

**ARTICLE 10.**
**EASEMENTS FOR THE ENJOYMENT OF THE COMMON ELEMENTS**

10.1     Subject to the terms of the By-laws and the Rules and Regulations, Sponsor, the Unit Owners, all other permitted tenants and occupants of the Building, the Selling Agent, the Managing Agent, the Condominium Board and all officers, partners, employees, agents, guests, invitees and licensees of the foregoing shall have, in common with all of the others, an easement for ingress and egress through, as well as for the use and enjoyment of, all of the General Common Elements, and the General Common Elements shall be subject to such easement. Notwithstanding the foregoing, however, no Person shall use or enjoy the General Common Elements except in accordance with the reasonable purposes for which they are intended and without encroaching upon the rights of other Persons to do so.

10.2     Each Residential Unit Owner whose Residential Unit has one or more appurtenant Limited Residential Common Elements shall have an exclusive easement for the use thereof. The Residential Units having the same are indicated on Exhibit B.

10.3     Notwithstanding anything to the contrary contained in Section 10.1 or 10.2 hereof, Sponsor and its invitees, licensees, contractors, employees, agents and tenants shall have an easement in, over, under, through and upon the Common Elements to use the same, without being subject to any fee or charge, for all purposes and activities in connection with the sale or renting of Unsold Units and shall have the right to use any one or more Unsold Residential Units as sales, rental and/or management offices and/or as model units. Such Unsold Units shall remain Units within the meaning of this Declaration, the By-laws and the Condominium Act, and shall not comprise a part of the Common Elements. In addition, Sponsor shall have the right, to the extent permitted by Law, to use one or more portions of the Common Elements (including but not limited to, lobby, hallways and corridors), as designated by Sponsor in its sole discretion, without being subject to any fee or charge, for all purposes and activities in connection with the

sale or renting of Unsold Units, which right shall include, without limitation, the right to place "for sale", "for rent" and other signs and promotional materials, of such size and content as Sponsor shall determine, in, on, about and adjacent to the exterior walls of the Building.

## ARTICLE 11.
## OTHER EASEMENTS

11.1    Subject to the terms of the By-laws and to the Rules and Regulations, each Unit Owner shall have an easement in common with all other Unit Owners to use, maintain, repair, alter and replace all Common Elements located in any of the other Units or elsewhere on the Property which serve his or her Unit. Each Unit shall be subject to an easement in favor of all Unit Owners to use, maintain, repair, alter and replace all Common Elements located in such Unit or elsewhere on the Property which serve other Units. All easements and rights of access described in this section shall be exercised by the Condominium Board on behalf of all Unit Owners. The Condominium Board shall have an easement and a right of access to each Unit and to the Common Elements to inspect the same, to remove violations therefrom and to install, operate, maintain, repair, alter, rebuild, restore and replace any of the Common Elements located in, over, under, through, adjacent to, or upon the same, and each Unit and the Common Elements shall be subject to such easement and right of access. Such easements and rights of access shall be exercised by the Condominium Board in such a manner as will not unreasonably interfere with the use of the Units for their permitted purposes. Such entry shall be permitted on reasonable prior notice based on the nature of the repair or replacement but in no event on less than two (2) days' notice, except that no notice will be necessary in the case of an "emergency" (i.e., a Condition requiring repair or replacement immediately necessary for the preservation or safety of the Building or for the safety of occupants of the Building, or other persons, or required to avoid the suspension of any necessary service in the Building). Plans and specifications with respect to any such proposed work shall be submitted by the Unit Owner who has requested that the Condominium Board exercise any such easement or right of access, to the Unit Owner whose Unit is to be accessed and all work is to be prosecuted diligently to completion. Notwithstanding any other provision of this Declaration, the By-laws or the Rules and Regulations, any alterations carried out in connection with the easements granted hereinabove shall be such that neither the configuration nor the usable area of the affected Unit shall be materially adversely affected.

11.2    Sponsor for so long as it shall own any Unsold Unit and the Condominium Board, on behalf of all Unit Owners, shall have the right to grant such additional electric, gas, steam, cable television, telephone, water, storm drainage, sewer and other utility easements in, or to relocate any existing utility easements to, any portion of the Property as Sponsor, or the Condominium Board, as the case may be, shall deem necessary or desirable for the proper operation and maintenance of the Building or any portion thereof, or for the general health or welfare of the owners, tenants and occupants of the appropriate Units, provided that the granting of such additional utility easements or the relocation of existing utilities will not prevent or unreasonably interfere with the normal use of the Units for their permitted purposes, and shall not result in the imposition of any mechanic's lien against any of the Units. Any utility company and its employees and agents shall have the right of access to each Unit or the Common Elements in furtherance of such easement, provided such right of access shall be exercised in such manner as shall not unreasonably interfere with the normal use of the Units for their

permitted purposes. Notwithstanding any other provision of this Declaration, the By-laws or the Rules and Regulations, any alterations carried out in connection with the easements granted hereinabove shall be such that neither the configuration nor the usable area of the affected Unit shall be materially adversely affected.

11.3    Sponsor and its contractors, employees and agents for so long as Sponsor shall own any Unsold Unit, shall have an easement for ingress and egress through all of the Common Elements in order to make alterations, additions, or improvements, whether structural or non-structural, interior or exterior, ordinary or extraordinary, in, to and upon Unsold Units.

11.4    Each Unit and the Common Elements shall have easements of subjacent support and necessity, and the same shall be subject to such easements in favor of all of the other Units and the Common Elements.

11.5    The Condominium and Building shall be designated and known as One Hunters Point. Sponsor shall own and control all rights and interest, appurtenant to the name of the Condominium and/or the Building. Only Sponsor shall have the right to change or assign the name of the Condominium subject to the consent of the Condominium Board. Sponsor shall have an exclusive easement for so long as the Condominium shall remain in existence to erect, maintain, repair and replace, from time to time, a plaque and/or sign ("Plaque"), without charge, on the exterior portion of the Building setting forth the name and address of Sponsor, or such other information as the Sponsor desires in its sole discretion. Only Sponsor shall have the right to remove the Plaque, unless mandated by Law.

11.6    If (a) any portion of the Common Elements encroaches upon any Unit or upon any other portion of the Common Elements, (b) any Unit encroaches upon any other Unit or upon any portion of the Common Elements or (c) any such encroachment shall hereafter occur as a result of (i) the settling or shifting of the Building, (ii) any alteration, repair or restoration of the Common Elements made by or with the consent (when required by the Bylaws) of the Condominium Board, or made by Sponsor in accordance with this Declaration or the By-laws or (iii) any alteration, repair or restoration of the Building (or any portion thereof) or of any Unit or Common Element after damage by fire or other casualty or any taking by condemnation or eminent domain proceedings of all any portion of any Unit or the Common Elements; then, in any such event, a valid easement shall exist for such encroachment and for the maintenance of the same as long as the Building shall stand.

11.7    In addition to the specific easements set forth in this Article 11 and in Article 10 hereof, the Property and every portion thereof shall be subject to all easements made with the City of New York or with any utility companies or other Persons in effect prior to the recording of this Declaration.

## ARTICLE 12.
## ALTERATIONS, ADDITIONS, IMPROVEMENTS AND
## CHANGES TO UNSOLD UNITS

Except to the extent prohibited by Law, Sponsor shall have the right, without the vote or consent or approval of the Condominium Board, other Unit Owners, the Selling Agent, the Managing Agent or the Mortgage Representatives, if any, to:

(i)       make alterations, additions or improvements, whether structural or non-structural, interior or exterior, ordinary or extraordinary, in, to and upon Unsold Units and their appurtenant Limited Residential Common Elements, if any;

(ii)      change the layout of, or number of rooms in, any Unsold Units;

(iii)    change the size and/or number of Unsold Units by (a) subdividing one or more Unsold Units into two or more separate Units, (b) combining separate Unsold Units (including those resulting from such subdivision or otherwise) into one or more Units, (c) altering the boundary walls between any Unsold Units, or (d) otherwise incorporating Common Elements (such as a portion of a hallway used exclusively by the occupant(s) of an Unsold Unit) which exclusively benefits an Unsold Unit into such Unit; and

(iv)    if appropriate, reapportion among the Unsold Units affected by such change in size or number pursuant to the preceding clauses their Common Interests and, as appropriate, their Residential Common Interest, Parking Space Common Interest or Roof Terrace Common Interest, provided, however, that, with respect to any such alteration, addition, improvement, or change in, to, of, or upon any Unsold Unit:

      (a)     no physical modifications shall be made to any other Unit and the Common Interest and, as appropriate, their Residential Common Interest, Parking Space Common Interest or Roof Terrace Common Interest (other than Unsold Units), as the case may be, or interior dimensions of any other Units (other than Unsold Units)

               shall not be changed by reason thereof, unless the owner of such other affected Unit shall consent thereto;

      (b)     Sponsor shall comply with Law and shall agree to hold the Condominium Board and all other Unit Owners harmless from any liability arising therefrom; and

      (c)     such alteration, addition improvement, or change shall not jeopardize the soundness or structural integrity of any part of the Building.

Notwithstanding the foregoing, however, the aggregate amount of the Common Interests of all the Units, the Residential Common Interests of all Residential Units, the Parking Space Common Interests of all of the Parking Space Units, and the Roof Terrace Common Interests of all the Roof Terrace Units, shall always remain at 100%, respectively, and no reapportionment of the Common Interest, the Residential Common Interest, the Parking Space Common Interest or the Roof Terrace Common Interest appurtenant to any Unit shall be made unless there is first delivered to the Condominium Board a written certification stating that the new Common Interest and, if applicable, Residential Common Interest, Parking Space Common Interest and Roof Terrace Common Interest of the affected Unit has been based upon the factors set forth in Article 8 hereof. The certification referred to in the preceding sentence shall be delivered, at Sponsor's election, by Sponsor, the Selling Agent, the Managing Agent, or any other Person reasonably acceptable to the Condominium Board. The provisions of this Article 12 may not be added to, amended, modified, or deleted without the prior written consent of Sponsor. By written permission of the Condominium Board which permission shall not be unreasonably withheld, any other Unit Owner, may be given with respect to his or her Unit, the same rights and be subject to the same limitations and conditions as are set forth in this Article with respect to Unsold Units. Notwithstanding the other provisions of this Article, no reapportionment of the Common Interests, the Residential Common Interests, the Parking Space Common Interests or the Roof Terrace Common Interests appurtenant to any Unit shall be made unless there is first delivered to the Condominium Board a written certification stating that the new Common Interest, Residential Common Interests, Parking Space Common Interests and Roof Terrace Common Interests of the affected Unit has been based upon the factors set forth in Article 8 hereof. The certification referred to in the preceding sentence shall be delivered, at Sponsor's election, by Sponsor, the Managing Agent or any other Person reasonably acceptable to the Condominium Board. The provisions of this Article may not be added to, amended, modified or deleted without the prior written consent of Sponsor.

## ARTICLE 13.
## ACQUISITION OF UNIT BY THE CONDOMINIUM BOARD

If (a) any Unit Owner surrenders his or her Unit, together with its Appurtenant Interests to the Condominium Board pursuant to the terms of the By-laws or Section 339-x of the Condominium Act, (b) the Condominium Board, pursuant to the By-laws or otherwise either acquires or leases a Unit, together with its Appurtenant Interests, or purchases a Unit, together with its Appurtenant Interests, at a foreclosure or other similar sale, then, in all such events, title to any such Unit and such Appurtenant Interests shall be held by the Condominium Board or its designee, corporate or otherwise, on behalf of all Unit Owners, in proportion to their respective Common Interests. Any lease or sublease of any Unit leased or subleased by the Condominium Board or its designee shall be held by the Condominium Board or its designee, corporate or otherwise, on behalf of all Unit Owners, in proportion to their respective Common Interests.

## ARTICLE 14.
## POWER OF ATTORNEY TO SPONSOR AND THE CONDOMINIUM BOARD

14.1    Each Unit Owner, by acceptance of a deed or otherwise succeeding to title to a Unit, shall be deemed to have irrevocably nominated, constituted and appointed as such Unit Owner's attorney-in-fact, coupled with an interest and with power of substitution, (i) Sponsor, to amend the Condominium Documents pursuant to the terms of Article 18 hereof, and (ii) the Persons who shall from time to time constitute the Condominium Board, jointly, to:

      (a)    employ counsel for purposes of protesting the New York City real property tax assessments with the Tax Commission and instituting tax certiorari proceedings on behalf of the Unit Owners for the reduction of the assessed valuation of their Units, such Unit Owners agreeing not to protest said assessments and bring such tax certiorari proceedings at their own initiative and on their own behalf,

      (b)    acquire or lease any Unit, together with its Appurtenant Interests whose owner desires to sell, convey, transfer, assign, lease, or surrender the same or acquire any Unit, together with its Appurtenant Interests that becomes the subject of a foreclosure or other similar sale, in the name of the Condominium Board or its designee, corporate or otherwise, on behalf of all Unit Owners;

      (c)    convey, sell, lease, mortgage, or otherwise deal with (but not to vote the Common Interest, appurtenant to) any Unit so acquired or to sublease any Unit so leased; and

      (d)    execute, acknowledge and deliver (1) any declaration or other instrument affecting the Condominium that the Condominium Board deems necessary or appropriate to comply with any law applicable to the maintenance, demolition, construction, alteration, repair, or restoration of the Condominium or (2) any consent, covenant, restriction, easement, or declaration, or any amendment thereto, affecting the Condominium or the Common Elements that the Condominium Board deems necessary or appropriate or (3) any protests and tax certiorari proceeding affecting Units.

14.2    In confirmation of the foregoing power of attorney, each Unit Owner, upon the request of either Sponsor or the Condominium Board, shall duly execute, acknowledge and deliver to the requesting party, for recording, in the Register's Office, a Unit Power of Attorney in the form set forth as an Exhibit E to this Declaration.

## ARTICLE 15.
## TERMINATION OF CONDOMINIUM

The Condominium shall continue and the Property shall not be subject to an action for partition (unless terminated by casualty loss, condemnation or eminent domain, as more particularly provided in the By-laws) until such time as withdrawal of the Property from the provisions of the Condominium Act is authorized by a vote of 80% in number and in Common Interest of all Unit Owners. No such vote shall be effective, however, without the written consent (which consent shall not be unreasonably withheld or delayed) of the Mortgage Representatives,

if any. In the event said withdrawal is authorized as aforesaid, but only in such event, the Property shall be subject to an action for partition by any Unit Owner or lienor as if owned in common, in which event the net proceeds of sale shall be divided among all Unit Owners in proportion to their respective Common Interests; provided, however, that no payment shall be made to a Unit Owner until there has first been paid from out of his or her share of such net proceeds all liens on his or her Unit (other than mortgages which are not Permitted Mortgages), in the order of priority of such liens.

## ARTICLE 16.
## COVENANT OF FURTHER ASSURANCES

16.1    Any Person who is subject to the terms of this Declaration, whether such Person is a Unit Owner, a lessee or sublessee of a Unit Owner, an occupant of a Unit, a member or officer of the Condominium Board or otherwise, shall, upon prior reasonable written request at the expense of any such other Person requesting the same, execute, acknowledge and deliver to such other Person such instruments, in addition to those specifically provided for herein, and take such other action as such other Person may reasonably request to effectuate the provisions of this Declaration or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

16.2    If any Unit Owner, the Condominium Board or any other Person who is subject to the terms of this Declaration fails or refuses, within ten (10) days after request therefor, either (i) to execute, acknowledge or deliver any instrument, or to take any action which the Condominium Board, Unit Owner or other Person is required to execute, acknowledge and deliver or to take pursuant to this Declaration, or (ii) to deliver a written notice to the Person requesting such execution, acknowledgement or delivery, and to the Condominium Board stating the reasons why such Unit Owner, Condominium Board or other Person refuses to execute, acknowledge or deliver such instrument or take such action, then the Condominium Board or other Person is hereby authorized as attorney-in-fact for such Unit Owner, Condominium Board or other Person, coupled with an interest, to execute, acknowledge and deliver such instrument, or to take such action in the name of such Unit Owner, Condominium Board or other Person and such document or action shall be binding, on such Unit Owner, Condominium Board or other Person.

16.3    If any Unit Owner, the Condominium Board or any other Person who is subject to the terms of this Declaration fails or refuses, within ten (10) days after request therefor, either (i) to execute, acknowledge or deliver any instrument, or to take any action which such Unit Owner, Condominium Board or other Person is required to execute, acknowledge and deliver pursuant to this Declaration at the request of Sponsor or (ii) to deliver a written notice to Sponsor and to the Condominium Board stating the reasons why such Unit Owner, Condominium Board or other Person refuses to execute, acknowledge or deliver such instrument or take such action, then Sponsor is hereby authorized, as attorney-in-fact for such Unit Owner, Condominium Board or other Person, coupled with an interest, to execute, acknowledge and deliver such instrument or to take such action in the name of such Unit Owner, Condominium Board or other Person and such document or action shall be binding on such Unit Owner, the Condominium Board or other Person, as the case may be.

## ARTICLE 17.
## COVENANTS RUNNING WITH THE LAND

17.1    All provisions of this Declaration, the By-laws and the Rules and Regulations which are annexed hereto and made a part hereof, including, without limitation, the provisions of this Article, shall to the extent applicable and unless otherwise expressly herein or therein provided to the contrary, be perpetual and be construed to be covenants running with the Land and with every part thereof and interest therein, and all of the provisions hereof and thereof shall be binding upon and inure to the benefit of the owner of all or any part thereof, or interest therein, and his or her heirs, executors, administrators, legal representatives, successors and assigns, but the same are not intended to create, nor shall they be construed as creating, any rights in or for the benefit of the general public. All present and future owners, tenants, subtenants licensees, and other occupants of Units shall be subject to and shall comply with the provisions of this Declaration, the By-laws and the Rules and Regulations, as they may be amended from time to time. The acceptance of a deed or conveyance or the entering into of a lease or the entering into occupancy of any Unit shall constitute an agreement that the provisions of this Declaration, the By-laws and the Rules and Regulations, as they may be amended from time to time, are accepted and ratified by such owner, tenant or occupant, and all of such provisions shall be deemed and taken to be covenants running with the Land and shall bind any person having at any time any interest or estate in such Unit, as though such provisions were recited and stipulated at length in each and every deed or conveyance or lease or use and occupancy agreement thereof.

17.2    If any provision of this Declaration or the By-laws is invalid under, or would cause this Declaration and the By-laws to be insufficient to submit the Property to the provisions of, the Condominium Act, such provision shall be deemed deleted from this Declaration or the By-laws, as the case may be, for the purpose of submitting the Property to the provisions of the Condominium Act but shall nevertheless be valid and binding upon and inure to the benefit of the owners of the Property and their heirs, executors, administrators, legal representatives, successors and assigns, as covenants running with the Land and with every part thereof and interest therein under other applicable Law to the extent permitted under such applicable Law with the same force and effect as if, immediately after the recording of this Declaration and the By-laws, all Unit Owners had signed and recorded an instrument agreeing to each such provision as a covenant running with the Land. If any provision which is necessary to cause this Declaration and the By-laws to be sufficient to submit the Property to the provisions of the Condominium Act is missing from this Declaration or the By-laws, then such provision shall be deemed included as part of this Declaration or the By-laws, as the case may be, for the purposes of submitting the Property to the provisions of the Condominium Act.

17.3    Subject to Section 17.2, if this Declaration and the By-laws are insufficient to submit the Property to the provisions of the Condominium Act, the provisions of this Declaration and the By-laws shall nevertheless be valid and binding upon and inure to the benefit of the owners of the Property, and their heirs, executors, administrators, legal representatives, successors and assigns, as covenants running with the Land and with every part thereof and interest therein under applicable Law to the extent permitted under such applicable Law with the

same force and effect as if, immediately after the recording of this Declaration and the By-laws, all Unit Owners had signed and recorded an instrument agreeing to each such provision as a covenant running with the Land.

## ARTICLE 18.
## AMENDMENTS TO THIS DECLARATION

18.1    Subject to the provisions contained herein or in the By-laws with respect to amendments, modifications, additions or deletions affecting Sponsor, or any Unsold Units, any provision of this Declaration may be added to, amended, modified or deleted by the vote of at least sixty-six and two-third (66 2/3%) percent in number and in Common Interest of all Unit Owners taken in accordance with the provisions of the By-laws; provided, however, that the Common Interest appurtenant to each Unit as expressed in this Declaration shall not be altered without the written consent of all Unit Owners directly affected.    Subject to the provisions contained herein or in the By-laws with respect to amendments, modifications, additions or deletions affecting Sponsor, or any Unsold Units, no amendment, modification, addition or deletion shall be effective without the written consent of the Mortgage Representatives, if any, which consent shall not be unreasonably withheld or delayed. No such amendment, modification, addition or deletion shall be effective until recorded in the Register's Office.    Subject to the provisions contained herein or in the By-laws with respect to amendments, modifications, additions or deletions affecting Sponsor, or any Unsold Units, any such amendment, modification, addition or deletion shall be executed by either the Condominium Board as attorney-in-fact for the Unit Owners, coupled with an interest, and the Condominium Board is hereby authorized by such Unit Owners so to act as their attorney-in-fact. Subject to the rights of Sponsor, under Articles 9,10,11,12,13,14 and 15 of this Declaration, Articles 9,10,11,12,13,14 and 15 of this Declaration may not be amended, modified, added to or deleted unless (in addition to the consent, if required, of the Mortgage Representatives, if any, as set forth above) eighty (80%) percent in number and in Common Interest of all Unit Owners affected thereby, approve such amendment, modification addition or deletion in the manner set forth above.

18.2    Sponsor shall have the right, at its sole cost and expense and without the vote or consent of any other Unit Owners, the Condominium Board, or the Mortgage Representatives (if any), other than Sponsor's Permitted Mortgagee, to the extent its consent is required under the terms of any Permitted Mortgage encumbering the Unsold Units, to execute acknowledge and record (or, at Sponsor's sole option, to require the Condominium Board or any other Unit Owners to execute, acknowledge and record) in the Register's Office and elsewhere, if required by Law, one or more amendments to this Declaration (including, Exhibit B hereto), together with such documents, plans and maps as Sponsor deems appropriate to effectuate the same:

    (i)    to reflect any changes in Unsold Units and/or the reapportionment of the Common interest of the affected Unsold Units resulting therefrom made by Sponsor in accordance with the terms of Article 12 hereof; or

    (ii)    required by (a) an Institutional Lender designated by Sponsor to make a loan secured by a mortgage on any Unit, (b) any governmental agency having regulatory jurisdiction over the Condominium, or (c) any title

insurance company selected by Sponsor to insure title to any Unit, provided, however, that any amendment made pursuant to the terms of subparagraph (i) or (ii) of this Section shall not (1) change the Common Interest of any Unit other than a Unit owned by Sponsor, or (2) require a physical modification of any Unit other than a Unit owned by Sponsor, or (3) adversely affect the priority or validity of the lien of any purchase money mortgage or any mortgage held by an Institutional Lender unless the owner of such affected Unit (in the event described in subparagraph (1) or (2) of this Section) or the holder of such mortgage (in the event described in subparagraph (3) of this Section) shall consent thereto by joining in the execution of such amendment.

18.3    Any amendment to this Declaration may be executed (i) if on behalf of Sponsor pursuant to the terms of Section 18.2 hereof, by any principal of Sponsor, or, (ii) if on behalf of the Unit Owners or by the Condominium Board, by any officer of the Condominium. If the amendment requires the approval of a specific percentage of Unit Owners pursuant to the terms of this Declaration or the By-laws, then there shall be attached to such amendment an original executed Secretary's Certificate, certifying that the requisite number and percentage of Unit Owners approved the amendment at a duly constituted meeting or (when permitted in this Declaration or the By-laws) in writing, without a meeting, in which Certificate shall be described the number and percentage of Unit Owners so consenting and (if voted upon at a meeting) the date and time of the meeting.

18.4    Notwithstanding anything contained in the Condominium Documents to the contrary, but subject to any limitation imposed by the Condominium Act, no amendment to the Condominium Documents shall be adopted for so long as Sponsor owns any Unit if the same would (i) unreasonably interfere with the sale, lease, or other disposition of a Unit owned by Sponsor, (ii) abridge, modify, suspend, eliminate, or otherwise affect any right, power, easement, privilege, or benefit granted to Sponsor, or (iii) impose any discriminatory charge or fee against Sponsor.

18.5    The provisions of this Article may not be modified, amended, added to or deleted, in whole or in part, without the consent of Sponsor if the same relate to Sponsor.

## ARTICLE 19.
## CONSENTS BY SPONSOR

When the consent, approval, satisfaction, or permission of Sponsor is required under this Declaration or the By-laws, such consent, approval, satisfaction, or permission shall not be required when Sponsor no longer owns any Units.

## ARTICLE 20.
## PERSON TO RECEIVE SERVICE

The Secretary of State of the State of New York is hereby designated to receive service of process in any action, which may be brought against the Condominium.

## ARTICLE 21.
### INCORPORATION BY REFERENCE

The terms, covenants, conditions, descriptions and other information contained in (i) the property description annexed hereto as Exhibit A; (ii) the description of the Units annexed hereto as Exhibit B; (iii) the table of definitions annexed hereto as Exhibit C; (iv) the By-laws annexed hereto as Exhibit D; (v) the Unit Power of Attorney annexed hereto as Exhibit E; and (vi) the Floor Plans are, by this reference, each incorporated herein and made a part of this Declaration as if set forth at length in the text hereof.

## ARTICLE 22.
### WAIVER

No provision contained in this Declaration shall be deemed to have been abrogated or waived by reason of any failure to enforce the same, irrespective of the number of violations or breaches which may occur.

## ARTICLE 23.
### SEVERABILITY

Subject to the provisions of Section 17.2 and 17.3 of Article 17 hereof, if any provision of the Condominium Documents is invalid or unenforceable as against any Person or under certain circumstances, the remainder of the Condominium Documents and the applicability of such provision to other Persons or circumstances shall not be affected thereby. Each provision of the Condominium Documents shall, except as otherwise herein provided, be valid and enforced to the fullest extent permitted by Law. Any conflict between any provisions of the Condominium Documents and the Condominium Act, or any questions regarding the interpretation of any of the Condominium Documents, shall be governed by the Condominium Act.

## ARTICLE 24.
### SUCCESSORS AND ASSIGNS

The rights and/or obligations of Sponsor as set forth herein shall inure to the benefit of and be binding upon any successor or assign or designee of Sponsor or, with the consent of Sponsor, any transferee of all then Unsold Units. Sponsor shall have the right, at any time, in its sole discretion, to assign or otherwise transfer its respective interests herein, whether by sale, merger, consolidation, lease, assignment or otherwise. Notwithstanding anything to the contrary contained in the Plan or the Declaration or By-Laws, any Permitted Mortgagee of Sponsor or such Permitted Mortgagee's designee that acquires title, by foreclosure, deed in lieu of foreclosure or otherwise, to the least of (i) twenty percent (20%) or more of all Units in the Condominium or (ii) ten (10) Unsold Units or (iii) all then remaining Unsold Units, shall be deemed to have all of the rights of Sponsor under the Declaration and By-Laws, including, without limitation, the veto and consent rights of Sponsor and the right to designate Members of the Condominium Board, but such Person shall not be required or deemed to assume any of the obligations of Sponsor under the Plan or the Condominium Documents except for the obligations

of Sponsor with respect only to the Unsold Units so acquired and only from and after the date of such acquisition and only to the extent required by Law.

## ARTICLE 25.
## CAPTIONS

The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope of this Declaration nor the intent of any provision hereof.

## ARTICLE 26.
## CERTAIN REFERENCES

26.1   A reference in this Declaration to any one gender, masculine feminine or neuter, includes the other two, and the singular includes the plural, and vice versa unless the context otherwise requires.

26.2   The terms "herein," "hereof or "hereunder" or similar terms used in this Declaration refer to this entire Declaration and not to the particular provision in which the terms are used, unless the context otherwise requires.

26.3   Unless otherwise stated, all references herein to Articles, Sections or other provisions are references to Articles, Sections or other provisions of this Declaration.

IN WITNESS WHEREOF, Sponsor has caused this Declaration to be executed as of the _____ day of _____, 2006.

**SPONSOR:**
BORDEN EAST RIVER REALTY LLC
By: Simone Borden LLC, its Managing Member

By: _____
        Joseph Simone, Manager

18

STATE OF NEW YORK    )
                          ) ss.:
COUNTY OF _____    )

On the ____ day of _____, in the year _____, before me, the undersigned, a Notary Public in and for said State, personally appeared Joseph Simone, Manager of Simone Borden LLC, the Managing Member of Borden East River LLC, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

**EXHIBIT A**

**DESCRIPTION OF THE LAND**

**EXHIBIT B**

**DESCRIPTION OF THE UNITS**

| Unit | Tax Lot No. | Location | Approx. Area in Sq. Ft. | No. of Rooms | Common Elements to Which Unit has Immediate Access | Percentage Interest in Common Elements |
|------|-------------|----------|-------------------------|--------------|----------------------------------------------------|----------------------------------------|
| A1 | | | | | | |
| A2 | | | | | | |
| A3 | | | | | | |
| A4 | | | | | | |
| A5 | | | | | | |
| A6 | | | | | | |
| A7 | | | | | | |
| A8 | | | | | | |
| A9 | | | | | | |
| A10 | | | | | | |
| A11 | | | | | | |
| A12 | | | | | | |
| B2 | | | | | | |
| B3 | | | | | | |
| B4 | | | | | | |
| B5 | | | | | | |
| B6 | | | | | | |
| B7 | | | | | | |
| B8 | | | | | | |
| B9 | | | | | | |
| B10 | | | | | | |
| B11 | | | | | | |
| B12 | | | | | | |