| Unit | Tax Lot No. | Location | Approx. Area in Sq. Ft. | No. of Rooms | Common Elements to Which Unit has Immediate Access | Percentage Interest in Common Elements |
|------|-------------|----------|-------------------------|--------------|---------------------------------------------------|----------------------------------------|
| C2 | | | | | | |
| C3 | | | | | | |
| C4 | | | | | | |
| C5 | | | | | | |
| C6 | | | | | | |
| C7 | | | | | | |
| C8 | | | | | | |
| C9 | | | | | | |
| C10 | | | | | | |
| C11 | | | | | | |
| C12 | | | | | | |
| D2 | | | | | | |
| D3 | | | | | | |
| D4 | | | | | | |
| D5 | | | | | | |
| D6 | | | | | | |
| D7 | | | | | | |
| D8 | | | | | | |
| D9 | | | | | | |
| D10 | | | | | | |
| D11 | | | | | | |
| D12 | | | | | | |
| E2 | | | | | | |
| E3 | | | | | | |
| E4 | | | | | | |
| E6 | | | | | | |
| E7 | | | | | | |

| Unit | Tax Lot No. | Location | Approx. Area in Sq. Ft. | No. of Rooms | Common Elements to Which Unit has Immediate Access | Percentage Interest in Common Elements |
|------|-------------|----------|-------------------------|--------------|----------------------------------------------------|----------------------------------------|
| F8 | | | | | | |
| E9 | | | | | | |
| E10 | | | | | | |
| E11 | | | | | | |
| F12 | | | | | | |
| F2 | | | | | | |
| F3 | | | | | | |
| F4 | | | | | | |
| F5 | | | | | | |
| F6 | | | | | | |
| F7 | | | | | | |
| F8 | | | | | | |
| F9 | | | | | | |
| F10 | | | | | | |
| F11 | | | | | | |
| F12 | | | | | | |
| G2 | | | | | | |
| G3 | | | | | | |
| G4 | | | | | | |
| G5 | | | | | | |
| G6 | | | | | | |
| G7 | | | | | | |
| G8 | | | | | | |
| G9 | | | | | | |
| G11 | | | | | | |
| G12 | | | | | | |

| Unit | Tax Lot No. | Location | Approx. Area in Sq. Ft. | No. of Rooms | Common Elements to Which Unit has Immediate Access | Percentage Interest in Common Elements |
|------|-------------|----------|-------------------------|--------------|----------------------------------------------------|----------------------------------------|
| H2 | | | | | | |
| H3 | | | | | | |
| H4 | | | | | | |
| H5 | | | | | | |
| H6 | | | | | | |
| H7 | | | | | | |
| H8 | | | | | | |
| H9 | | | | | | |
| H10 | | | | | | |
| H11 | | | | | | |
| H12 | | | | | | |
| J2 | | | | | | |
| J3 | | | | | | |
| J4 | | | | | | |
| J5 | | | | | | |
| J6 | | | | | | |
| J7 | | | | | | |
| J8 | | | | | | |
| J9 | | | | | | |
| J10 | | | | | | |
| J11 | | | | | | |
| J12 | | | | | | |
| K2 | | | | | | |
| K3 | | | | | | |
| K4 | | | | | | |
| K5 | | | | | | |

| Unit | Tax Lot No. | Location | Approx. Area in Sq. Ft. | No. of Rooms | Common Elements to Which Unit has Immediate Access | Percentage Interest in Common Elements |
|---|---|---|---|---|---|---|
| K6 | | | | | | |
| K7 | | | | | | |
| K8 | | | | | | |
| K9 | | | | | | |
| K10 | | | | | | |
| K11 | | | | | | |
| K12 | | | | | | |
| L2 | | | | | | |
| L3 | | | | | | |
| L4 | | | | | | |
| L5 | | | | | | |
| L6 | | | | | | |
| L7 | | | | | | |
| L8 | | | | | | |
| M2 | | | | | | |
| M3 | | | | | | |
| M4 | | | | | | |
| M5 | | | | | | |
| M6 | | | | | | |
| M7 | | | | | | |
| M8 | | | | | | |
| N2 | | | | | | |
| N3 | | | | | | |
| N4 | | | | | | |
| N5 | | | | | | |
| N6 | | | | | | |
| N7 | | | | | | |
| N8 | | | | | | |

| Unit | Tax Lot No. | Location | Approx. Area in Sq. Ft. | No. of Rooms | Common Elements to Which Unit has Immediate Access | Percentage Interest in Common Elements |
|---|---|---|---|---|---|---|
| R1 | | | | | | |
| R2 | | | | | | |
| R3 | | | | | | |
| R4 | | | | | | |
| R5 | | | | | | |
| R6 | | | | | | |
| R7 | | | | | | |
| R8 | | | | | | |
| R9 | | | | | | |
| R10 | | | | | | |
| R11 | | | | | | |
| R12 | | | | | | |
| R13 | | | | | | |
| R14 | | | | | | |
| R15 | | | | | | |
| R16 | | | | | | |
| R17 | | | | | | |
| R18 | | | | | | |
| R19 | | | | | | |
| R20 | | | | | | |
| R21 | | | | | | |
| R22 | | | | | | |
| R23 | | | | | | |
| R24 | | | | | | |
| R25 | | | | | | |
| R26 | | | | | | |

| Unit | Tax Lot No. | Location | Approx. Area in Sq. Ft. | No. of Rooms | Common Elements to Which Unit has Immediate Access | Percentage Interest in Common Elements |
|------|-------------|----------|-------------------------|--------------|-----------------------------------------------------|-----------------------------------------|
| GA1 | | | | | | |
| GA2 | | | | | | |
| GA3 | | | | | | |
| GA4 | | | | | | |
| GA5 | | | | | | |
| GA6 | | | | | | |
| GA7 | | | | | | |
| GA8 | | | | | | |
| GA9 | | | | | | |
| GA10 | | | | | | |
| GA11 | | | | | | |
| GA12 | | | | | | |
| GA13 | | | | | | |
| GA14 | | | | | | |
| GA15 | | | | | | |
| GA16 | | | | | | |
| GA17 | | | | | | |
| GA18 | | | | | | |
| GA19 | | | | | | |
| GA20 | | | | | | |
| GA21 | | | | | | |
| GA22 | | | | | | |
| GA23 | | | | | | |
| GA24 | | | | | | |
| GA25 | | | | | | |

# EXHIBIT C

## DEFINITIONS

"Adverse Effect", or "adverse effect", as used in the Condominium Documents, shall mean, with respect to any action or proposed change and with respect to any Unit Owner or Unit Owners, that such action or change could, if realized, (i) increase the Common Charges payable by such Unit Owner or Unit Owners, (ii) materially interfere with such Unit Owner's access to his or her Unit, (iii) obstruct or degrade the view from the windows of such Unit Owner's Unit or (iv) otherwise materially diminish such Unit Owner's use and enjoyment of his or her Unit.

"Appurtenant Interest" shall mean, with respect to any Unit, the undivided interest of the owner thereof, pursuant to the terms of Section 339-x of the Condominium Act, in and to: (i) the Common Elements; (ii) any other Units owned or leased at the time in question by the Condominium Board or its designee, corporate or otherwise, on behalf of all Unit Owners; (iii) any proceeds of the sale or lease of Units of the nature described in subdivision (ii) above; and (iv) any other assets of the Condominium.

"Building" shall mean the building known as One Hunters Point and located at 5-49 Borden Avenue, Long Island City, Queens, New York, in which the Units of the Condominium will be located.

"Building Department" shall mean the Department of Buildings of The City of New York or any successor agency.

"By-laws" shall mean the By-laws governing the operations of the Condominium, which are set forth as Exhibit D to the Declaration, as the same may be amended from time to time.

"Common Charges" shall mean the charges allocated and assessed by the Condominium Board to the Unit Owners, pro-rata, in accordance with their respective Common Interests (except as otherwise provided in the Declaration or in the By-laws or in the First Year's Budget) to meet the Common Expenses.

"Common Elements" shall mean the Property, other than the Units themselves, being comprised of the General Common Elements and the Limited Residential Common Elements.

"Common Expenses" shall mean all costs and expenses to be incurred generally by the Unit Owners pursuant to the Declaration and/or the By-laws in connection with: (i) the repair, maintenance, replacement, restoration and operation of, and any alteration, addition, or improvement to, the Common Elements; (ii) the establishment and/or maintenance of a general operating reserve, or a reserve fund for working capital, for replacements with respect to the Common Elements, or to make up any deficit in the Common Charges for any prior Year(s); and (iii) generally, the conduct of the affairs of the Condominium. Common Expenses shall be General Common Expenses attributable to all Unit Owners, Residential Common Expenses attributable to Residential Unit Owners only, Parking Space Common Expenses attributable to

Parking Space Unit Owners only and Roof Terrace Common Expenses attributable to Roof Terrace Unit Owners only.

"Common Interest" shall mean the proportionate undivided interest, expressed as a numerical percentage in the common Elements appurtenant to each Unit, as determined in accordance with the Declaration. The total of all Common Interest percentages appurtenant to all Units equals 100%. The Common Interest attributable to each Unit is set forth on Exhibit B annexed to the Declaration.

"Condominium" shall mean "One Hunters Point" which was established pursuant to the terms of the Declaration and which is governed pursuant to the terms of the By-laws.

"Condominium Act" shall mean the New York Condominium Act, as amended from time to time, and presently found in the New York Property Law, Article 9-B.

"Condominium Board" shall mean the board of managers of the Condominium who will manage the affairs of the Condominium.

"Condominium Documents" shall mean the Declaration, the By-laws and the Rules and Regulations.

"Declaration" shall mean the instrument creating the Condominium, as the same may be amended from time to time.

"Facilities" shall mean all personal property and fixtures now or hereafter existing in, on, or under the Land or the Building and either existing for the common use of the Units or the Unit Owners or necessary or convenient for the existence, maintenance, or safety of the Property. For purposes of illustrating the broad scope of such term and without intention to limit the generality of the foregoing in any respect, the term "Facilities" shall include all systems, equipment, apparatus, convectors, radiators, heaters, converters, heat exchangers, mechanisms, devices, machinery, induction units, fan coil units, motors, pumps, controls, tanks, tank assemblies, installations, condensers, compressors, fans, dampers, blowers, thermostats, thermometers, coils, vents, sensors, shut off valves, gongs, panels, receptacles, outlets, relays, alarms, sprinkler heads, electric distribution facilities, wiring, wireways, switches, switchboards, circuit breakers, transformers, fittings, Siamese connections, hoses, plumbing fixtures, lighting fixtures, other fixtures, bulbs, signs, antennae, telephones, intercom equipment, meters, meter assemblies, scaffolding, piping, lines, ducts, conduits, cables, risers, mains, shafts, pits, flues, locks, hardware, racks, screens, strainers, traps, drains, catch basins, leaders, filters, incinerators, canopies, closets, cabinets, doors, railings, copings, steps, furniture, mirrors, furnishings, appurtenances, urns, baskets, mail chutes, mail boxes, carpeting, files, floor coverings, draperies, shades, window coverings, wallpaper, wallcoverings, trees, shrubbery, flowers, plants, horticultural tubs and horticultural boxes.

"Family Members" shall mean the spouse, children (natural and adopted), stepchildren, grandchildren, siblings, nieces, nephews, parents, parents-in-law and grandparents of a Unit Owner who reside in such Unit Owner's Unit.

"First Closing" shall mean the Closing of Title with respect to the first Unit to be conveyed to a Purchaser pursuant to the terms of the Plan.

"First Year's Budget" shall mean the Section of the Plan entitled "Schedule B – First Year's Budget." First Year's Budget is sometimes referred to herein as "Schedule B."

"Floor Plans" shall mean the floor plans of the Units certified by a professional engineer or licensed architect,  filed in the Register's Office simultaneously with the recording of the Declaration, together with any supplemental floor plans thereto.

"Force Majeure" shall mean delays caused by weather, casualty, labor, difficulties (including work stoppages and strikes), late delivery or inability to obtain materials, government restrictions or other events beyond Sponsor's reasonable control.

"General Common Elements" shall mean those certain portions of the Property (other than the Units), as well as those Facilities therein, either existing for the common use of the Units or the Unit Owners or necessary for, or convenient to, the existence, maintenance, or safety of the Property, as more particularly described in the Declaration.

"General Common Expenses" shall mean all costs and expenses to be incurred generally by the Unit Owners pursuant to the Declaration and/or By-laws in connection with (i) the repair, maintenance, replacement, restoration and operation of, and any alteration, addition, or improvement to, the General Common Elements, and shall include the normal cleaning expenses of the Parking Space Units (such as sweeping, plowing); and (ii) the establishment and/or maintenance of a general operating reserve fund for working capital, for replacements with respect to the General Common Elements; and shall include all costs and expenses paid or incurred by the Condominium in connection with the purchase, lease, sublease or sale by the Condominium Board or its designee, corporate or otherwise, on behalf of all Unit Owners, of any Unit now or hereafter acquired by the Condominium Board.

"Initial Control Period" shall mean the period ending on the earlier of: (i) the closing of title with purchasers under the Plan to Units having at least 50% of the aggregate Common Interest appertaining to all Units, or (ii) 3 years after the First Closing.

"Institutional Lender" shall mean (i) a savings bank, savings and loan association, bank or trust company, insurance company, real estate investment trust, mortgage trust, or a group p of lenders which shall include one of the foregoing, or (ii) a federal, state, municipal, teacher's or union employee, welfare, pension or retirement fund or system, or (iii) Sponsor; or (iv) any Permitted Mortgagee of the Unsold Units.

"Institutional Mortgage" shall mean any first mortgage covering  one or more Units that is a Permitted Mortgage and the initial holder of which is either Sponsor or an Institutional Lender.

"Insurance Trustee" shall mean a bank or a trust company, in either event having both an office in the City of New York and a capital surplus and undivided profits of $500,000,000 or more, from time to time appointed to serve as such by the Condominium Board.  As long as Sponsor owns ten (10%) percent or more of the Units, Sponsor's Permitted Mortgagee shall have the right to serve as the Insurance Trustee.

"Land" shall mean the land located in the Borough of Queens on the Tax Map of the Real Property Assessment Department of The City of New York as Block 34, Lot 12 and more particularly described on Exhibit A to the Declaration.

"Law" shall mean the laws and ordinances of any or all of the Federal, New York State, New York City, County and Borough governments, the rules, regulations, orders and directives of any or all departments, subdivisions, bureaus, agencies, or offices thereof or of any other governmental, public or quasi-public authorities having jurisdiction over the Property and/or the Condominium and/or the direction of any public officer pursuant to law.

"Limited Residential Common Elements" shall mean those portions of the Property (other than the Units) existing for the use and enjoyment of certain Residential Unit Owners or one or more specified Residential Units to the exclusion of all other Unit Owners, as more particularly described in the Declaration.

"Majority of Unit Owners" shall mean those Unit Owners having more than 50% of the total authorized votes of all Unit Owners (determined in accordance with the terms of Section 4.8 of the By-laws) who are present, in person or by proxy, and voting at any duly constituted meeting of the Unit Owners at which a quorum is present.

"Managing Agent" shall mean the managing agent or manager of the Condominium at the time in question.

"Mortgage Representatives" shall mean the representatives of the holders of all mortgages encumbering Units, designated by the holders of Institutional Mortgages in accordance with the terms of paragraph (B) of Section 8.6 of the By-laws.  As long as Sponsor owns ten (10%) percent or more of the Units, Sponsor's Permitted Mortgagee shall have the right to serve as one of the Mortgage Representatives.

"Parking Space Common Expenses" shall mean all costs and expenses to be incurred generally by the Parking Space Unit Owners pursuant to the Declaration and/or By-laws in connection with structural or extraordinary repairs to the Parking Space Units.

"Parking Space Common Interest" shall mean the proportionate undivided interest, expressed as a numerical percentage, in the aggregate Common Interest of all Parking Space Units, as

iv

determined in accordance with the Declaration. The total of all Parking Space Common Interests of all Parking Space Units equals 100%.

"Parking Space Unit" shall mean any space designated as a Parking Space Unit in the Declaration together with its Common Interest and Parking Space Common Interest.

"Permitted Encumbrances" shall mean those matters encumbering title to a Unit subject to which a Purchaser agrees to take title, as more particularly described on Schedule A annexed to the form of Purchaser Agreement.

"Permitted Mortgage" shall mean a first mortgage permitted to be placed upon a Unit pursuant to the provisions of the By-laws.

"Permitted Mortgagee" shall mean any holder of a Permitted Mortgage at the time in question.

"Person" shall mean any natural person, partnership, corporation, trust, estate, fiduciary, unincorporated association, syndicate, joint venture, organization, government or any department or agency thereof, or any other entity.

"Plan" shall mean that certain condominium offering plan relating to the Property, as accepted for filing by the Department of Law of the State of New York pursuant to Section 352-e of the General Business Law of the State of New York and any amendments thereto.

"Property" shall mean the Land, the Building (and any structures attached thereto), all the improvements erected or to be erected on the Land, all easements, rights and appurtenances pertaining thereto and all other property, real, personal, or mixed, used or intended to be used in connection therewith.

"Register's Office" shall mean the Office of the Register of the City of New York of the County of Queens, in which the Property is located.

"Residential Common Expenses" shall mean all costs and expenses to be incurred generally by the Residential Unit Owners pursuant to the Declaration and/or By-laws in connection with (i) the repair, maintenance, replacement, restoration and operation of, and any alteration, addition, or improvement to, the Limited Residential Common Elements; or (ii) the establishment and/or maintenance of an operating reserve fund for working capital, for replacements with respect to the Limited Residential Common Elements.

"Residential Unit" shall mean any of the Residential Units located in the Building, which Residential Units are more particularly described in Articles 5 and 6, and Exhibit B to, the Declaration and Floor Plans.

"Residential Common Interest" shall mean the proportionate undivided interest, expressed as a numerical percentage, of each Residential Unit Owner in the Residential Common Elements. The total of all Residential Common Interest percentages appurtenant to all Residential Units

equals 100%. The Residential Common Interests are the basis for determining a Residential Unit Owner's liability for his share of the Common Expense. The Residential Common Interest attributable to each Residential Unit is set forth on Exhibit B annexed to the Declaration.

"Roof Terrace Common Expenses" shall mean all costs and expenses to be incurred generally by the Roof Terrace Unit Owners pursuant to the Declaration and/or By-laws in connection with structural or extraordinary repairs to the Roof Terrace Units.

"Roof Terrace Common Interest" shall mean the proportionate undivided interest, expressed as a numerical percentage, in the aggregate Common Interest of all Roof Terrace Units, as determined in accordance with the Declaration. The total of all Roof Terrace Common Interests of all Roof Terrace Units equals 100%.

"Roof Terrace Unit" shall mean any space designated as a Roof Terrace Unit in the Declaration together with its Common Interest and Roof Terrace Common Interest.

"Rules and Regulations" shall mean the rules and regulations of the Condominium, which are annexed as an addendum to the By-laws, as any of the same may be amended, modified, added to, or deleted from time to time pursuant to the terms of the By-laws, provided that they are not in conflict with the terms of the Condominium Act, the Declaration, or the By-laws.

"Selling Agent" shall mean the selling agent at the time in question.

"Special Assessments" shall mean the charges allocated and assessed by the Condominium Board to the Unit Owners, pro-rata in accordance with their respective Common Interest (except as otherwise provided in the Declaration or in the By-laws), in accordance with the By-laws of the Condominium.

"Sponsor" shall mean Borden East River Realty LLC and any successor or assignee of Sponsor or, with the consent of Sponsor, any transferee of all of the then Unsold Units. Whenever the Declaration or the By-Laws (including the Exhibits thereto) provide that Sponsor shall not be liable or responsible or that there shall be no recourse against Sponsor, such provision shall be deemed to include Sponsor's principals, officers, directors, shareholders, members, affiliates, agents and attorneys, whether or not so expressly stated.

"Superintendent's Unit" shall mean Unit 1A which is designated as the Superintendent's Unit located in the Building, which Unit is more particularly described in Articles 5 and 6 of, and Exhibit B to, the Declaration and Floor Plans.

"Terrace" shall mean a terrace, balcony or garden appurtenant to a Unit. All such terraces and balconies are, collectively referred to as the "Terraces".

"Unit" shall mean any Residential Unit, including the Superintendent's Unit, any Parking Space Unit and any Roof Terrace Unit, as more particularly described in Articles 5 and 6, and Exhibit B to, the Declaration and as shown in the Floor Plans.

"Unit Owner" shall mean any Person (including Sponsor, if Sponsor owns any Unsold Unit) who holds fee title, of record, to one or more Units at the time in question.

"Unsold Unit" shall mean any Unit owned or retained, by way of lease or any other arrangement by which management and/or financial responsibility is retained, by Sponsor or its designee, which designee may include purchasers purchasing one or more Units for investment at the time in question.

## EXHIBIT D

## BY-LAWS OF THE CONDOMINIUM

**<u>EXHIBIT E</u>**

**<u>UNIT OWNER POWER OF ATTORNEY</u>**

# BY-LAWS

## OF

## ONE HUNTERS POINT CONDOMINIUM

**Prepared by:**

**Ruskin Moscou Faltischek, P.C.**
**1425 RexCorp Plaza**
**East Tower, 15th Floor**
**Uniondale, New York 11556-1425**
**(516) 663-6600**

**THIS PAGE INTENTIONALLY LEFT BLANK**

## INDEX TO BY-LAWS

PAGE

ARTICLE 1 GENERAL 1
    Section 1.1    Purpose    1
    Section 1.2    Definitions    1
    Section 1.3    Applicability of By-Laws    1
    Section 1.4    Application of By-Laws    1
    Section 1.5    Principal Office of the Condominium    1

ARTICLE 2 CONDOMINIUM BOARD 2
    Section 2.1    General    2
    Section 2.2    Status of the Condominium Board    2
    Section 2.3    Principal Office of the Condominium Board    2
    Section 2.4    Powers and Duties of the Condominium Board    2
    Section 2.5    Certain Limitations on the Powers of the Condominium Board    7
    Section 2.6    Exercise and Delegation of Powers and Duties    8
    Section 2.7    Number, Election and Qualification of Members    8
    Section 2.8    Term of Office of Member    9
    Section 2.9    Removal and Resignation of Members    9
    Section 2.10    Vacancies    9
    Section 2.11    Organizational Meeting of the Condominium Board    10
    Section 2.12    Regular Meetings of the Condominium Board    10
    Section 2.13    Special Meetings of the Condominium Board    10
    Section 2.14    Waiver of Notice of Meetings    10
    Section 2.15    Quorum of the Condominium Board    11
    Section 2.16    Conduct of Meetings    11
    Section 2.17    Decisions by the Condominium Board    11
    Section 2.18    Compensation of Members    11
    Section 2.19    Common or Interested Members of the Condominium Board    11
    Section 2.20    Indemnification    12

ARTICLE 3 OFFICERS 15
    Section 3.1    General    15
    Section 3.2    President    15
    Section 3.3    Vice President    16
    Section 3.4    Secretary    16
    Section 3.5    Treasurer    16
    Section 3.6    Election, Term of Office and Qualification of Officers    16
    Section 3.7    Removal and Resignation of Officers    16
    Section 3.8    Vacancies    16
    Section 3.9    Compensation of Officers    17
    Section 3.10    Indemnification of Officers    17

i

PAGE

ARTICLE 4 UNIT OWNERS                                                              17
    Section 4.1    Annual Meetings of the Unit Owners               17
    Section 4.2    Special Meetings of the Unit Owners              17
    Section 4.3    Place of Meetings                               17
    Section 4.4    Notice of Meetings                              17
    Section 4.5    Quorum of the Unit Owners                       18
    Section 4.6    Conduct of Meetings                             18
    Section 4.7    Order of Business                               18
    Section 4.8    Voting                                          19
    Section 4.9    Election of Members of the Condominium Board     20
    Section 4.10   [Intentionally Omitted]                         21
    Section 4.11   Action Without a Meeting                        21
    Section 4.12   Title to Units                                  21
    Section 4.13   Contractual Liability of Unit Owners            21

ARTICLE 5 OPERATION OF THE PROPERTY                                                21
    Section 5.1    Maintenance and Repairs                         21
    Section 5.2    Alterations, Additions, Improvements or Repairs
                  in and to Units                                 24
    Section 5.3    Alterations, Additions, or Improvements to the
                  Common Elements                                 27
    Section 5.4    Insurance                                       28
    Section 5.5    Casualty or Condemnation                        30
    Section 5.6    Use of the Property                             34
    Section 5.7    Use of the Units                                34
    Section 5.8    Use of the Common Elements                      35
    Section 5.9    Rights of Access                                36
    Section 5.10   Modification of the Rules and Regulations       37
    Section 5.11   Real Estate Taxes                               38
    Section 5.12   Fuel                                            38
    Section 5.13   Water Charges and Sewer Rents                   38
    Section 5.14   Record and Audits                               38

ARTICLE 6 COMMON CHARGES                                                           39
    Section 6.1    Determination of Common Expenses and
                  Fixing of Common Charges                        39
    Section 6.2    Payment of Common Charges                       41
    Section 6.3    Statement of Common Charges                     42
    Section 6.4    Default in Payment of Common Charges            42

| | | PAGE |
|---|---|---|
| **ARTICLE 7 SELLING AND LEASING OF UNITS** | | 44 |
| Section 7.1 | General | 44 |
| Section 7.2 | Right of First Refusal | 44 |
| Section 7.3 | Acceptance of Offer | 45 |
| Section 7.4 | Failure to Accept Offer | 46 |
| Section 7.5 | Termination of, and Exceptions to, the Right of First Refusal | 47 |
| Section 7.6 | No Severance of Ownership | 49 |
| Section 7.7 | Payment of Common Charges | 49 |
| Section 7.8 | Power of Attorney | 49 |
| Section 7.9 | Gifts and Devises, Etc | 49 |
| Section 7.10 | Commencement of Time | 49 |
| Section 7.11 | Costs and Expenses | 50 |
| | | |
| **ARTICLE 8 MORTGAGING OF UNITS** | | 50 |
| Section 8.1 | General | 50 |
| Section 8.2 | Restrictions on Mortgaging | 50 |
| Section 8.3 | Notice of Unpaid Common Charges and Default | 51 |
| Section 8.4 | Performance by Permitted Mortgagees | 51 |
| Section 8.5 | Examination of Books | 51 |
| Section 8.6 | Consent of Mortgagees; Designation of Mortgage Representatives | 51 |
| | | |
| **ARTICLE 9 CERTAIN REMEDIES** | | 52 |
| Section 9.1 | Self Help | 52 |
| Section 9.2 | Abatement and Enjoinment | 52 |
| Section 9.3 | Remedies Cumulative | 53 |
| Section 9.4 | Costs and Expenses | 53 |
| | | |
| **ARTICLE 10 ARBITRATION** | | 53 |
| Section 10.1 | Procedure | 53 |
| Section 10.2 | Variation by Agreement | 54 |
| Section 10.3 | Binding Effect | 54 |
| Section 10.4 | Costs and Expenses | 54 |
| | | |
| **ARTICLE 11 NOTICES** | | 54 |
| Section 11.1 | General | 54 |
| Section 11.2 | Waiver of Service of Notice | 55 |
| | | |
| **ARTICLE 12 AMENDMENTS TO BY-LAWS** | | 55 |
| Section 12.1 | General | 55 |
| Section 12.2 | Special Amendments | 56 |

|                                                           | PAGE |
| --------------------------------------------------------- | ---- |
| ARTICLE 13 FURTHER ASSURANCES                             | 57   |
| Section 13.1    General                                   | 57   |
| Section 13.2    Failure to Deliver or Act                 | 57   |
| ARTICLE 14 MISCELLANEOUS                                  | 58   |
| Section 14.1    Inspection of Documents                   | 58   |
| Section 14.2    Waiver                                    | 58   |
| Section 14.3    Conflict                                  | 58   |
| Section 14.4    Severability                              | 58   |
| Section 14.5    Successors and Assigns                    | 58   |
| Section 14.6    Gender                                    | 58   |
| Section 14.7    Captions                                  | 58   |
| Section 14.8    Sponsor's Consent                         | 58   |
| ARTICLE 15 TAX STATUS AS A HOMEOWNERS ASSOCIATION`        | 59   |
| Section 15.1    General                                   | 59   |
| Section 15.2    Organization                              | 59   |
| Section 15.3    Inurement                                 | 59   |
| Section 15.4    Residential Use                           | 59   |

ADDENDUM

# BY-LAWS

## ARTICLE 1

## GENERAL

Section 1.1    *Purpose.* The purpose of these By-Laws is to set forth the rules and procedures concerning the conduct of the affairs of the Condominium. The Condominium covers the Property, which consists of: (i) the Land, which is more particularly described in Exhibit A to the Declaration; (ii) the Building, which includes, without limitation, the Units, the Common Elements and all easements, rights and appurtenances belonging thereto, and all other property, real, personal or mixed, intended for use in connection therewith; and (iii) all other property, real, personal, or mixed, intended for use in connection therewith. The Property has been submitted to the provisions of the Condominium Act by the recording of the Declaration in the Register's Office, of which Declaration these By-Laws form a part. The purpose of the Condominium is to carry on the acquisition, construction, management, maintenance and care of the Common Elements and to perform related functions with respect to the other portions of the Property.

Section 1.2    *Definitions.* All capitalized terms used in these By-Laws that are not otherwise defined in any of the Articles hereof shall have the meanings set forth in Exhibit C to the Declaration, unless the context in which the same are defined in any of the Articles hereof shall have the meanings ascribed to them in such Articles, unless the context in which the same are used shall otherwise require. Each of the aforedescribed capitalized terms shall be applicable to singular and to plural nouns, as well as to verbs of any tense.

Section 1.3    *Applicability of By-Laws.* These By-Laws are applicable to the Property and to the use and occupancy thereof.

Section 1.4    *Application of By-Laws.* All present and future Unit Owners, mortgagees, lessees, sublessees and occupants of Units, and employees and guests of Unit Owners, as well as all other Persons who may use the Property, are and shall be subject to the Declaration, these By-Laws and the Rules and Regulations, as each of the same may be amended from time to time. The acceptance of a deed or other instrument of conveyance, or the succeeding to title to, or the execution of a lease or sublease for, or the act of occupancy of, a Unit shall constitute an agreement that the provisions of the Declaration, these By-Laws and the Rules and Regulations, as each of the same may be amended from time to time, are accepted, ratified and will be complied with.

Section 1.5    *Principal Office of the Condominium.* The principal office of the Condominium shall be located either at the Property or at such other place reasonably convenient thereto as may be designated from time to time by the Condominium Board.

1

## ARTICLE 2

## CONDOMINIUM BOARD

Section 2.1   *General.* As more particularly set forth in Sections 2.4, 2.5 and 2.6 hereof, the affairs of the Condominium shall be governed by the Condominium Board. In exercising its powers and performing its duties under the Declaration and these By-Laws, the Condominium Board shall act as, and shall be, the agent of the Unit Owners, subject to, and in accordance with, the terms of the Declaration and these By-Laws.

Section 2.2   *Status of the Condominium Board.* Unless and until the Condominium Board shall incorporate in accordance with the terms of Section 2.4 hereof, the Condominium Board shall have, to the extent permitted by Law, the status conferred upon unincorporated associations under, or pursuant to, the terms of the General Association Law of the State of New York. If the Condominium Board shall incorporate in accordance with the terms of Section 2.4 hereof, the Condominium Board shall have, to the extent permitted by Law, the status conferred upon it under, or pursuant to, the terms of the applicable statutes of the State of New York. In either event, however, the Condominium Board shall also have the status conferred upon it under, or pursuant to, the terms of the Condominium Act.

Section 2.3   *Principal Office of the Condominium Board.* The principal office of the Condominium Board shall be located either at the Property or at such other place reasonably convenient thereto as may be designated from time to time by the Condominium Board.

Section 2.4   *Powers and Duties of the Condominium Board.*

(A)   The Condominium Board shall have all of the powers and duties necessary for, or incidental to, the administration of the affairs of the Condominium, provided, however, that the Condominium Board shall not have such powers and duties that by Law, or pursuant to the terms of the Declaration and these Bylaws, may not be delegated to the Condominium Board by the Unit Owners. Without intention to limit the generality of the foregoing in any respect, the Condominium Board shall have the following specific powers and duties:

(i)   to operate, maintain, repair, restore, add to, improve, alter and replace the Common Elements, including, without limitation, as the Condominium Board shall deem necessary or proper in connection therewith, the purchase and leasing of supplies, equipment and material and the employment, compensation and dismissal of personnel;

(ii)   to acquire, in the name of the Condominium Board or its designee, corporate or otherwise, and on behalf of the Unit Owners, all rights, titles and interests in real and personal property deemed necessary or proper by the Condominium Board for use in connection with the ownership and operation of the Property as a condominium;

(iii)    to maintain complete and accurate books and records with respect to the finances and the operation of the Condominium, including without limitation: (a) detailed accounts, in chronological order, of receipts and expenditures affecting the Property; (b) detailed books of account of the Condominium Board; (c) other financial records, as well as other books of account of the Condominium, as may be required to be kept pursuant to the terms of these By-Laws; and (d) minutes and other records of all meetings held pursuant to the terms of these By-Laws;

(iv)    to adopt a budget for the Condominium for each fiscal year thereof, setting forth, without limitation: (a) a detailed accounting of the anticipated Common Expenses for the ensuing fiscal year and (b) a detailed projection of all sources and amounts of income necessary to discharge the same;

(v)    to approve the amount and the means and methods of payment of, and collection of, the Common Charges, and Special Assessments from the Unit Owners;

(vi)    to borrow money on behalf of the Condominium in accordance with Section 339-j of the Real Property Law when required in connection with the operation, maintenance, repair, restoration, improvement, alteration and replacement of the Common Elements, provided, however, that: (a) the affirmative consent of at least sixty-six and two-thirds (66 2/3%) percent of the members of the Condominium Board shall be required for the borrowing of any sum in excess of Seven Hundred Fifty Thousand ($750,000) Dollars in any one fiscal year (regardless of the balance of any loans outstanding from previous fiscal years); (b) with respect to the operation, maintenance, repair, restoration, improvement, alteration and replacement of the General Common Elements, the affirmative consent of at least sixty-six and two-thirds (66 2/3%) percent, in aggregate Common Interest, of all Unit Owners shall be required for the borrowing of any sum in excess of Seven Hundred Fifty Thousand ($750,000) Dollars in any one fiscal year (regardless of the balance of any loans outstanding from previous fiscal years); (c) with respect to the operation, maintenance, repair, restoration, improvement, alteration and replacement of the Limited Residential Common Elements, the affirmative consent of at least sixty-six and two-thirds (66 2/3%) percent in aggregate Residential Common Interest, of all Residential Unit Owners shall be required for the borrowing of any sum in excess of Seven Hundred Fifty Thousand ($750,000) Dollars in any one fiscal year (regardless of the balance of any loans outstanding from previous fiscal years); (d) no lien to secure repayment of any sum borrowed may be created on any Unit or its Appurtenant Interests without the consent of the owner of such Unit; and

(e) the documentation executed in connection with any such borrowing, shall provide that, if any sum borrowed by the Condominium Board pursuant to this subparagraph (vi) shall not be repaid by the Condominium Board, any Unit Owner who pays to the creditor thereunder such proportion of the then outstanding indebtedness represented or secured thereby as such Unit Owner's Common Interest, Residential Common Interest, Parking Space Common Interest or Roof Terrace Common Interest, as applicable, bears to the aggregate Common Interests of all Unit Owners, or Residential Common Interests of all Residential Unit Owners, or Parking Space Common Interests of all Parking Space Unit Owners, or Roof Terrace Common Interests of all Roof Terrace Unit Owners, as applicable, shall be entitled to obtain from the creditor a release of any judgment or other lien that the said creditor shall have filed, or shall have the right to file against such Unit Owner's Unit;

(vii)   to open and maintain bank accounts on behalf of the Condominium and to designate the signatories required therefor which shall at no time be less than two and that each check drawn on such account shall need at least two signatures;

(viii)  to use the Common Charges and Special Assessments collected from Unit Owners, as well as all other funds held by the Condominium Board or received in connection with the operation of the Property, for the administration of the Condominium, including, without limitation: (a) the payment of Common Expenses and (b) the making of restorations, additions, alterations and improvements to the Common Elements;

(ix)    to obtain insurance for the Property, including the Units, pursuant to the terms of Section 5.4 hereof;

(x)     to adjust and settle claims under insurance policies obtained pursuant to the terms of Section 5.4 hereof, and to execute and deliver releases upon such adjustment and settlement on behalf of (a) all Unit Owners (except as otherwise provided herein); (b) all holders of mortgages and other liens on Units; and (c) all holders of any other interest in the Property;

(xi)    to make, or to contract with others for the making of, repairs, maintenance, additions and improvements to, and alterations, restorations and replacements of, the Property after damage or destruction by fire or other casualty, or as a result of condemnation or eminent domain proceedings, all in accordance with the terms of these By-Laws;

(xii)   to obtain and keep in force fidelity bonds, in amounts deemed appropriate by the Condominium Board, but in no event less than Two Hundred Fifty

Thousand ($250,000) Dollars, for: (a) all members of the Condominium Board; (b) all officers and employees of the Condominium; and (c) the Managing Agent, and the premiums on all such fidelity bonds shall constitute a part of the Common Expenses;

(xiii)   to accept the surrender of any Unit pursuant to the terms of paragraph (C) of Section 6.2 hereof, in the name of the Condominium Board or its designee, corporate or otherwise, and on behalf of all Unit Owners;

(xiv)   to purchase and maintain the Superintendent's Unit and otherwise deal in any way with respect to such Superintendent's Unit, including without limitation the execution, replacement or refinance of purchase money mortgage(s) and note(s) with respect to the acquisition of the Superintendent's Unit (if any) including, without limitation, the right to (a) assign to Sponsor or its designee or an Institutional Lender as additional collateral for the loan, the Condominium's rights in and to receive future income of all types, including the Common Charges; (b) create a security interest in, assign, pledge, mortgage or otherwise encumber funds or other real or personal property that it holds; (c) increase Common Charges to the extent necessary to pay the amounts due under any such loan; and (d) treat Common Charges as trust funds to the extent necessary to make required payments to Sponsor or its designee and/or an Institutional Lender pursuant to the terms of such loan.

(xv)   to purchase, lease, or otherwise acquire Units offered for sale or lease by their owners, in the name of the Condominium Board or its designee, corporate or otherwise, and on behalf of all Unit Owners but only with the consent of a majority of Unit Owners;

(xvi)   to purchase Units at foreclosure or other judicial sales, in the name of the Condominium Board or its designee, corporate or otherwise and on behalf of all Unit Owners;

(xvii)   to sell, lease, mortgage and otherwise deal with Units acquired by, and to sublease Units leased by, the Condominium Board or its designee, corporate or otherwise, on behalf of all Unit Owners, provided, however, that the Condominium Board or its designees shall in no event be entitled to vote the votes appurtenant to any such Unit;

(xviii)   to adopt and amend the Rules and Regulations and to levy and authorize collection of fines against Unit Owners for violations of the Rules and Regulations and these By-Laws (any such fines and fees shall be deemed to constitute Common Charges payable by Unit Owners of the Unit against which they are levied);

(xix) to enforce by legal means the terms, covenants and conditions contained in the Condominium Documents and to bring or defend against any proceedings that may be instituted on behalf of, or against, the Unit Owners;

(xx) to incorporate, to the extent and in the manner provided in the Condominium Act, provided, however, that: (a) the certificate of incorporation and By-Laws of any such resulting corporation shall conform as closely as practicable to the terms of the Declaration and these By-Laws and (b) the terms of the Declaration and these By-Laws shall prevail in the event of any inconsistency or conflict between the terms thereof and the terms of such certificate of incorporation and By-Laws;

(xxi) to organize corporations to act as the designees of the Condominium Board in acquiring title to, or leasing of, Units and in acquiring rights, titles and interests in real and personal property for use in connection with the ownership and operation of the Property as a condominium;

(xxii) to execute, acknowledge and deliver: (a) any declaration (including a declaration of single zoning lot) or other instrument affecting the Property that the Condominium Board deems necessary or appropriate to comply with any law applicable to the maintenance, demolition, construction, alteration, repair, or restoration of the Building and (b) any consent, covenant, restriction, easement, or declaration affecting the Property that the Condominium Board deems necessary or appropriate;

(xxiii) to prepare, execute, acknowledge and record on behalf of all Unit Owners, as their attorney in fact, coupled with an interest, a restatement of the Declaration or these By-Laws, whenever, in the Condominium Board's estimation, it is advisable to consolidate and restate all amendments, modification, additions and deletions theretofore made to the same;

(xxiv) to prepare, execute, acknowledge and institute on behalf of all Unit Owners, as their attorney-in-fact, coupled with an interest, protests of real property tax assessments and tax certiorari proceedings with respect to all Units and to assess any costs incurred thereby as a Common Expense;

(xxv) to commence summary eviction proceedings in the name of or on behalf of the Condominium Board and/or a Unit Owner or Unit Owners, as the case may be, against an authorized guest and/or a tenant of a Unit Owner if such authorized guest and/or tenant does not conform to the Rules and Regulations of the Condominium, annexed hereto as Schedule A, as said Rules and Regulations may at any time and from time to time, be

modified, amended or added to in accordance with the terms of these By-Laws. All costs in connection with the removal of the authorized guest and/or tenant, including reasonable attorney's fees, shall be borne by the Unit Owner;

(xxvi) to impose move-in fees and charges and transfer fees in connection with the sale or lease of a Unit, provided no such fees or charges or other conditions of transfer or lease may be imposed upon Sponsor;

(xxvii) to carry out any other duties imposed upon the Condominium Board pursuant to the Declaration and these By-Laws.

(B)     The Condominium Board shall be responsible for carrying out the duties imposed upon it under the Condominium Documents regardless of whether a Unit is vacant or occupied by the owner thereof or by a permitted lessee or other permitted occupant.

Section 2.5     *Certain Limitations on the Powers of the Condominium Board.* Notwithstanding anything to the contrary contained in these By-Laws, so long as Sponsor shall continue to own any Unit, the Condominium Board may not, without Sponsor's prior written consent:

(i)     make any addition, alteration, or improvement to the Common Elements or to any Unit, unless the same shall be required by Law;

(ii)     assess any Common Charges or Special Assessments for the creation or replacement of, or the addition to, all or any part of a reserve, contingency, or surplus fund;

(iii)     enter into any service or maintenance contracts for work or otherwise contract for work or otherwise provide services not covered in the First Year's Budget set forth in the Plan, except as is required to reflect normal annual increases in operating services;

(iv)     borrow money on behalf of the Condominium; or

(v)     exercise a right of refusal to lease or purchase a Unit.

The written consent of Sponsor shall not be necessary to perform any function or take any action described in clauses (i) through (v) above, if, and only if, the performance of such action or the carrying out of such action is necessary (and no other alternative is available) to enable the Condominium Board to: (i) comply with Law; or (ii) remedy any notice of violation; or (iii) remedy any work order of the Condominium's insurer. In no event will the limitations imposed herein continue for more than five (5) years from the First Closing.

Section 2.6    *Exercise and Delegation of Powers and Duties.*

(A)    Any act within the power of the Condominium Board to perform, and deemed necessary or desirable to be performed by the Condominium Board, shall be performed by the Condominium Board or shall be performed on its behalf and at its direction by the agents, employees, or designees of the Condominium Board.

(B)    The Condominium Board may appoint an Executive Committee by duly adopted resolution, which Executive Committee shall have, and may exercise, all of the powers of the Condominium Board, subject to both the exceptions and limitations as the Condominium Board may from time to time deem appropriate, during the intervals between the meetings of the Condominium Board. In addition, the Condominium Board may from time to time appoint, by duly adopted resolutions, such other committees as the Condominium Board may deem appropriate to perform such duties and services as the Condominium Board shall direct, each of which committees shall have, and may exercise, all of the powers delegated to it in its enabling resolution, subject, however, to the exceptions and limitations contained in paragraph (D) of this Section 2.6. The Executive Committee and each other committee shall consist of three members of the Condominium Board, at least one of whom shall be a member designated by Sponsor for so long as Sponsor shall have the right to designate or elect one or more members of the Condominium Board.

(C)    The Condominium Board may employ a Managing Agent to serve at a compensation approved by the Condominium Board and to perform such duties and services as the Condominium Board shall direct. Subject to the exceptions and limitations contained in paragraph (D) of this Section 2.6, the Condominium Board may delegate to the Managing Agent any of the powers granted to the Condominium Board in these By-Laws.

(D)    Notwithstanding anything to the contrary contained in this Section 2.6, the Executive Committee and the Managing Agent shall neither have nor be entitled to exercise, and the Condominium Board shall not delegate to either of them or to any other committee, the powers or duties described in subparagraphs (ii), (iv), (v), (vi), (xiii), (xiv), (xv), (xvi), (xvii), (xx), (xxi), (xxii) and (xxiii) of paragraph (A) of Section 2.4 hereof. In addition, neither the Managing Agent nor any of the committees described in Subsection (B) of this Section 2.6 shall have, or be entitled to exercise, any of the powers of the Condominium Board, except to the extent permitted by Law.

Section 2.7    *Number, Election and Qualification of Members.* Until the first annual meeting of the Unit Owners held pursuant to the terms of Section 4.1 hereof, the Condominium Board shall consist of three (3) individuals, all of which are to be designated from time to time by Sponsor. From and after the first annual meeting of the Unit Owners and for so long as Sponsor owns at least one Unsold Unit, the Condominium Board shall consist of five (5) individuals, which individuals shall be elected by the Unit Owners (including Sponsor). So long as Sponsor owns any Unsold Units, the number of members of the Condominium Board may not be changed without the consent of Sponsor. Except for members designated or elected by

Sponsor, all members of the Condominium Board shall be either: (i) individual Unit Owners or adult family members of an individual Unit Owner; or (ii) individual Permitted Mortgagees; or (iii) officers, directors, shareholders, partners, principals, employees, or beneficiaries of corporations, partnerships, fiduciaries, or any other entities that are Unit Owners or Permitted Mortgagees. In addition, no Unit Owner may be elected to serve on the Condominium Board, (nor may continue to serve on the Condominium Board) if the Condominium Board has perfected a lien against such Unit Owner's Unit and the amount necessary to release such lien has not been paid at the time of such election, or so long as such lien remains unpaid. In no event may more than one individual of a designated Unit serve on the Condominium Board or as an officer of the Condominium Board at the same time during the term of office.

Section 2.8    *Term of Office of Members.* The term of office of the three (3) members of the Condominium Board designated by Sponsor prior to the first annual meeting of the Unit Owners shall expire when the five (5) individuals to be elected at such meeting are so elected and qualified or designated, as the case may be. The term of office of each of the five (5) individuals elected and qualified or designated, as the case may be, at the first annual meeting of the Unit Owners pursuant to the terms of Section 4.9 hereof, shall be fixed at one (1) year. Notwithstanding anything to the contrary contained in this Section 2.8, however, each member of the Condominium Board shall serve until his or her successor shall be elected and qualified.

Section 2.9    *Removal and Resignation of Members.*

(A)    Any member of the Condominium Board who was elected thereto either by the Unit Owners, pursuant to the terms of Section 4.9 hereof, or by the Condominium Board, pursuant to the terms of Section 2.10 hereof, may be removed from office, with or without cause, by a vote of a Majority of Unit Owners. Any member of the Condominium Board who was designated as such or elected by Sponsor pursuant to the terms of Section 2.7, 2.10, or 4.9 hereof, may be removed, with or without cause, only by Sponsor. If any member of the Condominium Board who was designated by Sponsor is removed, his or her successor shall also be designated by Sponsor.  Any member of the Condominium Board whose proposed removal is to be acted upon at a meeting of the Unit Owners shall be given prior written notice thereof and an opportunity to be present and heard threat.

(B)    Any member of the Condominium Board may resign his or her membership at any time by giving written notice thereof to the Condominium Board and, with respect to members of the Condominium Board designated as such by Sponsor, to Sponsor. In addition, any member of the Condominium Board who shall cease to be qualified for membership pursuant to the terms of Section 2.7 hereof shall be deemed to have resigned his or her membership effective as of the date upon which such qualification shall cease.

Section 2.10   *Vacancies.*

(A)    Any vacancy on the Condominium Board that is caused by the removal, resignation, or death of a member who was elected thereto by the Unit Owners shall be filled by

an individual who is qualified to be a member pursuant to the terms of Section 2.7 hereof and who is elected by a vote of the majority of the members of the Condominium Board then in office. A special meeting of the Condominium Board shall be held for the purpose of filling any such vacancy promptly after the occurrence thereof, and the election held thereat shall be effective to such vacancy even if the number of members present at such meeting shall not constitute a quorum.

(B)     Any vacancy on the Condominium Board that is caused by the removal, resignation, or of a member who was designated as such or elected by Sponsor shall be filled by an individual designated by Sponsor.

(C)     Each member of the Condominium Board who is elected thereto or designated as such to fill a vacancy pursuant to the terms of paragraph (A) or (B), respectively, of this Section 2.10 shall serve as a member of the Condominium Board for the remainder of the term of the member replaced and until his or her successor shall be selected and qualified at the appropriate annual meeting of the Unit Owners pursuant to the terms of Section 4.9 hereof.

Section 2.11   *Organizational Meeting of the Condominium Board.* The first meeting of the Condominium Board following each annual meeting of the Unit Owners shall be held within ten (10) days of such annual meeting, at such time and place as shall be both fixed informally by a majority of the members of the Condominium Board and designated by the Secretary in a written notice given to all members thereof by personal delivery, mail, or telegram not later than five (5) business days prior to such date. At such meeting, the officers of the Condominium Board shall be elected.

Section 2.12   *Regular Meetings of the Condominium Board.* Regular meetings of the Condominium Board may be held at such time and place as shall be determined from time to time by a majority of the members thereof, provided that at least four (4) such meetings shall be held during each fiscal year. Written notice of all regular meetings of the Condominium Board shall be given by the Secretary to each member thereof by personal delivery, mail or telegram at least five (5) business days prior to the day named for such meeting.

Section 2.13   *Special Meetings of the Condominium Board.* The President may call a special meeting of the Condominium Board whenever he or she deems the same to be necessary or desirable. However, the President shall call such a meeting upon the written request of three (3) or more members of the Condominium Board. Written notice of all special meetings shall be given by the Secretary to each member thereof by personal delivery, mail, or telegram at least three (3) business days prior to the day named for such meeting, which notice shall state the time, place and purpose of the meeting.

Section 2.14   *Waiver of Notice of Meetings.* Any member of the Condominium Board may, at any time, waive notice of any meeting thereof in writing, and such waiver shall be deemed equivalent to the giving of notice. Attendance by a member of the Condominium Board at any meeting, thereof shall constitute a waiver by him or her of notice of the time and place

thereof. If all of the members of the Condominium Board are present at any meeting thereof, no notice of such meeting shall be required and any business may be transacted at such meeting.

Section 2.15 *Quorum of the Condominium Board.* For purposes of all meetings of the Condominium Board, a majority of the members thereof shall constitute a quorum for the transaction of business. In connection therewith, one or more members of the Condominium Board may participate in any meeting thereof by means of a conference telephone or similar communications equipment permitting all individuals participating in the meeting to hear each other at the same time, and such participation shall constitute presence at such a meeting for all purposes. If, at any meeting of the Condominium Board, there shall be less than a quorum present, a majority of the members of the Condominium Board in attendance may adjourn the meeting from time to time. At any such adjourned meeting at which a quorum is present, any business that might have been transacted at the meeting originally called but for the lack of a quorum may be transacted without further notice.

Section 2.16 *Conduct of Meetings.* The President shall preside at all meetings of the Condominium Board, and the Secretary shall faithfully record the minutes thereof, which minutes shall include the full text of all resolutions duly adopted by the Condominium Board and a record of all transactions and proceedings occurring thereat. The then current edition of Robert's Rules of Order, or any other rules of procedure from time to time acceptable to a majority of the Condominium Board, shall govern the conduct of the meetings of the Condominium Board unless the same shall be in conflict with the terms of the Declaration, these By-Laws, or the Condominium Act.

Section 2.17 *Decisions by the Condominium Board.* Except as otherwise provided in the Declaration or these By-Laws, the vote of a majority of the members of the Condominium Board present at a meeting thereof at which a quorum is present shall constitute the decision of the Condominium Board. Alternatively, any decision that is required or permitted to be made by the Condominium Board may be made without a meeting thereof if all of the members of the Condominium Board shall individually or collectively consent in writing to such decision, and all such written consents shall be duly filed by the Secretary of the Condominium in the minutes of the Condominium Board.

Section 2.18 *Compensation of Members.* No member of the Condominium Board shall receive any compensation from the Condominium for acting as such.

Section 2.19 *Common or Interested Members of the Condominium Board.* Each member of the Condominium Board shall perform his or her duties, and shall exercise his or her powers, in good faith and with a view to the interests of the Condominium. To the extent permitted by Law, no contract or other transaction between the Condominium Board and either (i) any of its members or (ii) any corporation, partnership, fiduciary, firm, association, or other entity in which any of the members of the Condominium Board are officers, directors, employees, partners, fiduciaries, beneficiaries, or principals, or are otherwise interested, pecuniarily or otherwise, shall be deemed either void or voidable because either (a) any such

member of the Condominium Board was present at the meeting or meetings of the Condominium Board during which such contract or transaction was discussed, authorized, approved, or ratified, or (b) the vote of any such member was counted for such purpose, provided, however, that either:

    (i)    the fact thereof is disclosed to, or known by, the Condominium Board or a majority of the members thereof and noted in the minutes thereof, and the Condominium Board shall authorize, approve, or ratify such contract or transaction in good faith by a vote of a majority of the entire Condominium Board, less the number of such members; or

    (ii)    the fact thereof is disclosed to, or known by, a Majority of Unit Owners, and a Majority of Unit Owners shall authorize, approve, or ratify such contract or transaction.

Any such member of the Condominium Board may be counted in determining the presence of a quorum of any meeting of the Condominium Board that authorizes, approves, or ratifies any such contract or transaction, but no such member shall be entitled to vote thereat to authorize, approve, or ratify such contract or transaction.

Section 2.20   *Indemnification.*

2.20-1 *Indemnification of Board Members and Officers.*

2.20-1.1   Any person made, or threatened to be made, a party to an action or proceeding (other than one by or in the right of the Condominium to procure a judgment in its favor), whether civil or criminal, including an action by or in the right of the Condominium, which any member of the Condominium Board or an officer of the Condominium served in any capacity at the request of the Condominium, by reason of the fact that he/she, his/her testator or intestate, was a member of the Condominium Board or an officer of the Condominium, shall be indemnified by this Condominium, against judgments, fines, amounts paid in settlement and reasonable expenses, including attorneys' fees actually and necessarily incurred by him or her in defense of such action or as a result of such action or proceeding, or any appeal therein, except that no indemnification shall be made to or on behalf of any member of the Condominium Board or an officer if a judgment or other final adjudication adverse to the member of the Condominium Board or an officer establishes that his or her acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or that he or she personally gained in fact a financial profit or other advantage to which he or she was not legally entitled.

2.20-1.2   The termination of any such civil or criminal action or proceeding by judgment, settlement, conviction or upon a plea of *nolo contendere,* or its equivalent, shall not in itself create a presumption that any such member of the Condominium Board or officer acted in bad faith or were the result of active and deliberate dishonesty and were

material to the cause of action so adjudicated, or that he or she personally gained in fact a financial profit or other advantage to which he or she was not legally entitled.

       2.20-1.3   The Condominium shall indemnify any person made, or threatened to be made, a party to an action by or in the right of the Condominium to procure a judgment in its favor by reason of the fact that he/she, his/her testator or intestate, is or was a member of the Condominium Board or officer of the Condominium, or is or was serving at the request of the Condominium as a member of the Condominium Board or officer against amounts paid in settlement and reasonable expenses, including attorneys' fees, actually and necessarily incurred by him or her in connection with the defense settlement of such action, or in connection with an appeal therein, if such member of the Condominium Board or officer acted, in good faith, for a purpose which he or she reasonably believed to be in the best interest of the Condominium, except that no indemnification shall be made to or on behalf of any member of the Condominium Board or officer if a judgment or other final adjudication adverse to the member of the Condominium Board or officer establishes that his or her acts were committed in bad faith or that his or her acts were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or that he or she personally gained in fact a financial profit or other advantage to which he or she was not legally entitled.

       2.20-1.4   Payment of any amount due an officer or member of the Condominium Board, former officer or member of the Condominium Board or the beneficiaries of a deceased former officer or member of the Condominium Board pursuant to the indemnification created by paragraph 2.20-1.1, 2.20-1.2 or 2.20-1.3 above shall be authorized by:

       (a)    Court order; or

       (b)    By the Condominium Board acting by a quorum consisting of members of the Condominium Board who are not parties to such action or proceeding upon a finding that the member of the Condominium Board or officer has met the standard of conduct established pursuant to paragraph 2.20-1.1, 2.20-1.2 or 2.20-1.3.

       (c)    If a quorum under subparagraph (b) is not obtainable or, even if obtainable, a quorum of disinterested directors so directs; or

       (d)    Where a person who has been successful, on the merits or otherwise, in the defense of a civil or criminal action or proceeding of the character described in Section 722 of the Business Corporation Law as authorized in such Section:

       (i)    By the Condominium Board upon the opinion in writing of independent legal counsel that indemnification is proper in the circumstances because the applicable standard of conduct set forth in paragraph 2.20-1.1, 2.20-1.2 or 2.20-1.3 above has been met by such member of the Condominium Board or officer; or

(ii)    By the Unit Owners of the Condominium upon a finding that the member of the Condominium Board or officer has met the applicable standard of conduct set forth in paragraph 2.20-1.1, 2.20-1.2 or 2.20-1.3.

2.20-1.5    Expenses incurred in defending a civil or criminal action or proceeding may be paid by the Condominium in advance of the final disposition of such action or proceeding upon receipt of an undertaking by or on behalf of such member or officer to repay such amount if the person receiving such advancement or allowance is ultimately found, under the procedure set forth in this Section, not to be entitled to indemnification or, where indemnification is granted, to the extent the expenses so advanced by the Condominium or allowed by the court exceed the indemnification to which he or she is entitled.

2.20-1.6    No indemnification, advancement, or allowance shall be made under this Section in any circumstances where it appears that if there has been a settlement approved by the court, that the indemnification would be inconsistent with any condition with respect to indemnification expressly imposed by the court in approving the settlement.

2.20-1.7    If any expenses or other amounts are paid by way of indemnification, otherwise than by court order or action by the Unit Owners, the Condominium shall, not later than the next annual meeting of Unit Owners, unless such meeting is held within three months from the date of such payment, and, in any event, within fifteen (15) months from the date of such payment, mail to its Unit Owners of record at the time entitled to vote for the election of members of the Condominium Board a statement specifying the person(s) paid, the amount(s) paid, and the nature and status at the time of such payment of the litigation or threatened litigation.

2.20-2  *Insurance for Indemnification of Board Members and Officers.*

2.20-2.1    Subject to paragraph 2.20-2.2 below, the Condominium Board shall have power to purchase and maintain insurance:

(a)    To indemnify the Condominium for any obligation which it incurs as a result of the indemnification of members and officers under the provisions of this Article 2, Section 2.20; and

(b)    To indemnify the members and officers in instances in which they may be indemnified by the Condominium under the provisions of this Article 2, Section 2.20; and

(c)    To indemnify the members and officers in instances in which they may not otherwise be indemnified by the Condominium under the provisions of this Article 2, Section 2.20, provided the contract of insurance covering such members and officers provides, in a manner acceptable to the superintendent of insurance, for a retention amount and for co-insurance.

2.20-2.2    No insurance under paragraph 2.20-2.1 above may provide for any payment, other than cost of defense, to or on behalf of any member or officer:

(a)    If a judgment or other final adjudication adverse to the insured member or officer establishes that his or her acts of active and deliberate dishonesty were material to the cause of action so adjudicated, or that he or she personally gained in fact a financial profit or other advantage to which he or she was not legally entitled, or

(b)    In relation to any risk, the insurance of which is prohibited under the Insurance Law of the State of New York.

2.20-2.3    Insurance under any and all subparagraphs of paragraph 2.20-2.1 may be included in a single contract or supplement thereto. Retrospective rated contracts are prohibited.

2.20-3 Nothing contained in this Section 2.20 shall limit any right to indemnification to which any member or any officer may be entitled by contract or under any law now or hereinafter enacted.

## ARTICLE 3

## OFFICERS

Section 3.1    *General.* The principal officers of the Condominium shall be the, President, the Vice President, the Secretary and the Treasurer. The Condominium Board may appoint an Assistant Treasurer, an Assistant Secretary and such other officers as in its discretion may be necessary or desirable. So long as Sponsor owns any Unsold Unit, Sponsor shall have the right to appoint one Assistant Secretary authorized to execute and deliver, in connection with the Unsold Units, estoppel certificates and any other document or instrument required to be delivered by the Condominium Board to Sponsor pursuant to the provisions of the Declaration and the By-Laws. All agreements, contracts, deeds, leases, checks and other instruments of the Condominium shall be executed, upon the direction of the Condominium Board, by any two officers of the Condominium or by such lesser number of officers or by such other Person or Persons as may be designated from time to time by the Condominium Board.

Section 3.2    *President.* The President shall be the chief executive officer of the Condominium and shall preside at all meetings of the Unit Owners and of the Condominium Board. The President shall have all of the general powers and duties that are incident to the office of president of a stock corporation organized under the Business Corporation Law of the State of New York (hereinafter referred to as the "BCL"), including, but not limited to, the power to appoint the members of all committees created by the Condominium Board from amongst the Unit Owners from time to time as he or she may decide, in his or her discretion, are appropriate to assist in the conduct of the affairs of the Condominium.

Section 3.3    *Vice President.* The Vice President shall take the place of the President and perform his or her duties whenever the President shall be absent or unable to act. If both the President and the Vice President are unable to act, the Condominium Board shall appoint some other member of the Condominium Board to act in the place of the President on an interim basis. The Vice President shall also perform such other duties as shall be imposed upon him or her from time to time by the Condominium Board or by the President.

Section 3.4    *Secretary.* The Secretary shall keep the minutes of all meetings of the Unit Owners and of the Condominium Board. The Secretary shall have charge of such books and papers as the Condominium Board shall direct and, in general, shall perform all of the duties that are incident to the office of secretary of a stock corporation organized under the BCL.

Section 3.5    *Treasurer.* The Treasurer shall have the care and custody of the funds and securities of the Condominium and shall be responsible for keeping full and accurate financial records and books of account thereof, showing all receipts and disbursements necessary for the preparation of all required financial data. The Treasurer shall be responsible for the deposit of all funds and other securities in the name of the Condominium Board or in the name of the Managing Agent in such depositories as may from time to time be designated by the Condominium Board and, in general, shall perform all of the duties incident to the office of treasurer of a stock corporation organized under the BCL.

Section 3.6    *Election, Term of Office and Qualification of Officers.* Each of the officers of the Condominium shall be elected annually by a majority vote of the Condominium Board taken at the organizational meeting of each new Condominium Board, and shall serve at the pleasure of the Condominium Board. The President, Vice President, and the Treasurer shall be elected from amongst the members of the Condominium Board. Such officers need not be Unit Owners and need not have any interest in the Condominium if they are designated by Sponsor. Such officers must be Unit Owners if they are elected by the other Unit Owners. The other officers of the Condominium Board need not be Unit Owners and need not have any interest in the Condominium.

Section 3.7    *Removal and Resignation of Officers.* Any officer of the Condominium Board may be removed from office, with or without cause, by an affirmative vote of a majority of the members of the Condominium Board. In addition, any officer may resign at any time by giving written notice to the Condominium Board. Finally, if the President, Vice President, or the Treasurer of the Condominium shall cease to be or shall be suspended as a member of the Condominium Board during his or her term of office, such officer shall be deemed to have resigned his or her office effective upon the date upon which his or her membership shall cease.

Section 3.8    *Vacancies.* Any vacancy in an office shall be filled by a majority vote of the Condominium Board at any regular meeting of the Condominium Board or at a special meeting thereof called for such purpose.

Section 3.9     *Compensation* of *Officers.* No officer of the Condominium shall receive any compensation from the Condominium for acting as such.

Section 3.10   *Indemnification of Officers.* Each officer shall be indemnified as set forth in Paragraph 2.20.

## ARTICLE 4

## UNIT OWNERS

Section 4.1     *Annual Meetings of the Unit Owners.* The first annual meeting of the Unit Owners shall be held approximately thirty (30) days before or after the first anniversary of the First Closing, at which meeting a member Condominium Board shall be elected, as provided both in this Article 4 and in Article 2 hereof. Thereafter, annual meetings of the Unit Owners shall be held on or about the anniversary date of the first annual meeting. At each such subsequent meeting, the Unit Owners (including Sponsor) shall elect successors to the members of the Condominium Board whose term of office expires on the day of such meeting and shall transact such other business as may properly come before such meeting.

Section 4.2     *Special Meetings of the Unit Owners.* The President shall call a special meeting of the Unit Owners whenever so directed by a duly adopted resolution of the Condominium Board or upon receipt by the Secretary of a petition calling for such a meeting signed by Unit Owners having, in the aggregate, not less than fifty (50%) percent of the Common Interests of all Unit Owners. Each such resolution or petition shall set forth, in reasonable detail, the purposes for calling such a meeting, and no business shall be transacted at such special meeting except business reasonably related to such stated purposes.

Section 4.3     *Place of Meetings.* Meetings of the Unit Owners shall be held at the principal office of the Condominium or at such other suitable and convenient place as may be designated by the Condominium Board.

Section 4.4     *Notice of Meetings.*

(A)     The Secretary of the Condominium shall give notice of each annual or special meeting of the Unit Owners to all Unit Owners then of record entitled to vote at such meeting, which notice shall set forth the purpose, time and place of such meeting. Such notice may be given to any Unit Owner by personal delivery, mail, or telegram addressed to his or her address at the Property, not less than ten (10) nor more than thirty (30) days prior to the day fixed for the meeting. Any Unit Owner may designate an address for the giving of notice other than such Unit Owner's address at the Property by giving written notice thereof to the Secretary of the Condominium not less than ten (10) days prior to the giving of notice of the applicable meeting.

(B)     If the business to be conducted at any meeting of the Unit Owners shall include the consideration of a proposed amendment to the Declaration or to these By-Laws, the notice of

such meeting shall be mailed to all Unit Owners at least thirty (30) days prior to the day fixed for such meeting and shall be accompanied by a copy of the text of such proposed amendment.

Section 4.5    *Quorum of the Unit Owners.* Except as otherwise provided in these By-Laws, the presence, in person or by proxy, of Unit Owners owning Units to which fifty (50%) percent or more of the aggregate Common Interests appertain shall constitute a quorum at all meetings of the Unit Owners. The Common Interests appurtenant to any Unit owned by the Condominium Board or any designee thereof shall not be counted in determining a quorum. If, at any meeting of the Unit Owners, there shall be less than a quorum present, a majority of the Unit Owners present at such meeting, either in person or by proxy, may adjourn the meeting to a time not less than forty-eight (48) hours from the time fixed for the original meeting.

Section 4.6    *Conduct of Meetings.* The President shall preside at all meetings of the Unit Owners, and the Secretary shall faithfully record the minutes thereof, which minutes shall include the full text of all resolutions duly adopted by the Unit Owners and a record of all transactions and proceedings occurring thereat. The then current edition of Robert's Rules of Order, or any other rules of procedure acceptable to a majority of the Unit Owners present at any meeting, in person or by proxy, shall govern the conduct of the meetings of the Unit Owners, unless the same shall be in conflict with the terms of the Declaration, these By-Laws, or the Condominium Act. All votes of the Unit Owners shall be tallied by the persons appointed by the presiding, officer of the meeting.

Section 4.7    *Order of Business.* The order of business at all meetings of the Unit Owners shall be as follows:

(i)     Roll call;

(ii)    Proof of notice of meeting;

(iii)   Reading of the minutes of the preceding meeting (unless waived);

(iv)    Reports of officers of the Condominium;

(v)     Reports of members of the Condominium Board;

(vi)    Reports of committees;

(vii)   Election of inspectors of election (when so required);

(viii)  Election of members of the Condominium Board (when so required);

(ix)    Unfinished business; and

(x)     New business.

The order of business at meetings of Unit Owners can be adjusted in the sole discretion of the Condominium Board.

Section 4.8 *Voting.*

(A)     Subject to the terms of Section 4.9 hereof, each Unit Owner (including Sponsor for so long as Sponsor shall own Unsold Units) shall be entitled to cast one (1) vote at all meetings of the Unit Owners for each .0001% percentage of Common Interest attributable to such Unit Owner's Unit(s).

(B)     Notwithstanding the terms contained in paragraph (A) hereof, no Unit Owner may vote at any meeting of the Unit Owners if the Condominium Board has perfected a lien against such Unit Owner's Unit and the amount necessary to release such lien has not been paid at the time of such meeting. In addition, neither the Condominium Board nor any designee thereof shall be entitled to vote the Common Interest appurtenant to any Unit owned by the Condominium Board or such designee. The Common Interests of all Units whose owners are precluded from voting pursuant to the terms of this paragraph (B) will be excluded when computing the aggregate Common Interests of all Unit Owners for voting purposes.

(C)     A fiduciary shall be the voting member with respect to a Unit owned in a fiduciary capacity. In addition, if two (2) or more Persons own a Unit, they shall designate one (1) Person amongst them to vote the Common Interest appurtenant to their Unit in a writing given to the Secretary of the Condominium, and the vote of such designee shall be binding upon all of such Persons. Failing such a designation, all of such Persons shall mutually vote such Common Interest under one (1) ballot without division, and the concurrence of all such Persons shall be conclusively presumed if any one of them purports to vote such Common Interest without protest being contemporaneously made to the individual presiding over the meeting at which such vote is taken. If protest is made, the Common Interest appurtenant to such Unit shall be counted solely for the purpose of determining whether a quorum is present for such voting.

(D)     The owner(s) of any Unit may designate any Person to act as a proxy on his or her behalf. The designation of any such proxy shall be made in a written notice both signed and dated by the designator and delivered to the Secretary of the Condominium at or before the appointed time for the meeting(s) during which the same is to be effective. Any such designation shall be revocable at any time upon written notice given to the Secretary of the Condominium; however no revocation of such designation shall be effective with respect to any votes cast by such proxy prior to the receipt of such revocation notice by the Secretary of the Condominium or, if such revocation is made at a meeting of the Unit Owners during which the Secretary of the Condominium is not in attendance, by the individual acting as the secretary of such meeting, except with respect to the designation of a Permitted Mortgagee to act as the proxy of its mortgagor(s), no designation to act as a proxy shall be effective for a period in excess of six (6) months after the date thereof.

Section 4.9     *Election of Members to the Condominium Board.*

(A)     When voting for members of the Condominium Board, each Unit Owner (including Sponsor for so long as Sponsor shall own a Unit) shall be entitled to cast one (1) vote for each .0001% of Common Interest attributable to his or her Unit(s) per member to be elected. However, nothing contained herein shall be deemed either to permit any Unit Owner to cumulate the votes attributable to the ownership of a Unit in favor of any one (1) or more members to be elected. In addition, the terms of paragraphs (B), (C) and (D) of Section 4.8 hereof shall apply to all elections of members of the Condominium Board.

(B)     All elections of members of the Condominium Board shall be by written ballot, and each ballot cast shall state: (i) the name of the voting Unit Owner and, if such ballot is cast by proxy, the name of the proxy; (ii) the designation number(s) of the Unit(s) owned by the voting Unit Owner; (iii) the percentage(s) of the Common Interest appurtenant to such Unit(s); and (iv) the names of the candidates for whom such ballot is cast (the number of which names shall not exceed the number of members to be elected). Any ballot that is not cast in conformity with this paragraph (B) shall not be counted. All election ballots shall be retained in the records of the Condominium, appropriately segregated by election for a period of two (2) years.

(C)     Subject to the terms of paragraph (D) of this Section 4.9, all elections of members of the Condominium Board shall be determined by plurality vote of Unit Owners present, in person or by proxy, at a duly convened meeting.

(D)     At meetings of the Unit Owners, Sponsor will have the right to vote all of the Common Interests attributable to the Units owned by Sponsor as it sees fit.  However, at elections of members to the Condominium Board held during the Initial Control Period, Sponsor will have the right to designate three (3) of the five (5) Members to the Condominium Board, and Sponsor, and all other Unit Owners shall have the right to vote for the remaining Members of the Condominium Board.

Subsequent to the Initial Control Period, and for so long as Sponsor continues to own at least one (1) Unsold Unit, Sponsor shall have the right to designate one (1) Member to the Condominium Board, and shall have the right to vote its Common Interest attributable to the Unsold Units for the remaining Members of the Condominium Board. There is no restriction on the right of the Unsold Unit Owners (including Sponsor) to vote for members of the Condominium Board who are not related to or affiliated with Sponsor or other Unsold Unit Owners.

(E)     Within thirty (30) days after the Initial Control Period, two (2) of the three (3) members of the Condominium Board who were designated by Sponsor shall resign and their replacements shall be filled by a Majority vote of the remaining Members of the Condominium Board (excluding Members designated by Sponsor) at any regular meeting of the Condominium Board or at a special meeting thereof called for such purpose.

Section 4.10   [Intentionally omitted]

Section 4.11   *Action Without a Meeting.* Any action required or permitted to be taken by the Unit Owners at a duly constituted meeting may be taken without such a meeting if the number of Unit Owners sufficient (both in absolute number and in aggregate Common Interests whenever applicable) to approve such an action at a duly constituted meeting of the Unit Owners pursuant to the Declaration or to these By-Laws consent in writing to the adoption of a resolution approving such action. All written consents given by Unit Owners pursuant to this Section 4.11 shall be retained in the records of the Condominium together with a true copy of the resolutions to which they relate.

Section 4.12   *Title to Units.* Title to any Unit may be taken by any Person or by any two (2) or more Persons as joint tenants, tenants in common, or tenants by the entirety, as may be appropriate. The sale of a Unit to a corporation, partnership, limited partnership, trust or any other entity shall require the delivery to the Condominium Board or its managing agent of such documents as reasonably requested by the Condominium Board, including, without limitation, a subjection to jurisdiction and designation of agent, occupancy agreement and guaranty of payment.

Section 4.13   *Contractual Liability* of *Unit Owners.* Every contract made by the Condominium Board, by any officer of the Condominium, or the Managing Agent of the Building, or any other Person authorized to act as agent for the Condominium Board, shall state (if obtainable and in addition to the limitation of liability of the members of the Condominium Board and the officers of the Condominium pursuant to the terms of Sections 2.20 and 3.10 hereof, respectively) that the liability of any Unit Owner with respect thereto shall be limited to: (i) such proportionate share of the total liability thereunder as the Common Interest of such Unit Owner bears to the aggregate Common Interests of all Unit Owners in the case of a contract relating to the General Common Elements, and (ii) such Unit Owner's interest in his or her Unit and its Appurtenant Interests, unless otherwise provided by Law.

## ARTICLE 5

## OPERATION OF THE PROPERTY

Section 5.1   *Maintenance and Repairs.*

(A)   Except as otherwise provided in the Declaration or in these By-Laws, all painting, decorating, maintenance, repairs and replacements, whether structural or non-structural, ordinary or extraordinary:

      (i)   in or to any Unit and all portions thereof (including, but not limited to, the interior walls, partitions, ceilings and floors in the Unit, kitchen and bathroom fixtures and appliances, window panes, all entrance doors and their frames and saddles, exposed plumbing, gas and heating fixtures and

equipment, air conditioning units, lighting and electrical fixtures and any Common Elements incorporated therein pursuant to paragraph (B) of Section 5.8 hereof, but excluding any other Common Elements contained therein) shall be performed by the Owner of such Unit at such Unit Owner's sole cost and expense;

(ii)     in or to the General Common Elements (other than any General Common Elements incorporated into one (1) or more Units pursuant to the terms of paragraph (B) of Section 5.8 hereof) shall be performed by the Condominium Board as a General Common Expense;

(iii)    in or to the exterior of the Roof Terrace Units which are not caused by the acts or omissions of the Roof Terrace Unit Owner, or such Owner's permitted occupants, agents or invitees, shall be performed by the Condominium Board as a Roof Terrace Common Expense and charged to all Roof Terrace Unit Owners; provided, however, that the costs and expenses of any structural or extraordinary maintenance, repairs or replacements caused by the acts or omissions of the Roof Terrace Unit Owner, or such Owner's permitted occupants, agents or invitees, shall be performed by the Condominium Board and charged to and payable by such Roof Terrace Unit Owner;

(iv)    in or to the Parking Space Units which are not caused by the acts or omissions of the Parking Space Unit Owner, or such Owner's permitted occupants, agents or invitees, shall be performed by the Condominium Board as a Parking Space Common Expense and charged to all parking Space Unit Owners; provided, however, that the costs and expenses of any structural or extraordinary maintenance, repairs or replacements caused by the acts or omission of the Parking Space Unit Owner, or such Owner's permitted occupants, agents or invitees, shall be performed by the Condominium Board and charged to and payable by such Parking Space Unit Owner.  Normal cleaning of the Parking Space Units (e.g., sweeping, plowing) shall be performed by the Condominium Board as a General Common Expense; and

(v)     in or to the Limited Residential Common Elements (other than any Limited Residential Common Elements incorporated into one (1) or more Units) shall be performed (a) by the Condominium Board as a Residential Common Expense, if involving structural or extraordinary maintenance, repairs, or replacements (including, but not limited to, the repair of any leaks that are not caused by the acts or omissions of the Residential Unit Owner having direct and exclusive access thereto); provided, however, that the costs and expenses of any structural or extraordinary maintenance, repairs or replacements caused by the acts or omissions of the Residential

Unit Owner having direct and exclusive access thereto, or such Owner's permitted occupants, agents or invitees, shall be performed by the Condominium Board and charged to and payable by such Residential Unit Owner, or (b) by the Residential Unit Owner having direct and exclusive access thereto at such Residential Unit Owner's sole cost and expense, if involving non-structural ordinary maintenance, repairs or replacements.

Promptly upon obtaining knowledge thereof, each Unit Owner shall report to the Condominium Board or to the Managing Agent any defect or need for repairs for which the Condominium Board is responsible pursuant to the terms hereof. All painting, decorating, maintenance, repairs and replacements performed hereunder or otherwise, whether by or at the behest of a Unit Owner or the Condominium Board, shall be performed in such a manner as shall not unreasonably disturb or interfere with any Unit Owners or the tenants and occupants of any Units.

(B)   Notwithstanding anything to the contrary provided in paragraph (A) of this Section 5.1, if any painting, decorating, maintenance, repairs, or replacements to the Property or any part thereof, whether structural or non-structural, ordinary or extraordinary, is necessitated by the negligence, misuse, or abuse of (i) any Unit Owner, the entire cost and expense thereof shall be borne by such Unit Owner, or (ii) the Condominium Board, the entire cost and expense thereof shall be borne by the Condominium as a General Common Expense attributable to all Unit Owners if relating to the General Common Elements, as a Residential Common Expense attributable to all Residential Unit Owners if relating to the Residential Common Elements and/or the Limited Residential Common Elements, as a Roof Terrace Common Expense attributable to all Roof Terrace Unit Owners if relating to the Roof Terrace Units, and as a Parking Space Common Expense attributable to all Parking Space Unit Owners if relating to the Parking Space Units, except, in all events, to the extent that such cost and expense is covered by the proceeds of any insurance maintained pursuant to the terms of these By-Laws. Similarly, each Unit Owner shall be responsible for any and all damage to any Unit or to the Common Elements resulting from such Unit Owner's failure to maintain, repair, or replace his or her Unit or any portion thereof as required herein.

(C)   Each Unit and all portions of the Common Elements shall be kept in first-class condition, order and repair (and free of snow, ice and accumulation of water with respect to any roof, Terrace, or other part of the Property exposed to the elements) by the Unit Owner or the Condominium Board, whichever is responsible for the maintenance thereof as set forth herein, and such Unit Owner or the Condominium Board, as the case may be, shall promptly make or perform, or cause to be made or performed, all maintenance work (including, without limitation, painting, repairs and replacements) that is necessary in connection therewith. In addition, the public areas of the Building and those residential areas exposed to public view shall be kept in good appearance, in conformity with the dignity and character of the Building, by (i) the Condominium Board, with respect to such parts of the Building required to be maintained by it, and (ii) each Unit Owner, with respect to the interior surfaces of windows and shades, venetian or other blinds, drapes, curtains or other window decorations in or appurtenant to his or her Unit. To promote a consistent appearance of the Building from the outside, no Unit Owner shall be

allowed to enclose, erect a greenhouse and/or alter the Terrace appurtenant to a Unit in such a way that will after the conformity of the Building, without the prior written consent of the Condominium Board.

(D)     In the event that any Unit Owner, after receipt of written notice from the Condominium Board, fails or neglects in any way to perform any of its obligations with respect to the painting, decorating, maintenance, repair or replacement of its Unit as provided in this Section 5.1 or of any Common Elements for which such Unit Owner is responsible under the Declaration or these By-Laws, the Condominium Board may perform or cause to be performed such painting, decorating, maintenance, repair or replacement unless such Unit Owner, within five (5) days after receiving notice of such default by the Condominium Board, cures such default, or in the case of a default not reasonably susceptible to cure within such period, commences and thereafter prosecutes to completion, with due diligence, the curing of such default. All sums expended and all costs and expenses incurred in connection with the making, of any such painting, decorating, maintenance, repair or replacement in such Unit Owner's Unit or to any such Common Element for which such Unit Owner is responsible, together with interest thereon at the rate of two (2%) percent per month (but in no event in excess of the maximum rate permitted by Law), shall be immediately payable by such Unit Owner to the Condominium Board and shall, for all purposes hereunder, constitute Common Charges payable by such Unit Owner.

Section 5.2     *Alterations, Additions, Improvements, or Repairs in and to Units.*

(A)     Subject to the terms of paragraph (B) of this Section 5.2, no Unit Owner may make any structural alteration, addition, improvement or repair, in or to his or her Unit or its appurtenant Limited Residential Common Elements without the prior written approval of the Condominium Board. For purposes of the Declaration and these By-Laws, the term "structural" when applied to any work performed in or to a Unit or the Property shall mean and refer to any work affecting the foundations, columns, girders, beams, supports, concrete slabs and other such structural members of the Building, those portions of the exterior walls of the Building lying beyond the interior face of the brickwork, and all Building systems, including without limitation, the mechanical, electrical, water supply and return (sewer), gas supply and heating systems. In the event, however, that the Condominium Board shall fail to answer any written, reasonably detailed request for such approval within thirty (30) days after such request is received, such failure to respond shall constitute the Condominium Board's consent thereto. A reasonably detailed request for approval shall include plans and specifications and such other information as the Condominium Board may reasonably require. Prior to, and as a condition of, the granting of any such approval, the Condominium Board may, at its sole option, require the Unit Owner to procure and agree to maintain during the course of such work such insurance as the Condominium Board may reasonably prescribe and to execute an agreement, in form and substance satisfactory to the Condominium Board, setting forth the terms and conditions under which such alteration, addition, or improvement, may be made, including, without limitation, the indemnity referred to in paragraph (D) hereof and the days and hours during which any such work may be done. The Condominium Board may impose charges upon the Unit Owner, as a Common Expense, to reimburse the Condominium for architectural, engineering, legal and other

fees incurred in reviewing the Unit Owner's request for approval and in monitoring the work performed until completion.

(B)     Notwithstanding anything to the contrary contained in paragraph (A) of this Section 5.2, however, Sponsor shall have the right, pursuant to the terms of Article 12 of the Declaration, to (i) make any alterations, additions, improvements, or repairs in or to any Unsold Unit or its appurtenant Limited Residential Common Elements, if any, whether structural or non-structural, interior or exterior, ordinary or extraordinary, and (ii) subdivide, combine and change the boundary walls of Unsold Units, all without the approval of the Condominium Board.

(C)     All alterations, additions, improvements and repairs by Unit Owners shall be made in compliance with Law. In connection therewith, the Condominium Board shall, at the Unit Owner's expense, execute applications to any departments of the City of New York, or to any-other governmental agencies having jurisdiction thereof, for any and all permits required in connection with the making of alterations, additions, improvements, or repairs in or to a Unit provided that, with respect to all such work of a structural nature to a Unit or its appurtenant Limited Residential Common Elements, if any (but other than that of the nature described in paragraph (B) hereof), the same was approved by the Condominium Board pursuant to the terms of paragraph (A) hereof. Notwithstanding anything to the contrary contained in this paragraph (C), Sponsor shall not be liable for and shall not be obligated to pay or reimburse the Condominium for any fees or expenses in connection with any applications by the Condominium for any permits in connection with the making of alterations, additions, improvements or repairs to an Unsold Unit.

(D)     Neither the Condominium Board nor any Unit Owner (other than the Unit Owner(s) making any alterations, improvements, additions, or repairs, or causing any of the same to be made, in or to his, her, or their Unit(s) and appurtenant Limited Residential Common Elements) shall incur any liability, cost, or expense either (i) in connection with the preparation, execution, or submission of the applications referred to in paragraph (C) hereof, (ii) to any contractor, subcontractor, materialman, architect, or engineer on account of any alterations, improvements, additions, or repairs made or caused to be made by any Unit Owner; or (iii) to any Person asserting any claim for personal injury or property damage arising therefrom. Any Unit Owner(s) (other than Sponsor with respect to Unsold Units) making any alterations, improvements, additions, or repairs, or causing any of the same to be made, in or to his, her or their Unit(s) and appurtenant Limited Residential Common Elements, shall agree (in a writing executed and delivered to the Condominium Board, if the Condominium Board shall so request), and shall be deemed to agree (in the absence of such writing) to indemnify and hold the Condominium Board, the members of the Condominium Board, the officers of the Condominium, the Managing Agent and all other Unit Owners harmless from and against any such liability, cost and expense. Notwithstanding anything to the contrary contained in this paragraph (D) or elsewhere in these By-Laws, Sponsor shall not be liable for and shall not indemnify or be obligated to pay or reimburse the Condominium for any costs or expenses in connection with subparagraphs (i) (ii) and (iii) contained in this paragraph (D).  No approval or deemed approval by the Condominium Board of a Unit Owner's structural alteration, addition, improvement or repair in accordance with these By-Laws shall be construed as being, or relied

upon by any Person as, a determination that the work or the plans and specifications therefore (or any modifications thereto) comply with any Law or the requirements of any insurer insuring the Condominium.

(E)   In addition to the requirements set forth above in this Section 5.2, until a permanent certificate of occupancy is obtained for the Building, no Unit Owner shall make any alterations in or to its Unit without first notifying Sponsor in writing and complying with Sponsor's reasonable requirements with respect to the alterations. Such requirements may include, but need not be limited to, the requirements that:

(i)    such work not include any change that would result in a delay in obtaining a temporary or permanent certificate of occupancy for the Building, or any amendment to, or extension of, the certificate of occupancy if theretofore issued;

(ii)   the Unit Owner post a bond or other similar security that is reasonably acceptable to Sponsor in any amount sufficient (in Sponsor's reasonable judgment) to insure the diligent completion of the work and the filing of any required notices or certificates with respect to such work and the completion of the work with all governmental authorities having jurisdiction;

(iii)  such work not be commenced until the Unit Owner causes all required plans, specifications, notices and/or certifications to be filed with all governmental authorities having jurisdiction, procures all required permits and licenses with respect to the same, and delivers copies of all such plans, specifications, notices, certifications, permits and licenses to Sponsor;

(iv)   such work be diligently prosecuted to completion in compliance with all plans, specifications, notices and/or certifications and in conformity with all permits and licenses;

(v)    Sponsor and its representatives shall be given reasonable opportunity, from time to time, to inspect such work as it progresses;

(vi)   promptly after the completion of such work, all necessary inspections and approvals of the work shall be obtained, all necessary notices and/or certifications shall be filed with the appropriate governmental authorities and Sponsor shall be given a copy of all such inspections, approvals, notices and certifications;

(vii)  the Unit Owner shall indemnify and hold Sponsor harmless from any cost, expense, claim, or liability arising, directly or indirectly, from such work, including, without limitation, any cost, expense, claim, or liability incurred

or suffered by Sponsor due to any violation of Law or due to any delay in obtaining a temporary or permanent certificate of occupancy for the Building (or any amendment to, or extension of, the certificate of occupancy if theretofore issued) as a result of such work or the failure to make all appropriate governmental filings in connection with same; and

(viii)   all contractors shall be duly licensed to the extent required by applicable Law and, if required under any contract with any union whose members are performing services at the Building (including, without limitation, services directly or indirectly at the behest, for the benefit, or for the account of Sponsor, any other Unit Owner, or the Condominium Board), such work shall be performed solely by union members.

If any Unit Owner commences any such alterations in violation of the foregoing terms and conditions, or fails to comply with the reasonable requirements of Sponsor in connection with the alterations, Sponsor shall be entitled to cause such work by the Unit Owner to be halted, including, without limitation, to cause the Managing Agent to deny access to the Building to the Unit Owner's workers and suppliers, until the Unit Owner complies with the same. During the period until such Unit Owner is permitted hereunder to resume its work, Sponsor shall have the right to perform any and all work in and to such Unit Owner's Unit as shall be necessary, in Sponsor's sole judgment, in order to avoid any delay in obtaining a temporary or permanent certificate of occupancy for the Building (or any amendment to, or extension of, the certificate of occupancy if theretofore issued), whether or not such work shall be in compliance with the plans and specifications for the work theretofore performed by, or on behalf of, such Unit Owner. The cost and expense of any such work performed by Sponsor shall be borne by such Unit Owner and shall be paid to Sponsor within fifteen (15) days of Sponsor's written demand therefor.

Section 5.3   *Alterations, Additions, or Improvements to the Common Elements.* Except as otherwise provided in the Declaration or in these By-Laws, all necessary or desirable alterations, additions, or improvements in or to any of the Common Elements shall be made by the Condominium Board, and the cost and expense thereof shall constitute a General Common Expense attributable to all Unit Owners, if relating to the General Common Elements, or a Residential Common Expense attributable to all Residential Unit Owners, if relating to the Limited Residential Common Elements, or a Roof Terrace Common Expense attributable to all Roof Terrace Unit Owners, if relating to the Roof Terrace Units, or a Parking Space Common Expense attributable to all Parking Space Unit Owners, if relating to the Parking Space Units. Notwithstanding the foregoing, however, whenever the cost and expense of such alterations, additions, or improvements would, in the judgment of the Condominium Board, exceed Seven Hundred Fifty Thousand ($750,000) Dollars with respect to the General Common Elements, the Limited Residential Common Elements, the Roof Terrace Units or the Parking Space Units at any one time, in any fiscal year, such proposed alterations, additions or improvements shall not be made unless first approved by the Unit Owners if relating to the General Common Elements, or the Residential Unit Owners, if relating to the Limited Residential Common Elements, or the Roof Terrace Unit Owners if relating to the Roof Terrace Units or the Parking Space Unit

Owners if relating to the Parking Space Units (including Sponsor if Sponsor then owns any Unsold Unit) owning sixty-six and two-thirds (66-2/3%) percent of the aggregate Common Interests, Residential Common Interests, Roof Terrace Common Interest or Parking Space Common Interest, as applicable, at a duly constituted meeting of the Unit Owners or the Residential Unit Owners, the Roof Terrace Unit Owners or the Parking Space Unit Owners, as applicable, and by the Mortgage Representatives, if any. Except as otherwise provided in the Declaration and in these By-Laws, all such alterations, additions, or improvements costing Seven Hundred Fifty Thousand ($750,000) Dollars or less, in any fiscal year may be made as aforesaid without the approval of either the Unit Owners or any Mortgage Representatives. Notwithstanding the foregoing, no additions, alterations, or improvements shall be made to any of the Common Elements, regardless of the cost thereof, unless the prior written consent of Sponsor (so long as Sponsor shall own at least one (1) Unsold Unit) is first obtained. In no event will the limitations imposed in the preceding sentence continue for more than five (5) years from the First Closing. Sponsor will not withhold consent to any addition, alteration or improvement to the Common Elements, if such addition, alteration or improvement is required to comply with Law, or to remedy any notice of violation or to remedy any work order by an insurer.

Section 5.4   *Insurance.*

(A)   If the same shall be obtainable, the Condominium Board shall obtain, and shall maintain in full force and effect, special multi-peril insurance policies including fire with extended "all risk" coverage, replacement cost coverage and agreed valuation, vandalism and malicious mischief endorsements, insuring the entire Building (including each Unit and the bathroom and kitchen fixtures installed therein on the date of recording the Declaration and all service machinery contained therein, but not including appliances, fixtures, improvements or any furniture, furnishings, decorations, belongings, or other personal property supplied or installed by Unit Owners or the tenants of Unit Owners) and covering the interests of the Condominium, the Condominium Board, all of the Unit Owners and all Permitted Mortgagees, as their interest may appear. Each of the said policies shall contain:

(i)   waivers of (a) subrogation, (b) any defense based upon co-insurance or other insurance, (c) invalidity arising out of any acts of the insured and (d) pro-rata reduction of liability;

(ii)   a provision that any adjustment of loss will be made by the Condominium Board and that all proceeds thereof shall be paid to either the Condominium Board or the Insurance Trustee, as provided in Section 5.5 hereof.

(iii)   a New York standard mortgagee clause in favor of each Permitted Mortgagee, which shall provide that the proceeds thereof shall be paid to such Permitted Mortgagee as its interest may appear, subject, however, to the loss payment provisions in favor of the Condominium Board and the

Insurance Trustee set forth in subparagraph (ii) above and in Section 5.5 hereof; and

(iv)    a provision that such policy may not be either canceled or substantially modified except upon at least ten (10) days' prior written notice to the Condominium Board and all insureds who may have requested such notice, including Permitted Mortgagees.

Duplicate originals or certificates of insurance of all such policies and of all renewals thereof, together with proof of payment of premiums, shall be on file at the office of the Managing Agent. Copies thereof shall be delivered to any Unit Owner or Permitted Mortgagee on written request thereof.

(B)    The Condominium Board shall also obtain and maintain, to the extent practicable:

(i)    comprehensive general liability insurance, covering all claims for personal injury or property damage arising out of any occurrence on the Property and listing as co-insureds (a) the Condominium Board and each member thereof, (b) the Managing Agent or manager (if any), (c) each officer and employee of the Condominium and (d) each Unit Owner (except, however, that such insurance shall not cover any liability of a Unit Owner arising from occurrences within his or her own Unit or its Limited Residential Common Elements, if any);

(ii)    rent insurance;

(iii)    worker's compensation and New York State disability benefits insurance;

(iv)    boiler and machinery insurance;

(v)    water damage legal liability insurance;

(vi)    officers and directors liability insurance;

(vii)    fidelity bonds;

(viii)    commercial umbrella insurance; and

(ix)    such other insurance as the Condominium Board shall from time to time determine.

Each of the aforementioned policies of insurance shall also cover cross-liability claims of one insured against another.

(C)    All policies of insurance to be maintained by the Condominium Board shall contain such limits as the Condominium Board shall from time to time determine, provided, however, that:

       (i)    with respect to insurance policies maintained by the Condominium Board pursuant to paragraph (A) hereof, the coverage shall be in an amount equal to not less than eighty (80%) percent of the full replacement cost of the Building, exclusive of footings and foundations, without deduction for depreciation, as approved by a fire insurance company, a qualified insurance broker, or another qualified source;

       (ii)    with respect to insurance policies maintained by the Condominium Board pursuant to subparagraph (i) of paragraph (B) hereof, such policies shall contain single limits of not less than One Million ($1,000,000) Dollars in the aggregate; and

       (iii)    with respect to insurance policies maintained by the Condominium Board pursuant to subparagraph (ii) of paragraph (B) hereof, the coverage shall be in an amount equal to the aggregate of all of the Unit Owners' Common Charges for one (1) year.

Any insurance policies maintained by the Condominium Board may also provide for such deductible amounts as the Condominium Board shall determine. The Condominium Board shall review the limits of each insurance policy, as well as the amount of any deductible sum thereunder, at least once each year.

(D)    The cost of all insurance maintained by the Condominium Board pursuant to this Section 5.4, together with the fees and disbursements of any Insurance Trustee appointed by the Condominium Board pursuant to the terms of these By-Laws, shall be borne by the Unit Owners as a General Common Expense.

(E)    Unit Owners shall not be prohibited from carrying other insurance for their own benefit, provided that all such policies shall contain waivers of subrogation and further provided that the liability of the carriers issuing the insurance maintained by the Condominium Board shall not be affected or diminished by reason of any such additional insurance carried by any Unit Owner.

Section 5.5    *Casualty or Condemnation.*

(A)    In the event that either (i) the Building or any part thereof is damaged or destroyed by fire or other casualty ("Casualty Loss") or (ii) the General Common Elements and/or Limited Residential Common Expense Elements, or any part thereof are taken in condemnation or by eminent domain ("Taking"), the net insurance proceeds payable under the insurance policies maintained by the Condominium Board pursuant to the terms of Section 5.4 hereof by reason of such Casualty Loss or the net condemnation awards receivable by reason of

such Taking, as the case may be, shall be payable either to the Condominium Board, if the same shall be One Million ($1,000,000) Dollars or less in the aggregate, or to the Insurance Trustee, if the same shall exceed One Million ($1,000,000) Dollars in the aggregate. In either instance, all such monies actually received ("Trust Funds") shall be held in trust for the benefit of all Unit Owners, with respect to the portion thereof allocated to a Casualty Loss to or Taking of the General Common Elements and the Units, and for the benefit of all Residential Unit Owners with respect to the portion thereof allocated to a Casualty Loss to or Taking of the Limited Residential Common Elements and their Permitted Mortgagees and shall be disbursed pursuant to the terms of this Section 5.5. Notwithstanding anything to the contrary contained either in this paragraph (A) or elsewhere in this Section 5.5, however, no Unit Owner whose Unit, its appurtenant Limited Residential Common Elements, if any, or any portion thereof are taken in condemnation or by eminent domain (whether or not all or a part of the Common Elements are contemporaneously taken) shall be deemed to have waived whatever rights that he or she may have to pursue a separate claim against the condemning authority by reason thereof.

(B)     Subject to the terms of paragraph (D) hereof, the Condominium Board shall arrange for the prompt repair or restoration ("Work") of (i) in the event of a Casualty Loss, the portion(s) of the Building (including all Units and the bathroom and kitchen fixtures installed therein on the date of recording the Declaration and all service machinery contained therein, but not including appliances, fixtures, improvements made therein by a Unit Owner, or any furniture, furnishings, decorations, belongings, or other personal property supplied or installed by either Unit Owners or the tenants of Unit Owners) affected by such Casualty Loss or (ii) in the event of a Taking, the portion(s) of the Common Elements or the Units affected by such Taking. If, pursuant to the immediately preceding sentence, Work is to be performed in or to Units, Common Elements that service or enclose Units and other Common Elements, or any combination of the foregoing, the Work shall be performed to the extent practicable, first in or to the Units, next in or to the Common Elements that service or enclose Units and then in or to the balance of the Common Elements. Each Unit Owner whose Unit, its appurtenant Limited Residential Common Elements, if any, or any portion thereof, shall be the subject of all or part of any Work shall have the right subject to the terms of Section 5.2 hereof, to supervise any redecorating of his or her Unit or of such Limited Residential Common Element, if any.

(C)     In the event that Work shall be performed pursuant to the terms of paragraphs (B) and (D) of this Section 5.5, the Condominium Board or the Insurance Trustee, as the case may be, shall disburse the Trust Funds to the contractors engaged in the Work in appropriate progress payments. If the Trust Funds shall be less than sufficient to discharge the cost and expense of performing the Work, the Condominium Board shall levy a Special Assessment against all Unit Owners for the amount of such deficiency in proportion to their respective Common Interests, for Work to the General Common Elements and against all Residential Unit Owners for the amount of such deficiency in proportion to their respective Residential Common Interests for work to the Limited Residential Common Elements, and all proceeds of such Special Assessment shall become part of the Trust Funds. If, conversely, the Trust Funds shall prove to be more than sufficient to discharge the cost and expense of performing the Work, such excess shall be paid to all Unit Owners in proportion to their respective Common Interests, with respect to Work to the

Common Elements, and to all Residential Unit Owners in proportion to their residential Common Interest with respect to Work to the Limited Residential Common Elements, except that no payment shall be made to a Unit Owner until there has first been paid, out of such Unit Owner's share of such excess, such amounts as may be necessary to reduce unpaid liens on the Unit Owner's Unit (other than mortgages that are not Permitted Mortgages) in the order of priority of such liens. Notwithstanding the foregoing, however, in the event that the Unit Owners are assessed pursuant to the terms of the second sentence of this paragraph (C) for any projected deficiency in the amount of the Trust Funds available to the Condominium Board and, after the payment of all costs and expenses incurred in connection with the Work, any portion of the Trust Funds remaining unspent, such excess Trust Funds shall, to the extent of such Special Assessment, be deemed to be, and shall constitute, an unspent Special Assessment and shall be paid to the Unit Owners so assessed in proportion to their respective Common Interests, with respect to Work to the Common Elements, free of any claim of any lienor (including, without limitation, any Permitted Mortgagee), and to the Residential Unit Owner so assessed in proportion to their respective Residential Common Interests, with respect to Work to the Limited Residential Common Elements, free of any claim of any lienor (including, without limitation, any Permitted Mortgagee).

(D)    If either seventy-five (75%) percent or more of the Building is destroyed or substantially damaged by fire or other casualty or seventy-five (75%) percent or more of the Common Elements are taken in a Taking, the Work shall not be performed unless seventy-five (75%) percent or more of all Unit Owners (including Sponsor if Sponsor shall then, own any Units), in aggregate Common Interests, shall promptly resolve to proceed with the same. In the event that a sufficient number of Unit Owners shall so resolve, the Work shall be performed pursuant to the terms of paragraphs (B) and (C) hereof. Conversely, in the event that a sufficient number of Unit Owners shall either fail or refuse to so resolve, the Work shall not be performed and the Property shall be subject to an action for partition by any Unit Owner or lienor, as if owned in common, in which event the net proceeds of the resulting sale, together with any Trust Funds, shall be paid to all Unit Owners in proportion to their respective Common Interest, to the extent allocated to destroyed or damaged portions of the General Common Elements and to all Residential Unit Owners in proportion to their respective Residential Common Interest, to the extent allocated to destroyed or damaged portions of the Limited Residential Common Elements, except that no payment shall be made to a Unit Owner until there first has been paid, out of such Unit Owner's share of such funds, such amounts as may be necessary to pay off any Permitted Mortgage and other unpaid liens on the Unit Owner's Unit.

(E)    In the event that the damage resulting from a Casualty Loss shall (i) render one or more Units wholly or partially unusable for the purposes permitted herein and in the Declaration or (ii) destroy the means of access to one or more Units, the installments of Common Charges otherwise payable by the owner of any Unit so affected thereby shall proportionately abate until such Unit shall again be rendered usable for such purposes and/or until the means of access thereto shall be restored, as the case may be. Notwithstanding the foregoing, however, if such Casualty Loss shall be caused by the act, the omission to act, or the negligence of the owner of a Unit so affected thereby, by a Family Member of such Unit Owner, or by a tenant or other

occupant of such Unit, such installments of Common Charges shall abate only to the extent of any proceeds of rent insurance actually collected by the Condominium Board with respect to such Unit.

(F)     If (i) a portion of any Unit shall be taken in condemnation or by eminent domain and (ii) the Condominium shall not be terminated by reason of a simultaneous Taking pursuant to the terms of paragraph (D) hereof, the Common Interest, Residential Common Interest, Roof Terrace Common Interest and Parking Space Common Interest, where applicable, appurtenant to such Unit shall be adjusted in the proportion that the total floor area of such Unit and its appurtenant Common Elements, if any, after such Taking bears to the total floor area of such Unit and its appurtenant Common Elements prior to such Taking. The Condominium Board shall promptly prepare and record an amendment to the Declaration reflecting the new Common Interest, Residential Common Interest, Roof Terrace Common Interest and Parking Space Common Interest, where applicable, appurtenant to such Unit, which amendment shall be executed by the owner of such Unit together with the holders of record of any liens thereon (or, in lieu of execution by such Unit Owner and lienors, the same may execute a consent to such amendment in recordable form). Following the Taking of a portion of a Unit and the recording of the aforementioned amendment to the Declaration, the votes appurtenant to such Unit shall be based upon the new Common Interest, Residential Common Interest, Roof Terrace Common Interest and Parking Space Common Interest, where applicable, of such Unit, and, in the event of a Taking of an entire Unit, the right to vote appurtenant to such Unit shall wholly terminate. In either event, the Common Interests, Residential Common Interest, Roof Terrace Common Interest and Parking Space Common Interest, where applicable, of the other or remaining Units shall be adjusted accordingly and reflected in an amendment to the Declaration duly executed and acknowledged by the Condominium Board and the owners of, all of the other or remaining Units together with the holders of the Permitted Mortgages.

(G)     As used in this Section 5.5, the terms:

(i)     "Prompt repair or restoration" shall mean that the Work is to be commenced not more than either: (a) sixty (60) days after the date upon which the Insurance Trustee notifies the Condominium Board that it has received Trust Funds sufficient to discharge the estimated cost and expense of the Work, or (b) ninety (90) days after the date upon which the Insurance Trustee notifies the Condominium Board that it has received Trust Funds insufficient to discharge the estimated cost and expense of the Work, or (c) in the event that the Trust Funds are payable to the Condominium Board pursuant to the terms of paragraph (A) of this Section 5.5, sixty (60) days after the date upon which the Condominium Board notifies the Unit Owners that it has received the Trust Funds, whether or not the same are sufficient to discharge the cost and expense of the Work; and

(ii)     "Promptly resolve" shall mean that a resolution shall be duly made not more than sixty (60) days after the date upon which the Condominium Board notifies the Unit Owners that it has received the Trust Funds and that the same are or are not sufficient to discharge the estimated cost and expense of the Work, as the case may be.

(H)     Any dispute that may arise under this Section *5.5* between Unit Owners or between any Unit Owner(s) and the Condominium Board shall be resolved by arbitration pursuant to the terms of Article 10 hereof.

Section 5.6     *Use of the Property.*

(A)     No nuisance shall be allowed on the Property, nor shall any use or practice be allowed that either is a source of annoyance to its residents or interferes with the peaceful possession or proper use of the Property by its residents or occupants. No immoral, improper, offensive, or unlawful use shall be made of the Property or any portion thereof, and all valid Laws relating to any portion of the Property shall be complied with at the sole cost and expense of the respective Unit Owners or the Condominium, whoever shall have the obligation to maintain or repair such part of the Property.

(B)     Nothing, shall be done or kept in any Unit or in any of the Common Elements that would increase the rate of insurance for the Property, except upon the prior written consent of the Condominium Board. No Unit owner shall permit anything to be done or kept in a Unit or in the Common Elements that will result in the cancellation of insurance on the Property or the contents thereof, or that would be in violation of any Law. No waste shall be committed in the Common Elements.

(C)     Nothing shall be done in any Unit or in, on, or to the Common Elements that will impair the structural integrity of the Property or will structurally change the Building, except as is otherwise provided in the Declaration or in these By-Laws. In no event shall interior partitions contributing to the support of any Unit or the Common Elements be altered or removed.

Section 5.7     *Use of the Units.*

(A)     In order to provide for congenial occupancy of the Property and for the protection of the values of the Units, the use of Units shall be restricted to, and shall be in accordance with, the terms contained in the balance of this Section 5.7.

(B)     Subject to the terms of paragraph (C) of this Section 5.7, each Residential Unit shall be used only as a residence, and not more than one family may occupy a Unit at any one time; each Roof Terrace Unit shall be used only for passive recreational purposes (such as sunbathing and lounging) by the Owner and tenants and occupants of such Unit; and each Parking Space Unit shall be used only for the parking of a passenger vehicle or motorcycle by the Owner and tenants and occupants of the Unit. Ownership of Roof Terrace Units and Parking

Space Units is restricted to the Sponsor and Residential Unit Owners. A Unit owned or leased by an individual, corporation, partnership, fiduciary, or any other entity may be occupied only by an individual, or by an individual officer, director, stockholder, or employee of such corporation, or by an individual partner or employee of such partnership, or by an individual fiduciary (including directors, officers, stockholders, or employees of corporate fiduciaries and partners and employees of partnership fiduciaries), or by an individual beneficiary of said fiduciary, or by an individual principal or employee of such other entity, respectively, or by the Family Members and guests of any of the foregoing (and nothing herein contained shall be deemed to prohibit the exclusive occupancy of any Unit by such Family Members or guests). Notwithstanding the foregoing, Sponsor (or, when there are no longer any Unsold Units, the Condominium Board) may, in its sole discretion, permit Persons other than those set forth above to use or occupy a Unit. In no event, however, shall a portion of a Unit (as opposed to the entire Unit) be sold, conveyed, leased, or subleased, and no transient occupant (other than a guest permitted under this paragraph (B)) may be accommodated therein.

(C)     The Condominium Board may, in its sole discretion, consent to the use of a Unit as a professional or business office or for any purpose other than that set forth in paragraph (B) hereof, provided that the nature and manner of such use complies with Law and does not violate the then existing Certificate of Occupancy covering the Building. Any such consent shall be in writing and shall be personal to such Unit Owner. Any lessee of, or successor in title to, such Unit Owner shall be required to obtain the prior written consent of the Condominium Board before using such Unit for any purpose other than that set forth in paragraph (B) hereof.

(D)     Notwithstanding anything to the contrary contained in this Section 5.7, Sponsor may, without the consent of either the Condominium Board or the Unit Owners:

     (i)     grant permission for the use of any Unsold Unit as a professional or business office or for any other purpose, provided that the nature and manner of such use complies with Law and the user thereof complies with all applicable governmental regulations; and

     (ii)     use any one or more Unsold Units as models and offices for the sales promotions, rental, management and operation of the Unsold Units or for any other purpose, subject only to compliance with Law.

Section 5.8     *Use of the Common Elements.*

(A)     Subject to the terms of paragraphs (B) and (C) of this Section 5.8, the Common Elements (including, without limitation, the electrical, heating, gas, plumbing and other mechanical systems and equipment of the Building and the Facilities) may be used only for the furnishing of the services and facilities, and for the other uses, for which they are reasonably suited and capable. In addition, no furniture, packages, or objects of any kind shall be placed in the lobbies, vestibules, public halls, stairways, public elevators, or any other part of the Common Elements (except for those areas designated as storage areas) without the prior written consent of

the Condominium Board. The lobbies, vestibules, public halls, stairways and public elevators shall be used only for normal passage through them. Accordingly, all Unit Owners shall require their tradesmen to utilize exclusively the elevator and entrance designated by the Condominium Board for transporting packages, merchandise, or other objects.

(B)     The owner or owners of any two (2) or more Units, which Units are the only Units serviced or benefited by any General Common Element adjacent or appurtenant to such Units (for example, that portion at the end of any residential hallway that is directly adjacent to any such Units located on opposite sides of such hallway) shall, with the consent of the Condominium Board (which consent shall not be unreasonably withheld or delayed), have the right to use such General Common Elements exclusively, as if it were a part of such Units (including the right, in the above example of a portion of a hallway, to enclose such portion), and no amendment to the Declaration or reallocation of Common Interests shall be made by reason thereof. In such event, however, such owner or owners shall, at his, her or their sole cost and expense, both (i) operate, maintain and repair such General Common Element for so long as such owner or owners exercise such exclusive right of use and (ii) restore such General Common Element to its original condition, reasonable wear and tear excepted, after such owner or owners cease to exercise such exclusive right of use.

(C)     The terms of paragraph (A) of this Section 5.8 shall not apply to Sponsor for so long as there are any Unsold Units. Sponsor shall have the right, without charge or limitation, and without Condominium Board approval, to: (i) erect and maintain signs, of any size or content determined by Sponsor on or about any portion of the Common Elements chosen by Sponsor including, without limitation, on the exterior walls of the Building or adjacent to the main entrance thereof (ii) have its employees, contractors, subcontractors and sales agents present on the Property; (iii) erect, use, lease, license, maintain, repair, replace and operate telecommunications equipment and pipes, risers, ducts, flues, and equipment necessary or desirable to provide heat, air-conditioning, exhaust, or ventilation as required or as permitted by Law, on any part of the mechanical rooms, roofs, roof setbacks and/or facade of the Building and elsewhere on the Common Elements; (iv) utilize any risers, conduits, piping, cables, ducts and electrical panels and rooms, telephone/cable panels and rooms in connection therewith; and (v) do all things necessary or appropriate, including the use of the Common Elements (such as lobbies, corridors and the like), to sell, lease, manage, or operate Unsold Units, to complete any work or repairs to the Building expressly undertaken by Sponsor and to comply with Sponsor's obligations under the Plan and the Condominium Documents. In no event, however, shall Sponsor be entitled to use any Common Elements in such a manner as will unreasonably interfere with the use of any Unit for its permitted purposes.

Section 5.9     *Rights of Access.*

(A)     Subject to the rights of existing tenants and other occupants of Unsold Units, each Unit Owner shall grant to the Condominium Board, to the Managing Agent or manager (if any), or to any other Person authorized by any of the foregoing a right of access (including the right of forced entry if required in the discretion of the party seeking such entry) to his or her Unit and its appurtenant Limited Residential Common Elements, if any, for the purposes of

(i)      making inspections of, or removing violations noted or issued by any governmental authority against, the Common Elements or any other part of the Property;

(ii)     curing defaults hereunder or under the Declaration or violations of the Rules and Regulations committed by such Unit Owner or correcting any conditions originating in his or her Unit and threatening, another Unit or all or a portion of the Common Elements;

(iii)    performing maintenance, installations, alterations, repairs, or replacements to the mechanical or electrical services, or other portions of the Common Elements located within his or her Unit or elsewhere in the Building;

(iv)    reading, maintaining, or replacing utility meters relating to the Common Elements, to his or her Unit, or to any other Unit; or

(v)     correcting any condition that violates the provisions of any Permitted Mortgage encumbering another Unit.

Except in cases of emergency (that is, a condition requiring repairs or replacement immediately necessary for the preservation of safety of the Building or for the safety of the occupants of the Building or other individuals, or required to avoid the suspension of any necessary service in the Building), the foregoing rights of access shall be exercised only upon not less than two (2) days' advance notice and only in such a manner as will not unreasonably interfere with the use of the Units and their appurtenant Limited Residential Common Elements for their permitted purposes. In cases of emergency, however such rights of access may be exercised immediately, without advance notice and whether or not the Unit Owner is present.

(B)     Each Unit Owner shall grant a right of access to his or her Unit and its appurtenant Limited Residential Common Elements, if any, and the Condominium Board shall grant rights of access to the Common Elements, to Sponsor and its contractors, subcontractors, agents and employees for the purpose of fulfilling Sponsor's obligations as set forth in the Plan or in any amendment thereto, provided that access thereto shall not be exercised, with respect to any Unit and its appurtenant Limited Residential Common Elements, if any, in such a manner as will unreasonably interfere with the use of such Unit and its appurtenant Limited Residential Common Elements, if any, for their permitted purposes.

Section 5.10 *Modification* of *the Rules and Regulations.* The Condominium Board shall have the right to modify, add to, or delete any of the Rules and Regulations from time to time, provided, however, that any such amendment, modification, addition, or deletion may be overruled by a vote of at least sixty-six and two-thirds (66 2/3%) percent of all Unit Owners in number and Common Interest. Copies of the text of any amendments, modifications, additions, or deletions to the Rules and Regulations shall be furnished to all Unit Owners not less than

thirty (30) days prior to the effective date thereof. Notwithstanding the foregoing, the Condominium Board shall not have the right to amend, modify, add to, or delete any of the Rules and Regulations if the same would adversely affect Unsold Units owned by Sponsor and the sale, lease or use thereof, without the prior written consent of Sponsor.

Section 5.11  *Real Estate Taxes.* Unless and until real estate taxes are billed directly to Unit Owners by the City Collector, the Condominium Board shall promptly pay such taxes as a Common Expense. In the event of a proposed sale of any Unit, the Condominium Board (for so long as the Condominium Board is still paying such real estate taxes) shall, upon the written request of the selling Unit Owner, and provided that such Unit Owner has paid the Unit's pro rata share of real estate taxes due on such Unit, execute and deliver to the purchaser of such Unit or such purchaser's title company, a letter agreeing to promptly pay all such real estate taxes affecting such to the date of the closing of title to such Unit.

Section 5.12  *Fuel.* Unless and until fuel is billed directly to Unit Owners by the supply company, in accordance with and subject to the provisions of the Plan, the cost and expense of fuel (for heating and cooling) serving or benefiting any Unit and/or Common Element shall be: (i) considered part of the expense of maintaining such Unit and/or Common Element, (ii) determined by the Condominium Board, (iii) paid by the Condominium Board, and (iv) charged to: (a) the Unit Owners as a General Common Expense for such portion attributable to the General Common Elements, and (b) the Residential Unit Owners as a Residential Common Expense for such portion attributable to the Limited Residential Common Elements. In the event there is a particular or unique use being made of a Unit and/or Common Element, the Condominium Board shall cause a new survey to be made the cost of which shall be borne by the Unit Owners as a General Common Expense.

Section 5.13  *Water Charges and Sewer Rents.* Unless and until water is separately metered in a Unit and water charges and sewer rents are billed directly to a Unit Owner by the City Collector, in accordance with and subject to the provisions of the Plan, the cost and expense of water serving or benefiting a Unit and/or Common Element shall be: (i) considered part of the expense of maintaining, such Unit and/or Common Element, (ii) determined by the Condominium Board, (iii) paid by the Condominium Board, and (iv) charged to: (a) the Residential Unit Owners as a Residential Common Expense for such portion attributable to the Limited Residential Common Elements, and (b) the Unit Owners as a General Common Expense for such portion attributable to the General Common Elements.

Section 5.14  *Record and Audits.*

(A)    The Treasurer of the Condominium, or the Managing, Agent under the supervision of such Treasurer, shall keep full, detailed and accurate records and books of account with respect to the financial affairs of the Condominium, which records and books of account shall include, without limitation, (i) a listing of all receipts of and expenditures by the Condominium Board and the Managing Agent and (ii) a separate listing for each Unit, setting forth, among other things, the amount of each assessment of Common Charges and Special

Assessments levied against such Unit, the date when due, the amounts paid thereon and the balance, if any, remaining unpaid, as well as all Permitted Mortgages having an interest in such Unit.

(B)    Within four (4) months after the end of each fiscal year of the Condominium, the Condominium Board shall submit to each Unit Owner, and, if so requested, to any Permitted Mortgagee, an annual report of the receipts and expenditures of the Condominium prepared and certified by an independent certified public accountant. The cost of preparing and distributing, each such report shall be borne by the Condominium Board as a General Common Expense. The fiscal year of the Condominium shall be a calendar year.

## ARTICLE 6

## COMMON CHARGES

Section 6.1    *Determination of Common Expenses and Fixing of Common Charges.*

(A)    From time to time, but not less frequently than once a year, the Condominium Board shall: (i) prepare and adopt a budget for the Condominium, subject, in all respects, to the strictures set forth in Section 2.5 hereof, (ii) determine the aggregate amount of Common Charges necessary to be charged to the Unit Owners in order to meet the Common Expenses; and (iii) allocate and assess such Common Charges amongst the Unit Owners in accordance with allocations set forth in the First Year's Budget. The Condominium Board shall advise all Unit Owners promptly thereafter in writing of the amount of Common Charges payable by each of them, not later than ten (10) days prior to the date upon which the first installment of newly-determined Common Charges is due, shall furnish copies of the budget (in a reasonably itemized form) upon which such Common Charges are based to all Unit Owners and to their respective Permitted Mortgagees whenever requested in writing by such Permitted Mortgagees. The Condominium Board may, subject to Section 6.1 (E) hereof, at its sole discretion, from time to time increase or decrease the amount of Common Charges allocated to the Units and payable by the Unit Owners and may modify its prior determination of the Common Expenses for any fiscal year so as to increase or decrease the amount of Common Charges payable for such fiscal year or portion thereof; however, no such revised determination of Common Expenses shall have a retroactive effect on the amount of Common Charges payable by Unit Owners for any period prior to the date of such new determination. Notwithstanding, the foregoing, however, the Condominium Board shall not reduce the Common Charges payable during any fiscal year occurring within the Initial Control Period solely as a result of either reducing the number of employees of the Condominium below the number employed (or anticipated in the First Year's Budget) for the Property on the date of recording the Declaration, except with the Sponsor's prior written consent, or eliminating or reducing the insurance coverage below that provided for the Property on such date, except with the concurrence of a majority of the members of the Condominium Board elected by Unit Owners other than Sponsor. All Unit Owners will be given a copy of the proposed annual budget of the Condominium at least ten (10) days prior to the date set for adoption thereof by the Condominium Board.

(B)     The failure or delay of the Condominium Board to prepare or adopt a budget or to determine the Common Expenses for any fiscal year or portion thereof shall not be deemed a waiver or modification in any respect of the covenants and provisions hereof or a release of any Unit Owner from the obligation to pay Common Charges. In such event, the Common Charges that were computed on the basis of the Common Expenses last determined for any fiscal year or portion thereof shall continue thereafter to be the Common Charges payable by the Unit Owners until a new determination of the Common Expenses shall be made.

(C)     In addition to the foregoing duty to determine the amount of and assess Common Charges, the Condominium Board shall have the right, subject, in all respects, to the strictures contained in Section 2.5 hereof, to levy Special Assessments to meet the Common Expenses. All Special Assessments relative to the General Common Elements shall be levied against all Unit Owners in proportion to their respective Common Interests, all Special Assessments relative to the Limited Residential Common Elements shall be levied against all Residential Unit Owners in proportion to their Residential Common Interests, all Special Assessments relative to the Roof Terrace Units shall be levied against all Roof Terrace Units in proportion to their Roof Terrace Common Interests and all Special Assessments relative to the Parking Space Units shall be levied against all Parking Space Units in proportion to their Parking Space Common Interests. Special Assessments may be payable either in one lump sum or in installments, as the Condominium Board shall determine, provided, however, that the Condominium Board shall give each Unit Owner not less than fifteen (15) days' written notice prior to the date upon which such Special Assessment, or the first installment thereof, shall be due and payable, which notice shall set forth, in reasonable detail, the nature and purpose thereof. The Condominium Board shall have all rights and remedies for the collection of Special Assessments as are provided herein for the collection of Common Charges (including, without limitation, the provisions of Section 6.4 hereof).

(D)     The excess of all rents, profits and revenues derived from the rental or use of any space forming a part of, or included in, any Common Element remaining after deduction of all expenses incurred in connection with generating the same shall constitute income of the Unit Owners and shall be collected on behalf of the Unit Owners by the Condominium Board and applied against the Common Expenses attributable to the Common Elements for the fiscal year in which collected. In the event that such net rents, profits and revenues, together with the Common Charges and any Special Assessments collected from the Unit Owners, for any year of operation shall exceed the Common Expenses for such year, then such excess shall be applied by the Condominium Board against the Common Expenses attributable to the Common Elements for the next succeeding year(s) of operation. No Unit Owner shall be entitled to a distribution of any portion of such excess unless the Condominium Board shall determine to distribute all or part of such excess to all Unit Owners prorata, in proportion to their respective Common Interests and any such distributions must be made out of the Common Charges collected from Unit Owners.

(E)     [Intentionally omitted]

Section 6.2     *Payment of Common Charges.*

(A)     All Unit Owners (including Sponsor with respect to Unsold Units for so long as the same are owned thereby) shall be obligated to pay Common Charges and Special Assessments assessed by the Condominium Board pursuant to the terms of Section 6.1 hereof at such time or times (but not less than annually) as the Condominium Board shall determine. Unless otherwise determined by the Condominium Board, Common Charges shall be payable in installments on the first day of every month in advance. To the extent permitted by Law, the Condominium Board shall have a lien on each Unit, on behalf of all Unit Owners, for unpaid Common Charges and Special Assessments assessed against such Unit. Such lien, however, shall be subordinate, to the extent required by Law, to any liens for real estate taxes assessed against such Unit and any sums unpaid on a Permitted Mortgage recorded against the Unit.

(B)     No Unit Owner shall be liable for the payment of any part of the Common Charges and any Special Assessments assessed against his or her Unit subsequent to a sale, transfer, or other conveyance by him or her of such Unit, together with its Appurtenant Interests, made in compliance with the terms of Article 7 hereof. A purchaser or other successor-in-title to the owner of a Unit shall be liable for the payment of all Common Charges and any Special Assessments accrued and unpaid against such Unit prior to his or her acquisition thereof, except that, to the extent permitted by Law, a Permitted Mortgagee acquiring title to a mortgaged Unit or a purchaser at a mortgage foreclosure sale held with respect to a Permitted Mortgage shall not be liable, and such mortgaged Unit shall not be subject to a lien, for the payment of any Common Charges and Special Assessments assessed subsequent to the recording of such Permitted Mortgage and prior to the acquisition of title to such Unit by the Permitted Mortgagee or by such purchaser. However, in the event of a foreclosure of a Permitted Mortgage (whether by sale, deed in lieu of foreclosure, or otherwise), the defaulting Unit Owner shall remain fully liable for the payment of all unpaid Common Charges and Special Assessments that accrued prior to such foreclosure or sale. Any excess proceeds from such foreclosure or sale shall be paid directly to the Condominium Board in payment of all unpaid Common Charges and Special Assessments.

(C)     Subject to the terms and conditions contained in these By-Laws, any Unit Owner may convey his or her Unit, together with its Appurtenant Interests, to the Condominium Board or to its designee, corporate or otherwise, on behalf of all Unit Owners, without being compensated therefor, and, in such event, be exempt from the payment of Common Charges and Special Assessments thereafter accruing, provided, however, that: (i) all Common Charges and any Special Assessments then due and payable with respect to such Unit have been paid; (ii) such Unit is free and clear of all liens and encumbrances other than a Permitted Mortgage and the statutory lien for unpaid Common Charges and Special Assessments; and (iii) no violation of any provision of the Condominium Documents then exists with respect to such Unit. However, in no event shall Sponsor be permitted to convey any Unsold Unit to the Condominium Board and thereby exempt itself from Common Charges and any Special Assessments attributable to such Unit thereafter accruing unless the aggregate Common Interests then appertaining to the

Unsold Units constitute fifteen (15%) percent or less of the total Common Interests then appertaining to all Units, at least five years shall have elapsed from the date of the First Closing and, at the time of conveyance, Sponsor shall pay to the Condominium Board an amount equal to the product of the then current monthly Common Charges for the Unsold Unit(s) being conveyed multiplied by twenty-four (24).

(D)     No Unit Owner shall be exempted from liability for the payment of Common Charges or Special Assessments by waiving the use or enjoyment of any or all of the Common Elements or by abandoning his or her Unit (except with respect to a conveyance of the same to the Condominium Board, without compensation, pursuant to the terms of paragraph (C) hereof). Except as expressly provided to the contrary in paragraph (E) of Section 5.5 hereof, no Unit Owner shall be entitled to a diminution or abatement in the Common Charges or Special Assessments payable thereby for any inconvenience or discomfort arising from: (i) the failure or interruption of any utility or other services; (ii) the making of repairs or improvements to the Common Elements or any Unit (including, without limitation, such Unit) pursuant to the terms of Section 5.1, 5.2, or 5.3 hereof, or (iii) any action taken by the Condominium Board or the officers of the Condominium to comply with Law.

Section 6.3     *Statement* of *Common Charges.* The Condominium Board shall promptly provide a written statement of unpaid Common Charges due from any Unit Owner upon its receipt of a written request therefor from such Unit Owner. In addition, each Unit Owner shall be permitted to examine the books of account of the Condominium at reasonable times on business days, but not more frequently than once a month.

Section 6.4     *Default in Payment* of *Common Charges.*

(A)     The Condominium Board shall take prompt action to collect any Common Charges due to the Condominium Board that remain unpaid for more than fifteen (15) days after the due date for the payment thereof, including but not limited to the imposition of late charges, notice fees and the institution of such actions for the recovery of interest and expenses as provided in this Article 6. All costs incurred by the Condominium Board (including reasonable attorney's fees) as a result of its attempt to collect unpaid Common Charges and/or Special Assessments shall be borne by the Unit Owner as an "additional common charge". In connection therewith, the Condominium Board shall have the right and obligation to cause liens for all sums due and owing to the Condominium Board to be filed in the Register's Office pursuant to the terms of Section 339-z of the Condominium Act, to cause such liens to be foreclosed in the manner provided in Section 339-aa of the Condominium Act and/or to institute all other proceedings deemed necessary or desirable by the Condominium Board to recover all such unpaid Common Charges, together with all additional sums of money collectible by the Condominium Board by reason of such nonpayment pursuant to the terms of paragraph (B) hereof. A suit to recover a money judgment for unpaid Common Charges, however, shall be maintainable without foreclosing or waiving the lien securing such charges.

(B)     In the event that any Unit Owner shall fail to make prompt payment of Common Charges, such Unit owner shall be obligated to pay: (i) interest thereon at the rate of one and one-half (1.5%) percent per month of such unpaid amounts (less any late "charges" theretofore collected), to be computed from the due date thereof until paid in full together with all costs and expenses paid or incurred by the Condominium Board, the Managing Agent, or the manager (if any) in connection with collecting such unpaid Common Charges with interest as aforesaid and/or in foreclosing the aforementioned lien, including, without limitation, reasonable attorneys' fees and disbursements and court costs; (ii) a late charge of One Hundred Fifty ($150) Dollars per month for Common Charges which remain unpaid for more than ten (10) days after the date when due, plus all expenses of collection including but not limited to reasonable attorney's fees, in such amount as may be determined by the Condominium Board from time to time, to be computed from the due date thereof until paid in full. In addition, if the Condominium Board shall bring an action to foreclose the aforementioned lien, the defaulting Unit Owner will be required to pay a reasonable rental for the use of his or her Unit, and the plaintiff in such foreclosure action shall be entitled to the appointment of a receiver to collect the same. All such late charges, interest, costs and expenses and rentals shall be added to and shall constitute Common Charges payable by such Unit Owner.

(C)     In any action brought by the Condominium Board to foreclose a lien on a Unit because of unpaid Common Charges, the Condominium Board shall have, on behalf of all Unit Owners, the power to purchase such Unit at the foreclosure sale thereof and to acquire, hold, lease, mortgage, convey, or otherwise deal with such Unit (but not to vote the votes appurtenant to the same). In the event that the net proceeds received on such foreclosure (after deduction of all legal fees and disbursements, advertising costs, brokerage commissions, court Costs and other costs and expenses paid or incurred in connection therewith) shall be insufficient to satisfy the defaulting Unit Owner's obligations to the Condominium, such Unit Owner shall remain liable for the deficit. Any surplus on such foreclosure shall be paid to the defaulting Unit Owner after first paying all liens on such Unit Owner's Unit in the order of priority of such liens.

(D)     If the Unit Owner shall at any time lease the Unit and shall default in the payment of any Common Charges or additional Common Charges, the Board may, at its option, so long as such default shall continue, demand and receive from the tenant the rent due or becoming due from such tenant to the Unit Owner, and apply the amount to pay sums due and to become due from the Unit Owner to the Condominium. Any payment by a tenant to the Condominium shall constitute a discharge of the obligation of such tenant to the Unit Owner, to the extent of the amount so paid. The acceptance of rent from any tenant shall not be deemed a consent to or approval of any leasing by the Unit Owner, or a release or discharge of any of the obligations of the Unit Owner hereunder. In the event the tenant fails to pay the rent to the Condominium after demand by the Board, the Board shall have the right to commence summary eviction proceeding in the name of or on behalf of the Unit Owner, against the tenant. All expenses incurred by the Board shall be borne by the Unit Owner and shall constitute Common Charges payable by such Unit Owner.

## ARTICLE 7

### SELLING AND LEASING OF UNITS

Section 7.1    *General.* Subject to the terms of Section 7.2 hereof, each Residential Unit Owner may (i) sell or transfer his or her Residential Unit, and (ii) lease his or her Residential Unit, for periods of one (1) year or more only, provided however, no Residential Unit Owner may sell or lease his or her Unit except in compliance with the applicable provisions of this Article 7.  Subject to the terms of Section 7.2 hereof, each Roof Terrace Unit Owner may (a) sell or transfer the Roof Terrace Unit only to a Residential Unit Owner or, upon the resale or transfer of the Owner's Residential Unit, to the purchaser on such resale or the succeeding Owner on a transfer, and (b) lease the Roof Terrace Unit for periods of one (1) year or more only; provided, however, no Roof Terrace Unit Owner may sell or lease his or her Unit except in compliance with the applicable provisions of this Article 7.  Subject to the terms of Section 7.2 hereof, each Parking Space Unit Owner may (a) sell or transfer the Parking Space Unit only to a Residential Unit Owner or, upon the resale or transfer of the Owner's Residential Unit, to the purchaser on such resale or the succeeding Owner on a transfer, and (b) lease the Parking Space Unit for periods of one (1) year or more only; provided, however, no Parking Space Unit Owner may sell or lease his or her Unit except in compliance with the applicable provisions of this Article 7. Any purported sale or lease consummated in default in the applicable terms hereof shall be voidable at the sole election of the Condominium Board, and, if the Condominium Board shall so elect, the selling or leasing Unit Owner shall be deemed to have authorized and empowered the Condominium Board to institute legal proceedings to eject the purported purchaser (in the event of an unauthorized sale) or to evict the purported tenant (in the event of an unauthorized lease) in the name of such Unit Owner. Such Unit Owner shall reimburse the Condominium Board for all costs and expenses paid or incurred in connection with such proceedings, including, without limitation, reasonable attorneys' fees and disbursements and court costs.

Section 7.2    *Right of First Refusal.*

(A)    Subject to the terms of Sections 7.5 and 7.9 hereof, any contract to sell a Unit together with its Appurtenant Interests and any lease of a Unit ("Sale Agreement or Lease Agreement") shall contain the following language: "THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER ARE HEREBY MADE EXPRESSLY SUBJECT TO THE RIGHTS IF ANY OF THE CONDOMINIUM BOARD OF THE CONDOMINIUM WITH RESPECT TO THE TRANSACTION EMBODIED HEREIN PURSUANT TO THE TERMS OF SECTIONS 7.2 AND 7.3 OF THE BY-LAWS OF THE CONDOMINIUM, AS THE SAME MAY HAVE BEEN AMENDED".

Promptly after any such bona fide Sale Agreement or Lease Agreement shall be fully executed, the Unit Owner executing the same ("Offeree Unit Owner") shall send written notice thereof to the Condominium Board by certified or registered mail, return receipt requested, which notice shall be accompanied by a fully executed, original counterpart of the Sale

Agreement or Lease Agreement, as the case may be, containing all of the terms offered in good faith by the prospective purchaser or tenant ("Outside Offeror").

(B)    The sending of the notice referred to in paragraph (A) of this Section 7.2 shall constitute an offer by the Offeree Unit Owner to sell his or her Unit, together with its Appurtenant Interests, or to lease his or her Unit, as the case may be, to the Condominium Board or to its designee, corporate or otherwise, on behalf of all Unit Owners, subject, however, to any variance therefrom provided in Section 7.3 hereof. The giving of such notice shall further constitute a representation and warranty by the Offeree Unit Owner to the Condominium Board, on behalf of all Unit Owners, that such Offeree Unit Owner believes the Sale Agreement or Lease Agreement to be bona fide in all respects. Thereafter, upon the written demand of the Condominium Board, the Offeree Unit Owner shall submit to the Condominium Board, in writing, such further information with respect to the Outside Offeror and the Sale Agreement or Lease Agreement as the Condominium Board may reasonably request.

(C)    The Condominium Board may elect, by sending written notice thereof to the Offeree Unit Owner by certified or registered mail not later than thirty (30) business days (in the event of a proposed sale) and fifteen (15) business days (in the event of a proposed lease) after receipt of the notice referred to in paragraph (A) hereof together with such further information as may have been requested pursuant to the terms of paragraph (B) hereof, to purchase such Unit together with its Appurtenant Interests or to lease such Unit, as the case may be (or to cause the same to be purchased or leased by its designee, corporate or otherwise) on behalf of all Unit Owners upon the same terms and conditions as were contained in the Sale Agreement or Lease Agreement and stated in the response(s) by the Offeree Unit Owner to any requests for additional information pursuant to the terms of paragraph (B) hereof. Notwithstanding, anything to the contrary contained herein, however, the Condominium Board shall not exercise any option set forth in this Section 7.2 to purchase or lease any Unit without the prior approval of a Majority of all Unit Owners.

(D)    The Condominium Board may not discriminate against any person on the basis of race, creed, color, national origin, sex, sexual orientation, age, disability, marital status or other grounds prohibited by Law in connection with its exercise of its right of first refusal with respect to the sale or lease of a Unit.

Section 7.3    *Acceptance of Offer.*

(A)    In the event that the Condominium Board shall elect, within the time and in the manner provided in Section 7.2 hereof, to purchase a Unit together with its Appurtenant Interests, to lease such Unit, or to cause the same to be purchased or leased by its designee, title shall close or a lease shall be executed, in either event in accordance with the terms of the Sale Agreement or Lease Agreement, at the office of the attorneys for the Condominium Board within forty-five (45) days after the day upon which the Condominium Board shall give notice of its election to accept such offer.

(B)    If such Unit and its Appurtenant Interests are to be purchased by the Condominium Board or its designee on behalf of all Unit Owners, such purchase may be made from the funds deposited in the capital and/or expense accounts of the Condominium. If the funds in such accounts are insufficient to effectuate such purchase, the Condominium Board may levy a Special Assessment against each Unit Owner (other than the Offeree Unit Owner) in accordance with the terms of paragraph (C) of Section 6.1 hereof and/or the Condominium Board may, in its discretion, finance the acquisition of such Unit; provided, however, that no such financing may be secured by an encumbrance on or a hypothecation of any portion of the Property other than the Unit to be purchased together with its Appurtenant Interests. In addition, if the Outside Offeror was to assume or to take title to the Unit subject to the Offeree Unit Owner's existing mortgage or mortgages pursuant to the Sale Agreement, the Condominium Board may purchase the Unit and assume or take title thereto subject to such mortgage or mortgages as the case may be. At the closing of title, the Offeree Unit Owner shall convey the Unit, together with its Appurtenant Interests, to the Condominium Board or to its designee, on behalf of all Unit Owners, by deed in the form required by Section 399-o of the Condominium Act with all tax and/or documentary stamps affixed at the expense of the Offeree Unit Owner, who shall also pay all other transfer taxes arising out of such sale (including, if applicable, the New York State Real Property Transfer Gains Tax, the New York State Documentary Stamp Tax and the New York City Real Property Transfer Tax) notwithstanding any terms of the Sale Agreement to the contrary. Real estate taxes, mortgage interest (if applicable) and Common Charges shall be apportioned between the Offeree Unit Owner and the Condominium Board or its designee as of the closing date, notwithstanding any terms of the Sale Agreement to the contrary. Thereafter, such Unit shall be held, so long as the same is owned by the Condominium Board or its designee, on behalf of all Unit Owners, as tenants-in-common, and all such Unit Owners shall be deemed to have waived all rights of partition with respect to such Unit and the entire Property, as herein provided.

(C)    In the event that such Unit is to be leased by the Condominium Board or its designee on behalf of all Unit Owners, the Offeree Unit Owner shall execute and deliver to the Condominium Board or such designee a lease covering such Unit by and between the Offeree Unit Owner, as landlord, and the Condominium Board or such designee, as tenant. Such lease shall be in the then current form of apartment lease recommended by the Real Estate Board of New York, Inc., and shall contain all of the terms and conditions of the Lease Agreement not in conflict with such form of lease, including, without limitation, the rental and term provided for therein. Notwithstanding anything to the contrary set forth hereinabove or in the Lease Agreement, however, such lease shall expressly provide that the Condominium Board or such designee may enter into a sublease of the premises demised thereunder without consent of the landlord.

Section 7.4     *Failure to Accept Offer.*

(A)    In the event that the Condominium Board shall fail to accept an offer made pursuant to the terms of Section 7.2 hereof within the respective times set forth in paragraph (C) thereof, the Offeree Unit Owner shall be free to consummate the transaction embodied in the

Sale Agreement or Lease Agreement within sixty (60) days after (i) notice of refusal is sent to the Offeree Unit Owner by the Condominium Board or (ii) the expiration of the period within which the Condominium Board or its designee might have accepted such offer, as the case may be. If the Offeree Unit Owner shall fail to consummate the transaction embodied in the Sale Agreement or Lease Agreement within such sixty (60) day period, then, should the Offeree Unit Owner thereafter elect to sell such Unit together with its Appurtenant Interests or to lease such Unit, the Offeree Unit Owner shall be required again to comply with all of the terms and provisions of Section 7.2, 7.3 and 7.4 hereof, but not more often than once in any twelve (12) month period, except the Condominium Board shall have the right to waive this for good cause shown, in its sole discretion.

(B)     Any deed of a Unit and its Appurtenant Interests to an Outside Offeror shall expressly provide that the acceptance thereof by the grantee shall constitute an assumption of all of the terms of the Condominium Documents, and, in the absence of such express language the same shall be conclusively deemed to have been included herein.

(C)     Each lease of a Unit to an Outside Offeror shall be in the then current form of apartment lease recommended by the Real Estate Board of New York, Inc., subject to such modifications as may be approved in writing by the Condominium Board or such other form approved in writing by the Condominium Board. Notwithstanding the foregoing, however, each such lease shall be consistent with the Condominium Documents and shall expressly provide that:

> (i)     such lease may not be amended, modified, or extended without the prior written consent of the Condominium Board in each instance;
>
> (ii)     the tenant thereunder shall not assign his or her interest in such lease or sublet the premises demised thereunder or any part thereof without the prior written consent of the Condominium Board in each instance; and
>
> (iii)     the Condominium Board shall have the power to terminate such lease and/or to bring summary proceedings to evict the tenant in the name of the landlord thereunder in the event of (a) a default by the tenant in the performance of its obligations under such lease or (b) a foreclosure of the lien granted by Section 339-z of the Condominium Act.

Section 7.5 *Termination* of, *and Exceptions to, the Right* of *First Refusal.*

(A)     A certificate executed and acknowledged by the Secretary of the Condominium or the Managing Agent, stating that the provisions of Section 7.2 hereof have been met by a Unit Owner or that the right of first refusal provided for therein has been duly released or waived by the Condominium Board and that, as a result thereof, the rights of the Condominium Board thereunder have terminated, shall be conclusive upon the Condominium Board and all Unit Owners in favor of all persons who rely upon such certificate in good faith. After the due

issuance of such a certificate, the Unit to which the same shall relate, together with its Appurtenant Interests, may be sold, conveyed, or leased free and clear of the terms and conditions contained in Section 7.2 hereof. The Condominium Board shall furnish or cause the Managing Agent to furnish without charge, such certificate upon written request to any Unit Owner in respect to whom the provisions of Sections 7.2 hereof have, in fact, been terminated. In no event, however, shall the right of first refusal described in Section 7.2 hereof be deemed released or waived by the Condominium Board (as opposed to satisfied pursuant to the express terms of Sections 7.2, 7.3 and 7.4 hereof) in the absence of the certificate that has been duly executed, acknowledged and issued by the Secretary of the Condominium or the Managing Agent as aforesaid.

(B)     The terms and conditions contained in Section 7.1 hereof shall not apply with respect to any sale, lease or conveyance of an Unsold Unit, together with its Appurtenant Interests, by Sponsor. The terms and conditions contained in Section 7.2, 7.3 and 7.4 hereof shall not apply with respect to any sale, lease or conveyance of a Unit, together with its Appurtenant Interests, by:

(i)      the Unit Owner thereof to any of his or her adult Family Members, to any combination of the same, or to a trust for the benefit of any of them provided, however, that if the succeeding Unit Owner is an infant or a person judicially declared incompetent of managing his or her affairs, then such Unit shall be held by the personal representative of such infant or incompetent, or in the case of a Unit Owner that is not an individual, to any entity or individual that owns more than fifty (50%) percent of the legal and beneficial interests of such Unit Owner or to any entity with respect to which such Unit Owner (individual or otherwise) owns more than fifty (50%) percent of the legal and beneficial interest thereof,

(ii)     Sponsor with respect to the Unsold Units;

(iii)    the Condominium Board;

(iv)     any proper officer conducting the sale of a Unit in connection with the foreclosure of a mortgage or other lien covering such Unit or delivering a deed in lieu of such foreclosure; or

(v)      any Permitted Mortgagee or its nominee, who has acquired title to any Unit at any foreclosure sale of its Permitted Mortgage or by deed in lieu thereof delivered in a bona fide transaction; provided, however, that each succeeding Unit Owner shall be bound by, and his or her Unit shall be subject to all of the terms and conditions of this Article 7. The foregoing proviso shall not apply to a succeeding Unit Owner that acquires Unsold Units from a Permitted Mortgagee if such succeeding Unit Owner qualifies as a "sponsor" under Section 20.1(c) of Part 20 of the NYCRR,

in which case the terms and conditions contained in Section 7.2, 7.3 and 7.4 shall not apply to such succeeding Unit Owner but shall apply to any subsequent transferee.

Section 7.6    *No Severance of Ownership.* No Unit Owner shall execute any deed or other instrument conveying title to his or her Unit without including therein its Appurtenant Interests, it being the intention to prevent any severance of such combined ownership. Any deed or other instrument purporting to affect one or more such interests shall be taken to include the interest or interests so omitted, even though the latter shall not be expressly mentioned or described therein. No part of the Appurtenant Interests of any Unit may be sold, conveyed, or otherwise disposed of, except as part of a sale, conveyance, or other disposition of the Unit to which such interests are appurtenant or as part of a sale, conveyance, or other disposition of such part of the Appurtenant Interests of all Units. Nothing contained in this Section 7.6, however, shall prohibit the lease of any Unit without the simultaneous lease of its Appurtenant Interests.

Section 7.7    *Payment of Common Charges.* No Unit Owner shall be permitted to convey or lease his or her Unit unless he or she shall have paid in full to the Condominium Board all unpaid Common Charges and Special Assessments theretofore assessed against such Unit and shall have satisfied all unpaid liens, other than that of Permitted Mortgages, levied against such Unit. However, where the payment of such unpaid Common Charges and/or Special Assessments is made by the grantee or provided for out of the proceeds of the sale, a sale may take place notwithstanding the foregoing.

Section 7.8    *Power of Attorney.* At the time of acquiring title to a Unit and as a condition thereof, the new Unit Owner shall duly execute, acknowledge and deliver to the representative of his or her title insurance company (or, if no such representative is present, to the Condominium Board for recording in the Register's Office at such Unit Owner's sole cost and expense), the Unit Owner's Power of Attorney required in Article 14 of the Declaration, in the form set forth as Exhibit E to the Declaration.

Section 7.9    *Gifts and Devises, Etc.* Any Unit Owner shall be free to convey or transfer his or her Unit, together with its Appurtenant Interests, by gift, or to devise the same by will or to have the same pass by intestacy, without restriction, provided, however, that each succeeding Unit Owner shall be bound by, and his or her Unit shall be subject to, the provisions of this Article 7.

Section 7.10    *Commencement of Time.* The period of time set forth in Section 7.2 for which the Condominium Board has to waive its right of first refusal shall not commence until such time as the Condominium Board or its managing agent has received a completed sales or lease package, including all fees set forth therein, as the case may be, from a Unit Owner. If the information provided by the Unit Owner or prospective purchaser or tenant, as the case may be, is incomplete, the Condominium Board shall have the right to request additional information and the thirty (30) day period will commence on receipt by the Condominium Board of the additional information.

Section 7.11   *Costs and Expenses.* All costs and expenses incurred by the Condominium Board, including, without limitation, attorneys' fees and disbursements paid or incurred by the Condominium Board or by its Managing Agent in connection with any action taken by the Condominium Board with regard a violation of this Article 7, shall be borne by the Unit Owner as an Additional Common Charge.

## ARTICLE 8

## MORTGAGING OF UNITS

Section 8.1   *General.* Each Unit Owner shall have the right to mortgage his or her Unit, subject only to the terms and conditions contained in Section 8.2 hereof. Any Unit Owner who mortgages his or her Unit, or the holder of such mortgage, shall supply the Condominium Board with the name and address of his or her mortgagee and shall file a conformed copy of the note and mortgage with the Condominium Board. Any Unit Owner who satisfies a mortgage covering his or her Unit shall so notify the Condominium Board and shall file a conformed copy of the satisfaction of mortgage with the Condominium Board. The Secretary of the Condominium shall maintain such information in a book entitled "Mortgages of Units". The terms and conditions contained in this Section 8.1, however, shall not apply to Sponsor.

Section 8.2   *Restrictions on Mortgaging.*

(A)   No Unit Owner shall be permitted to mortgage, pledge, or hypothecate his or her Unit unless and until he or she shall have paid in full to the Condominium Board all unpaid Common Charges and Special Assessments theretofore assessed against such Unit and shall have satisfied all unpaid liens, except the liens of Permitted Mortgages levied against such Unit.

(B)   No Unit Owner shall execute any mortgage or other document mortgaging, pledging, or hypothecating title to his or her Unit without including therein its Appurtenant Interests, it being the intention to prevent any severance of such combined ownership. Any mortgage or other instrument purporting to affect one or more of such interests without including all such interests shall be deemed and taken to include the interest or interests so omitted, even though the latter shall not be expressly mentioned or described therein.

(C)   Any mortgage covering a Unit shall be substantially in the form used by any Institutional Lender then making mortgage loans secured by residential condominiums in New York State.

(D)   Any mortgage covering a Unit shall be made by an Institutional Lender, Sponsor, or by a Unit Owner providing purchase money financing in connection with the sale of his or her Unit.

Section 8.3 *Notice of Unpaid Common Charges and Default.* Whenever requested in writing by a Permitted Mortgagee, the Condominium Board shall promptly report to such Permitted Mortgagee any default by his or her mortgagor(s) in the payment of Common Charges or Special Assessments or in the observance or performance of any of the provisions of the Condominium Documents as to which the Condominium Board has knowledge then exists. The Condominium Board shall, when giving notice to a Unit Owner of any such default, also send a copy of such notice to his or her Permitted Mortgagee, if so requested. However, the Condominium Board shall have no liability for any failure, through oversight or negligence, in notifying a Permitted Mortgagee of any default by his or her mortgagor under the Condominium Documents, provided that (i) the Condominium Board shall advise such Permitted Mortgagee of the default promptly after discovering such failure and (ii) if the Condominium Board shall foreclose a lien on such mortgagor's Unit pursuant to the terms of Section 6.4 hereof by reason of such default, the Condominium Board shall pay to such Permitted Mortgagee any net proceeds of any foreclosure sale of such Unit (after retaining all sums due and owing to the Condominium Board pursuant to the Condominium Documents) or such lesser sum as shall be due and owing to such Permitted Mortgagee.

Section 8.4 *Performance by Permitted Mortgagees.* Any sum of money to be paid or any act to be performed by a Unit Owner pursuant to the terms of the Condominium Documents may be paid or performed by his or her Permitted Mortgagee, and the Condominium Board shall accept such Permitted Mortgagee's payment or performance with the same force and effect as if the same were paid or performed by such Unit Owner.

Section 8.5 *Examination of Books.* Each Permitted Mortgagee shall be permitted to examine the books of account of the Condominium at reasonable times on business days, but not more frequently than once a month.

Section 8.6 *Consent of Mortgagees; Designation of Mortgage Representatives.*

(A) Except as otherwise expressly provided for herein or in the Declaration, no consent or approval by any mortgagee shall be required with respect to any determination or act of the Condominium Board or any Unit Owner, provided, however, that nothing contained herein shall be deemed to limit or affect the rights of any mortgagee against his or her mortgagor. In the event that any such consent or approval shall be expressly required pursuant to the terms of the Declaration or these By-Laws, the decision of a majority of the Mortgage Representatives, if any are designated pursuant to the terms of paragraph (B) of this Section 8.6, shall be deemed binding upon the holders of all mortgages encumbering Units.

(B) The holders of Institutional Mortgages constituting a majority in principal amount of all Institutional Mortgages may, if they so elect, designate not more than three (3) Mortgage Representatives by giving written notice thereof to the Condominium Board, which Mortgage Representatives shall thereby be empowered to act as the representatives of the holders of all mortgages encumbering Units with respect to any matter requiring the consent or approval of mortgagees under the Declaration or these By-Laws. Any designation of a Mortgage

Representative pursuant to the terms of this paragraph (B) shall be effective until any successor Mortgage Representative is designated pursuant to the terms hereof and written notice thereof is given to the Condominium Board. Unless otherwise required by Law, no holders of mortgages (which are not Institutional Mortgages) shall be entitled to participate in the designation of Mortgage Representatives, but all holders of mortgages encumbering Units shall be subject to all determinations made by the Mortgage Representatives pursuant to the terms of the Declaration or these By-Laws. So long as Sponsor owns ten (10%) percent or more of the Units, Sponsor's Permitted Mortgagee shall have the right to serve as a Mortgage Representative.

## ARTICLE 9

## CERTAIN REMEDIES

Section 9.1   *Self Help.* If any Unit Owner shall violate or breach any of the provisions of the Condominium Documents on his or her part to be observed or performed, including, without limitation, any breach of his or her obligation to paint, decorate, maintain, repair, or replace his or her Unit or its appurtenant Limited Residential Common Elements, if any, pursuant to the terms of Article 5 hereof, and shall fail to cure such violation or breach within five (5) days after receipt of written notice of the same from the Condominium Board, the Managing Agent, or any manager (or, with respect to any violation or breach of the same not reasonably susceptible to cure within such period, to commence such cure within such five (5) day period and, thereafter, to prosecute such cure with due diligence to completion), the Condominium Board shall have the right to enter such Unit Owner's Unit and/or its appurtenant Limited Residential Common Elements, if any, and summarily to abate, remove, or cure such violation or breach without thereby being deemed guilty or liable in any manner of trespass. In addition, in the event that the Condominium Board shall determine that the abatement, removal, or cure of any such violation or breach is immediately necessary for the preservation or safety of the Building or for the safety of the occupants of the Building or other individuals or is required to avoid the suspension of any necessary service in the Building, the Condominium Board may take such action immediately, without prior notice and without allowing the said Unit Owner any period of time within which to cure or to commence to cure such violation or breach.

Section 9.2   *Abatement and Enjoinment.*

(A)   In the event that any Unit Owner shall violate or breach any of the provisions of the Condominium Documents on his or her part to be observed or performed, the Condominium Board shall have the right (i) to enter any Unit or Common Elements in which, or as to which, such violation or breach exists and to summarily abate and remove, at the expense of the defaulting Unit Owner, any structure, thing or condition resulting in such violation or breach and the Condominium Board shall not thereby be deemed guilty or liable in any matter of trespass, and/or (ii) to enjoin, abate, or remedy the continuance or repetition of any such violation or breach by appropriate proceedings brought either at law or in equity, provided that the Condominium Board gives the Unit Owner notice (which may be by telephone or in writing) that such violation exists, that repairs or replacements are necessary and that the Condominium Board

will complete such repairs or replacements in the event the Unit Owner does not promptly act or complete the repairs or replacements, and/or (iii) to levy such fines and penalties as the Condominium Board may deem appropriate, and the Condominium Board shall have the same remedies for nonpayment of such fines and penalties as for non-payment of Common Charges.

(B)     The violation or breach of any of the terms of the Condominium Documents with respect to any rights, easements, privileges, or licenses granted to Sponsor shall give to Sponsor the right to enjoin, abate, or remedy the continuation or repetition of any such violation or breach by appropriate proceedings brought either at law or in equity.

Section 9.3    *Remedies Cumulative.* The remedies specifically granted to the Condominium Board or to Sponsor in this Article 9 or elsewhere in the Condominium Documents shall be cumulative, shall be in addition to all other remedies obtainable at law or in equity and may be exercised at one time or at different times, concurrently or in any order, in the sole discretion of the Condominium Board or Sponsor, as the case may be. Further, the exercise of any remedy shall not operate as a waiver, or preclude the exercise, of any other remedy.

Section 9.4    *Costs and Expenses.* All sums of money expended, and all costs and expenses incurred, by (i) the Condominium Board in connection with the abatement, enjoinment, removal, or cure of any violation, breach, or default committed by a Unit Owner pursuant to the terms of Section 9.1 or paragraph (A) of Section 9.2 hereof or (ii) Sponsor in connection with any abatement, enjoinment, or remedy of any violation or breach of the Condominium Documents pursuant to the terms of paragraph (B) of Section 9.2 hereof, shall be immediately payable by (a) in the event set forth in subparagraph (i) hereof, such Unit Owner to the Condominium Board or (b) in the event set forth in subparagraph (ii) hereof, the offending party (i.e., the Condominium Board or the Unit Owner) to Sponsor, as the case may be, which amount shall, in either event, bear interest (to be computed from the date expended) at the rate of two (2%) percent per month (but in no event in excess of the maximum rate chargeable to such Unit Owner pursuant to Law). All sums payable by a Unit Owner to the Condominium Board pursuant to the terms of this Section 9.4 shall, for all purposes hereunder, constitute Common Charges payable by such Unit Owner.

## ARTICLE 10

## ARBITRATION

Section 10.1   *Procedure.* Any matter required or permitted to be determined by arbitration pursuant to the terms of the Condominium Documents shall be submitted for resolution by a single arbitrator in a proceeding held in the City of New York in accordance with the then existing rules of the American Arbitration Association or any successor organization thereto. In the event that the American Arbitration Association shall not then be in existence and has no successor organization, any such arbitration shall be held in the City of New York before one (1) arbitrator appointed, upon the application of any party, by any Justice of the highest court of appellate jurisdiction then located in the City of New York. The decision of the arbitrator so

chosen shall be given within ten (10) days after his or her selection or appointment. Any arbitrator appointed or selected in connection with any arbitration to be conducted hereunder shall be a member of a law firm having at least five (5) members whose principal office is located in the City of New York.

Section 10.2   *Variation by Agreement.* The parties to any dispute required or permitted to be resolved by arbitration pursuant to the terms of the Condominium Documents may, by written agreement, vary any of the terms of Section 10.1 hereof with respect to the arbitration of such dispute or may agree to resolve their dispute in any manner, including, without limitation, the manner set forth in Section 3031 of the New York Civil Practice Law and Rules and known as "New York Simplified Procedure for Court Determination of Disputes".

Section 10.3   *Binding Effect.* The decision in any arbitration conducted pursuant to the terms of Section 10.1 and 10.2 hereof shall be binding upon all of the parties thereto and may be entered in any court of appropriate jurisdiction.

Section 10.4   *Costs and Expenses.*

(A)   The fees, costs and expenses of the arbitrator shall be borne by the losing party in the arbitration or, if the position of neither party to the dispute shall be substantially upheld by the arbitrator, such fees, costs and expenses shall be borne equally by the disputants. Each disputant shall also bear the fees and expenses of his or her counsel and expert witnesses.

(B)   All costs and expenses paid or incurred by the Condominium Board in connection with any arbitration held hereunder, including, without limitation, the fees and expenses of counsel and expert witnesses, shall constitute Common Expenses, to be borne by all Unit Owners.

## ARTICLE 11

## NOTICES

Section 11.1   *General.* All notices required or desired to be given hereunder (except for notices of regular annual or special meetings of the Unit Owners and except all meetings of the Condominium Board) shall be sent by registered or certified mail, return receipt requested, postage prepaid addressed:

> (i)   if to the Condominium Board, to the Condominium Board at its principal office as set forth in Section 1.5 hereof, with a copy sent by regular first class mail to the Managing Agent (if any) at its principal office address as aforesaid;

> (ii)   if to a Unit Owner other than Sponsor, to such Unit Owner at his or her address at the Property;

    (iii)    if to Sponsor, to Sponsor at its principal office as set forth in the Plan;

    (iv)    if to a Permitted Mortgagee, to such Permitted Mortgagee at its latest address designated in writing to the Condominium Board.

Any of the foregoing parties may change the address to which notices are to be sent, or may designate additional addresses for the giving of notice, by sending written notice to the other parties as aforesaid. All notices sent pursuant to the terms of this Section 11.1 shall be deemed given when mailed in the State of New York, provided, however, that notices of change of address, notices designating additional addresses and notices deposited in a United States Postal Service depository located outside of the State of New York shall be deemed to have been given when received.

Section 11.2   *Waiver of Service of Notice.* Whenever any notice is required to be given by Law or pursuant to the terms of the Condominium Documents, a waiver thereof in writing, signed by the Persons entitled to such notice, whether before or after the time stated therein, shall be deemed the equivalent thereof.

## ARTICLE 12

## AMENDMENTS TO BY-LAWS

Section 12.1   *General.*

(A)   Subject to the terms of paragraph (B) hereof and subject, further, to any provisions contained in the Declaration or these By-Laws with respect to any amendments ("Special Amendments") affecting or in favor of Sponsor, any Unsold Unit(s) and/or any Permitted Mortgagee, any provision of these By-Laws may be amended, modified, added to, or deleted by the affirmative vote of not less than sixty-six and two-thirds (66 2/3%) percent in number and aggregate Common Interest of all Unit Owners either taken at a duly constituted meeting thereof or given in writing without a meeting as provided in Section 4.10 hereof. Each duly adopted amendment, modification, addition, or deletion hereof or hereto shall be effectuated in an instrument executed and recorded in the Register's Office by or on behalf of the Condominium Board as attorney-in-fact of all Unit Owners, which power-of-attorney shall be deemed irrevocable and coupled with an interest. Attached to each such instrument shall be an original, executed Secretary's Certification, certifying that the requisite number and percentage (where applicable) of Unit Owners approved the amendment, modification, addition, or deletion set forth therein either at a duly constituted meeting of Unit Owners or in writing without a meeting pursuant to the terms of Section 4.10 hereof, in which Secretary's Certification there shall be described the number and percentage (where applicable) of Unit Owners approving the same and, if voted at a meeting, the date, time and place of such meeting. No such amendment, modification, addition, or deletion shall be effective unless and until such an instrument shall be duly recorded in the Register's Office.

(B)     Notwithstanding anything to the contrary contained in paragraph (A) hereof, but still subject to any provision contained in the Declaration or these By-Laws with respect to Special Amendments:

    (i)     the Common Interest, Residential Common Interest, Roof Terrace Common Interest and Parking Space Common Interest, if any, appurtenant to any Unit, as set forth in the Declaration, shall not be altered without the consent of the Unit Owner thereof, except as otherwise provided in paragraph (F) of Section 5.5 hereof;

    (ii)    no amendment, modification, addition, or deletion agreed to pursuant to the terms of paragraph (A) hereof shall be effective without the prior written consent of the Mortgage Representatives, if any, provided, however, that no such consent shall be unreasonably withheld or delayed; and

    (iii)   the terms of Section 5.7 hereof may not be amended, modified, added to, or deleted unless (in addition to the consent, if required, of the Mortgage Representatives as provided above) not less than eighty (80%) percent in number and in aggregate Common Interests of all Unit Owners affected thereby shall approve such amendment, modification, addition or deletion in writing.

Section 12.2   *Special Amendments.*

(A)     Any amendment, modification, addition, or deletion of or to any of the provisions of these By-Laws that, pursuant to the terms of the Declaration or these By-Laws, may be effected by Sponsor, without the consent of the Condominium Board or the Unit Owners, shall be embodied in an instrument executed and recorded in the Register's Office by Sponsor, as attorney-in-fact of both the Condominium Board and all Unit Owners, which power-of-attorney shall be deemed to be irrevocable and coupled with an interest. Attached to each such instrument shall be an original, executed Certification by Sponsor certifying that the amendment, modification, addition, or deletion set forth therein was effectuated by Sponsor pursuant to the terms of the Declaration and/or these By-Laws, in which Certification there shall be set forth the Article and/or Section of the Declaration or these By-Laws pursuant to which the same was effectuated. No such amendment, modification, addition, or deletion shall be effective unless and until such an instrument shall be duly recorded in the Register's Office.

(B)     Notwithstanding any provision contained herein to the contrary, no amendment, modification, addition, or deletion of or to these By-Laws shall be effective in any respect against Sponsor, any Unsold Unit, or the holder of any present mortgage, pledge, lien, or security agreement covering any Unsold Unit unless and until Sponsor, and/or such holder shall consent to the same in writing.

(C)      Notwithstanding any provision contained herein to the contrary, no amendment, modification, addition, or deletion of or to Section 5.4 or 5.5, paragraph (B) of Section 6.2. subparagraph (iv) or (v) of paragraph (B) of Section 7.5 or Article 8 hereof shall be effective with respect to the holder of any Permitted Mortgage theretofore made unless and until such Permitted Mortgagee shall have given its written consent thereto,

## ARTICLE 13

## FURTHER ASSURANCES

Section 13.1   *General.* Any Person that is subject to the terms of these By-Laws, whether such Person is a Unit Owner, a lessee or sublessee of a Unit Owner, an occupant of a Unit, a member of the Condominium Board, an officer of the Condominium, or otherwise, shall, at the expense of any other Person requesting the same, execute, acknowledge and deliver to such other Person such instruments, in addition to those specifically provided for herein, and take such other action as such other Person may reasonably request in order either to effectuate the provisions of these By-Laws or any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

Section 13.2   *Failure to Deliver or Act.*

(A)      If any Unit Owner or other Person that is subject to the terms of these By-Laws fails to execute, acknowledge, or deliver any instrument, or fails or refuses, within ten (10) days after request therefor, to take any action that such Unit Owner or Person is required to execute, acknowledge and deliver or to take pursuant to these By-Laws, then the Condominium Board is hereby authorized, as attorney-in-fact for such Unit Owner or other Person, coupled with an interest, to execute, acknowledge and deliver such instrument, or to take such action, in the name of such Unit Owner or other Person, and such document or action shall be binding on such Unit Owner or other Person.

(B)      If the Condominium Board, any Unit Owner, or other Person that is subject to the terms of these By-Laws fails to execute, acknowledge, or deliver any instrument, or fails or refuses, within ten (10) days after request therefor, to take any action that the Condominium Board, such Unit Owner, or Person is required to execute, acknowledge and deliver or to take pursuant to these By-Laws at the request of Sponsor, then Sponsor is hereby authorized, as attorney-in-fact for the Condominium Board, such Unit Owner, or other Person, coupled with an interest, to execute, acknowledge and deliver such instrument, or to take such action, in the name of the Condominium Board, such Unit Owner or other Person, and such document or action shall be binding on the Condominium Board, such Unit Owner, or other Person. The Condominium Board shall not unreasonably withhold or delay its consent or approval with respect to any matter contained in these By-Laws which requires the consent or approval of the Condominium Board.

## ARTICLE 14

## MISCELLANEOUS

Section 14.1   *Inspection of Documents.* Copies of the Declaration, these By-Laws, the Rules and Regulations and the Floor Plans, as the same may be amended from time to time, shall be maintained at the office of the Condominium Board and shall be available for inspection by Unit Owners and their authorized agents during reasonable business hours.

Section 14.2   *Waiver.* No provision contained in these By-Laws shall be deemed to have been abrogated or waived by reason of any failure to enforce the same, regardless of the number of violations or breaches that may occur.

Section 14.3   *Conflict.* In the event that any provision of these By-Laws or of the Rules and Regulations shall be construed to be inconsistent with any provision of the Declaration or of the Condominium Act, the provision contained in the Declaration or in the Condominium Act shall control.

Section 14.4   *Severability.* If any provision of these By-Laws is invalid or unenforceable as against any Person or under certain circumstances, the remainder of these By-Laws and the applicability of such provision to other Persons or circumstances shall not be affected thereby. Each provision of these By-Laws shall, except as otherwise provided herein, be valid and enforced to the fullest extent provided by Law.

Section 14.5   *Successors and Assigns.* The rights and/or obligations of Sponsor as set forth herein shall inure to the benefit of, and shall be binding upon, any successor or assignee of Sponsor or, with the consent of Sponsor, any transferee of all of the then Unsold Units.

Section 14.6   *Gender.* A reference in these By-Laws to any one gender, masculine or feminine, includes the other one, and the singular includes the plural, and vice-versa, unless the context otherwise requires.

Section 14.7   *Captions.* The index hereof and the captions herein inserted are included only as a matter of convenience and for reference, and in no way define, limit, or describe the scope of these By-Laws or the intent of any provision hereof.

Section 14.8   *Sponsor's Consent.* Wherever in these By-Laws or the Declaration the consent of the Sponsor is required, such consent shall be granted or withheld in Sponsor's sole and absolute discretion, unless specifically provided otherwise.

# ARTICLE 15

## TAX STATUS AS A HOMEOWNERS ASSOCIATION

Section 15.1    *General.* The Condominium Board intends to act in a manner consistent with enabling the Condominium to be eligible to elect to be treated as a "homeowners association" under Section 528 of the Internal Revenue Code of 1986, as amended.

Section 15.2    *Organization.* The Condominium is and will be organized and operated to provide for the acquisition, construction, management, maintenance and care of the Property.

Section 15.3    *Inurement.* No part of the Condominium's net earnings shall inure, and the Condominium Board will act in a manner such that no part of such earnings will inure to the benefit of any private shareholder or individual (other than by acquiring, constructing, or providing management, maintenance, and care of the Property, and other than by rebate of excess membership dues, fees, or assessments).

Section 15.4    *Residential Use.* Substantially all of the Units are and will be used by individuals for residences.

## ADDENDUM TO THE BY-LAWS

## RULES AND REGULATIONS

1.     The sidewalks, entrance passages, public halls, elevators, vestibules, corridors and stairways of or appurtenant to the Building shall not be obstructed or used for any purpose other than ingress to and egress from the Units.

2.     No velocipedes, bicycles, rollerblades, scooters, or similar vehicle shall be taken into or from the Building through the main entrance or shall be allowed in any of the elevators of the Building other than the elevator designated by the Condominium Board or the Managing Agent for such purpose, and no baby carriages or any of the above-mentioned vehicles shall be allowed to stand in the public halls, passageways, or other public areas of the Building.

3.     All service and delivery persons will be required to use the service entrance or such other entrance of the Building designated by the Condominium Board or the Managing Agent. In addition, all servants, messengers and tradespeople visiting the Building shall use the elevator designated by the Condominium Board or the Managing Agent for the purpose of ingress and egress, and shall not use any of the other elevators for any purpose, provided, however, that nurses in the employ of Unit Owners or their Family Members, guests, tenants, subtenants. licensees, or invitees may use any of the other elevators when accompanying said Unit Owners, Family Members, guests subtenants, licensees, or invitees.

4.     Trunks and heavy baggage shall be taken in or out of the Building only by the elevator designated by the Condominium Board or the Managing Agent for the purpose and only through the service entrance.

5.     No article (including, but not limited to, garbage cans, bottles or mats) shall be placed or stored in any of the halls or on any of the staircases or fire tower landings of the Building, nor shall any fire exit thereof be obstructed in any manner.

6.     No Unit may be used for the storage of any flammable materials or any other materials the storage of which may constitute a building code violation or which will increase the insurance requirements for the Building.

7.     No refuse from the Units shall be sent to the service area of the Building, except at such times and in such manner as the Condominium Board or the Managing Agent may direct. Nothing shall be hung or shaken from any doors, windows, or placed upon the window sills, of the Building, and no Unit Owner shall sweep or throw, or permit to be swept or thrown, any dirt, debris or other substance therefrom.

8.     There shall be no playing, or lounging in the entrances, passages, public halls, elevators, vestibules, corridors, stairways, or fire towers of the Building.

9.     The Condominium Board or the Managing Agent may, from time to time, curtail or relocate any portion of the Common Elements devoted to storage or service purposes in the Building.

10.     Nothing shall be done or kept in any Unit or in the Common Elements that will increase the rate of insurance of the Building, or the contents thereof. No Unit Owner shall permit anything to be done or kept in his or her Unit or in the Common Elements that will result in the cancellation of insurance on the Building, or the contents thereof, or that would be in violation of any Law. No Unit Owner or any of his or her Family Members, agents, servants, employees, licensees, or visitors shall, at any time, bring into or keep in his or her Unit any inflammable, combustible, or explosive fluid, material, chemical, or substance, except as shall be necessary and appropriate for the permitted uses of such Unit.

11.     There shall be no barbecuing in the Units (other than in the Roof Terrace Units), in their appurtenant Limited Common Elements, if any, or in the Common Elements.

12.     No Residential Unit Owner shall make, cause, or permit any unusual, disturbing, or objectionable noises or odors to be produced upon or to emanate from his or her Unit or its appurtenant Limited Residential Common Elements, if any, or permit anything to be done therein that will interfere with the rights, comforts, or conveniences of the other Unit Owners. No Unit Owner shall play upon or suffer to be played upon any musical instrument, or shall operate or permit to be operated a phonograph, radio, television set, or other loudspeaker in such Unit Owner's Unit or its appurtenant Limited Residential Common Elements, if any, between midnight and the following 8:00 A.M., if the same shall disturb or annoy other occupants of the Building, and in no event shall any Unit Owner practice of suffer to be practiced either vocal or instrumental music between the hours of 10:00 P.M. and the following 9:00 A.M. No construction, repair work, or other installation involving noise shall be conducted in any Unit except on weekdays (not including legal holidays) and only between the hours of 9:00 A.M. and 5:00 P.M., unless such construction or repair work is necessitated by an emergency.

13.     No bird, reptile, or animal shall be permitted, raised, bred, kept, or harbored in, on or about the Building unless, in each instance, the same shall have been expressly permitted in writing by the Condominium Board or the Managing Agent. Any such consent, if given, shall be revocable at any time by the Condominium Board or the Managing Agent in their sole discretion. In no event shall any bird, reptile, or animal be permitted in any public elevator of the Building, other than the elevator designated by the Condominium Board or the Managing Agent for that purpose, or in any of the public portions of the Building, unless carried or on leash. No pigeons or other birds or animals shall be fed from the window sills, the roof or other public portions of the Building, or on the sidewalk or street adjacent to the Building.

14.     No group tour or exhibition of any Unit or its contents shall be conducted, nor shall any auction sale be held in any Unit, without the consent of the Condominium Board or the Managing Agent in each instance. In the event that any Unit shall be used for home

occupation purposes in conformance with the Declaration and the By-Laws, no patients, clients, or other invitees shall be permitted to wait in any lobby, public hallway, or vestibule.

15.     Unless expressly authorized by the Condominium Board in each instance, not less than eighty (80%) percent of the floor area of each Residential Unit (excepting, only kitchens, pantries, bathrooms, closets and foyers) must be covered with rugs, carpeting, or equally effective noise reducing material.

16.     No window guards or other window decorations shall be used in or about any Unit, except such as shall have been approved in writing by the Condominium Board or the Managing Agent, which approval shall not be unreasonably withheld or delayed. In no event, however, shall any windows of any Unit be colored or painted.

17.     No ventilator or air conditioning device shall be installed in any Unit or its appurtenant Limited Residential Common Elements, if any, without the prior written approval of the Condominium Board, which approval may be granted or refused in the sole discretion of the Condominium Board.

18.     No radio or television aerial shall be attached to or hung from the exterior of the Building, and no sign, notice, advertisement, or illumination (including, without limitation, "For Sale", "For Lease", or "For Rent" signs) shall be inscribed or exposed on or at any window or other part of the Building, except such as are permitted pursuant to the terms of Declaration and/or the By-Laws or shall have been approved in writing, by the Condominium Board or the Managing Agent. Nothing shall be projected from any window of a Residential Unit without similar approval.

19.     All radio, television, or other electrical equipment of any kind or nature installed or used in each Unit shall fully comply with all rules, regulations, requirements, or recommendations of the New York Board of Fire Underwriters and the public authorities having jurisdiction, and the Unit Owner alone shall be liable for any damage or injury caused by any radio, television, or other electrical equipment.  No electric shall be installed or be permitted to be installed in the Roof Terrace Units.

20.     Water-closets and other water apparatus in the Building shall not be used for any purpose other than those for which they were designed, and no sweepings, rubbish, rags or any other article shall be thrown into same. Any damage resulting from misuse of any water-closets or other apparatus in a Unit shall be repaired and paid for by the owner of such Unit.

21.     Each Unit Owner shall keep his or her Unit and its appurtenant Limited Residential Common Elements, if any, in a good state of preservation, condition, repair and cleanliness in accordance with the terms of the By-Laws.

22.     The agents of the Condominium Board or the Managing Agent, and any contractor or workman authorized by the Condominium Board or the Managing Agent, may

enter any room or Unit at any reasonable hour of the day, on at least one (1) day's prior notice to the Unit Owner, for the purpose of inspecting such Unit for the presence of any vermin, insects, or other pests and for the purpose of taking such measures as may be necessary to control or exterminate any such vermin, insects, or other pests; however, such entry, inspection and extermination shall be done in a reasonable manner so as not to unreasonably interfere with the use of such Unit for its permitted purposes.

23.     The Condominium Board or the Managing Agent may retain a pass-key to each Unit. If any lock is altered or a new lock is installed, the Condominium Board or the Managing Agent shall be provided with a key thereto immediately upon such alteration or installation. If the Unit Owner is not personally present to open and permit an entry to his or her Unit at any time when an entry therein is necessary or permissible under these Rules and Regulations or under the By-Laws, and has not furnished a key to the Condominium Board or the Managing Agent, then the Condominium Board or Managing Agent or their agents (but, except in an emergency, only when specifically authorized by an officer of the Condominium or an officer of the Managing Agent) may forcibly enter such Unit without liability for damages or trespass by reason thereof (if, during such entry, reasonable care is given to such Unit Owner's property).

24.     If any key or keys are entrusted by a Unit Owner, by any Family Member thereof, or by his or her agent, servant, employee, licensee, or visitor to an employee of the Condominium or of the Managing Agent, whether for such Unit Owner's Unit or an automobile, trunk, or other item of personal property, the acceptance of the key shall be at the sole risk of such Unit Owner, and neither the Condominium Board nor the Managing Agent shall (except as provided in Rule 22 above) be liable for injury loss, or damage of any nature whatsoever, directly or indirectly resulting therefrom or connected therewith.

25.     Unit Owners and their respective Family Members, guests, servants, employees, agents, visitors, or licensees shall not at any time or for any reason whatsoever, enter upon, or attempt to enter upon any roof area of the Building, except the Roof Terrace Units unless such roof area is part of the designated common area of the Building.

26.     No occupant of the Building shall send any employee of the Condominium or of the Managing Agent out of the Building on any private business.

27.     Any consent or approval given under these Rules and Regulations may be amended, modified, added to, or repealed at any, time by resolution of the Condominium Board. Further, any such consent or approval may, in the discretion of the Condominium Board or the Managing Agent, be conditional in nature.

28.     No Residential Unit Owner shall install any plantings on any Terrace or roof without the prior written approval of the Condominium Board. Plantings shall be placed in containers impervious to dampness and standing on supports at least two inches from the terrace, balcony or roof surface, and if adjoining a wall, at least three inches from such wall. Suitable

weep holes shall be provided in the containers to draw off water. In special locations, such as a corner abutting a parapet wall, plantings may be contained in containers which shall be at least three inches from the parapet and flashing, with the floor of drainage tiles and suitable weep holes at the sides to draw off water. Such masonry planting beds shall not, however, rest directly upon the surface of such Terrace or roof but shall stand on supports at least two (2) inches above such surface. No planting shall be permanently affixed to the Terrace or roof surface and shall be able to be easily moved. It shall be the responsibility of the Residential Unit Owner to maintain the containers in good condition, and the drainage tiles and weep holes in operating condition. Such Residential Unit Owner shall pay the cost of any repairs rendered necessary by or damage caused by such plantings. The Condominium Board shall have an easement and a right of access to the Terrace appurtenant to a Unit to inspect the same and to remove violations therefrom and to install, operate, maintain, repair, alter, build, restore, and replace any of the Common Elements located in, over, under through, adjacent to, or upon the same.

29.    No Residential Unit Owner shall enclose, erect a greenhouse and/or alter the Terrace appurtenant to a Residential Unit in such a way that will alter the conformity of the Building, without the prior written consent of the Condominium Board.

30.    Complaints regarding the service of the Condominium shall be made in writing to the Condominium Board or to the Managing Agent.

## UNIT POWER OF ATTORNEY

Terms used in this Unit Power of Attorney which are used (a) in the declaration (the "Declaration") establishing a plan for condominium ownership of the premises known as ONE HUNTERS POINT CONDOMINIUM ("Condominium") and by the street number 5-49 Borden Avenue, Long Island City, New York under Article 9-B of the Real Property Law of the State of New York, dated _____, 200_, and recorded in the Queens County Office of the Register of The City of New York on _____, 200_, in Reel ___, Page ____ or (b) in the By-laws of the Condominium ("By-laws") attached to, and recorded together with, the Declaration, shall have the same meanings in this Power of Attorney as in the Declaration or the By-laws.

The undersigned, _____, (having an office) (residing at) _____, the owner of the Unit (the "Unit") in the Condominium which is designated and described as Unit No. ___ in the Declaration and also designated as Tax Lot ___ in Block 34 of Section 1 of the Borough of Queens on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans, do(es) hereby nominate, constitute and appoint the persons who may from time to time constitute the Condominium Board, true and lawful attorneys-in-fact for the undersigned, coupled with an interest, with power of substitution, in their own names, as members of the Condominium Board or in the name of their designee (corporate or otherwise), on behalf of all Unit Owners, in accordance with such Unit Owners' respective interest in the Common Elements, subject to the provisions of the By-laws then in effect, (1)(a) following due authorization by a Majority of Unit Owners, to acquire or lease any Unit, together with its Appurtenant Interest, from any Unit Owner desiring to sell, convey, transfer, assign, surrender or lease the same, (b) to acquire any Unit, together with its Appurtenant Interests, from any Unit Owner who elects to surrender the same pursuant to the By-laws, and (c) following due authorization by a Majority of Unit Owners, to acquire any Unit, together with it Appurtenant Interests, which becomes the subject of a foreclosure or other similar sale, all on such terms and at such price or rental, as the case may be, as said attorneys-in-fact shall deem proper, in the name of the Condominium Board or its designee, corporate or otherwise, on behalf of all Unit Owners, and, after any such acquisition or leasing, to convey, sell, lease, sublease, mortgage or otherwise deal with (but not vote the interest appurtenant thereto) any such unit so acquired by them or to sublease any Unit so leased by them without the necessity of further authorization by the Unit Owners, on such terms as said attorney-in-fact may determine, granting to said attorneys-in-fact the power to do all things in the said premises which the undersigned could do if the undersigned were personally present, (2) to commence, pursue, appeal, settle and/or terminate administrative and certiorari proceedings to obtain reduced real estate tax assessments with respect to Units, including retaining counsel and taking any other actions which the Condominium Board deems necessary or appropriate, and (3) to execute, acknowledge and deliver (a) any declaration or other instrument affecting the Property which the Condominium Board deems necessary or appropriate to comply with any law, ordinance, regulation, zoning resolution or requirement of the Department of Buildings, the City Planning Commission, the Board of Standards and Appeals, or any other public authority, applicable to the maintenance, demolition, construction, alteration, repair or restoration of the Property or (b) any consent, covenant, restriction, easement or declaration, or any amendment thereto, affecting the Property or the Common Elements which the Condominium Board deems necessary or appropriate.

The acts of a majority of such persons constituting the Condominium Board shall constitute the acts of said attorneys-in-fact.

The undersigned (does) (do) hereby irrevocably nominate, constitute and appoint Borden East River Realty LLC (hereinafter referred to as "Sponsor") as attorney-in-fact for the undersigned, coupled with an interest, with power of substitution, to amend from time to time the Declaration, By-laws and the Rules and Regulations of the Condominium, or any of said documents, when such amendment (1)

shall be required to reflect any changes in Unsold Units and/or the reapportionment of the Common Interests of the affected Unsold Units resulting therefrom made by Sponsor in accordance with the Declaration or (2) shall be required by (a) an Institutional Lender designated by Sponsor to make a mortgage loan secured by a mortgage on any Unit, (b) any governmental agency having regulatory jurisdiction over the Condominium, or (c) any title insurance company selected by Sponsor to insure title to any Unit provided, however, that any amendment made pursuant to the terms of subdivision (1) or (2) of this paragraph shall not (i) change the Common Interest of the Undersigned's Unit, (ii) require a material, physical modification to the Undersigned's Unit, or (iii) adversely affect the priority or validity of the lien of any mortgage held by an Institutional Lender covering, the Undersigned's Unit unless the undersigned (in the event described in subdivision (i) or (ii) of this paragraph) or the holder of such mortgage (in the event described in subdivision (iii) of this paragraph shall consent thereto by joining, in the execution of such amendment. The terms, covenants and conditions contained in, and the powers granted pursuant to, this paragraph shall remain in full force and effect until such time as Sponsor shall cease to own any Unit in the Condominium.

This Power of Attorney shall be irrevocable.

IN WITNESS WHEREOF, the undersigned has/have executed this Power of Attorney as of the _____ day of _____, 20__.

Print Name:_____

STATE OF NEW YORK    )
                                           ) ss.:
COUNTY OF_____)

On the _____ day of _____ in the year 20__, before me, the undersigned, a Notary Public in and for said state, personally appeared _____, personally known to be or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

_____
Notary Public



RUSKINMOSCOUFALTISCHEK P.C.

*Counselors at Law*

February 8, 2007

Borden East River Realty, LLC
c/o Simone Development Company, LLC
1000 Main Street
New Rochelle, New York 10801

    Re:  One Hunters Point Condominium
       Premises: 5-49 Borden Avenue, Long Island City, Queens

Ladies and Gentlemen:

   In connection with the Offering Plan for the above referenced offering of condominium units (the "Plan") you have requested our opinion (a) as to the deductibility for federal and New York State income tax purposes of payments for home mortgage interest and real estate taxes by individual Unit owners, and (b) as to the tax status of the condominium association (the "Association").

   All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Plan.

   We understand that under the Plan each Unit Owner will hold title to his Unit and an undivided interest in the Common Elements of the Property in fee simple. Under New York State law, each Unit and its interest in the Common Elements will be taxed as a separate parcel for real estate tax purposes. Each Unit Owner may place a separate mortgage on his Unit and, by doing so, incur direct liability for the interest payable on such mortgage.

   In our opinion under present law, subject to the limitations discussed in the following paragraph and subject to limitations imposed on the deduction of itemized deductions, interest on a mortgage secured by a Residential Unit paid or accrued by owner of such Residential Unit who is liable for the interest payment on such mortgage and who uses the Residential Unit exclusively as his personal residence will be deductible for federal income tax purposes in the appropriate year according to his method of accounting, provided that he itemizes his deductions. In rendering this opinion, we assume that such interest is not prepaid, that the mortgage proceeds were used by the Residential Unit Owner to purchase the Residential Unit, that the Residential Unit is the owner's principal residence and that the Residential Unit Owner is an individual.

   Except as provided below, residential interest is deductible if paid or accrued during the taxable year on indebtedness which is secured by either the taxpayer's principal residence, as defined for purposes of exclusion of gain on sale under Internal Revenue Code ("Code") Section



**RMF**

RUSKINMOSCOUFALTISCHEK P.C.

*Counselors at Law*

February 8, 2007
Page 2

121, or on certain designated second homes. However, a ceiling is placed on the amount of indebtedness which may be taken into account for purposes of this deduction. In general, with respect to indebtedness incurred in purchasing a Unit, this ceiling is $1,000,000, or $500,000 in the case of a married individual filing a separate return. In addition, an individual may deduct interest on an additional $100,000 of indebtedness in excess of the $1,000,000 limit mentioned above as interest on home equity indebtedness. However, special limitations may apply to the deductibility of points and prepaid interest if any.

It is also our opinion that interest borrowed on funds to purchase a Parking Space Unit or Roof Terrace Unit will not be deductible as residential interest.

It is also our opinion under present law that real estate taxes assessed against a Residential Unit Owner's Residential Unit which are paid or accrued by such owner will be deductible for federal income tax purposes in the appropriate year according to his method of accounting, provided that he itemizes his deductions.

We note that in some cases the amount of mortgage interest deductible by an individual Unit Owner subject to the alternative minimum tax may be less than the amount deductible by Unit Owner subject to the regular income tax and that no deduction is allowed for real estate taxes paid by a taxpayer subject to the alternative minimum tax.

The mortgage interest and real estate taxes described above will also be allowable as deductions for New York State income tax purposes to a resident individual. We express no opinion with respect to these items under the New York State personal income tax on nonresidents. We also express no opinion as to the taxation of Unit Owners who are not individuals.

With respect to our opinion as to whether the Association will be eligible to qualify as a tax-exempt organization for federal income tax purposes, we find as follows:

In order for the Association to qualify as an exempt organization for federal income tax purposes under Code Section 528, it must meet the following six conditions:

(1)     The Association must be organized and operated to provide for the acquisition, construction, management, maintenance, and care of the Association's property.

(2)     Sixty percent (60%) or more of the Association's gross income for the taxable year must consist solely of amounts received as membership dues, fees or assessments from owners of Units.

(3)     Ninety percent (90%) or more of the expenditures of the Association for the taxable year must be expenditures for the acquisition, construction, management, maintenance, and care of the Association's property.



**RUSKINMOSCOUFALTISCHEK** P.C.
*Counselors at Law*

February 8, 2007
Page 3

(4)     No part of the net earnings of the Association may inure to the benefit of any Unit owner, other than by acquiring, constructing, or providing management, maintenance, and care of the Association's property and other than by a rebate of excess membership dues, fees or assessments.

(5)     The Association must qualify as a "condominium management association," which is an organization meeting the requirements of condition (1), above, with respect to a condominium project substantially all the Units of which are used by individuals for residences.

(6)     The Association must properly elect to have Code Section 528 apply for the taxable year.

"Substantially all of the units" of a condominium management association will be considered as used by individuals for residences if at least eighty-five percent (85%) of the total square footage of all Untis within the project is used by individuals for residential purposes. No building or Unit will be considered as used for residential purposes if, for more than one half the days in the Association's taxable year, such Unit or building is occupied by a person or series of persons each of whom occupies the Unit or building for less than thirty (30) days.

We have been advised that more than eighty-five percent (85%) of the total square footage of the Premises will be used by individuals for residential purposes and that no person may rent his Residential Unit for a period of less than thirty (30) days.   Accordingly, the "substantially all" test should initially be met.

Our review of the documents referred to above indicates that the Association meets all the organizational tests described above for qualification for exemption.  Assuming the Plan is consummated in accordance with its provisions and that the Association, in its actual operation, meets the other tests set forth above, it is our opinion that the Association will be eligible to elect tax-exempt status under Code Section 528.  If such exempt status is properly elected, it is our opinion that the Association will not be subject to federal income tax for the taxable years in which such election is in effect, except as noted in the following paragraph.

An effective election will exempt from federal income taxation all amounts received by the Association as exempt function income.  This consist of amounts received, membership dues, fees, or assessments from owners of Residential Units.  However, the Association will be subject to tax on income which is not exempt function income to the extent such income exceeds expenses properly allocable to such income.  Examples of income which is not exempt function income are interest earned on reserve funds, amounts received from persons who are not members of the Association, amounts received for work done on privately owned property which is not Association Property, and amounts received from members for special use of the Association's facilities, the use of which is not available to all members as a result of having paid the dues, fees, or assessments required to be paid by all members.



**RMF**
RUSKINMOSCOUFALTISCHEK,P.C.
*Counselors at Law*

February 8, 2007
Page 4

In the event the Association fails to qualify for and elect Code Section 528 taxation status in any year, it may, to the extent it has any income from unrelated sources or from accumulated revenues received by virtue of dues, fees and assessments received from home owners not expended in any taxable year, be subject to Federal and New York State Income Taxation (see Rev. Ruling 74-99, 1974-1 C.B. 131). It should be noted that meeting the qualifying conditions prescribed by statute will require careful periodic planning and monitoring.

Furthermore, if the Association fails to qualify as a "homeowners association", or if it does but chooses not to make the necessary election, its status for tax purposes is unclear. It is possible that in such event the Association may be taxable as a corporation or partnership for federal income tax purposes.

This opinion is based solely on the facts and documents referred to above. No warranties are made that the tax laws upon which counsel bases this opinion will not change. In no event will the Sponsor, the Sponsor's counsel, the Association, counsel to the Association, or any other person be liable if by reason of future changes in fact or applicable law, regulation, decisional law or Internal Revenue Service rulings the tax status or zoning matters should cease to meet the requirements contained in this opinion. Accordingly, it is recommended that each prospective purchaser of a Residential Unit consult with his or her own tax advisor concerning the federal, New York State, and New York City tax consequences of the purchase and ownership of a Residential Unit.

We express no views as to any Federal, New York State, New York City tax consequences or as to any aspects of the Plan other than those explicitly discussed in this opinion, or as to the tax status and tax consequences of the Plan under the laws of any other U.S. or foreign jurisdiction. This opinion also does not address the tax consequences that might arise if Units were acquired and/or leased by the Condominium Board.

We make no warranty that the Internal Revenue Service, the New York State Department of Taxation and Finance or the New York City Department of Finance will accept any or all of the views stated above.

**THE DISCUSSION CONTAINED IN THIS OPINION OF COUNSEL IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING U.S. FEDERAL, STATE, OR LOCAL TAX PENALTIES. THIS OPINION OF COUNSEL IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED IN THIS OPINION OF COUNSEL. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

February 8, 2007
Page 5



**RMF**
RUSKINMOSCOUFALTISCHEK P.C.
*Counselors at Law*

  The opinions expressed herein are based upon our review of applicable statutory law and judicial precedent existing as of the date hereof, and we express no opinion as to the effect of any law that is hereafter enacted or any court case that is hereafter decided.  This letter is limited to the matters expressly set forth herein, and no opinion is to be implied or may be inferred beyond the matters expressly so stated.

  We assume no obligation to update or supplement the opinions contained herein to reflect any changes in statutory law or judicial precedent, or any changes in fact or circumstances, that may hereafter come to our attention pertaining to the subject matter hereof.

  We have been advised that you intend to use this letter as part of the Offering Plan and we consent to its inclusion in the Plan.

      Very truly yours,

      RUSKIN MOSCOU FALTISCHEK, P.C.

      By: _____

**THIS PAGE INTENTIONALLY LEFT BLANK**



# R·I·F
## RUSKINMOSCOUFALTISCHEK P.C.
*Counselors at Law*

February 8, 2007

Borden East River Realty, LLC
c/o Simone Development Company, LLC
1000 Main Street
White Plains, NY 10801

<div style="margin-left:2em">

Re:   One Hunters Point Condominium
5-49 Borden Avenue, Long Island City, New York
<u>421-a Partial Tax Exemption</u>

</div>

Ladies and Gentlemen:

In connection with the Offering Plan and various supporting documents for the above referenced offering of condominium units (the "Plan") you have requested our opinion concerning the eligibility of the above-referenced premises (the "Project") to receive partial real estate tax exemption benefits pursuant to Section 421-a of the Real Property Tax Law of the State of New York (the "Real Property Tax Law"), Section 11-245 of the Administrative Code of the City of New York and the Rules and Regulations (the "Rules") governing the 421-a program (collectively, the "421-a Program") and the procedures for obtaining such benefits. Unless specifically stated otherwise, the analyses and conclusions set forth herein are based on facts represented to us by Sponsor and its agents and on the projected assessed valuation and tax rates for the Project prepared by Stanley Natkins for the benefit of this firm and Sponsor by letter dated July 31, 2006.

The 421-a Program was enacted with the specific intent to encourage residential construction. It does so by providing for partial real estate tax exemption on increases in assessed valuation of eligible property, which result from the new construction of Class "A" Multiple Dwelling, during the construction period and on a descending sliding scale for a period of fifteen years after completion of construction. The owner of the property must, at all times, continue to pay real estate taxes on the assessed valuation of the property in effect for the fiscal year prior to the tax year in which construction commences and on any subsequent valuation for local improvements.

We have been advised that the Project is to be developed and owned as a condominium building and is expected to contain one hundred thirty-two (132) residential units, including a superintendent's unit, twenty-five (25) parking space units, and twenty-six (26) roof terrace units. We have been further advised that the Project will be erected on Section 1, Block 34, Lot 12 in the Borough of Queens.

352



RuskinMoscouFaltischek p.c.
*Counselors at Law*

February 8, 2007
Page 2

Assessments in New York City are made on a fiscal year basis extending from July I of any one year to the next succeeding June 30. The status of the building on January 5 of any one year is the basis of the assessment for the fiscal year beginning July 1. The assessment tax roll containing the final 2006/2007 assessment was published on May 25, 2006 and it shows the Property as a tax class four property with an actual assessed valuation of $349,401.

The Real Property Tax Law provides that cooperative and condominium apartments shall be assessed for real estate tax purposes as if the building was a comparable rental property. Thus, the Department of Finance is prohibited from utilizing the sales prices of the individual condominium units in determining the assessed valuation. Therefore, the prices that are set in the offering plan and any subsequent sales or resales are not relevant in determining the assessed valuation of the Property or of the individual condominium units.

It is believed that there will be an increase in the 2007/2008 assessed valuation as a result of the new construction. If this occurs, the tentative assessment which will be released on January 15, 2007, will be for the partial construction of the Project which exists on the Property as of January 5, 2007.

Upon conversion to a condominium and after an application is submitted, the New York City Department of Finance will assign individual tax lot numbers to each of the condominium units. The units will pay taxes based on the tax class 2 tax rate. As of this date, the New York City Council has not set the 2006/07 class 2 tax rate and the City of New York has issued tax bills for payment by July 1, 2006 calculated with the 2005/06 Class 2 tax rate of $12.396 / $100 of assessed valuation. As a consequence the estimates of real estate taxes contained in this letter are based on the 2005/06 Class 2 tax rate.

The projection of real estate taxes for the new building assumes that construction on the new building will be completed on or about December 31, 2007, and that a temporary or permanent certificate of occupancy has been issued by the NYC Department of Buildings. On the basis of the aforementioned it is anticipated that the full assessed valuation for the new building will appear on the 2008/2009 final assessment roll, which will be released on May 25, 2008. Accordingly, the 2008/2009 final assessment roll is projected to reflect the new building's assessment and the real estate taxes have been projected for the 2008/2009 period, which will be the initial period of condominium operation.

It is estimated that for tax year 2008/2009, starting July 1, 2008, the assessed valuation of the Property will be $17,900,000. In determining the assessed values for the individual units, the surveyor's office generally, but not always, follows the common interest percentages set forth in the condominium declaration if such percentages are rationally and fairly determined.



RUSKINMOSCOUFALTISCHEK P.C.
*Counselors at Law*

February 8, 2007
Page 3

Therefore, assuming the Class 2 tax rate increases by approximately 3% annually for each $100 of assessed valuation for fiscal years 2006/2007, 2007/2008 and 2008/2009, the real estate taxes prior to any tax exemptions or abatements for the period beginning July 1, 2008 and ending June 30, 2009 are projected as follows.

| 2008/2009 | | | |
|---|---|---|---|
| Assessed Valuation | Tax Rate | Tax | Six Month Tax |
| $17,900,000 | $13.545 | $2,424,555 | $1,212,277 |
| Budget Period (6 months) Real Estate Taxes for July 1, 2008 to Dec. 31, 2008: | | | $1,212,277 |
| Budget Period (6 months) Real Estate Taxes for Jan. 1, 2009 to June 30, 2009: | | | $1,212,278 |
| Budget Period Total Real Estate Taxes for July 1, 2008 to June 30, 2009 | | | $2,424,555 |

It has been determined that (1) prior to the commencement of construction and on a date three years prior to commencement, the property met the "vacant" site requirements of the regulations; and you have indicated that (2) all work will be performed in accordance with law and that all required filings have or will be will be made with the Department of Buildings and all agencies having jurisdiction; and (3) construction will start in December 2006 and will be completed in December 2007. You have further advised that there will be no commercial occupancy.

In order for the completed Project to be eligible for partial real estate tax exemption benefits pursuant to the 421-a program, the following is an outline of the eligibility requirements that will have to be satisfied:

**A Location Requirements**

1. Geographic Exclusion Area Limitation

Sections 6-02(b)(3) and 6-02(c)(10) of the Rules provide that a project in the Geographic Exclusion Area is eligible for Section 421-a benefits only if carried out with Substantial Governmental Assistance or if affordable units are created in accordance with the requirements of Section 6-08 of the Rules.

The Project is not located in the Geographic Exclusion Area and therefore is not subject to these limitations.



#### 2. Public and Private Park Limitations

Section 6-02(c) Paragraphs (5) and (6) prohibit 421-a benefits for projects located on land mapped as a public park (with certain exceptions) or utilized for ten (10) or more consecutive years immediately prior to October 1, 1971, as a Private Park.

You state and we assume that the Premises does not fall into either category.

### B.  Site Requirements

Section 6-02(f) of the Rules states that for a project to be eligible for 421-a benefits, the land on which the project is located must have been "vacant, predominantly vacant, underutilized or improved with a non-conforming use on the operative date." "Operative date" is defined as the date thirty-six (36) months prior to commencement of the project. Since the Project will commence construction work in December 2006, the operative date would be December 2003, which is the 2003/2004 fiscal year.

The Property was used as an open parking lot and thus meets the site requirement test for vacant land.

### C.  Project Requirements

#### 1.  New Multiple Dwelling

Section 6-02(b) of the Rules provides that a project is eligible for 421-a benefits only if it is a "new multiple dwelling" containing three or more dwelling units. Section 6-02(c) states that multiple dwellings resulting from the conversion or rehabilitation of a building or structure are ineligible for benefits, and Section 6-01 of the Rules states that:

"Construction shall not commence prior to the issuance by the Department of Buildings of either (i) a building or alteration permit for the construction of an entirely new multiple dwelling, the footprint of which consisted entirely of vacant and unimproved land upon such date, or (ii) an alteration permit for the construction of a new multiple dwelling above, and on an entirely separate tax lot from, one or more existing structures which are to be retained provided that only the floor area attributable to the new multiple dwelling and an eligible commercial, community facility or accessory use space within the new structure shall be eligible for benefits under the act."

You state that the Project will carried out pursuant to a new building permit, and upon completion, will be one new multiple dwelling constructed on land which was an open parking lot as of Commencement of Construction. Therefore, the Project will meet the requirement set



**RUSKINMOSCOUFALTISCHEK** P.C.
*Counselors at Law*

February 8, 2007
Page 5

forth above. You also state that the Project will have a total of one hundred thirty-two (132) newly constructed residential condominium units.

### 2. Not Used as a Hotel or for Single Room Occupancy

Section 6-02(c), Paragraphs (3) and (4) of the Rules, state that any building or portion of a building which is used for Hotel or Single Room Occupancy is ineligible for 421-a benefits.

You state that the Project will not be used for Hotel or Single Room Occupancy purposes.

### D. Construction Requirements

### 1. Number of Dwelling Units

Section 6-02(e)(2) of the Rules states that if the project contains more than one hundred (100) dwelling units, not less than ten percent of the dwelling units shall contain at least four and one half rooms, and fifteen percent of the dwelling units not less than three and one half rooms.

You state that the Project will have a total of one hundred thirty-two (132) dwelling units of which fifty-four (54) dwelling units contain three and one half rooms or 41% of the total, seventy-four (74) dwelling units contain four and one half room or 56% of the total and four (4) dwelling units contain five and one half rooms or 3% of the total. The Project exceeds the dwelling unit requirement.

### 2. Class A Unit Replacement

Section 6-02(e)(3) of the Rules states that if construction of the new multiple dwelling commences on or after August 1, 1981, and the construction occurs on land which immediately prior to commencement of construction was improved with a residential building(s) that were substantially demolished, and the new building(s) contain more than twenty (20) dwelling units, then the new building shall contain at least five (5) dwelling units for each Class A dwelling unit in existence immediately prior to the demolition preceding construction.

You have state and records of the New York City Department of Finance indicate that the Property was an open parking lot (Class 4); accordingly, the aforementioned is not applicable to the Project.



**RMF**
RUSKINMOSCOUFALTISCHEK P.C.
*Counselors at Law*

February 8, 2007
Page 6

### 3.  Limitation on Other Real Estate Tax Benefits

Section 6-02(c)(1) of the Rules states that 421-a benefits will be available to a project only if exemption from taxes is not availed of concurrently under any other law.

You state that only 421-a benefits will be sought for the Project.

### E.  Timing Requirements

### 1.  Project Commencement and Completion

Subdivision (2) (c) (ii) of §421-a requires that a project commence construction prior to December 31, 2007. The 421-a rules and regulations define Commencement of Construction in part as follows: "Commencement of construction'" shall mean the date upon which excavation and the construction of initial footings and foundations commences in good faith. An architect or professional engineer licensed in the State of New York shall certify that such construction commenced on such date and that such construction was thereafter completed without undue delay.

The Project will meet this requirement as you have advised that construction will begin in December 2006.

The 421-a rules and regulations define Completion of Construction as follows: "Completion of construction" shall mean the date upon which either a Temporary Certificate of Occupancy is issued for all residential areas in the multiple dwelling or a Permanent Certificate of Occupancy is issued for the entire building.

You advised that construction work is expected to be completed in December 2007 and either a temporary or permanent certificate of occupancy obtained on completion of construction. As long as work is completed within three years of commencement, there will be no reduction in 421-a tax exemption benefits.

### 2.  Application Timing

Section 6-05(b) of the Rules states that a Preliminary Application must be submitted to the 421-a Tax Incentive Program after commencement of construction but prior to issuance of either a temporary certificate of occupancy for the residential areas or a permanent certificate of occupancy.

You have stated that a Preliminary Application will be submitted to the 421-a Tax Incentive Program in a timely manner after initial start of construction on the Project.



February 8, 2007
Page 7

Section 6-05(d)(2)(ii) of the Rules states that final application must be submitted to 421-a Tax Incentive Program prior to the first taxable status date (January 5) following completion of construction.

You indicate that this requirement will be met.

Utilizing the information you have supplied, it has been determined that upon completion of construction, and issuance of residential certificates of occupancy by the Department of Buildings evidencing one Class A multiple dwelling, the Project will qualify for 421-a tax exemption benefits. The 421-a tax exemption that is applicable to the Project will be for a period of fifteen (15) years as set forth below:

| Year | Percentage of Increased Assessed Valuation Which is Exempt |
|------|-------------------------------------------------------------|
| 1-11 | 100% |
| 12 | 80% |
| 13 | 60% |
| 14 | 40% |
| 15 | 20% |
| 16 | 0% |

Multiple dwellings which satisfy all of the requirements of the law and receive a Preliminary Certificate of Eligibility will be exempt from real property taxes, other than assessments for local improvements, upon any increase in assessed valuation over the prior assessed valuation during the statutorily defined period of construction, or for a period of three years, whichever is less, provided that taxes shall be paid in each year for the remaining tax that shall be due. Based upon the information you have provided and assuming the Department of Finance processes your certificate of eligibility in a timely manner, it is expected that the 421-a tax exemption benefits to be in effect in the 2008/2009 fiscal year, commencing July 1, 2008.

Set forth above is the estimate of real estate taxes for the Project without a 421-a partial tax exemption for the period commencing July 1, 2008 through June 30, 2009. Utilizing the assumptions previously noted above, the real estate taxes for the Project with a 421-a partial tax exemption for the same period are estimated as follows:

358



RUSKINMOSCOUFALTISCHEK P.C.

*Counselors at Law*

February 8, 2007
Page 8

| 2008/2009 | | | | | |
|---|---|---|---|---|---|
| Assessed Value | Exempt Value | Taxable Value | Tax Rate | Tax | Apportioned (6 Month Tax) |
| $17,900,000 | $17,602,581 | $297,419 | $13.545 | $40,285 | $20,142 |
| **Budget Period (July 1 to Dec. 31, 2008) Real Estate Tax after 421-a Tax Exemption:** | | | | | **$20,142** |
| **Budget Period (Jan 1 to June 30, 2009) Real Estate Tax after 421-a Tax Exemption:** | | | | | **$20,142** |
| **Budget Period Total (July 1, 2008 to June 30, 2009)** **Real Estate Tax after 421 Tax Exemption:** | | | | | **$40,285** |

This letter was prepared at the Sponsor's request. The opinions set forth herein are approximations derived from material and/or factual information submitted by the Sponsor or its agents and the opinion of Stanley Natkins, Sponsor's Real Estate Tax Consultant, and are subject to variation. We have not passed on the accuracy of any figures or estimates contained in the Offering Plan, and offer no warranties on real estate taxes for any period. If any of the foregoing requirements or conditions should not be met to the satisfaction of the New York City Department of Housing Preservation and Development ("HPD") and/or the New York City Department of Finance ("DOF"), or if any of the foregoing representations or statements should prove to be inaccurate, then the building would not be eligible for real property tax exemption under the 421-a Program. We make no representations and express no opinion as to whether or not any or all of the requirements and conditions set forth herein will be fulfilled by you.

No representation is made that the provisions of law or DOF and/or HPD policies and practices will apply at the time the construction of the Project is completed. You should be aware that the laws, regulations, policies and/or practices of DOF and/or HPD upon which this opinion is predicated may in the future be revised in a manner adverse to your interests, or that there may be an adverse interpretation of the law or regulations by one or more agencies of the City of New York, or Courts of competent jurisdiction.

This opinion is not a guarantee. No warranties are made herein that HPD will approve the Section 421-a application or that the laws or regulations or policies and practices upon which this opinion is based will not be changed after the date of this opinion. We assume no obligation to advise you of any such changes of law or fact that may occur after the date hereof, notwithstanding that such changes may affect the legal analysis or conclusions contained herein.

February 8, 2007
Page 9



In addition, we do not warrant or represent the amount of tax savings if the project receives partial real estate tax exemption benefits.

    We hereby consent to the inclusion of this letter in the Offering Plan.

            Very truly yours,

            RUSKIN MOSCOU FALTISCHEK, P.C.

            By: _____

**THIS PAGE INTENTIONALLY LEFT BLANK**

## First American Title Insurance Company of New York

### Schedule A - Owner's Policy

Amount of Insurance:  $                    Policy No.:  O-2006-4333AG

File No.:  ANY2006-4333AG

**Date of Policy:**

1.   Name of Insured:

2.   The estate or interest in the land which is covered by this policy is: Fee Simple

3.   Title to the estate or interest in the land is vested in:

                              by means of a Deed dated _____ from
BORDEN EAST RIVER REALTY  LLC  to be recorded in the Office of the City Register of the City of New York, Queens County.

4.   The land referred to in this policy is described as follows:

     See Schedule A attached hereto

Countersigned:   **SPECIMEN**

                          Authorized Officer or Agent

                     **(914) 686-5600**
           **ALL NEW YORK TITLE AGENCY, INC.**

**ALL NEW YORK TITLE AGENCY, INC.**

**Title No. ANY2006-4333AG**

**S C H E D U L E   A**

THE Condominium Unit (hereinafter referred to as the "Unit") known as Unit _____ in the Building (hereinafter referred to as the "Building") known as _____ _____Condominium(s) located at 5-43 Borden Avenue, Long Island City, New York, Borough and County of Queens, City and State of New York, said Unit being designated and described in that certain Declaration dated _____ made by _____ (the "Sponsor"), pursuant to Article 9-B of the Real Property Law of the State of New York establishing a plan for Condominium Ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situated, which Declaration was recorded in the Office of the New York City Register, Queens County on _____ in CRFN _____ (the "Declaration"). The Unit is also designated as Tax Lot _____ in Block 34 of the Borough of New York on the Tax Map of the Real Property Assessment Department of the City of New York, and on the floor plans of the Building, certified by _____ and filed in the Office of the New York City Register, Queens County on _____ in CRFN _____ as Condominium Plan No. _____.

 THE land area of the Building in which the Unit is located is more particularly described in said Declaration.

TOGETHER with an undivided _____ % interest in the Common Elements of the property described in said Declaration.

SPECIMEN

**First American Title Insurance Company of New York**

**Schedule B - Owner's Policy**

**Exceptions from Coverage**

Policy No.:  O-2006-4333AG

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.  Mortage from _____ to _____ in the original principal amount of $ _____ dated _____ and to be recorded in the Office of the City Register, Queens County.

2.  Easement recorded in Liber 6522 page 266.

3.  Declaration of Zoning Lot Restrictions in CRFN 2005000388660 (Covers premises under examination and more).

    IN CONNECTION THEREWITH:

    a) Waiver of Right to Execute Declaration of Zoning Lot Description in CRFN 2005000388658 (Covers premises under examination and more).

    b) Waiver of Right to Execute Declaration of Zoning Lot Description in CRFN 2005000388659 (Covers premises under examination and more).

4.  Zoning Lot Development Agreement in CRFN 2005000388661 (Covers premises under examination and more).

5.  With respect to Unit _____, policy excepts any state of facts an accurate survey would show, but policy insures that any encroachment of said unit upon other units in the condominium or upon the "Common elements" may remain undisturbed so long as the building in which said unit is located shall stand.

6.  Terms and conditions set forth in the Declaration of Condominium and By-Laws, and any amendments thereto recorded in the Office of the Register of New York City in CRFN _____, and as same may be amended but policy insures against loss or damage occasioned by the premises not being a part of a Condominium validly created pursuant to Article 9-B of the Real Property Law as amended.

**SPECIMEN**

# ALL NEW YORK TITLE AGENCY, INC.

## Title No. ANY2006-4333AG

## Exceptions From Coverage  (continued)

7.    Terms and conditions set forth in the Declaration of Condominium and By-Laws, and any amendments thereto recorded in the Office of the Register of New York City in CRFN _____, and as same may be amended  but policy insures against loss or damage occasioned by the premises not being a part of a Condominium validly created pursuant to Article 9-B of the Real Property Law as amended.

SPECIMEN

# ALL NEW YORK TITLE AGENCY, INC.

### SCHEDULE B - PART 2

### Policy No. O-2006-4333AG

In addition to the matters set forth in Part I of this Schedule, the title to the estate or interest in the land described or referred to in Schedule A is subject to the following matter, if any be shown, but the Company insures that these matters are subordinate to the lien of charge or the insured mortgage upon the estate or interest:

NONE

SPECIMEN

## First American Title Insurance Company of New York

### STANDARD NEW YORK ENDORSEMENT

### (OWNER'S POLICY)

1.  The following is added to the insuring provisions on the face page of this policy:

    "5. Any statutory lien for services, labor or materials furnished prior to the date hereof, and which has now gained or which may hereafter gain priority over the estate or interest of the insured as shown in Schedule A of this policy."

2.  The following is added to Paragraph 7 of the Conditions and Stipulations of this policy:

    "(d) If the recording date of the instruments creating the insured interest is later than the policy date, such policy shall also cover intervening liens or incumbrances, except real estate taxes, assessments, water charges and sewer rents."

Nothing herein contained shall be construed as extending or changing the effective date of the policy unless otherwise expressly stated.

This endorsement, when countersigned below by a validating signatory, is made part of this policy and is subject to the Exclusions from Coverage, Schedules, Conditions and Stipulations therein, except as modified by the provisions hereof.

DATED:

Countersigned

By _____ **SPECIMEN** _____

Authorized Officer or Agent

**STANDARD NEW YORK ENDORSEMENT (9/1/93)**
**FOR USE WITH ALTA OWNER'S POLICY (10-17-92)**

| Form **W-9**<br>(Rev. November 2005)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer**<br>**Identification Number and Certification** | Give form to the<br>requester. Do not<br>send to the IRS. |
|---|---|---|

Name (as shown on your income tax return)

Business name, if different from above

Check appropriate box:  ☐ Individual/Sole proprietor  ☐ Corporation  ☐ Partnership  ☐ Other ▶ ..............  ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.)                    Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

*(left margin: Print or type   See Specific Instructions on page 2.)*

### Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

Social security number

or

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Employer identification number

### Part II    Certification

Under penalties of perjury, I certify that:

1.  The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2.  I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3.  I am a U.S. person (including a U.S. resident alien).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

| Sign<br>Here | Signature of<br>U.S. person ▶ | Date ▶ |
|---|---|---|

## Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

**U.S. person.** Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

In 3 above, if applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

For federal tax purposes, you are considered a person if you are:

● An individual who is a citizen or resident of the United States,

● A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, or

● Any estate (other than a foreign estate) or trust. See Regulations sections 301.7701-6(a) and 7(a) for additional information.

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

● The U.S. owner of a disregarded entity and not the entity,

Form **W-8BEN**
(Rev. February 2006)
Department of the Treasury
Internal Revenue Service

## Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding

► Section references are to the Internal Revenue Code. ► See separate instructions.
► Give this form to the withholding agent or payer. Do not send to the IRS.

OMB No. 1545-1621

**Do not use this form for:**                                                                                         **Instead, use Form:**
- A U.S. citizen or other U.S. person, including a resident alien individual . . . . . . . . . . . . . . W-9
- A person claiming that income is effectively connected with the conduct
  of a trade or business in the United States . . . . . . . . . . . . . . . . . . . . . . . . W-8ECI
- A foreign partnership, a foreign simple trust, or a foreign grantor trust (see instructions for exceptions) . . . W-8ECI or W-8IMY
- A foreign government, international organization, foreign central bank of issue, foreign tax-exempt organization,
  foreign private foundation, or government of a U.S. possession that received effectively connected income or that is
  claiming the applicability of section(s) 115(2), 501(c), 892, 895, or 1443(b) (see instructions) . . . . W-8ECI or W-8EXP

Note: *These entities should use Form W-8BEN if they are claiming treaty benefits or are providing the form only to claim they are a foreign person exempt from backup withholding.*
- A person acting as an intermediary . . . . . . . . . . . . . . . . . . . . . . . . . W-8IMY

Note: *See instructions for additional exceptions.*

**Part I**   **Identification of Beneficial Owner** (See instructions.)

1   Name of individual or organization that is the beneficial owner | 2   Country of incorporation or organization

3   Type of beneficial owner:   ☐ Individual   ☐ Corporation   ☐ Disregarded entity   ☐ Partnership   ☐ Simple trust
    ☐ Grantor trust   ☐ Complex trust   ☐ Estate   ☐ Government   ☐ International organization
    ☐ Central bank of issue   ☐ Tax-exempt organization   ☐ Private foundation

4   Permanent residence address (street, apt. or suite no., or rural route). **Do not use a P.O. box or in-care-of address.**

City or town, state or province. Include postal code where appropriate. | Country (do not abbreviate)

5   Mailing address (if different from above)

City or town, state or province. Include postal code where appropriate. | Country (do not abbreviate)

6   U.S. taxpayer identification number, if required (see instructions) | 7   Foreign tax identifying number, if any (optional)
    ☐ SSN or ITIN   ☐ EIN

8   Reference number(s) (see instructions)

**Part II**   **Claim of Tax Treaty Benefits** (if applicable)

9   I certify that (check all that apply):
a  ☐  The beneficial owner is a resident of . . . . . . . . . . . . . . . within the meaning of the income tax treaty between the United States and that country.
b  ☐  If required, the U.S. taxpayer identification number is stated on line 6 (see instructions).
c  ☐  The beneficial owner is not an individual, derives the item (or items) of income for which the treaty benefits are claimed, and, if
       applicable, meets the requirements of the treaty provision dealing with limitation on benefits (see instructions).
d  ☐  The beneficial owner is not an individual, is claiming treaty benefits for dividends received from a foreign corporation or interest from a
       U.S. trade or business of a foreign corporation, and meets qualified resident status (see instructions).
e  ☐  The beneficial owner is related to the person obligated to pay the income within the meaning of section 267(b) or 707(b), and will file
       Form 8833 if the amount subject to withholding received during a calendar year exceeds, in the aggregate, $500,000.

10  **Special rates and conditions** (if applicable—see instructions): The beneficial owner is claiming the provisions of Article . . . . . . . . . . . . of the
    treaty identified on line 9a above to claim a . . . . . . . . . . . . . % rate of withholding on (specify type of income): . . . . . . . . . . . . . . . . . . . . .
    Explain the reasons the beneficial owner meets the terms of the treaty article: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Part III**   **Notional Principal Contracts**

11  ☐  I have provided or will provide a statement that identifies those notional principal contracts from which the income is **not** effectively
       connected with the conduct of a trade or business in the United States. I agree to update this statement as required.

**Part IV**   **Certification**

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I
further certify under penalties of perjury that:
1 I am the beneficial owner (or am authorized to sign for the beneficial owner) of all the income to which this form relates,
2 The beneficial owner is not a U.S. person.
3 The income to which this form relates is (a) not effectively connected with the conduct of a trade or business in the United States, (b) effectively connected but is
not subject to tax under an income tax treaty, or (c) the partner's share of a partnership's effectively connected income, and
4 For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.
Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or
any withholding agent that can disburse or make payments of the income of which I am the beneficial owner.

**Sign Here**   ►
_____
Signature of beneficial owner (or individual authorized to sign for beneficial owner) | Date (MM-DD-YYYY) | Capacity in which acting

For Paperwork Reduction Act Notice, see separate instructions.          Cat. No. 25047Z          Form **W-8BEN** (Rev. 2-2006)

ETF-1

## APPLICATION TO THE ATTORNEY GENERAL
## FOR A DETERMINATION ON THE
## DISPOSITION OF DOWNPAYMENTS

[Send this application to the reviewing attorney assigned to the subject plan.]

Re:_____ _____

Address of Building or Name of Project

File Number: _____

Application is made to the Attorney General to consider and determine the disposition of down payments held pursuant to GBL Sections 352-e(2-b) and 352-h. The following information is submitted in support of this application:

1.    Name of Applicant _____

2.    Address of Applicant _____

3.    Name, Address, and Telephone Number of Applicant's Attorney (if any) _____

_____

4.    This is an application for
            [   ]   return of downpayment.
            [   ]   forfeiture of downpayment.
            [   ]   other: _____

5.    The project is      [   ]   a conversion of occupied premises.
            [   ]   newly constructed or rehabilitated.
            [   ]   vacant (as is).

6.    The project is structured as
            [   ]   a cooperative.
            [   ]   a condominium.
            [   ]   a homeowners association.
            [   ]   a timeshare.
            [   ]   other: _____

2/6/92

7.    Name and Address of Sponsor: _____
      _____

8.    Name and Address of Escrow Agent: _____
      _____

9.    If downpayments are maintained in an escrow account:

      (a)    Name of account _____

      (b)    Name and address of bank _____

      (c)    Account number (if known) _____

      (d)    Initial interest rate (if known) _____

10.   If downpayments have been secured by bonds:

      (a)    Name and address of bond issuer or surety: _____
             _____

      (b)    Copy of bond included in this application.  (DO NOT SEND ORIGINAL BOND).  If not
             included, explain:
             _____
             _____

11.   If downpayments have been secured by a letter of credit:

      (a)    Name and address of bank which issued the letter of credit: _____
             _____

      (b)    Date of expiration of the letter of credit, if known:
             _____

12.   Plan information:

      (a)    Date of filing of plan: _____

2

(b)    Plan
        [   ]   has been declared effective.  Approximate date: _____
        [   ]   has not been declared effective.

(c)    If effective, the plan
        [   ]   has closed or the first unit has closed.  Approximate date: _____
        [   ]   has not closed.
        [   ]   don't know.

(d)    Downpayments are secured by
        [   ]   escrow account.
        [   ]   bonds.
        [   ]   letter of credit.

13.    Contract information:

(a)    Copy of contract and of all riders or modification letters are attached.  (DO NOT SEND ORIGINALS.)

(b)    Date on which subscription or purchase agreement was signed: _____

(c)    Date(s) of downpayment(s): _____

(d)    Total amount of downpayment(s): _____

(e)    Names and addresses of subscribers or purchasers affected by this application:

_____

_____

_____

_____

14.    State the basis for your claim.  Please be as specific as possible.  You may add additional sheets. Attach copies of any relevant documents.

_____

_____

_____

15.    I am contemporaneously sending a copy of this application to the following persons:

372

_____

_____

Note:  You are required to mail a copy of this Application to all other affected parties.

      In filing this application, I understand that the Attorney General is not my private attorney, but represents the public in enforcing laws designed to protect the public from unlawful business practices. I also understand that if I have any questions concerning my legal rights or responsibilities I may contact a private attorney.  The above application is true and accurate to the best of my knowledge.  False statements made herein are punishable as a Class A Misdemeanor under Section 175.30 and/or Section 210.45 of the Penal Law.

Signature: _____   Date: _____

Name (Printed): _____

Telephone: (Home) _____  (Business) _____

Mailing Address: _____

_____

2/6/92

## ESCROW AGREEMENT

AGREEMENT made as of the filing date of the Offering Plan (defined below), between BORDEN EAST RIVER REALTY, LLC ("SPONSOR") as SPONSOR of the Offering Plan and Ruskin Moscou Faltischek, P.C. ("ESCROW AGENT") as escrow agent.

WHEREAS, SPONSOR is the sponsor of an offering plan for premises known as and located at 5-49 Borden Avenue, Long Island City, New York ("Offering Plan"); and

WHEREAS, Ruskin Moscou Faltischek, P.C. is authorized to act as an escrow agent hereunder in accordance with General Business Law ("GBL") Sections 352-e(2-b) and 352-h and the Attorney General's regulations promulgated thereunder; and

WHEREAS, SPONSOR desires that ESCROW AGENT act as escrow agent for deposits and payments by purchasers or subscribers, pursuant to the terms of this Agreement and the Offering Plan.

NOW, THEREFORE, in consideration of the covenants and conditions contained herein and other good and valuable consideration, the parties hereby agree as follows:

1.   ESTABLISHMENT OF THE ESCROW ACCOUNT.

1.1   ESCROW AGENT will establish a master escrow account for the purpose of holding deposits, downpayments, advances or payments ("Deposits") made by purchasers or subscribers ("Purchasers") pursuant to the Offering Plan at Madison National Bank located at 849 Whitman Road, Merrick, New York 11566 entitled "Ruskin Moscou Faltischek, P.C." ("Master Escrow Account").

1.2   All Deposits will be placed initially in a non-interest bearing checking portion of the Master Escrow Account. If ESCROW AGENT receives a completed and signed Form W-9 (Request for Taxpayer Identification Number) or Form W-8 (Certificate of Foreign Status), as applicable, from a Purchaser at the time the Deposit is delivered to ESCROW AGENT, the Deposit of such Purchaser will be promptly transferred from the non-interest bearing checking portion of the Master Escrow Account into an individual interest bearing sub-escrow account in the name of such Purchaser. At such time as the Deposit is released, the Deposit will be transferred from the individual sub-escrow savings account to the non-interest bearing checking portion of the Master Escrow Account so that checks may be drawn thereon.

1.3   Michael L. Faltischek, Esq., Benjamin Weinstock, Esq. and Eric C. Rubenstein, Esq., Partners in ESCROW AGENT, are the sole signatories on the Master Escrow Account.

1.4   The Master Escrow Account is not an IOLA account established pursuant to Judiciary Law Section 497.

1.5     All interest will be credited to Purchaser at such time as: (1) there is a closing under the Contract of Sale (defined below), or (ii) Purchaser is entitled to a return of the Deposit. All interest will be credited to SPONSOR only in the event there is a "consummation of the Offering Plan" (as such term is defined in the Attorney General's regulations) and Purchaser defaults.

2.      DEPOSITS INTO THE ESCROW ACCOUNT.

2.1     All funds received from Purchasers prior to closing, whether in the form of checks, drafts, money orders, wire transfers, or other instruments which identify the payor, shall be deposited into the Master Escrow Account. All instruments to be deposited into the Master Escrow Account shall be made payable directly to the order of "Ruskin Moscou Faltischek, P.C., Escrow Agent". Endorsed instruments will not be accepted. Any instrument payable other than as required hereby, and which cannot be deposited into the Master Escrow Account, shall be returned to the Purchaser promptly, but in no event more than five (5) business days following receipt of such instrument by ESCROW AGENT. In the event of such return of funds, the instrument shall be deemed not to have been delivered to ESCROW AGENT pursuant to the terms of this Agreement.

2.2     Within ten (10) business days after tender of the Deposit submitted with the purchase agreement or subscription agreement ("Contract of Sale"), ESCROW AGENT shall notify the Purchaser of the deposit of such funds in the Master Escrow Account, provide the account number, and disclose the initial interest rate. If the Purchaser does not receive notification of such deposit within fifteen (15) business days after tender of the Deposit, the Purchaser may cancel the Contract of Sale and rescind within ninety (90) days after tender of the Deposit, or may apply to the Attorney General for relief. Rescission may not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Deposit was timely deposited in accordance with the Attorney General's regulations and requisite notice was timely mailed to the Purchaser.

3.      RELEASE OF FUNDS.

3.1     ESCROW AGENT shall not release the Deposit of a defaulting Purchaser until after consummation of the Offering Plan. Consummation of the Offering Plan shall not relieve SPONSOR of its fiduciary obligations pursuant to GBL Section 352-h.

3.2     ESCROW AGENT shall continue to hold the Deposit in escrow until otherwise directed in (a) a writing signed by both SPONSOR and Purchaser or (b) a determination of the Attorney General or (c) a judgment or order of a court of competent jurisdiction or until released pursuant to the regulations of the Attorney General pertaining to release of escrowed funds.

3.3     SPONSOR shall not object and will be deemed to have agreed, without the need for a written agreement, to the release of the Deposit to: (a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Offering Plan or an amendment to

2

the Offering Plan, or (b) all Purchasers after an amendment abandoning the Offering Plan is accepted for filing by the Department of Law.

3.4 In the event SPONSOR and a Purchaser close title under the Contract of Sale, ESCROW AGENT shall be entitled to release the Deposit to SPONSOR without the need for a written agreement from Purchaser. Except as otherwise set forth above, if there is no written agreement between the parties to release the Deposit, ESCROW AGENT shall not pay the funds to SPONSOR until ESCROW AGENT has given the Purchaser written notice of not fewer than ten (10) business days. Thereafter, the Deposit may be paid to SPONSOR unless the Purchaser has made application to the Department of Law pursuant to the dispute resolution provisions contained in the Attorney General's regulations and ESCROW AGENT has received notice from the Purchaser in accordance with such provisions.

4. RECORDKEEPING.

4.1 ESCROW AGENT shall maintain all records concerning the Master Escrow Account for seven (7) years after release of the funds.

4.2 Upon the dissolution of ESCROW AGENT, the former partners of the firm shall make appropriate arrangements for the maintenance of these records by one of the partners or members of the firm or by the successor firm and shall notify the Department of Law of such transfer.

4.3 ESCROW AGENT shall make available to the Attorney General, upon request, all books and records of ESCROW AGENT relating to the Funds deposited and disbursed hereunder.

5. GENERAL OBLIGATIONS OF ESCROW AGENT.

5.1 ESCROW AGENT shall maintain the Master Escrow Account under its direct supervision and control.

5.2 A fiduciary relationship shall exist between ESCROW AGENT and Purchasers, and ESCROW AGENT acknowledges its fiduciary obligations.

5.3 ESCROW AGENT shall not be liable to SPONSOR for any error in judgment, mistake of fact or law or for any act or omission on ESCROW AGENT'S part, including, without limitation, any act or omission which permits a Purchaser to rescind a Contract of Sale, unless taken or suffered in bad faith or in willful disregard of this Agreement or involving gross negligence on the part of ESCROW AGENT.

5.4 ESCROW AGENT shall be permitted to act as counsel for SPONSOR in any dispute as to the disbursement of the Deposit or any other dispute between SPONSOR and a Purchaser whether or not ESCROW AGENT is in possession of the Deposit and continues to act as ESCROW AGENT.

5.5    ESCROW AGENT may rely upon any paper or document which may be submitted to it in connection with its duties under this Agreement and which is believed by ESCROW AGENT to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution or validity thereof.

5.6    ESCROW AGENT may consult with legal counsel selected by it and the opinion of such counsel shall be full and complete authorization and protection to ESCROW AGENT in respect of any action taken or omitted in good faith by ESCROW AGENT hereunder in accordance with the opinion of such counsel.

5.7    The provisions of paragraphs 5.5 and 5.6 shall apply only to SPONSOR and nothing contained therein shall be in derogation of the rights of a purchaser under Article 23-A of the General Business Law.

6.    <u>RESPONSIBILITIES OF SPONSOR</u>.

6.1    SPONSOR agrees that SPONSOR and its agents, including any selling agents, shall deliver all Deposits received by them prior to closing of an individual transaction to a designated attorney who is a partner of or attorney or legal assistant employed by ESCROW AGENT within two (2) business days of tender of the Deposit by a Purchaser, using such transmittal forms as required by ESCROW AGENT from time to time.

6.2    SPONSOR agrees that it shall not interfere with ESCROW AGENT'S performance of its fiduciary duties and compliance with the Attorney General's regulations.

6.3    SPONSOR shall obtain or cause the selling agent under the Offering Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from each Purchaser and deliver such form to ESCROW AGENT together with the Deposit and Contract of Sale.

7.    <u>TERMINATION OF AGREEMENT</u>.

7.1    This Agreement shall remain in effect unless and until it is cancelled by either:

(a)    Written notice given by SPONSOR to ESCROW AGENT of cancellation of designation of ESCROW AGENT to act in said capacity, which cancellation shall take effect only upon the filing of an amendment to the Offering Plan with the Department of Law providing for a successor escrow agent; or

(b) The resignation of ESCROW AGENT upon giving notice to SPONSOR of its desire to so resign.  Such resignation shall take effect on the date set forth in the notice from ESCROW AGENT, except such resignation shall take effect only upon the filing of an amendment to the Offering Plan with the Department of Law providing for a successor escrow agent with respect to Deposits held in the Master Escrow Account on the date of such resignation; or

(c) all units offered by SPONSOR pursuant to the Offering Plan have been sold and no Deposits of Purchasers from SPONSOR remain in the Master Escrow Account.

7.2     Upon termination of the duties of ESCROW AGENT as described in paragraph 7.1(a) or (b) above, ESCROW AGENT shall deliver any and all funds held by ESCROW AGENT in escrow and any and all contracts or documents maintained by ESCROW AGENT relating to such funds to the new escrow agent.

8.      SUCCESSORS AND ASSIGNS.

This Agreement shall be binding upon SPONSOR and ESCROW AGENT and their respective successors and assigns.

9.      GOVERNING LAW.

This Agreement shall be construed in accordance with and governed by the laws of the State of New York.

10.     ESCROW AGENTS COMPENSATION.

SPONSOR agrees to pay ESCROW AGENT for services rendered by its attorneys and paralegals and expenses incurred by ESCROW AGENT in connection with this Agreement, including, without limitation, disputes arising with respect to the Deposit. SPONSOR shall not be charged with any administrative costs for maintenance of the Master Escrow Account. ESCROW AGENT'S fees and disbursements shall neither be paid by SPONSOR from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

11.     SEVERABILITY.

If any provision of this Agreement or the application thereof to any person or circumstance is determined to be invalid or unenforceable, the remaining provisions of this Agreement or the application of such provision to other persons or to other circumstances shall not be affected thereby and shall be valid and enforceable to the fullest extent permitted by law.

12.     INDEMNIFICATION.

SPONSOR agrees to defend, indemnify and hold ESCROW AGENT harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of this Agreement or the performance or non-performance of ESCROW AGENT'S duties under this Agreement, except with respect to actions or omissions taken or suffered by ESCROW AGENT in bad faith or in willful disregard of this Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation,

disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by ESCROW AGENT to itself.

13.     <u>ALTERNATE SECURITY</u>.

In the event SPONSOR is authorized by the Department of Law to post a Letter of Credit or Surety Bond as alternate security to secure all or a portion of the Deposits, Escrow Agent agrees to be the beneficiary of the Letter of Credit or Surety Bond, and to act as fiduciary with respect to such Letter of Credit or Surety Bond for the benefit of Purchasers under the Offering Plan whose Deposits were released from escrow in accordance with the "Escrow and Trust Fund" section of the Offering Plan or an amendment to the Offering Plan.

14.     <u>ENTIRE AGREEMENT</u>.

This Agreement, read together with GBL Sections 352-e(2-b) and 352-h and the Attorney General's regulations, constitutes the entire agreement between the parties with respect to the subject matter hereof.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day and year first above written.

ESCROW AGENT:

RUSKIN MOSCOU FALTISCHEK, P.C.

By:     _____
                            , Partner

SPONSOR:

BORDEN EAST RIVER REALTY,  LLC
By:  Simone Borden LLC, its Managing Member

By:     _____
        Joseph Simone, Manager

6

379

CERTIFICATION BY SPONSOR AND SPONSOR'S PRINCIPALS PURSUANT TO
13 NYCRR 20.4(b)

Office of the Attorney General
State of New York
Department of Law
120 Broadway, 23rd Floor
New York, NY 10271

Re: One Hunters Point Condominium
Queens County

      We are the Sponsor and the principals of the Sponsor of the condominium offering plan for the above captioned property. We understand that we have the primary responsibility for compliance with the provisions of Article 23-A of the General Business Law, the regulations promulgated by the Department of Law in Part 20, and such other laws and regulations as may be applicable.

      We have read the entire Offering Plan. We have investigated the facts set forth in the Offering Plan and the underlying facts. We have exercised due diligence to form a basis for this certification. We jointly and severally certify that the Offering Plan does, and that the documents submitted hereafter by us which amend or supplement the Offering Plan will:

      (i) set forth the detailed terms of the transaction and be complete, current and accurate;

      (ii) afford potential investors, purchasers and participants an adequate basis upon which to found their judgment;

      (iii) not omit any material fact;

      (iv) not contain any untrue statement of a material fact;

      (v) not contain any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;

      (vi) not contain any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

      (vii) not contain any representation or statement which is false, where we: (a) knew the truth; (b) with reasonable effort could have known the truth; (c) made no reasonable effort to ascertain the truth; or (d) did not have thorough knowledge concerning the representation of statement made.

This certification is made under penalty of perjury for the benefit of all persons to whom this offer is made. We understand that violations are subject to the civil and criminal penalties of the General Business Law and Penal Law.

Dated:   January ___, 2007

SPONSOR:

Borden East River Realty LLC
By:  Simone Borden LLC, its Managing Member

By: _____
Name:  Joseph Simone
Title:   Manager

PRINCIPAL:

_____
Joseph Simone

Severally sworn to before me this
5ᵗʰ day of January, 2007.

_____
Notary Public

LISA M. RADICE
Notary Public, State of New York
No. 01RA6090488
Qualified in Westchester County
Commission Expires April 14, 20 ___



ARCHITECTURE · URBAN PLANNING · ENGINEERING

## CERTIFICATION OF SPONSOR'S ARCHITECT
## SECTION 20.4 (C) OF THE REGULATIONS INSURED
## PURSUANT TO GENERAL BUSINESS LAW ARTICLE 23-a

January 16, 2007

New York State Department of Law
Investment Protection Bureau Estate Financing Section
Office of the Attorney General
120 Broadway, 23rd Floor
New York, NY 10271

Re:   5-43 Borden Avenue
Long Island City, NY (the "Property")

Gentlemen:

I, Mitchell D. Newman am an Architect licensed to practice as an Architect in the
State of New York. The Sponsor of the offering plan for condominium ownership of the
captioned property retained my firm to prepare a report describing the construction of the
property (the "Report"). I examined building plans and specifications that were prepared
by NDG Architect, P.C. dated July 10, 2006, and prepared a report dated January 16,
2007 a copy of which is intended to be incorporated into the offering plan so that
perspective purchasers may rely on the Report.

I understand that I am responsible for complying with Article 23-A of the General
Business Law and the regulations promulgated by the Department of Law in Part 20
insofar as they are applicable to this Report.

I have read the entire Report and investigated the fact set forth in the Report and
the facts underlying it with due diligence in order to form a basis for this certification, I
certify that the Report;

(i)   sets forth in narrative form the description and/or physical
condition of the entire property, as it will exist upon completion of
the new construction, provided that the construction is in
accordance with the plans and specifications that I examined.

(ii)     in my professional opinion, affords potential investors, purchasers and participants, an adequate basis upon which to found their judgment concerning the physical condition of the property as it will exist upon completion of the new construction, provided that the new construction is in accordance with the plans and specifications that we examined;

(iii)    not omit any material facts;

(iv)    not contain any untrue statement of material fact;

(v)    does not contain any fraud, deception concealment or suppression;

(vi)    not contain any promise or representation as to the future which is beyond reasonable explanation or unwarranted by existing circumstances;

(vii)    not contain any representation or statement which is false where I: (a) knew the truth; (b) with reasonable effort could have known the truth; (c) made no reasonable effort to ascertain the truth; (d) did not have knowledge concerning the representation or statement made.

     I further certify that we are not owned or controlled by and have no beneficial interest in the sponsor and that our compensation for preparing this Report is not contingent on the conversion of the property to a condominium or on the profitability or price of the offering. This statement is not intended as a guarantee or warranty of the physical condition of the property.

NDG Architect, P.C.

Mitchell D. Newman, President

Sworn to before me this

_16th_ Day of _January_ _____ 2007

_____
Notary Public

ELISA SPADA
NOTARY PUBLIC-STATE OF NEW YORK
No. 01SP6137227
Qualified in Nassau County
My Commission Expires November 21, 2009



**LICENSED REAL ESTATE BROKER**

204 East 83rd Street • New York, NY 10028
Tel 212.288.0077 • Fax 212-734.2065

January 17, 2007

Office of the Attorney General
State of New York Department of Law
120 Broadway, 23rd Floor
New York, NY 10271

   Re: Hunters Point Condominium
      <u>5-49 Borden Avenue, Long Island City, Queens County, NY</u>

  The Sponsor of the Condominium Offering Plan for the above captioned property has retained our firm to review Schedules B and B-1, which includes projections of common charges payable by the owners of units for the first year of condominium operation. Our firm has over thirty-five (35) years experience in the management of multifamily properties in the City of New York, and it is a licensed real estate broker.

  We understand that we are responsible for complying with Article 23-A of the General Business Law and the regulations promulgated by the Department of Law in Part 20 insofar as they are applicable to Schedules B and B-1.

  We have reviewed the Schedules and investigated the facts set forth in the Schedules and the facts underlying it with due diligence in order to form a basis for this certification. We also have relied on our experience in managing residential buildings.

  We certify that the projections in Schedules B and B-1 for common charges appear reasonable and adequate under existing circumstances and the projected income appears to be sufficient to meet the anticipated operating expenses for the projected first year of condominium operation.

We certify that Schedules B and B-1:

  (i)  set forth in detail the projected income and expenses for the first year of condominium operation;

  (ii)  affords potential investors, purchasers and participants an adequate basis upon which to found their judgment concerning the common charges payable in the first year of condominium operation;

  (iii)  does not omit any material fact;

(iv)        does not contain any untrue statement of a material fact;

(v)        does not contain any fraud, deception, concealment, or suppression;

(vi)        does not contain any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

(vii)        does not contain any representation or statement which is false, where we: (a) knew the truth; (b) with reasonable effort could have known the truth; (c) made no reasonable effort to ascertain the truth; or (d) did not have thorough knowledge concerning the representation or statement made.

We further certify that we are not owned or controlled by the sponsor. We understand that a copy of this certification is intended to be incorporated into the Offering Plan. This statement is not intended as a guarantee or warranty of the income and expenses and projected common charges for the first year of condominium operation.

This certification is made under penalty of perjury for the benefit of all persons to whom this offer is made. We understand that violations are subject to the civil and criminal penalties of the General Business Law and Penal Law.

Dated: January 17, 2007

By: _____

State of New York
County of New York
Sworn to before me this
23rd day of January, 2007

_____
Notary Public JANET KANE
Notary Public, State of New York
No. 01KA4662615
Qualified in New York County
Commission Expires March 30 2007

Mr' `ney's Real Property Law § 339-kk

\/   ney's Consolidated Laws of New York Annotated Currentness
    .l Property Law (Refs & Annos)
    Chapter 50. Of the Consolidated Laws
        ^▣ Article 9-B. Condominium Act (Refs & Annos)
        ➡§ 339-kk. Rents

a) For the purposes of this section, "non-occupying owner" shall mean a unit owner in a condominium
ssociation who does not occupy the dwelling unit.

b) If a non-occupying owner rents any dwelling unit to a rental tenant and then fails to make payments due
or common charges, assessments or late fees for such unit within sixty days of the expiration of any grace
eriod after they are due, upon notice in accordance with subdivision (c) of this section, all rental payments
rom the tenant shall be directly payable to the condominium association.

c) If the common charges, assessments or late fees due for any unit have not been paid in full, within sixty
ays after the expiration of any grace period of the earliest due date, the board of managers shall provide
ritten notice to the tenant and the non-occupying owner providing that, commencing immediately and until
uch time as all payments for common charges, assessments or late fees are made current, all rental
ayments due subsequent to the issuance of such notice are to be made payable to the condominium
ssociation at the address listed on the notice. Where a majority of the board of managers has been elected by
nd from among the unit owners who are in occupancy, the board may elect not to require that rental
a·  ~ents be made payable to the condominium association. At such time as payments for common charges,
s   sments and late fees from the non-occupying owner are once again current, notice of such fact shall be
i'     within three business days to the rental tenant and non-occupying owner. Thereafter all rental payments
       )e made payable to the non-occupying owner or a designated agent. A non-occupying owner who
lsputes the association's claim to rental payments pursuant to this section shall be entitled to present facts
upporting such owner's position at the next scheduled meeting of the board of managers, which must be held
lthin thirty days of the date that such board receives notice that such owner seeks to dispute such claim.

l) Nothing in this section shall limit any rights of unit owners or of the board of managers existing under any
:her law or agreement.

:) Payment by a rental tenant to the condominium association made in connection with this section shall
lleve that rental tenant from the obligation to pay such rent to the non-occupying owner and shall be an
)solute defense in any non-payment proceeding commenced by such non-occupying owner against such
nant for such rent.

₹EDIT(S)

.dded L.1998, c. 422, § 3, eff. July 22, 1998.)

<Laws 1909, Chapter 52>

ᒪTORICAL AND STATUTORY NOTES

    ∃lectronic Update

l998, c. 422 legislation

L⟋  ⟍8, c. 422, §§ 4 and 5, provide:

"§ 4. This act may be enforced by any party by means of a special proceeding brought pursuant to article 4 of the civil practice law and rules.

"§ 5. This act shall take effect immediately, and is applicable to all cooperative corporations and condominiums in existence on or after such date."

Derivation

General Business Law § 352-e, subd. 2-d as added L.1991, c. 594, § 1.

LEGISLATIVE HISTORIES

**L.1998, c. 422:** For Legislative, Executive or Judicial memoranda relating to this law, see McKinney's 1998 Session Laws of New York, p. 1834.